# EXHIBIT B



Deposition of
# Richard Cavalli

**Volume II**

**Date:** August 23, 2022

**Case:** IN RE: PARAQUAT PRODUCTS LIABILITY LITIGATION

**No.** 3:21-md-3004-NJR

**Court Reporter:**  Angela M. Taylor, RPR, IL-CSR, MO-CCR, LA-CCR, WA-CCR

Paszkiewicz Court Reporting
Phone:  618-307-9320
Toll-Free:  855-595-3577
Fax:  618-855-9513

CONFIDENTIAL

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

_____

IN RE: PARAQUAT PRODUCTS       )
LIABILITY LITIGATION           )
                               )
                               )Case Number
                               )3:21-md-3004-NJR
                               )
                               )MDL No. 3004
                               )
                               )
THIS DOCUMENT RELATES TO       )
ALL CASES.                     )

_____


* * HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY * *

30(b)(6) VIDEOTAPED DEPOSIITON OF

CHEVRON BY: RICHARD CAVALLI, VOLUME II

AUGUST 23, 2022

_____




Angela M. Taylor, RPR, IL-CSR, MO-CCR, LA-CCR, WA-CCR
CSR No. 084.004538
CCR No. 1067

Richard Cavalli
August 23, 2022

CONFIDENTIAL

Page 2

1   PURSUANT TO WRITTEN NOTICE AND 26 AND
2   30(B)(6) OF THE FEDERAL RULES OF CIVIL PROCEDURE, the
3   30(b)(6) videotaped deposition of CHEVRON BY:
4   RICHARD CAVALLI, VOLUME II, called by Plaintiffs, was
5   taken commencing at 8:41 a.m. Pacific Time Zone on
6   August 23, 2022, at 14811 Kruse Oaks Drive, Lake
7   Oswego, Oregon, 97035, before Angela M. Taylor, CSR,
8   CCR, RPR.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1   APPEARANCES (CONTINUED):
2       Also Present:
3       Devin Williams
4       Videographer
5       Scott Sill
        Audio-Video Tech Team Manager
6       Paszkiewicz Reporting
7   APPEARANCES VIA VIDEOCONFERENCE:
8
9           For the MDL Plaintiffs:
10      Sarah Shoemake Doles, Esq.
        Alyson M. Petrick, Esq.
11      Levin Papantonio Rafferty Proctor
        Buchanan Oâ€™Brien Barr & Mougey P.A
12      316 South Baylen Street
        Pensacola, Florida  32502
13          and
14      Chad Finley, Esq.
        Tor Hoerman Law, LLC
15      210 South Main Street
        Edwardsville, Illinois  62025
16
17          and
18      Khaldoun A. Baghdadi, Esq.
        Walkup Melodia Kelly + Schoenberger
19      650 California Street
        San Francisco  California 94108
20
21          For the Defendant Chevron U.S.A. Inc.:
22      Jennifer Cecil, Esq.
        Husch Blackwell, LLP
23      190 Carondelet Plaza, Suite 600
        St. Louis, MO 63105
24
25          and

Page 3

1   APPEARANCES:
2
3       For the MDL Plaintiffs:
4       R. Eric Kennedy, Esq.
        Weisman Kennedy & Berris Co., LPA
5       2900 Detroit Avenue, 2nd Floor
        Cleveland, Ohio  44113
6
7           and
8       Michael A. Kelly, Esq.
        Walkup, Melodia, Kelly & Schoenberger
        650 California Street, 26th Floor
9       San Francisco, California  94108
10          and
11      Peter J. Flowers, Esq.
        Frank V. Cesarone, Esq.
12      Meyers & Flowers, LLC
        3 North Second Street, Suite 300
13      Saint Charles, Illinois  60174
14
15          For the Defendant Chevron U.S.A. Inc.:
16      Sharyl A. Reisman, Esq.
        Jones Day
17      250 Vesey Street
        New York, NY  10281
18
            and
19
20      David J. DiMeglio, Esq.
        Jones Day
        555 South Flowers Street, 50th Floor
21      Los Angeles, California  90071
22          and
23      Megan A. Scheiderer, Esq.
        Husch Blackwell
24      4801 Main Street, Suite 1000
        Kansas City, Missouri  64112
25

Page 5

1   APPEARANCES (CONTINUED) VIA VIDEOCONFERENCE:
2
3       Leon F. DeJulius, Esq.
        Debra R. Belott, Esq.
4       Jones Day
        51 Louisiana Avenue, N.W.
5       Washington, D.C. 20001-2113
6
7           For the Defendant Syngenta AG and Syngenta Crop
        Protection LLC:
8
        Ragan Naresh, Esq.
9       Grace C. Brier, Esq.
        Kirkland & Ellis LLP
10      1301 Pennsylvania Avenue, N.W.
        Washington, D.C. 20004
11
12          For the Plaintiff Keith Fuller:
13      Leslie LaMacchia, Esq.
        LaMacchia Law, P.C.
14      PO Box 131812
        Houston, TX  77219
15
16      Also Present (via videoconference):
17      Jodee Whitley
        Operations Manager
18      Paszkiewicz Reporting
19      Nicholas Campbell
        Scheduling Manager
20      Paszkiewicz Reporting
21
22
23
24
25

2  (Pages 2 to 5)

Richard Cavalli
August 23, 2022

CONFIDENTIAL

Page 6

INDEX OF EXAMINATION

1
2  QUESTIONS BY MR. KELLY ...........................7
   QUESTIONS BY MR. KENNEDY .......................73
3  QUESTIONS BY MS. REISMAN .......................126
   QUESTIONS BY MR. KENNEDY ......................145
4
5        INDEX OF EXHIBITS
6  Exhibit 24, Neurotoxicology, Volume 1 ...........9
   by Roizin, et al.
7  Exhibit 51, Letter by J.N. Ospenson ..............29
   Exhibit 49, Notes on Meetings Held at ...........38
8     CTL 6-9 October '75
   Exhibit 48, 3/29/76 Memo from Cavalli to Ospenson 50
9  Exhibit 50, 9/29/76 Letter from Cavalli .........57
      to Ospenson with Meeting Minutes
10 Exhibit 43, Paraquat Worker Safety ..............63
   Exhibit 45, 11/14/85 Letter to J.N. Sullivan ....68
11    from J.N. Ospenson
   Exhibit 111, A Study of the Health of Malaysian ..103
12    Plantation Workers with Particular
      Reference to Paraquat Spraymen by J.K.
13    Howard, et al
   Exhibit 40, The Toxicity of Paraquat ...........131
14    by D.G. Clark, et al.
15
16       (Exhibits are attached to transcript.)
17
18
19
20
21
22
23
24
25

Page 7

1           TUESDAY, AUGUST 23, 2022
2            8:41 A.M. PACIFIC TIME
3            ------------------
4
5        VIDEOGRAPHER:  Stand by.  Good morning.  We
6  are now on the record.  This is Volume II of the
7  videotaped deposition of Richard Cavalli.  Today's
8  date is Tuesday, August 23, 2022.  The time is
9  8:41 a.m.
10       The witness has been previously sworn.  You
11 may begin.
12       MR. KELLY:  Thank you.
13          [EXAMINATION]
14   QUESTIONS BY MR. KELLY:
15   Q   Good morning, Mr. Cavalli.
16   A   Good morning.
17   Q   Are you good to go this morning?
18   A   Yes, I am.
19   Q   Terrific.
20       MR. KELLY:  Let me just -- small piece of
21 housekeeping from yesterday I intended to do but
22 didn't.  Let me mark and attach the disclosure of
23 nonretained expert that was served in the case for use
24 in both the California JCCP and the MDL, just so we
25 have that as part of our record.

Page 8

1        And I'm going to continue this morning
2  talking about topics that were raised in the direct
3  yesterday, and then as I mentioned yesterday, my
4  colleague has questions as well that may be different
5  and independent of that.
6        MS. REISMAN:  Mr. Kelly, I just have a
7  question.  You handed each of us a copy.  Is one of
8  these intended for the court reporter or --
9        MR. KELLY:  Oh, I thought the court reporter
10 would get them.  Sure.  Why don't you give it to the
11 court reporter, please.
12       MS. REISMAN:  That's okay.
13       MR. KELLY:  Yeah.  You have your own, I
14 assume.  Sorry.
15       THE WITNESS:  Am I supposed --
16       MS. REISMAN:  Nothing you need to do.
17       MR. KELLY:  I have -- I have a third one.
18 You don't have to do anything with it, sir.
19       THE WITNESS:  Excellent.
20   Q   (By Mr. Kelly) Okay.  In the direct
21 examination yesterday when you were asked what you did
22 to learn about what other scientists and researchers
23 were doing and learning about paraquat, you mentioned
24 that you had access to the toxicology literature and
25 the medical literature from all over the world; is that

Page 9

1  true?
2    A   I did have access to that.
3    Q   And then that you had a system that would
4  flag papers and publications about paraquat, and your
5  library would get copies of those?
6    A   Yes.
7    Q   And was it a purposeful -- that's actually
8  not a good question.  Let me back up.
9        Was the purpose for doing that so that you
10 could keep abreast of the relevant scholarly
11 literature that dealt with, among other things, the
12 risk to human health of exposure to paraquat?
13       MS. REISMAN:  Objection to form.
14   A   Yes.
15   Q   (By Mr. Kelly) Let me show you what we've
16 marked as Exhibit 24.
17       MS. REISMAN:  Can we go off the record for
18 one minute?
19       VIDEOGRAPHER:  Going off the record at
20 8:43 a.m.
21       (A break was taken.)
22       VIDEOGRAPHER:  Okay.  We're back on the
23 record at 8:44 a.m.
24       (Exhibit 24 has been marked and now
25        identified for the record.)

3  (Pages 6 to 9)

Richard Cavalli
August 23, 2022

CONFIDENTIAL

Page 10

1    Q   (By Mr. Kelly) And I've handed you Exhibit 24
2    and a couple of questions just about the front page of
3    Exhibit 24.
4        Do you recognize any of these authors, most
5    particularly Leon Roizin, R-O-I-Z-I-N, MD, by name?
6        A   I do not.
7        Q   And did you -- were you -- excuse me -- were
8    you in this '73 through '86 time frame familiar with
9    who the most prominent specialists were in the field
10   of neurotoxicology?
11       MS. REISMAN:  Objection to form.
12       A   I don't.  I can't say one way or the other.
13       Q   (By Mr. Kelly) Okay.  As you sit here now, do
14   you have recollection of actually having gotten this
15   article which begins on the next page through the
16   process of having your librarian pull relevant
17   toxicology literature from the worldwide literature
18   base?
19       A   You know, I don't remember one way or the
20   other.
21       Q   Would cerebral changes in human beings
22   secondary to paraquat -- paraquat poisoning have been
23   a topic in which you were interested in at 1977?
24       MS. REISMAN:  Objection to form.
25       A   Long time ago.  I don't remember one way or

Page 11

1    the other.
2        Q   (By Mr. Kelly) Just to refresh, in '73,
3    '74 when you were asked to focus in the area through
4    '86, was it your custom and practice to read relevant
5    literature about the health effects on the human brain
6    of paraquat exposure?
7        A   Yes.
8        Q   Okay.  Were there any topics in the
9    toxicology literature relating to human health effects
10   of paraquat exposure that you asked the librarian not
11   to pull and share with you?
12       A   No.
13       Q   If we go just to the front page, the title
14   "Cerebral Changes in Paraquat Poisoning," you can see
15   up in the right-hand corner this is 1977.
16       Are you with me?
17       A   I am.
18       Q   Come down the right-hand side and the
19   paragraph that begins with the word "we."  Do you see
20   that?
21       A   I think so, yes.
22       Q   All right.  It says:  "We have had the
23   opportunity to examine the brain of two patients who
24   died of paraquat poisoning.  And since they showed
25   certain pathological changes that might indicate the

Page 12

1    direct or indirect neurotoxicity of this compound, we
2    considered them interesting for presentation and
3    discussion."
4        Have I read that correctly?
5        A   That's what it says on the page.
6        Q   As you sit here now, do you remember in '73,
7    '74 reading scholarly texts or treatises or monographs
8    or textbook chapters that had as their subject matter
9    the pathological changes that might indicate the
10   direct or indirect neurotoxicity of paraquat?
11       A   I can't say one way or the other.
12       Q   Would that, given the nature of your work,
13   have been a topic in which you would have been
14   interested?
15       MS. REISMAN:  Objection to form.
16       A   In general, yes.
17       Q   (By Mr. Kelly) As of 1977, had Chevron shared
18   with any pathologists anywhere what it believed was an
19   appropriate pathological examination to be conducted in
20   a postmortem exam to identify brain changes in humans
21   thought to be due to paraquat?
22       MS. REISMAN:  Objection to form.
23   Foundation.
24       A   Could you repeat that?
25       MS. REISMAN:  And the only thing, I would

Page 13

1    remind you, Mr. Kelly, and the witness is he's here in
2    his individual capacity and can testify to his
3    recollection.  He's not here testifying on behalf of
4    Chevron Corporation.  That's a corporation in terms of
5    its person most knowledgeable of 30(b)(6).
6        MR. KELLY:  Then let me rephrase that so
7    there's no ambiguity.
8        Q   (By Mr. Kelly) As of 1977, Mr. Cavalli, as
9    the person who was directing paraquat inquiries,
10   research in toxicology from '77 to 1980 had you and any
11   members of the team that you identified yesterday ever
12   shared with pathologists what you and your group
13   thought should be an appropriate postmortem exam from a
14   histopathological point of view to identify brain
15   changes in human beings thought to be related to
16   paraquat exposure?
17       MS. REISMAN:  Objection to form.
18       A   I -- I'm sorry.  I just don't remember one
19   way or the other.
20       Q   (By Mr. Kelly) Okay.  Did your group -- and
21   again, the group is the persons you identified for me
22   yesterday and yourself -- at any time author in writing
23   any kind of an outline or template intended to be read
24   by pathologists who were doing postmortem exams on
25   patients who died from paraquat exposure explaining

4  (Pages 10 to 13)

Richard Cavalli
August 23, 2022

CONFIDENTIAL

Page 14

1  what the brain examination should consist of?
2       MS. REISMAN: Objection to form.
3    **A  No. I don't think we did.**
4    Q  (By Mr. Kelly) Did you ever discuss whether
5  that would be helpful or of assistance to you and your
6  group in trying to identify whether or not there was on
7  postmortem examinations changes in the human brain that
8  were thought to be paraquat-related?
9       MS. REISMAN: Objection to form.
10   **A  Could you repeat? I'm sorry.**
11   Q  (By Mr. Kelly) Yes, sir.
12   **A  Long question.**
13   Q  Yeah, yeah.
14      Did you and your group ever discuss whether
15  you thought it would be helpful or of assistance to
16  you in trying to identify whether or not there was on
17  postmortem examination changes in human beings that
18  were thought to be due to paraquat exposure to give
19  pathologists doing postmortems a template or outline
20  of what should be done?
21      MS. REISMAN: Objection to form.
22   **A  I don't recall one way or the other.**
23   Q  (By Mr. Kelly) Okay. I'm -- lower right-hand
24  corner, there was some numbers. I'm all the way over
25  to page 4700.

Page 15

1       Do you see that, sir?
2    **A  4700?**
3    Q  Yes, sir.
4    **A  Yes.**
5    Q  And I'm in the left-hand column under the
6  heading "Results."
7       Do you see that?
8    **A  I do.**
9    Q  And then it says: "Light Microscopic
10  Examination, Case 1." And I'm in the paragraph that
11  begins with the word "histological examination."
12  Okay?
13      "Histological examination, in addition to
14  severe edema and congestion showed a number of quite
15  marked morphological changes."
16      Does the phrase "morphological changes" have
17  significance to you, sir?
18      MS. REISMAN: Objection to form.
19   **A  I think it does.**
20   Q  (By Mr. Kelly) Okay. What is a morphological
21  change in your mind?
22   **A  Change in structure of something.**
23   Q  Okay.
24      MS. REISMAN: Again, Mr. Kelly, I'd ask --
25  you're popping back and forth in time. If you're

Page 16

1  asking him about his current recollection --
2       MR. KELLY: Counsel -- Counsel, let me
3  just --
4       MS. REISMAN: Mr. Kelly, let me -- let me
5  finish my objection, and then you can --
6       MR. KELLY: Let me just tell you something.
7  No.
8       MS. REISMAN: For the record, I think we
9  should make it clear as to whether you're asking for
10  current understanding or his understanding back then.
11      MR. KELLY: Fine. I'm going to proceed with
12  my questions, and if there's confusion, I'll depend on
13  the witness to ask me.
14   Q  (By Mr. Kelly) Sir, the next sentence says:
15  "The most striking was a very pronounced accumulation
16  of lipofuscin-like material in the ganglion cells
17  throughout the brain but most marked in the pallidum
18  intralaminar nuclei of the thalamus, corpus geniculatum
19  laterale, substantia nigra, dentate and fastigial
20  nuclei of the cerebellum."
21      Did I get that right? Maybe not so much
22  with the Latin.
23   **A  It's what it says on the page.**
24   Q  I want to ask you a couple questions about
25  this sentence, sir. Do you know what lipofuscin --

Page 17

1  L-I-P-O-F-U-S-C-I-N -- like material is?
2       MS. REISMAN: Objection. Form.
3    **A  As I sit here, I don't know.**
4    Q  (By Mr. Kelly) Do you --
5    **A  I mean, I don't know. No.**
6    Q  Have you ever known what lipofuscin-like
7  material is?
8    **A  Can't say one way or the other.**
9    Q  Do you know whether lipofuscin is caused by
10  oxidative stress?
11      MS. REISMAN: Objection to form.
12   **A  Since I sit here, I'm not sure what the word**
13  **means. I have no opinion as to whether -- where it**
14  **comes from.**
15   Q  (By Mr. Kelly) Does paraquat kill human cells
16  by oxidative stress?
17      MS. REISMAN: Objection to form.
18   **A  I'm not exactly sure what that term means.**
19   Q  (By Mr. Kelly) All right. Have you ever
20  known whether or not paraquat kills plant or human
21  cells by oxidative stress?
22      MS. REISMAN: Objection. Form.
23   **A  I'm not sure what oxidative stress means.**
24   Q  (By Mr. Kelly) All right. And in your
25  training, experience, and reading, have you ever known

5 (Pages 14 to 17)

Richard Cavalli
August 23, 2022

CONFIDENTIAL

Page 18

1   what oxidative stress means?
2        MS. REISMAN:  Objection to form.
3        A   Specifically as oxidative stress, no, I
4   don't.
5        Q   (By Mr. Kelly) In your study of paraquat from
6   '73 through '86, have -- did you ever learn that the
7   process of oxidative stress was in any way related to
8   how paraquat operated as a nonselective herbicide?
9        MS. REISMAN:  Objection.  Form.
10       A   I'm having trouble -- I'm sorry -- with
11  oxidative stress.
12       Q   (By Mr. Kelly) Okay.
13       A   You have another name for it?
14       Q   Do you know what a reactive oxygen species
15  is?
16       A   Yes, I do.
17       Q   Is a paraquat a reactive oxygen species --
18       Q   (By Mr. Kelly) -- or does it produce a
19       Q   (By Mr. Kelly) -- or does it produce a
20  reactive oxygen species?
21       MS. REISMAN:  Objection.  Form.
22       A   Which question?
23       Q   (By Mr. Kelly) And how about we do it in
24  order.  Is paraquat an oxidative species?
25       MS. REISMAN:  Objection to form.

Page 19

1        A   No.
2        Q   (By Mr. Kelly) Does paraquat produce a
3   reactive oxygen species?
4        MS. REISMAN:  Objection to form.
5        A   I believe it does.
6        Q   (By Mr. Kelly) Does a reactive oxygen species
7   contribute to the production of lipofuscin?
8        MS. REISMAN:  Objection to form.
9        A   I don't know the definition of that word, so
10  I can't say.
11       Q   (By Mr. Kelly) Is the pathological
12  accumulation of lipofuscin implicated in Parkinson's
13  disease?
14       A   I have --
15       MS. REISMAN:  Objection.  Form.  Lack of
16  foundation.
17       Q   (By Mr. Kelly) Go ahead, sir.
18       A   I don't know --
19       Q   All right.
20       A   -- very much about Parkinson's disease.
21       Q   When in -- did you at any time in the
22  '73 through 1986 period educate yourself on how
23  Parkinson's disease was thought to begin?
24       A   No.
25       Q   All right.  Did you at any time in 1973

Page 20

1   through 1986 have a person on your staff who educated
2   you about the course of development to end stage of
3   Parkinson's disease in human beings?
4        MS. REISMAN:  Objection to form.
5        A   I don't recall either way.
6        Q   (By Mr. Kelly) Okay.  Did you at any time
7   undertake to educate yourself on how Parkinson's
8   disease begins and how it ends in human beings?
9        MS. REISMAN:  Objection to form.
10       A   I didn't.
11       Q   (By Mr. Kelly) Do you know what the
12  relationship is, if any, between the substantia nigra
13  and Parkinson's disease?
14       A   I do have a vague understanding of that.
15       Q   And did you have a vague understanding of
16  what that was in the period 1973 to 1986?
17       A   I can't pin it down by date either way.
18       Q   During the period of time during which you
19  were charged with making an assessment as to whether
20  or not there was a risk to human health in terms of
21  injury in the brain between 1973 and 1986, did you
22  have any understanding of the role of the substantia
23  nigra in Parkinson's disease?
24       MS. REISMAN:  Objection to form.
25       A   Only vaguely in a general way.

Page 21

1        Q   (By Mr. Kelly) And what was the vague general
2   way that you had some understanding about the
3   relationship of the substantia nigra to Parkinson's
4   disease?
5        A   I can't say for certain.
6        Q   Okay.  So we go back, and I want to read
7   this paragraph again.  "Histological examination, in
8   addition to severe edema and congestion, showed a
9   number of quite marked morphological changes.  The
10  most striking was a very pronounced accumulation of
11  lipofuscin-like material in the ganglion cells
12  throughout the brain but most marked in the pallidum
13  intralaminar nuclei of the thalamus, the corpus
14  geniculatum laterale, substantia nigra -- excuse me --
15  substantia nigra, dentate and fastigial nuclei of the
16  cerebellum."
17       Having that paragraph in mind, do you know
18  whether any part of those brain structures articulated
19  by the authors have anything to do with Parkinson's
20  disease?
21       MS. REISMAN:  Objection to form.
22       A   Again, the only one that stands out is a
23  vague memory of the substantia nigra have something to
24  do with it.
25       Q   (By Mr. Kelly) In the period 1973 to 1986,

6  (Pages 18 to 21)

Richard Cavalli
August 23, 2022

Page 22

1  did your group under your direction at any time
2  commission any consultation with a neurotoxicologist to
3  evaluate whether or not a substantia nigra was or was
4  not something that would be affected negatively by
5  exposure to paraquat?
6        MS. REISMAN:  Objection to form.
7     A   I don't recall any such discussion.
8        MS. REISMAN:  One way or the other, or you
9  don't recall a discussion?
10        THE WITNESS:  Well, one way or the other.
11        MR. KELLY:  Excuse me.  Counsel, that's not
12  appropriate to coach the witness.
13        MS. REISMAN:  I was not -- Mr. Kelly, I am
14  not coaching the witness.  I've sat here as you've
15  asked question after question, some very unclear that
16  the witness is confused about.  I was making sure that
17  the record was clear as to whether he didn't recall it
18  happening or whether he didn't recall it -- whether he
19  didn't recall it either way, that it happened or not.
20        You can continue with your questioning.  I
21  was not coaching the witness.  I was making sure that
22  his answer was clear.
23        MR. KELLY:  May I just say that the process
24  of exam and redirect is for the benefit of
25  clarification, and to the extent that this is

Page 23

1  testimony to potentially be played in court, I don't
2  believe it is appropriate for you to interject your
3  thoughts or comments.  They wouldn't be permitted in
4  court.  That's all I'm saying.
5        MS. REISMAN:  Thank you, Mr. Kelly.
6     Q   (By Mr. Kelly) Mr. Cavalli, turn, if you
7  will, for me to -- in the lower right-hand corner,
8  page 4702.  And on the left-hand side at the top, you
9  see it's the heading "Case 2"?
10     A   Yes, I see it.
11     Q   All right.  I'm just going to read the first
12  paragraph to make sure you and I are on the same page
13  here.  It says: "Gross and histological examination of
14  the brain showed a strikingly similar picture of that
15  of Case 1.  Here also, the most pronounced
16  pathological change was an accumulation of PAS
17  positive, mostly granular, partly brownish,
18  lipofuscin-like material in the ganglion cells with
19  the same pattern of predilection as in the previous
20  case."
21        Do you understand that sentence to say in
22  the second person who was being studied they saw
23  essentially what we just described in Case No. 1?
24        MS. REISMAN:  Objection to form.
25     A   Yes, I do understand that.

Page 24

1     Q   (By Mr. Kelly) All right.  And does addition
2  of this modifying language "PAS positive, mostly
3  granular, partly brownish lipo- -- lipofuscin-like
4  material," does that bring any more clarity to mind as
5  to what lipofuscin is?
6        MS. REISMAN:  Objection to form.
7     A   No, it doesn't.
8     Q   (By Mr. Kelly) Okay.  Let's just go to
9  page 4711.  And on -- on the left-hand column, sir,
10  60 percent of the way down, a sentence begins
11  "Hypoxia..."
12        Do you see that?  "Hypoxia has also..."?
13     A   Not yet.
14     Q   Okay.  Take -- take your time, sir.
15     A   You said on the left side?
16     Q   Yes, sir.  On the column on the left just
17  down here.
18     A   Okay.  Second -- yeah.  First -- the far
19  left word is "system"?
20     Q   Yes, sir.
21     A   Okay.  I see.
22     Q   "Hypoxia has also been indicated by some
23  authors as a possible cause of excessive production of
24  lipofuscin.  Pathological changes in the lungs of our
25  cases, as well as in many cases from the literature,

Page 25

1  seemed to have developed rather late in the course of
2  the disease with blockage of alveolar space being
3  produced mostly by acute hemorrhages and hyaline
4  membranes."
5        Do you understand what the authors are
6  talking about there?
7        MS. REISMAN:  Objection.  Form.
8     A   I do.
9     Q   (By Mr. Kelly) All right.  And do you
10  understand that hypoxic changes causing acute
11  hemorrhage and hyaline membranes is something that
12  these authors say happens late in the course of someone
13  poisoned by paraquat?
14        MS. REISMAN:  Objection to form.
15     A   That's what's on the page.
16     Q   (By Mr. Kelly) Okay.  Do you agree with that,
17  sir?
18     A   I have no -- I mean, I don't know what
19  "late" means in this context.
20     Q   All right.  And that's true --
21     A   Perhaps it's elsewhere in the paper.
22     Q   Okay.
23        MS. REISMAN:  And if you need to read the
24  paper to answer these questions, please feel free to
25  do so given that response.

7  (Pages 22 to 25)

Richard Cavalli
August 23, 2022

CONFIDENTIAL

Page 26

1      Q   (By Mr. Kelly) So the next sentence begins:
2  "Clinically, both of our patients developed breathing
3  difficulties quite terminally."
4         You understand what that means?
5         MS. REISMAN:  Objection to form.
6      A   Yes, I do.
7      Q   (By Mr. Kelly) "Quite terminally" means at or
8  near the end of life, correct?
9      A   Yes.
10     Q   And then the authors conclude "Thus, one
11 would presume that hypoxia of respiratory origin could
12 not have played a decisive role in influencing
13 formulation of lipofuscin-like material in our cases."
14        Do you understand what that means?
15        MS. REISMAN:  Objection to form.
16     A   I understand that's what's on the page.
17     Q   (By Mr. Kelly) Well, do you understand what
18 these authors are saying is the lipofuscin-like
19 materials they saw were not in any way produced by
20 terminal hypoxia?
21        MS. REISMAN:  Objection to form.
22     A   The sentence reads "Thus, one would
23 presume..."
24     Q   (By Mr. Kelly) Yes, sir.
25     A   So that -- that's...

Page 27

1      Q   This is the presumption of the authors,
2  correct?
3      A   It -- it is their presumption.  Not -- not
4  having the case histories, the -- I don't know.  You
5  ask the questions.
6      Q   You yourself have never published in a
7  journal of neurology or neurotoxicology, correct?
8      A   That is correct.
9      Q   And do you understand that the purpose of
10 journal publications and peer-reviewed journals is to
11 educate other members of the profession?
12        MS. REISMAN:  Objection to form.
13     A   I would have said to share experiences.
14     Q   (By Mr. Kelly) Is the purpose of sharing
15 experiences in medical journals so that all members of
16 the medical community in a particular discipline have a
17 better understanding of what their sisters and brothers
18 in the medical profession are learning in the treatment
19 of a given disease?
20        MS. REISMAN:  Objection.  Form.
21     A   Yes.
22     Q   (By Mr. Kelly) And would you expect these
23 physicians publishing in neurotoxicology to be not more
24 knowledgeable than yourself in that field?
25        MS. REISMAN:  Objection to form.

Page 28

1      A   More knowledgeable in neurotoxicity than I,
2  likely.
3      Q   (By Mr. Kelly) And not just limiting to you,
4  Mr. Cavalli, but in your group of five and in the
5  people whom you interacted with at ICI, was there a
6  neurotoxicologist who regularly participated in the
7  meetings you had with ICI?
8      A   I don't recall that one way or the other.
9      Q   In the period 1973, '74, through 1986, did
10 you yourself or any members of your group that we
11 talked about yesterday ever suggest that you should
12 get a board-certified neurotoxicologist involved with
13 your team?
14        MS. REISMAN:  Objection.  Form.
15     A   No, we did not.
16     Q   (By Mr. Kelly) Did -- 1973 to 1986, did
17 anyone in your group or yourself suggest that you
18 should economically underwrite research on the
19 potential of brain injury as a result of paraquat
20 exposure by hiring a neurotoxicologist to research and
21 write on the topic?
22        MS. REISMAN:  Objection to form.
23     A   I -- I don't recall.
24     Q   (By Mr. Kelly) As a person who had attended
25 three classes at UCSF, did you at any point think --

Page 29

1  putting aside the other five people in the group -- it
2  would be helpful to you to have a better understanding
3  of the potential neurotoxicity of paraquat on human
4  beings to have somebody from the UCSF
5  neurotoxicological department consult with you?
6         MS. REISMAN:  Objection to form.
7      A   No.
8      Q   (By Mr. Kelly) Let me change -- change
9  topics, change subjects here for a minute, if we can.
10 Yesterday there were questions asked that had -- find
11 the right place here -- had to do with your interaction
12 with the people at ICI.
13        Was there a period of time that came --
14 actually, let me withdraw that.
15        When you were asked to focus more of your
16 efforts on paraquat issues, was that the point in
17 which you became involved interacting with the ICI
18 team?
19     A   Yes.
20     Q   Okay.  Let me show you what we'll mark as
21 Exhibit 51.
22        (Exhibit 51 has been marked and now
23        identified for the record.
24     Q   (By Mr. Kelly) And can I ask you to look at
25 the last page first because I think it's helpful for

8  (Pages 26 to 29)

Richard Cavalli
August 23, 2022

CONFIDENTIAL

Page 30

1  orienting us.
2       Do you see the last page, sir?
3    **A   I think I do, yes.**
4    Q   Okay.  And this is written by J.N. Ospenson?
5       MS. REISMAN:  This being the last page is
6  written by J.N. Ospenson?
7       MR. KELLY:  Yes.
8    Q   (By Mr. Kelly) So it's a letter, correct?
9    **A   Yes.**
10   Q   And it contains an agenda, if we believe the
11 top, for a March 27, 1974, paraquat conference ICI and
12 Chevron Chemical Company, correct?
13   **A   That's what it says.**
14      MS. REISMAN:  Object to the form.
15   Q   (By Mr. Kelly) And this is to be held at
16 555 Market Street.  Was that at the time a Chevron
17 Chemical Company address?
18   **A   It was a Chevron address.**
19   Q   Okay.  And among the addressees, you are
20 listed as Number 1?
21   **A   I see that.**
22   Q   And under the agenda topics, 2-B,
23 toxicological aspects, you are listed with -- looks
24 like Dr. Kinoshita, K-I-N-O-S-H-I-T-A.  Right?
25   **A   That's correct.**

Page 31

1       MS. REISMAN:  Mr. Kelly, just a correction
2  so the record's clear.  You noted that this agenda was
3  for a meeting taking place on March 27.  I believe
4  that last page --
5       MR. KELLY:  No.
6       MS. REISMAN:  -- indicates that it's an
7  agenda for meetings being held on March 28 and 29.
8       MR. KELLY:  Yeah.  I'm sorry.  I should have
9  said "it's dated."
10   Q   (By Mr. Kelly) This letter is dated March 27,
11 1974.  And when we go to the front page, we see the
12 meeting report, correct?
13   **A   I'm sorry.**
14   Q   Let's go to the front page of the exhibit --
15   **A   Yes.**
16   Q   -- which is page 10 -- 1060?
17   **A   Yes.**
18   Q   Okay.  And you are listed here in the second
19 line from the bottom, says "SOCAL-R.D. Cavalli."  Do
20 you know what the "SOCAL" stands for?
21   **A   Standard Oil California.**
22   Q   This is, as counsel was discussing
23 yesterday, before the name changed?  Is that right?
24   **A   Apparently so.**
25   Q   If you go to the next page which -- in the

Page 32

1  lower right-hand corner, 1061, under the heading
2  "Toxicology," this is one of the topics you're listed
3  on for the addenda, correct?
4    **A   Yes.**
5    Q   It begins and says:  "It was felt that the
6  lack of chronic inhalation toxicity information and
7  epidemiological surveys were a definite weakness in
8  properly evaluating the safety of paraquat use or
9  properly defending the safety of paraquat."
10      Did I read that correctly?
11   **A   You did.  That's what's on the page.**
12   Q   And were those opinions that you shared with
13 all of the people in attendance at this conference?
14      MS. REISMAN:  Objection to form.
15   **A   I have to say I do not have a specific**
16 **recollection of this conference.**
17   Q   (By Mr. Kelly) Okay.  Were those your
18 opinions in 1974?
19      MS. REISMAN:  Objection to form.
20   **A   I would not consider -- I mean, again, I**
21 **can't -- can't go back to '74.  The -- no, I -- I**
22 **can't say one way or another.**
23   Q   (By Mr. Kelly) In your history of attending
24 these meetings, was it your understanding that the
25 purpose of generating minutes or a meeting report was

Page 33

1  to accurately document what had happened?
2       MS. REISMAN:  Objection to form.
3    **A   Yes.**
4    Q   (By Mr. Kelly) And would you yourself keep a
5  binder or a collection of meeting reports or minutes so
6  that you could keep track of what happened
7  historically?
8       MS. REISMAN:  Objection to form.
9    **A   No.**
10   Q   (By Mr. Kelly) Do you have reason to believe
11 that these minutes are inaccurate in documenting what
12 your thoughts were toxicologically in 1974?
13      MS. REISMAN:  Objection to form.
14   **A   I can't say one way or the other.**
15   Q   (By Mr. Kelly) In 1974, was there, in your
16 opinion, a lack of chronic inhalation toxicity
17 information?
18      MS. REISMAN:  Objection to form.
19   **A   There was not a specific study, but we have**
20 **large collection of studies and data that supported a**
21 **view that chronic inhalation was not a significant**
22 **risk in the field if the product was used according to**
23 **the precautionary label.**
24   Q   (By Mr. Kelly) Let me ask my question.
25      Was -- in 1974 did you believe there was a

9  (Pages 30 to 33)

Richard Cavalli
August 23, 2022

CONFIDENTIAL

Page 34

1  lack of chronic inhalation toxicity information?
2      MS. REISMAN:  Objection to form.  Asked and
3  answered.
4      A   Not information, no.
5      Q   (By Mr. Kelly) Yesterday you told us you
6  would be -- you were in favor of doing an inhalation
7  study.
8      Do you recall that?
9      A   I do.
10     Q   And were you in favor of doing an inhalation
11 study because there was a lack of chronic inhalation
12 toxicity information?
13     MS. REISMAN:  Objection to form.  Asked and
14 answered.
15     A   I have to give you the same answer.  There
16 wasn't a study, but there was information.
17     Q   (By Mr. Kelly) In 1974, was it your opinion
18 that the lack of epidemiological surveys were a
19 definite weakness in properly evaluating the safety of
20 paraquat use or properly defending the safety of
21 paraquat?
22     MS. REISMAN:  Objection to form.
23     A   Once again, I don't recall what I said.
24 Those are not my words.
25     Q   (By Mr. Kelly) In 1974, did you believe that

Page 35

1  the lack of epidemiological surveys were a definite
2  weakness in properly evaluating the safety of paraquat
3  use?
4      MS. REISMAN:  Objection to form.
5      A   As I say, there was a large body of
6  information in supporting that an epidemiology study
7  would have been a good thing to do but not because of
8  any weakness on -- on my part.
9      Again, I don't recall the discussions we
10 had, and I didn't write this.
11     Q   (By Mr. Kelly) From 1974 to 1986, did you at
12 any point personally commission one or more
13 epidemiological surveys in order to properly evaluate
14 the safety of paraquat use?
15     MS. REISMAN:  Objection to form.
16     A   If I understood your question, no.
17     Q   (By Mr. Kelly) Okay.  From 1974 to 1986, did
18 any member of your group either individually or
19 together commission one or more epidemiological surveys
20 in order to properly evaluate the safety of paraquat
21 use in the United States?
22     MS. REISMAN:  Objection to form.
23     A   I don't believe so.
24     Q   (By Mr. Kelly) The balance of that sentence
25 says that -- and I put in context fairly -- "It was

Page 36

1  felt that the lack of chronic inhalation toxicity
2  information and epidemiological surveys were a definite
3  weakness in properly evaluating the safety of paraquat
4  use or properly defending the safety of paraquat."
5      My question to you is, was it part of your
6  job at any time between 1973 and 1986 to properly
7  defend the safety of paraquat?
8      MS. REISMAN:  Objection to form.
9      A   Again, those aren't my words, but I
10 certainly believed at the time that it would be useful
11 in understanding the toxicity of paraquat to have
12 several different kinds of studies, among the two
13 mentioned here.
14     Q   (By Mr. Kelly) But with reference to the
15 specific phrase "defending the safety of paraquat," did
16 you understand that that was part of your job between
17 1973 and 1986?
18     MS. REISMAN:  Objection to form.  Asked and
19 answered.
20     A   Part of my job in those years, as I recall,
21 was to study the toxicity of paraquat, make
22 recommendations for its safe use, and review the work
23 of -- of others.  I -- I personally don't think of
24 that as defending.
25     Q   (By Mr. Kelly) Was it any part of your work

Page 37

1  in 1973 through 1986 or the work of anybody in your
2  group to defend paraquat's safety to the state of
3  California?
4      MS. REISMAN:  Objection to form.  Asked and
5  answered.
6      A   To share to the extent that we did that, it
7  would have been a sharing of data and information, and
8  I mean, that's what we did.
9      Q   (By Mr. Kelly) Okay.  Was it any part of your
10 job or other members of the group to defend paraquat's
11 safety in lawsuits against Chevron or workers'
12 compensation claims against Chevron from 1973 through
13 1986?
14     MS. REISMAN:  Objection to form.
15     A   Yes, it was.
16     Q   (By Mr. Kelly) Okay.  When the phrase
17 "defending the safety of paraquat" -- when you look at
18 that phrase, do you look at that with the connotation
19 of defending the safety of paraquat in legal
20 proceedings?
21     MS. REISMAN:  Objection to form.
22     A   You know, I don't have a specific
23 recollection of this.  I have no idea what the author
24 meant by that phrase.
25     Q   (By Mr. Kelly) With respect to your group in

10  (Pages 34 to 37)

Richard Cavalli
August 23, 2022

CONFIDENTIAL

Page 38

1  the 1973 through 1986 period, were there any persons
2  besides yourself who had as part of their job defending
3  the safety of paraquat in either lawsuits against
4  Chevron or workers' compensation claims?
5      MS. REISMAN:  Objection to form.
6      A   We did provide assistance in -- in those
7  cases from a factual standpoint.
8      Q   (By Mr. Kelly) And when you say "we," which
9  persons in your group are you referring to?
10     A   Myself, John Ford.  I think it was just the
11 two of us.
12     MR. KELLY:  I want to move to the next
13 thing.  Exhibit 49.
14         (Exhibit 49 has been marked and now
15         identified for the record.
16     MS. REISMAN:  When you get to a convenient
17 stopping point, Mike, it's probably a good time for a
18 break.  We've been going a bit over an hour.
19     MR. KELLY:  Okay.  We can stop.
20     VIDEOGRAPHER:  Okay.  We're going off the
21 record at 9:26 a.m.
22         (A break was taken.)
23     VIDEOGRAPHER:  We're back on the record at
24 9:42 a.m.
25     Q   (By Mr. Kelly) Mr. Cavalli, we're back on the

Page 39

1  record here.  Are you good to continue forward?
2      A   Yes, I am.
3      Q   Okay.  Just before we took this break, I
4  think I handed you Exhibit 49; is that right?
5      A   Yes, you did.
6      Q   Okay.  This has a date stamped on it of
7  24 November 1975, but I think that's -- these are
8  "Notes on Meetings Held at CTL 6-9 October '75."
9      Do you see that on the front page?
10     A   Yes, I do.
11     Q   And do you know that CTL is part of ICI?
12     A   Yes.
13     Q   That's the Central -- is it the Central
14 Toxicology Laboratory?
15     A   Yes.
16     Q   And during this period of time '73,
17 '74 through '86, you had more than one opportunity to
18 go and meet on this biannual program with folks at
19 ICI?
20     MS. REISMAN:  Objection to form.
21     Q   (By Mr. Kelly) Is that correct?
22     A   Yes.
23     Q   Okay.  And if we go to page -- the numbers
24 are at the bottom in the midpage -- page 4, this
25 confirms under Roman Numeral II that you were present?

Page 40

1      A   I'm not there yet.
2      Q   Oh, I'm sorry.  At the top of the page to
3  make it easier for you.
4      A   Page 4 of the document.
5      Q   Yes.  And way up at the top,
6  Roman Numeral II, it says "Meetings With"?
7      A   Yes.
8      Q   Can you see that you are present with
9  Dr. Ospenson?
10     A   I am.  I was.
11     Q   And is it also correct that the other folks
12 on the list Swan, Fletcher, and Waitt were ICI people?
13     MS. REISMAN:  Objection to form.
14     A   Yes.
15     Q   (By Mr. Kelly) Do you recognize PPD next to
16 Mr. Waitt's name as the plant protection division of
17 ICI?
18     A   I -- I think that's what PPD was.
19     Q   Okay.  If you'll turn to the next page,
20 No. 5, heading "Chronic Toxicity."
21     Do you see that?
22     A   Not yet.
23     Q   Okay.
24     A   Yes, I do.
25     Q   It says:  "Chevron are concerned on the

Page 41

1  chronic effects of paraquat sprays resulting from
2  four cases reported to the state of California.  The
3  syndrome is reported as injury to the CNS,
4  nonspecific liver/kidney injury."
5      Just stopping right there, do you have a
6  memory of in 1975 in the fall carrying that concern on
7  behalf of Chevron to this meeting?
8      MS. REISMAN:  Objection to form.
9      A   No.  I don't remember the meeting.  I don't
10 remember the document.
11     Q   (By Mr. Kelly) Okay.
12     A   I can't say one way or the other.
13     Q   And in 1975, it was still part of your job
14 to assist in the defense of lawsuits against Chevron
15 alleging injury from paraquat exposure?
16     MS. REISMAN:  Objection to form.
17     Q   (By Mr. Kelly) Is that right?
18     A   It was.
19     Q   Okay.  If you just come down towards the
20 bottom of that paragraph, do you see the sentence that
21 begins:  "Refutation of this claim..."
22     Do you see that sentence?
23     A   I do.
24     Q   It says:  "Refutation of this claim is
25 extremely difficult, and Chevron would like more

11  (Pages 38 to 41)

Richard Cavalli
August 23, 2022

CONFIDENTIAL

Page 42

1  positive data to use in litigation cases."
2      Did you on behalf of Chevron reach out to
3  ICI for information, witnesses, or data to use in
4  defending litigation cases?
5      MS. REISMAN:  Objection to form.
6      A   I don't recall one way or the other.
7      Q   (By Mr. Kelly) In 19- -- November of --
8  excuse me.
9      In October of 1975 -- and I'm looking at the
10  next sentence -- it says:  "It is suggested that a
11  critical epidemiology study is carried out and a
12  long-term toxicity study using sprays on animals."
13      Was it your belief in the fall of 1975 that
14  both an epidemiology study and a long-term toxicity
15  study using sprays on animals was necessary to assist
16  in defending lawsuits against Chevron?
17      MS. REISMAN:  Objection to form.
18      A   Specifically with regard to lawsuits, I -- I
19  don't know one way or the other.
20      Q   (By Mr. Kelly) The question of a critical
21  epidemiology study -- actually, let me rephrase it.
22      Was there any time in 1975 that you
23  suggested to ICI an epidemiology study should be
24  carried out as well as a long-term study using sprays
25  on animals?

Page 43

1      MS. REISMAN:  Objection to form.
2      A   There were such discussions.
3      Q   (By Mr. Kelly) Okay.  And was there a
4  decision made that ICI would provide Chevron with a --
5  using the phraseology here -- "critical epidemiology
6  study and a long-term toxicity study using sprays on
7  animals"?
8      MS. REISMAN:  Objection to form.
9      A   One more time for me, please.
10      Q   (By Mr. Kelly) Yes, sir.
11      Was there a decision made that ICI would
12  provide Chevron with a critical epidemiological study
13  and a long-term toxicity -- toxicity study using
14  sprays on animals?
15      MS. REISMAN:  Objection to form.
16      A   I don't recall one way or the other.
17      Q   (By Mr. Kelly) Did Chevron itself ever do an
18  epidemiology study for the purpose of defending
19  lawsuits?
20      MS. REISMAN:  Objection to form.
21      A   We didn't -- Chevron did not do an
22  epidemiology study.  That's all I can say.
23      Q   (By Mr. Kelly) All right.  Did Chevron at any
24  time do a long-term toxicity study using sprays on
25  animals for purposes of defending lawsuits?

Page 44

1      MS. REISMAN:  Objection to form.
2      A   The -- we did not do such a study.
3      Q   (By Mr. Kelly) Going down to the next
4  paragraph there, it says:  "Activity of paraquat on
5  CNS."
6      Do you understand that CNS in this context
7  refers to the nervous system?
8      MS. REISMAN:  Objection to form.
9      A   Yes.
10      Q   (By Mr. Kelly) Did you or your team at any
11  time investigate central nervous system effects on
12  human beings as reflected in autopsy data that you
13  collected?
14      MS. REISMAN:  Objection to form.
15      A   You lost me somewhere.
16      Q   (By Mr. Kelly) Yes, sir.  I'm wondering if
17  you at -- and we have -- I think we'll get to some
18  autopsies here before we finish.
19      Over time you, Mr. Ford, and others
20  collected autopsies from victims of paraquat
21  poisoning, correct?
22      MS. REISMAN:  Objection to form.
23      Q   (By Mr. Kelly) Is that right?
24      A   Yes.
25      Q   All right.  Was discussion of the autopsies,

Page 45

1  of paraquat poisoning autopsies done in the
2  United States, something that was ever discussed at
3  the Chevron ICI meetings?
4      A   Again, specifically I don't recall one way
5  or the other.
6      Q   Do you generally remember whether you set in
7  place a protocol or process for exchanging all of the
8  autopsies that you obtained between you and ICI on
9  victims of paraquat poisoning?
10      MS. REISMAN:  Objection to form.
11      A   We did exchange information.
12      Q   (By Mr. Kelly) Okay.  Going back to this
13  paragraph just for a second.  It says:  "In a recent
14  autopsy on a paraquat poisoning, the pathologist
15  discovered lesions on the motor neurons."
16      Do you remember discussing that with ICI?
17      A   I do not one way or another.
18      Q   It goes on to say:  "The lesions were
19  sufficient to cause debilitation."  Do you see that
20  sentence?
21      A   I do.
22      Q   Does that refresh your memory at all as to
23  whether or not the discussion of autopsy-discovered
24  motor neuron lesions in a paraquat victim were
25  discussed with ICI?

12  (Pages 42 to 45)

Richard Cavalli
August 23, 2022

CONFIDENTIAL

Page 46

1      MS. REISMAN:  Objection to form.
2      A   You know, again, I don't remember the
3  specific meeting.
4      Q   (By Mr. Kelly) Okay.
5      A   So...
6      Q   I'm wondering more generally in the '73 to
7  '86 period, do you have a memory of discussing that
8  topic?
9      MS. REISMAN:  Objection to form.
10      A   We discussed numerous topics, this may or
11  may not have been among them.  I just -- that was a
12  long time ago.
13      Q   (By Mr. Kelly) Well, I understand it was a
14  long time ago, sir, but was potential central nervous
15  system effects of paraquat on human beings a topic of
16  importance for the ICI Chevron group?
17      MS. REISMAN:  Objection to form.
18      A   Yes.
19      Q   (By Mr. Kelly) Okay.  If we continue down
20  this paragraph, do you see -- I'm starting with the
21  sentence that begins with "Fisher..."
22      Do you see that?
23      A   Uh-huh.
24      Q   Just the word "Fisher."  That's someone's
25  name?

Page 47

1      A   I see that, yes.
2      Q   And do you know who that refers to where it
3  says "Fisher has also reported ataxia"?
4      MS. REISMAN:  Wait.  What's the question?
5  Are you asking if he sees that?
6      MR. KELLY:  I'm ask- -- no.  I'm asking if
7  he knows who Fisher is.
8      A   Well, I may have at one point, but I don't
9  recall.
10      Q   (By Mr. Kelly) All right.  The full sentence
11  says: "Fisher has also reported ataxia from paraquat
12  administered by any route."  Just focusing on that part
13  of it.
14      Do you know what ataxia is?
15      A   Yes, I do.
16      Q   Is that a CNS effect?
17      MS. REISMAN:  Objection to form.
18      A   It can be.
19      Q   (By Mr. Kelly) And with reference to studying
20  the CNS effect of ataxia in people exposed to paraquat,
21  did you or your group ever endeavor to study that
22  focused topic?
23      MS. REISMAN:  Objection to form.
24      A   I think -- again, you know, we had a lot of
25  information, a lot of data.  Basically, it -- it just

Page 48

1  didn't support involvement of the central nervous
2  system.
3      Q   (By Mr. Kelly) Okay.  My question,
4  Mr. Cavalli, was a little bit different.  It's a
5  little -- just a discreet question.
6      With reference to studying the CNS effect of
7  ataxia in people exposed to paraquat, did you or your
8  group ever endeavor to study that focused topic?
9      MS. REISMAN:  Objection to form.  Asked and
10  answered.
11      A   In human beings?
12      Q   (By Mr. Kelly) Yes, sir.
13      A   Don't believe so.
14      Q   Okay.  And then the sentence continues:
15  "And Fletcher has received a few inquiries on
16  peripheral neurites."
17      Do you see that part of the sentence?
18      A   Yes, I do.
19      Q   Do you know Dr. Fletcher?
20      A   I do.
21      Q   He was your primary contact at ICI?
22      A   Yes.
23      MS. REISMAN:  Objection to the form.
24      Q   (By Mr. Kelly) And did you and Dr. Fletcher
25  at any time investigate or commission any analysis of

Page 49

1  the link between paraquat exposure and the development
2  of peripheral neuritis?
3      MS. REISMAN:  Objection to form.
4      A   Don't recall one way or the other.
5      Q   (By Mr. Kelly) And the next sentence says:
6  "It was agreed that this effect was difficult to check,
7  but evidence might be obtained from an epidemiological
8  study."
9      Do you see that?
10      A   Yes.
11      Q   Did anyone ever do an epidemiological study
12  to investigate the relationship or lack of a
13  relationship between paraquat exposure and the
14  development of peripheral neuritis in human beings?
15      MS. REISMAN:  Objection to form.
16      A   Yes.
17      Q   (By Mr. Kelly) Who did that study?
18      A   Dr. Howard of ICI and a Dr. Sabapathy.
19      Q   Is the -- the Howard-Sabapathy study you're
20  talking about the one you also referenced yesterday in
21  your direct?
22      MS. REISMAN:  Objection.  Form.
23      A   I -- probably, yeah.
24      Q   (By Mr. Kelly) Okay.  Did they do one that
25  was focused exclusively on peripheral neuritis?

13  (Pages 46 to 49)

Richard Cavalli
August 23, 2022

CONFIDENTIAL

Page 50

1    MS. REISMAN: Objection to form. Asked and
2 answered.
3    **A   It would have included -- their examination**
4 **would have found peripheral neuritis -- neuritis --**
5 **excuse me -- had it been there.**
6    Q   (By Mr. Kelly) Okay. I'm going to try and
7 move with some dispatch. I'm moving to my next
8 exhibit. Mr. Cavalli, if you would put that aside.
9 Thank you, sir.
10    (Exhibit 48 has been marked and now
11    identified for the record.)
12    Q   (By Mr. Kelly) This particular exhibit is
13 marked No. 48. This -- as you can see on the -- on the
14 first page, appears to be directed to Mr. J.N. Osperson
15 [as pronounced]?
16    MS. REISMAN: Ospenson.
17    Q   (By Mr. Kelly) Ospenson.
18    This is an internal Chevron document; is
19 that right?
20    **A   Yes, it is.**
21    MS. REISMAN: Now, I'm just going to object
22 because the copy that you've put in front of the
23 witness, Mr. Kelly, is a Syngenta document. So I
24 don't know what your question is actually asking
25 but...

Page 51

1    MR. KELLY: My question is -- you'll find
2 out if you wait.
3    MS. REISMAN: No, no, no. My point is
4 you -- you said that this document, this particular
5 document is not a Chevron document. It is -- so I
6 just wanted to make that clear. You can go on with
7 your questions.
8    Q   (By Mr. Kelly) Do you see the last page, sir,
9 and where you are the signature on this document?
10    **A   Yes, I do.**
11    MS. REISMAN: Just so there's no --
12 Mr. Kelly, I'm objecting because this is not from
13 Syngenta and are handwritten notes -- I mean, this is
14 not from Chevron files, and there are handwritten
15 notes on it. So -- at least on mine. So go ahead.
16    Q   (By Mr. Kelly) Let's focus on Exhibit 48
17 here. You see it bears the date March 29, 1976,
18 directed to Mr. J.N. Ospenson.
19    You know who that is, correct?
20    **A   Yes.**
21    Q   And do you see the last page says: "Original
22 Signed R.D. Cavalli -- Cavalli." Excuse me.
23    **A   Yes, I see that.**
24    Q   And this would indicate to you, then, that
25 this in whatever form it was originally before anybody

Page 52

1 wrote on it was something you authored for review by
2 the person who was your superior, correct?
3    **A   Yes.**
4    Q   All right. I just want to focus on two
5 things. First -- the first sentence says: "The
6 following is a summary of the meetings held between
7 myself and Ken Fletcher of CTL on February 17 and 18,
8 1976."
9    Did I read that correctly?
10    **A   That's what's on the page.**
11    Q   And in this context, "myself" was you,
12 Mr. Richard Cavalli, right?
13    **A   Yes.**
14    Q   Okay. And -- and this would have been
15 consistent with the arrangement that was struck where
16 Fletcher would be the primary contact for ICI, you
17 would be the primary contact for Chevron; is that
18 true?
19    MS. REISMAN: Objection to form.
20    **A   In matters pertaining to health effects,**
21 **yes.**
22    Q   (By Mr. Kelly) Okay. I'm looking exclusively
23 here at Paragraph 3. This is in 1976. It begins: "We
24 discussed at some length the gaps in our knowledge of
25 the chronic effects of paraquat exposure."

Page 53

1    Did I read that correctly?
2    **A   Yes, you did.**
3    Q   And so in 1976, were both you and
4 Dr. Fletcher acknowledging there were gaps in your
5 knowledge regarding the effects of paraquat exposure?
6    MS. REISMAN: Objection to form.
7    **A   You know, I -- I -- I don't recall this**
8 **specific document. I don't recall what Ken and I**
9 **discussed, and I don't know -- we may have discussed**
10 **gaps, but it doesn't say that we found gaps. But I**
11 **have very poor recollection of this.**
12    Q   (By Mr. Kelly) Well, you do recall that at
13 this particular time in history, it would have both
14 been part of your personal practice and your job
15 responsibilities to accurately report to Dr. Ospenson
16 what transpired between you and Dr. Fletcher, correct?
17    MS. REISMAN: Objection. Objection to form.
18    **A   Yes. It would have been.**
19    Q   (By Mr. Kelly) There would be no incentive,
20 purpose, or reason to mislead Dr. Ospenson, would
21 there?
22    **A   No.**
23    Q   The second sentence says: "The animal
24 studies available are old and do not meet current
25 standards."

14  (Pages 50 to 53)

Richard Cavalli
August 23, 2022

CONFIDENTIAL

Page 54

1  That was a statement that you made here as
2  of 1976, correct?
3      A   Correct.
4      Q   And you go on to say:  "Some are poorly
5  done."  Right?
6          MS. REISMAN:  Objection to form.
7  What are you asking him?
8      Q   (By Mr. Kelly) You report here that with
9  reference to the animal studies that are available,
10 "some are poorly done."  Correct?
11     A   That's what it says.
12     Q   And are "poorly done studies" studies that
13 you regularly rely on?
14         MS. REISMAN:  Objection to form.
15     A   Could you --
16     Q   (By Mr. Kelly) Yes, sir.  My question was,
17 are "poorly done studies" studies that you regularly
18 rely on?
19         MS. REISMAN:  Objection to form.
20     A   That's -- you know, I -- I -- I don't
21 remember what studies I had in mind at that time.  It
22 says "some," not "all," on the paper.  I just don't
23 remember one way or the other.
24     Q   (By Mr. Kelly) The next sentence says:  "In
25 fact, the cause of death from chronic exposure to

Page 55

1  paraquat could not be determined from these studies."
2          Do you see that sentence?
3      A   I do.
4      Q   And it would be important to have current,
5  valid, reliable studies from which the cause of death
6  from chronic exposure to paraquat could be determined;
7  isn't that correct?
8          MS. REISMAN:  Objection to form.
9      A   Yes.
10     Q   (By Mr. Kelly) Then you go on to say:
11 "Dr. Fletcher agreed to review those and to consider
12 repeating certain of the studies."
13         Did I get that right?
14     A   You did.
15     Q   And does this reflect that you, in fact,
16 asked ICI to get current studies that were not poorly
17 done?
18         MS. REISMAN:  Objection to form.
19     A   You know, I don't recall one way or the
20 other.
21     Q   (By Mr. Kelly) The next sentence says then:
22 "I have recently received a letter from him,
23 enclosed" -- and here you're referencing Dr. Fletcher,
24 correct?
25     A   Yes.

Page 56

1      Q   -- "in which he states that he has reviewed
2  this area with Allen Calderbank and Arthur Waitt, and
3  they do not believe it warranted to repeat any of this
4  work."
5          Did I say that correctly?
6      A   You did.
7      Q   And to repeat any of this work was asking
8  them to repeat the animal studies to bring them up to
9  date and to make sure they were not poorly done,
10 right?
11         MS. REISMAN:  Objection to form.
12     A   Again, I don't remember the meeting.
13     Q   (By Mr. Kelly) And you are unable to
14 ascertain -- actually, I'll withdraw that.
15         You then write as follows:  "I agree with
16 this" -- and this -- that phrase, "I agree with this"
17 references not redoing the studies, correct?
18         MS. REISMAN:  Objection to form.
19     A   I believe so.
20     Q   (By Mr. Kelly) Okay.  "I agree with this only
21 if we can do the proposed epidemiology study.  If not,
22 our only recourse will be to have good animal studies
23 in this area."
24         Did I read that correctly?
25     A   Yes, you did.

Page 57

1      Q   What is the proposed epidemiology study to
2  which you reference in the March 29, 1976
3  correspondence to Ospenson?
4      A   The -- it would have been the study that was
5  ultimately conducted in Malaysia by Dr. Howard and
6  Dr. Sabapathy.
7      Q   And so were you for Chevron proposing an
8  epidemiology study in Malaysia rather than a study in
9  the United States to substitute for the poorly done
10 animal studies referred to here?
11         MS. REISMAN:  Objection to form.
12     A   There -- there were -- I mean, basically,
13 yes.
14     Q   (By Mr. Kelly) Okay.  Okay.
15         I'm going to next my exhibit, sir, which is
16 Exhibit 50.
17     A   Thank you.
18         (Exhibit 50 has been marked and now
19         identified for the record.)
20     Q   (By Mr. Kelly) This Exhibit 50 at the top
21 says September of 1976, and on the second page, it is
22 headed:  "Minutes of Chevron/CTL Liaison Meeting 8-9
23 September 1976."  Correct?
24     A   That's what it -- what it says.
25     Q   And earlier, I reference this as -- I don't

15  (Pages 54 to 57)

Richard Cavalli
August 23, 2022

CONFIDENTIAL

Page 58

1  think I was clear enough.
2      Was it correct that there were twice yearly
3  meetings, once in the US in California and once in
4  London with the ICI people?
5      MS. REISMAN:  Objection to form.
6      A   Minor point, the meetings were held in
7  Manchester.
8      Q   (By Mr. Kelly) Once a year in Manchester,
9  once a year in California?
10      MS. REISMAN:  Objection to form.
11      Q   (By Mr. Kelly) Is that right?
12      A   Yes.
13      Q   And beginning in 1973?  Or had they already
14  begun before you were tasked with your paraquat
15  responsibilities?
16      A   My recollection is that those meetings were
17  held before I got involved.
18      Q   And for how long did they continue?  Did
19  they continue all the way until 1986 when Chevron
20  withdrew from the business?
21      MS. REISMAN:  Objection to form.
22      A   I believe they did.
23      Q   (By Mr. Kelly) Okay.  I just have one small
24  piece of this that involves you that I wanted to speak
25  about, and so if you will turn to the one, two,

Page 59

1  third page of text.  In the lower right-hand corner,
2  the number is 1160.
3      A   Okay.
4      Q   And at the very bottom, it says:
5  "Litigation USA."
6      Do you see that?
7      A   I do.
8      Q   It says: "The four cases involving
9  litigation against paraquat were summarized by
10  Dr. Cavalli."  Stop there.
11      Was it a regular part of these meetings from
12  '73 forward for you to report on the status of
13  litigation between Chevron and American litigants at
14  the joint meetings?
15      MS. REISMAN:  Objection to form.
16      A   I don't know if it was regular, but I think
17  it was among the things we talked about.
18      Q   (By Mr. Kelly) Did the ICI scientists and
19  professionals assist in the defense of the litigation
20  against Chevron?
21      MS. REISMAN:  Objection to form.
22      A   Not to my knowledge.
23      Q   (By Mr. Kelly) Continuing with that
24  paragraph, it says: "Two of these involved
25  hematological disorders and two generalized organ

Page 60

1  damage.  Chevron believe that more work should be
2  carried out on the effects of chronic exposure to
3  paraquat to help in the defense of these actions.
4  Two approaches were seen to be possible - experimental
5  and epidemiological."
6      Now, this was the report you gave, right?
7      MS. REISMAN:  Objection to form.
8      A   No.  Again, I don't specifically recall the
9  document or the meeting, but that's what's written on
10  the page.
11      Q   (By Mr. Kelly) Okay.  In the September of
12  1976 which is ten years plus or minus since Chevron had
13  been selling paraquat, did you and your group have in
14  mind experimental or epidemiological work to assist in
15  the defense of litigation?
16      MS. REISMAN:  Objection to form.
17      A   One more time, please.
18      Q   (By Mr. Kelly) Sure.
19      Did you and your group in 1976 ten years
20  after you had started -- or not you -- but Chevron had
21  started selling paraquat in the US have in mind what
22  kind of experimental or epidemiological reach would be
23  necessary to assist in the defense of litigation
24  alleging injury from paraquat exposure?
25      MS. REISMAN:  Objection to form.

Page 61

1      A   Specifically to defend litigation?
2      Q   (By Mr. Kelly) Yes.
3      A   I don't recall.
4      Q   Okay.  The -- your presentation here is
5  reported as you saying:  "Chevron believe that more
6  work should be carried out on the effects of chronic
7  exposure to paraquat to help in the defense of these
8  actions."
9      Did I read that correctly?
10      MS. REISMAN:  Objection to form.
11      A   You did read it correctly.
12      Q   (By Mr. Kelly) And did Chevron ultimately
13  undertake work on the effects of chronic exposure to
14  paraquat to help in the defense of litigation against
15  it?
16      MS. REISMAN:  Objection to form.
17      A   To -- you know, I don't -- I don't recall
18  one way or the other whether we did work to defend
19  litigation as opposed to doing work to further
20  understand the toxicity of paraquat and its use.
21      Q   (By Mr. Kelly) This particular little piece
22  of the report says: "There are four cases involving
23  hematological disorders."
24      Do you understand what hematological
25  disorders are?

16  (Pages 58 to 61)

Richard Cavalli
August 23, 2022

CONFIDENTIAL

Page 62

1    A   I do.
2    Q   This would be some blood-related injury,
3   disease, or ailment; is that right?
4    A   Yes.
5    Q   And/or some organ damage of some kind.  We
6   don't know which organ, correct?
7    A   Doesn't say that here.
8    Q   Which organ?
9    A   No, it doesn't.
10    Q   Okay.  Focusing just on that, do you have a
11   memory of Chevron undertaking work that had as its
12   focus hematological disorders or organ damage where it
13   studied the effect of chronic exposure to help defend
14   those lawsuits?
15        MS. REISMAN:  Objection to form.  Asked and
16   answered.
17    A   Again, the work would have been done for the
18   overall assessment of paraquat and its risks but as
19   opposed to being done for litigation purposes.
20    Q   (By Mr. Kelly) Was that done?
21        MS. REISMAN:  Objection to form.
22    A   I lost the paragraph.  Oh, there it is.
23        MS. REISMAN:  Objection to form.
24        Do you know what he's asking?
25        MR. KELLY:  No.  You don't have to ask him.

Page 63

1   He can tell me.  It's not your job, Counsel.  This is
2   trial -- this is trial testimony.  Stop pretending
3   it's not.  Please.
4        MS. REISMAN:  Mr. Kelly, please.  The
5   witness looks confused to you and me.
6        MR. KELLY:  The witness does not look
7   confused.  The witness looks no more confused than
8   he's been for two days which is not confused.
9        MS. REISMAN:  Well, the record will -- is
10   what it is.  Why don't you continue with your
11   questioning.
12        MR. KELLY:  Goodness gracious.
13    Q   (By Mr. Kelly) Did your group at any time do
14   studies or analysis on the effect of paraquat exposure
15   in causing hematological or organ disorders?
16    A   Those end points would have been -- would
17   have been part of any subchronic or chronic study.
18        MR. KELLY:  Okay.  I have just a couple more
19   things.  Then I'm going to pass this.  Let me --
20   apparently, I had two of these.  So giving one to
21   counsel and one to the witness.
22        This is Exhibit 43.  Oh, I do have one more.
23   Here you go, Counsel.
24        (Exhibit 43 has been marked and now
25        identified for the record.

Page 64

1    Q   (By Mr. Kelly) And this -- I will tell you,
2   it's not on here, Mr. Cavalli, but the computer says
3   this is from December 12 of 1978, if it makes any
4   difference, the way these documents are produced.
5        And this is simply headed:  "Paraquat Worker
6   Safety."  If we go to the end of it, is this your name
7   with your initials?
8    A   Yes.
9    Q   All right.  And can we, therefore, be
10   assured that this is something that you authored,
11   read, and then initialed as accurate?
12    A   It would have been.
13    Q   If you would just go to the page in the
14   lower, the third -- the second page, I'm sorry.  3320.
15        MS. REISMAN:  I don't have a 3320.
16        MR. KELLY:  2320.  I'm sorry.  I need to get
17   my lenses refracted.
18    Q   (By Mr. Kelly) The last paragraph on
19   page 32320.
20    A   Oh, okay.  Looking at the wrong number.
21    Q   Oh, yeah.  I'm sorry.  I see there's another
22   one at the bottom.
23        The paragraph begins:  "Due to paraquat's
24   extremely low vapor pressure..."  Do you see that?
25    A   Yes.

Page 65

1    Q   Okay.  I'm focused on the sentence that
2   begins:  "A requirement to use a full-face
3   respirator..."
4        Are you there?
5    A   I am.
6    Q   Okay.  Let me read this, please.
7        "A requirement to use a full-face respirator
8   will only lessen the effectiveness of these directions
9   with regard to chemicals for which they should be
10   worn."
11        Do you have in mind what that refers to,
12   sir?
13    A   You know, I don't remember the meeting.  I
14   don't remember what this -- as I sit here, what this
15   inspired that.
16    Q   Okay.
17    A   I just know what it says.
18    Q   All right.  Well, in 1978, sir, did you
19   oppose the utilization of a full-face respirator
20   because it would lessen the effectiveness of the use
21   of full-face respirators for other chemicals for which
22   they should be worn?
23        MS. REISMAN:  Objection the form.  Objection
24   to form.
25    A   Yeah.  I can't remember one way or another

17  (Pages 62 to 65)

Richard Cavalli
August 23, 2022

CONFIDENTIAL

Page 66

1  whether that was my view or a view I carried for
2  others.
3     Q   (By Mr. Kelly) All right.  Did you ever carry
4  the view for others or for yourself that workers
5  utilizing paraquat sold by Chevron should be wearing
6  full-face respirators?
7     MS. REISMAN:  Objection to form.
8     A   I don't recall one way or the other.
9     Q   (By Mr. Kelly) Continuing in that paragraph,
10  sir.  You go on to say -- in this document you wrote
11  and initialed -- "Likewise, there is no reason to
12  protect the entire body with waterproof gear since
13  there is no evidence which indicates that the
14  incidental exposure to skin from dilute paraquat is
15  detrimental."
16     Did I read that correctly?
17     A   Yes, you did.
18     Q   Was that the opinion that you held or
19  carried or both in December of 1978?
20     MS. REISMAN:  Object to form.
21     A   Again, I -- I don't have a specific
22  recollection of this.  It just -- long ago.
23     Q   (By Mr. Kelly) Okay.  Sir, at any time
24  between 1973 and 1986, did you, the, sig-- signature
25  of this document, R.D. Cavalli, ever hold the opinion

Page 67

1  that there is no reason to protect the entire body with
2  waterproof gear since there is no evidence which
3  indicates that the incidental exposure to skin from
4  dilute paraquat is detrimental?
5     MS. REISMAN:  Objection to form.  Asked and
6  answered.
7     A   You know, again, I just don't remember one
8  way or the other.
9     Q   (By Mr. Kelly) Sir, was there a period of
10  time in 1978 where you had it as part of your job
11  responsibilities to articulate what the company's
12  position was with reference to wearing either full-face
13  respirators or protecting the entire body with
14  waterproof gear?
15     MS. REISMAN:  Objection to form.
16     A   You know, I just can't say.
17     Q   (By Mr. Kelly) Was there in 1978 any person
18  other than yourself who was a spokesperson for the
19  company on what the appropriate use was of either
20  full-face respirators or waterproof gear to protect
21  from paraquat exposure?
22     MS. REISMAN:  Objection to form.
23     A   There was an industrial hygiene group
24  that -- whose business it was to recommend protective
25  equipment or approve protective equipment.

Page 68

1     Q   (By Mr. Kelly) And was it part of your job to
2  respond on behalf of Chevron to the State of California
3  Worker Health and Safety Unit regarding what was
4  appropriate protective gear in 1978?
5     MS. REISMAN:  Objection to form.
6     A   I -- I may have done so.  I just don't
7  recall.
8     Q   (By Mr. Kelly) And would that have been a
9  task that would have been within the job description of
10  the position you held at that time?
11     MS. REISMAN:  Objection to form.
12     A   Yes, it would have been.
13     Q   (By Mr. Kelly) I have one last thing, sir,
14  and then we're going to take a break and Mr. Kennedy is
15  going to conclude our work for the day.
16     MR. KELLY:  I'm going to mark Exhibit 45, if
17  I can.
18     (Exhibit 45 has been marked and now
19     identified for the record.)
20     Q   (By Mr. Kelly) Yesterday in the questioning,
21  there were questions for you about an article in
22  ScienceDirect linking -- proposing that there was a
23  link between Parkinson's and exposure to paraquat.
24     Do you remember that?
25     MS. REISMAN:  Give me one second.  Go ahead.

Page 69

1     Q   (By Mr. Kelly) Do you remember that?
2     A   Yes, I do.
3     Q   Okay.  And -- and I think you talked about a
4  study by somebody named Barbeau.  Do you remember
5  talk- -- talking about that?
6     A   Yes, I do.
7     Q   So I've handed you Exhibit 45, and this is a
8  piece of correspondence from J.N. Ospenson to J.N.
9  Sullivan where you are copied here.
10     Do you see that?
11     A   I do.
12     Q   And as you look at this and you go to -- go
13  two pages in, if you will.  The Bates number in the
14  corner is 3004.
15     A   Yes.
16     Q   And -- in the upper right-hand portion, I
17  don't know what you call these.  I do recall when I
18  started practice we had these where you stamped
19  everybody's name on something and you circulated and
20  you read it.
21     Do you see that box of folks?
22     A   Yes, I do.
23     Q   And your name is on there?
24     MS. REISMAN:  Objection to form.
25     A   Yeah.  That's our -- our department stamp,

18  (Pages 66 to 69)

Richard Cavalli
August 23, 2022

CONFIDENTIAL

Page 70

1  so.
2      Q   (By Mr. Kelly) Great.  And that's what -- my
3  next question.  Are these the folks in your department?
4          MS. REISMAN:  Objection to form.
5      A   Yes.
6      Q   (By Mr. Kelly) Okay.  Do you know who R. Gwin
7  Follis is?
8      A   He --
9      Q   Was I think is the correct way to say it.
10     A   He was chairman of the board of Chevron for
11  many years.
12     Q   And in 1985, who was Mr. Keller?
13     A   George Keller was the chairman of the board
14  at that time.
15     Q   And Mr. Follis, after his retirement, did he
16  remain in contact with the executives there at
17  Chevron?
18         MS. REISMAN:  Objection to form.
19  Foundation.
20     A   I have no idea.
21     Q   (By Mr. Kelly) On -- on this page 3004,
22  Mr. Follis's letter to Mr. Keller talks about an
23  article about paraquat.  And the second paragraph says:
24  "Since we don't want to take any chance of facing an
25  asbestos situation down the road, I am sure your people

Page 71

1  are following this aspect of the matter most closely."
2          Do you actually remember seeing this letter,
3  sir?
4      A   I do not.
5      Q   Okay.  Do you remember being consulted with
6  respect to the response to Mr. Follis?
7      A   I don't.
8      Q   Do you remember any discussion about this
9  correspondence and this article and the question of a
10  long period of latency after exposure to paraquat
11  resulting in a "asbestos"-like problem?
12         MS. REISMAN:  Objection to form.
13     A   No.  I have no recollection of having seen
14  this at the time.
15     Q   (By Mr. Kelly) And the -- back to the front
16  page for a moment, the transmittal from Ospenson to
17  Sullivan.
18         Would a response regarding the toxicological
19  effects of asbestos exposure in 1985 been the kind of
20  correspondence that you necessarily would have
21  received copies of in your position?
22         MS. REISMAN:  Objection to form.
23     A   I don't recall any discussion of asbestos.
24     Q   (By Mr. Kelly) This cover letter says:
25  "Files with attachment."  And if we go to page 006, one

Page 72

1  of the attachments is the article you discussed
2  yesterday; is that correct?
3      A   What was the number -- page number?
4      Q   Yes, sir.
5      A   6?
6      Q   Yeah.  006 in the lower right-hand corner.
7      A   Yes.
8      Q   This is the article you were discussing
9  yesterday with counsel, right?
10         MS. REISMAN:  Objection to form.
11     A   I believe it is.
12     Q   (By Mr. Kelly) Does this refresh your memory
13  that this is how you saw this article, you saw it when
14  it was forwarded to the company by the former chairman?
15         MS. REISMAN:  Objection to form.
16     A   No.  I saw this article that other people
17  sent to me.  I -- I just -- I have no memory of
18  letters between chairman and vice chairmans and all
19  that.
20     Q   (By Mr. Kelly) And when you say I have a
21  memory of it from other people sending it to me, are
22  you referring to people within the company?
23     A   You know, I can't say one way or the other.
24     Q   Okay.  Okay.
25         MR. KELLY:  Mr. Cavalli, thank you for your

Page 73

1  courtesy.  I don't have additional questions at this
2  time.  And I think we'll take a break and let
3  Mr. Kennedy change chairs here.
4          VIDEOGRAPHER:  Okay.  We're going off the
5  record at 10:28 a.m.
6          (A break was taken.)
7          VIDEOGRAPHER:  Stand by.  We're back on the
8  record at 10:33 a.m.
9          [EXAMINATION]
10         QUESTIONS BY MR. KENNEDY:
11     Q   Mr. Cavalli, my name's Eric Kennedy, and I
12  represent the plaintiffs in various lawsuits brought
13  against Chevron.  All right?
14     A   All right.
15     Q   And I want to focus my questioning today on
16  your testimony given in response to the questions
17  asked to you by the Chevron attorney.  All right?
18     A   All right.
19     Q   Before I do that, though, so the jury has an
20  understanding of -- of just how toxic paraquat is,
21  just how dangerous it is, would I be correct in saying
22  that if an applicator were to get as little as an
23  ounce of paraquat on their skin and not wash it off
24  for 24 hours, that could cause their death, correct?
25         MS. REISMAN:  Objection to form.

19  (Pages 70 to 73)

Richard Cavalli
August 23, 2022

CONFIDENTIAL

Page 74

1   A   That would depend on the circumstances.
2   Q   (By Mr. Kennedy) Sir, you remember -- and I
3   know it's a long time ago -- giving testimony all the
4   way back in -- in 1982 directly addressing the toxicity
5   of -- of paraquat.
6       Do you recall that back in 1982?
7   A   Do you have the name of the --
8   Q   I'm going to -- let me bring that up.
9   MR. KENNEDY:  If you can bring up
10  Mr. Cavalli's testimony from 4/29/1982, please.
11  Q   (By Mr. Kennedy) This was the case of
12  Ferebee.  Do you recall that, sir?
13  A   Yes.  Thank you.
14  MS. REISMAN:  Mr. Kennedy, do you have hard
15  copies of this?
16  MR. KENNEDY:  Pardon me?
17  MS. REISMAN:  Do you have hard copies of
18  your exhibits?
19  MR. KENNEDY:  I do not.
20  MS. REISMAN:  Can we -- does anybody have
21  hard copies?
22  MR. KENNEDY:  This is transcript.  This is
23  not --
24  Q   (By Mr. Kennedy) If you can go to page 1545,
25  please.  And if you --

Page 75

1   MS. REISMAN:  Let me just have a standing
2   objection to the use of this testimony without a hard
3   copy or a full transcript and having -- directing this
4   witness to one single response.
5       With that objection, please proceed.
6   Q   (By Mr. Kennedy) If you go to line 17, this
7   was sworn testimony in the Ferebee case, was it not?
8   A   If you say so.
9   Q   Question asked you --
10  MS. REISMAN:  Do you know whether it was
11  sworn testimony?
12  THE WITNESS:  Well, looks like it.
13  MS. REISMAN:  Okay.
14  Q   (By Mr. Kennedy) "QUESTION:  Doctor, can you
15  answer my question once again, or can you answer it
16  once?
17      "If you put an ounce of paraquat on your
18  skin, it will kill you, won't it, if you leave it on,
19  if you don't wash it off?"
20      Your answer:  "If you leave it on and if the
21  skin breaks down, I would guess that might be a
22  sufficient amount."
23      Do you recall that testimony under oath?
24  A   I don't specifically recall it, but I see it
25  on the page.

Page 76

1   Q   This was 1982 when you were still working at
2   Chevron, true?
3   A   Uh-huh.  Yes.
4   Q   Before you gave testimony yesterday in
5   response to the questioning of the Chevron attorney,
6   can you tell me about what meetings to prepare you for
7   your testimony you had with the Chevron attorneys?
8   MS. REISMAN:  Objection to form.
9   A   In this -- in this matter?
10  Q   (By Mr. Kennedy) Yes, sir.
11  A   Okay.
12  MS. REISMAN:  What are you asking?
13  MR. KENNEDY:  Let him answer.
14  MS. REISMAN:  Are you asking for the number
15  of times?  I'm not going to allow him to testify with
16  respect to the content of those minutes.
17  Q   (By Mr. Kennedy) Sir, if you can please
18  answer my question.
19  MS. REISMAN:  Could you answer it without
20  revealing any of the content of your meetings and
21  conversations with counsel.
22  THE WITNESS:  Okay.
23      Could you repeat your question?
24  Q   (By Mr. Kennedy) Can you tell me about the
25  preparation that you had by the attorneys for Chevron

Page 77

1   prior to your testimony here today?
2   MS. REISMAN:  And again, you can answer
3   other than with respect to the content of the meetings
4   that you have had with counsel.
5   MR. KENNEDY:  Do we have a Special Master
6   available?
7   MR. FLOWERS:  We can try.
8   MR. KENNEDY:  Check it out.
9   Q   (By Mr. Kennedy) Please answer my question,
10  sir.
11  MS. REISMAN:  You can -- you can answer
12  without revealing the content of the conversations.
13  MR. KENNEDY:  That's the third time.  Once
14  is enough.  No?
15  MS. REISMAN:  Well, I just -- I'm directing
16  him not to answer with the respect to the content of
17  conversation.
18  MR. KENNEDY:  You've don't it three times.
19  MS. REISMAN:  You've asked the question
20  three times in an unclear way.
21  Q   (By Mr. Kennedy) Go ahead, sir.
22  A   I did meet with attorneys representing
23  Chevron on several occasions.
24  Q   How many occasions?
25  A   I don't recall.

20  (Pages 74 to 77)

Richard Cavalli
August 23, 2022

CONFIDENTIAL

Page 78

1    Q    More than once?
2    A    Several implies more than once, yes.
3    Q    Where did those meetings take place?
4    A    They took place at my residence.
5    Q    When was the last time you had a meeting at
6    your residence?
7    A    Last week, I believe, was.
8    Q    And prior to last week, did you have a
9    meeting at your residence with the attorneys from
10   Chevron?
11   A    Prior to that, yes.
12   Q    And more than one occasion?
13   A    On more than one occasion.
14   Q    On more than two occasions prior to last
15   week?
16   A    More than two occasions.
17   Q    Would you say that you met with the
18   attorneys from Chevron more or less than
19   five occasions?
20   A    I couldn't say.
21   Q    At each of those meetings, how long did
22   those meetings last at your home?
23        MS. REISMAN:  Objection to form.
24   A    They varied from couple of hours to four or
25   five hours.

Page 79

1    Q    (By Mr. Kennedy) And were you shown any
2    medical literature, published articles, in any of these
3    meetings?
4        MS. REISMAN:  I'm going to object to you
5    asking him what he was shown until you establish that
6    those documents refreshed his recollection.
7        You can answer to the extent any of the
8    documents refreshed your recollection.
9    A    I -- I don't remember specifically.
10   Q    (By Mr. Kennedy) Were you shown any Chevron
11   documents during those -- those meetings?
12       MS. REISMAN:  Same objection. And object to
13   the extent that those documents didn't refresh your
14   recollection.  If any of the documents refreshed your
15   recollection, please do testify.
16   A    None of the documents that I looked at
17   refreshed my memory.
18   Q    (By Mr. Kennedy) That wasn't my question.  My
19   question was, did you review any documents provided you
20   by the lawyers from Chevron?
21       MS. REISMAN:  You can answer yes or no.
22   A    Yes.
23   Q    (By Mr. Kennedy) You're being paid for your
24   time to testify and the time for your preparation by
25   Chevron?

Page 80

1        MS. REISMAN:  Objection to form.
2    A    I am being paid for my time.
3    Q    (By Mr. Kennedy) And how much are you being
4    paid, sir?
5    A    Being paid $500 an hour.
6    Q    Today how many hours have you billed Chevron
7    for your time to testify?
8        MS. REISMAN:  Objection to form.
9    A    I don't have that number in mind.
10   Q    (By Mr. Kennedy) And last evening after the
11   questioning by Mr. Kelly and before the commencement of
12   his questioning today, did you meet with the Chevron
13   lawyers to discuss this case?
14       MS. REISMAN:  Objection to form.
15   A    I did.
16   Q    (By Mr. Kennedy) And did you meet again
17   between Mr. Kelly's questioning last night and the
18   beginning of his questioning today?  Did you meet this
19   morning in talking to Chevron lawyers about this case?
20       MS. REISMAN:  Objection to form.
21   A    Yes.
22   Q    (By Mr. Kennedy) Let's talk about some of the
23   testimony of -- let's talk about some of the testimony
24   that you gave in response to the -- to the Chevron
25   questioning.

Page 81

1        You testified, sir, that -- that the
2    scientific studies that you have reviewed led you to
3    believe that paraquat does not get into the brains of
4    paraquat applicators.
5        Do you remember stating that?
6    A    I probably did, yeah.
7    Q    And that's your -- your belief and was your
8    belief when you were at Chevron in studying paraquat?
9    A    Yes.  That was my belief at the time.
10   Q    And because it was your belief that paraquat
11   did not get into the brains of paraquat applicators,
12   you concluded that paraquat was a safe for
13   applicators.
14       Is that what you believed?
15       MS. REISMAN:  Objection to form.
16   A    I believe that paraquat was safe for use if
17   the label precautions were followed.
18   Q    (By Mr. Kennedy) And, sir, you told us
19   yesterday that you believe that paraquat did not get
20   into the brains of applicators, number one, because of
21   the animal studies that you reviewed, correct?
22   A    That -- that's correct.
23   Q    Back at the time that you were -- were at
24   Chevron and you were studying this topic, you looked
25   at the animal studies that had been done by Chevron

21  (Pages 78 to 81)

Richard Cavalli
August 23, 2022

CONFIDENTIAL

Page 82

1  and -- and the IBT laboratory in ICI, correct?
2       A   Yes.
3       Q   And based upon those animal studies you came
4  to the belief that paraquat did not get into the
5  brains of applicators, correct?
6          MS. REISMAN:  Objection to form.
7       A   That paraquat appeared to have no effect on
8  the central nervous system.
9       Q   (By Mr. Kennedy) Well, we're talking about
10 paraquat getting into the brain.  That's what we're
11 focused on.  And yesterday you testified that you
12 believe paraquat did not get into the brains of
13 applicators, correct?
14      A   I do.  I do remember, and I do believe that.
15      Q   And the second thing beside the animal
16 studies that you -- you were relying upon were the
17 autopsies, correct?
18         MS. REISMAN:  Objection to form.
19      Q   (By Mr. Kennedy) You reviewed the autopsies
20 while you were at Chevron, did you not, sir?  Autopsies
21 of folks that had been poisoned by paraquat and died?
22      A   Okay.  I didn't catch the jump from animals
23 to people.  Sorry.
24         Yes.  I did review those.
25      Q   And the third thing that you based this

Page 83

1  opinion on that paraquat was not getting into the
2  brains of applicators were the human applicator
3  studies which you talked about yesterday and today,
4  correct?
5          MS. REISMAN:  Objection to form.
6       A   I missed something.
7       Q   (By Mr. Kennedy) You also looked at the human
8  studies, the applicator human studies, particularly in
9  Malaysia, correct?
10      A   Yes.
11      Q   And that was the third body of evidence that
12 you told us that you looked at to conclude that
13 paraquat does not get into the brains of applicators,
14 correct?
15      A   Yes.
16      Q   All right.  What I want to do with you is
17 look at those three bodies of studies, the animals,
18 brain tissue, and the human studies, and try to
19 understand how those led you to conclude that paraquat
20 does not get into the brains of applicators.
21         Can we do that?
22      A   Yes.
23      Q   Okay.  Let's start with the animal studies.
24 Rat studies were done, correct?
25      A   Yes.

Page 84

1       Q   And when I say "rat studies," I'm talking
2  about either Chevron, or ICI, or the independent
3  laboratory exposing or intoxicating rats with
4  paraquat, correct?
5          MS. REISMAN:  Objection to form.
6       A   Exposing them to it, yes.
7       Q   (By Mr. Kennedy) Okay.  So they're either
8  intraperitoneal exposure; there's dermal exposure;
9  there's inhalation exposure; there's feeding studies.
10 Correct?
11      A   Yes.
12      Q   And the rat studies that were done, when you
13 looked, you found paraquat in the brain, correct?
14         MS. REISMAN:  Objection to form.
15      A   You know, I don't specifically recall.
16      Q   (By Mr. Kennedy) When you did mice studies,
17 you found paraquat in the brain, correct?
18         MS. REISMAN:  Objection to form.
19      A   Again, I don't recall one way or the other.
20      Q   (By Mr. Kennedy) When you studied hens in
21 paraquat, you found paraquat in the brain, correct?
22         MS. REISMAN:  Objection to form.
23      A   Same thing.  I don't remember one way or the
24 other.
25      Q   (By Mr. Kennedy) When you studied monkeys,

Page 85

1  you found paraquat in the brain, true?
2          MS. REISMAN:  Objection.  Form.
3       A   I don't recall one way or the other.
4       Q   (By Mr. Kennedy) When you studied goats, you
5  found paraquat in the brain, did you not?
6          MS. REISMAN:  Objection to form.
7       A   Same answer.  I don't have specific
8  recollection.
9       Q   (By Mr. Kennedy) When you studied pigs, you
10 found paraquat in the brain, did you not?
11         MS. REISMAN:  Objection to form.
12      A   I don't recall.
13      Q   (By Mr. Kennedy) When you studied dogs, you
14 found paraquat in the brain, did you not, sir?
15         MS. REISMAN:  Objection to form.
16      A   You know, I don't -- I don't have a
17 recollection of that either way.  If you have
18 documents...
19      Q   (By Mr. Kennedy) I'm going to show you
20 Exhibit 135, if we could.  Sir, this the testimony of
21 Dr. Philip Botham.  Dr. Botham gave testimony in this
22 case as the representative of ICI.  All right?  Have
23 you ever reviewed this?
24      A   I don't recall reviewing this.
25      Q   And -- and again, ICI, that's the company

22  (Pages 82 to 85)

Richard Cavalli
August 23, 2022

CONFIDENTIAL

Page 86

1  that was manufacturing paraquat, correct?
2      A   Yes.
3          MS. REISMAN:  During the time that --
4      A   During -- during --
5      Q   (By Mr. Kennedy) During the time that you
6  folks were selling it from 1965 to '86, correct?
7      A   Yes.
8      Q   Okay.  And you understand Mr. Botham was
9  chosen by ICI to represent them and make statements of
10 their behalf in this case.  All right?
11         MS. REISMAN:  Objection.
12     Q   (By Mr. Kennedy) And assume that.  All right?
13         MS. REISMAN:  Object -- object to form and
14 foundation.
15     Q   (By Mr. Kennedy) All right.  Again, ICI was
16 the company that Chevron was working with to understand
17 the risks of paraquat, correct?
18         MS. REISMAN:  Objection to form.
19     A   Yes.
20     Q   (By Mr. Kennedy) And when they did a study,
21 they would share it with you, true?
22         MS. REISMAN:  Objection to form.
23 Foundation.
24     A   They shared with us.  I -- I have no idea
25 how complete that sharing was.

Page 87

1      Q   (By Mr. Kennedy) Go to page 239.  It's the
2  last page of -- of Dr. Botham from ICI, his testimony.
3      A   Where are the numbers?
4      Q   239 up in the top right.  The very last
5  page, sir.
6      A   Okay.  This page 239 of the report?
7      Q   Yes, sir.
8      A   Yes.
9      Q   Go to -- starting at line 3, Dr. Botham, who
10 gave testimony on behalf of ICI, he was asked:  "So
11 can I add pigs to that list I gave you before, rats,
12 mice, hens, monkeys, man, goats, pigs, all found after
13 either injection or feeding studies where they were
14 slaughtered to have accumulated residual paraquat in
15 the brain?"
16         "ANSWER:  Yes.  Very low levels of paraquat
17 found in the brain, yes."
18         "QUESTION:  And although I don't have the
19 study here, can dogs also be added to that list by
20 1976?"
21         "ANSWER:  I think they can, yes."
22         Did you have any memory that -- that
23 disagrees with the testimony here of -- of Dr. Botham
24 on behalf of ICI that every single one of these animal
25 studies, each of these types of animals, when they

Page 88

1  looked, they found paraquat in the brain?
2          MS. REISMAN:  Objection to form.
3  Foundation.
4      A   Again, if I could see the studies again, it
5  might refresh my memory, but I don't recall one way or
6  the other.
7      Q   (By Mr. Kennedy) Sir, can we agree that in
8  every animal study where they looked showed paraquat in
9  the brain?  Can we agree that that doesn't support the
10 conclusion that paraquat can never get into the brain
11 of an applicator, true?
12         MS. REISMAN:  Objection to form.
13 Foundation.
14     A   You know, it -- it -- it depends on the --
15 the circumstances under which these animals were
16 exposed, and I just don't have that in my mind.
17     Q   (By Mr. Kennedy) Well, you told us yesterday
18 that a lot of these studies were high-dose studies,
19 correct?
20         MS. REISMAN:  Objection.  Form.
21     Q   (By Mr. Kennedy) Is that correct?
22         MS. REISMAN:  Objection to form.
23     A   Oh.
24         MS. REISMAN:  Objection to form.
25     Q   (By Mr. Kennedy) Is that correct, sir?

Page 89

1      A   Could you repeat that?
2      Q   A lot of these studies were high-dose
3  studies, correct?
4          MS. REISMAN:  Objection to form.
5      A   These studies generally included at least
6  one high dose.
7      Q   (By Mr. Kennedy) And if high-dose paraquat
8  study leads to paraquat in the brain, that certainly
9  doesn't prove that a lesser dose will not get in the
10 brain, correct?
11         MS. REISMAN:  Objection to form.
12     A   I -- I don't follow you.
13     Q   (By Mr. Kennedy) Sir, the -- the type of dose
14 that -- that an applicator gets is -- is probably a
15 low-dose, long-term chronic, correct?
16         MS. REISMAN:  Objection to form.
17     A   I would agree with low dose.
18     Q   (By Mr. Kennedy) Okay.  And they can be
19 exposed over years, correct?
20         MS. REISMAN:  Objection to form.
21     A   Yeah.  Yes.  Possible.
22     Q   (By Mr. Kennedy) And if they're exposed over
23 years, that would fit the definition of a chronic long
24 term, correct?
25         MS. REISMAN:  Objection to form.

23  (Pages 86 to 89)

Richard Cavalli
August 23, 2022

CONFIDENTIAL

Page 90

1    A   It could, yes.
2    Q   (By Mr. Kennedy) And if you -- if you wanted
3 to know -- if you wanted to know whether or not
4 paraquat could get into the brain of an applicator, the
5 best study to do would be a low-dose, long-term chronic
6 study, correct?
7        MS. REISMAN:  Objection to form.  I assume
8 you're asking about his recollections from back then.
9 He's not identified as an expert today.
10    A   I mean, there were chronic studies on -- on
11 paraquat.
12    Q   (By Mr. Kennedy) Sir, my question is:  If you
13 want to try to understand through animal studies
14 whether paraquat is going to get into the brain of an
15 applicator, the best studies to do would be low-dose,
16 long-term chronic studies, true?
17        MS. REISMAN:  Objection to form and
18 foundation.
19    A   I think that's what was done.
20    Q   (By Mr. Kennedy) Sir, the fact of the matter
21 is neither Chevron nor ICI ever, ever did a long-term
22 chronic study to determine whether or not paraquat got
23 into the brain.  That's the truth, correct?
24        MS. REISMAN:  Objection to form.
25    A   We -- we had body of data that suggested

Page 91

1 that it didn't, and we didn't do such a study.
2    Q   (By Mr. Kennedy) Never.  You never did what
3 would be the best study to determine whether or not
4 paraquat would get into the brain of an applicator,
5 correct?
6        MS. REISMAN:  Objection to form.
7    A   You know, again, there were so many studies
8 on paraquat, exposure studies in the field that was
9 the evaluation of the health of the Malaysian
10 sprayers, and at the time I was of the opinion that
11 there was a very low risk to applicators in the
12 United States following the labeled precautions.
13    Q   (By Mr. Kennedy) Sir, we're -- we're going to
14 talk about the Malaysia study.  We're going one group
15 of studies at a time.  We're talking about the animal
16 studies right now.  And the purpose of doing animal
17 studies is try to determine what happens in human
18 beings, true?
19        MS. REISMAN:  Objection.  Form.
20    Q   (By Mr. Kennedy) That's the purpose?
21    A   Yes.
22    Q   Because you can't do an applicator study and
23 look into their brain to determine whether or not
24 there's paraquat in their brain, that wouldn't be a
25 good thing for applicators, correct to -- to look into

Page 92

1 their brains because that would mean you would have to
2 do an autopsy, correct?
3        MS. REISMAN:  Objection to form.
4    Q   (By Mr. Kennedy) Is that true, sir?
5    A   Yes.  That's correct.
6    Q   So with the animal studies -- with the
7 animal studies it would be true that Chevron never did
8 a long-term study to look to see whether or not
9 paraquat got into the brain, true?
10        MS. REISMAN:  Objection to form.
11    A   We did not, as I recall, any studies that --
12 in which the paraquat level in the brain was measured.
13 The chronic studies we did did look at behavioral
14 effects and any pathology in the brain.
15    Q   (By Mr. Kennedy) So the best study to
16 determine whether paraquat would actually get into the
17 brain was never done with respect to animals, true?
18        MS. REISMAN:  Objection to form.  Asked and
19 answered.
20    Q   (By Mr. Kennedy) Is that true, sir?
21        MS. REISMAN:  Objection to form.  Asked and
22 answered.
23    A   That study wasn't done.
24    Q   (By Mr. Kennedy) Sir, you also testified
25 with -- with respect to these animal studies that the

Page 93

1 primary target of paraquat seemed to be the lung.
2        Do you remember that?
3    A   Yes.
4    Q   And so we could be clear for the jury, just
5 because the lung was the primary target, that
6 certainly doesn't mean that the brain can't also be
7 damaged by paraquat, correct?
8        MS. REISMAN:  Objection to form.
9    A   No.  No, it doesn't exclude any other organ
10 from...
11    Q   (By Mr. Kennedy) If we look at alcohol, the
12 primary target of alcohol would be the brain, true?
13        MS. REISMAN:  Objection to form.
14 Foundation.
15    A   It certainly affects neuro function, yes.
16    Q   (By Mr. Kennedy) But that certainly doesn't
17 mean that the liver in the long term can't be damaged
18 by alcohol, true?
19        MS. REISMAN:  Objection to form.
20 Foundation.
21    A   Yeah.  As I said, the damage to the lung
22 does not preclude consideration of other organs.
23    Q   (By Mr. Kennedy) You needed to consider other
24 organs with respect to paraquat, like the brain; would
25 that be right?

24  (Pages 90 to 93)

Richard Cavalli
August 23, 2022

CONFIDENTIAL

Page 94

1      MS. REISMAN:  Objection.  Form.
2    **A    And I believe we did.**
3    Q    (By Mr. Kennedy) Stereology.  Was stereology
4  available in the 1970s and the 1980s?
5      MS. REISMAN:  Objection to form.
6    **A    What was the word?**
7    Q    (By Mr. Kennedy) Stereology.  Was that
8  available in -- in examining tissues of animal or human
9  beings?  Was stereology available in the 1970s or '80s?
10      MS. REISMAN:  Objection -- object to form.
11    **A    I'm not sure --**
12      MS. REISMAN:  Hold on.  Let me just -- I'm
13  sorry -- let me just get an objection.  Objection to
14  form.
15      Go ahead.
16    **A    I'm not sure I understand what you mean.**
17    Q    (By Mr. Kennedy) Was cell counting available?
18  Could you -- could you count the cells in tissue in the
19  1970s and '80s to evaluate in animal studies?  Could
20  you count cells?
21      MS. REISMAN:  Objection to form.
22    **A    You -- you could count red cells and white**
23  **cells and mass cells and any other kind of cell in the**
24  **blood.  I don't -- I don't know about counting**
25  **cells -- cells of the organ.**

Page 95

1      MS. REISMAN:  Mr. Kennedy, when you get to a
2  good stopping point, we've been going about --
3      MR. KENNEDY:  Fine's right now.
4      MS. REISMAN:  You want to stop now?
5      VIDEOGRAPHER:  We're going off the record at
6  11:01 a.m.
7      (A break was taken.)
8      VIDEOGRAPHER:  We're back on the record at
9  11:22 a.m.
10    Q    (By Mr. Kennedy) So, Mr. Cavalli, we are --
11  we had been talking about your belief that paraquat did
12  not get into the brain of applicators, and before we --
13  let me ask you this:
14      Was there anybody else at Chevron who shared
15  your opinion and your belief that paraquat could not
16  get into the brains of applicators?
17      MS. REISMAN:  Objection to form.
18  Foundation.
19    **A    Yes, there were.**
20    Q    (By Mr. Kennedy) And who was that?
21    **A    Dr. Ford, Dr. White.  I -- I'm sorry.**
22    Q    And did you communicate your -- your belief
23  that paraquat could not get into the brains of
24  applicators?  Did you communicate and share that
25  belief with -- with any of the people at Chevron that

Page 96

1  were involved with warnings and education of
2  applicators?
3      MS. REISMAN:  Objection to form.
4    **A    One more time, please.**
5    Q    (By Mr. Kennedy) Your belief that paraquat
6  could not get into the brains of applicators, did you
7  share that belief with anyone at Chevron that was
8  involved with communicating with applicators by way of
9  labels, warnings?
10      MS. REISMAN:  Objection to form.
11    **A    We shared the data that we had that was the**
12  **basis of my opinion that paraquat would not harm the**
13  **brain.**
14    Q    (By Mr. Kennedy) And that's not my question.
15  My question:  Did you share your belief that paraquat
16  could not get into the brain of an applicator?
17      Did you share that belief with any of the
18  folks at Chevron that had responsibility for creating
19  labels and warnings and communicating with workers?
20      MS. REISMAN:  Objection to form.  Asked and
21  answered.
22    **A    I don't have a recollection of specific**
23  **discussions about paraquat getting into the brain.**
24  **The discussions were on whether paraquat affected**
25  **various organs including the brain.**

Page 97

1    Q    (By Mr. Kennedy) We looked at animal studies
2  as to how you got to this conclusion that paraquat did
3  not get into the brain of applicators.  I want to ask
4  you about autopsies.  All right?
5    **A    Okay.**
6    Q    When someone would intentionally or
7  unintentionally drink paraquat and it would cause them
8  to die, autopsies were done on some of these folks,
9  right?
10    **A    Yes, they were.**
11    Q    And that information and sometimes brain
12  tissue would be sent to Chevron, true?
13    **A    Yes.**
14    Q    And you were aware of -- of those autopsies
15  and that brain tissue while you were at Chevron; would
16  that be accurate?
17      MS. REISMAN:  Objection to form.
18    **A    Yes.**
19    Q    (By Mr. Kennedy) And Chevron, when they would
20  receive tissue from the brain of a patient that died
21  from paraquat poisoning, Chevron at times would do its
22  own analysis of that tissue, true?
23    **A    At the request of the physician, yes.**
24    Q    And one of the things that the Chevron would
25  do would be to look to determine whether or not there

25  (Pages 94 to 97)

Richard Cavalli
August 23, 2022

CONFIDENTIAL

Page 98

1  was paraquat in the brains of these people that had
2  been poisoned with paraquat, true?
3      **A   Yes.**
4      Q   Now, Chevron and -- and ICI have sent us --
5  lawyers for -- for these applicators -- have sent us
6  26 reports.
7      MS. REISMAN:  I'm sorry.  You said the
8  lawyers of the applicators?
9      MR. KENNEDY:  Let me repeat my question.
10     Q   (By Mr. Kennedy) Chevron and ICI have sent us
11  reports, 26 reports, showing paraquat in the brains of
12  poison victims.
13     Can you explain to me how does that support
14  your conclusion that paraquat cannot get into the
15  brain of a human applicator?
16     MS. REISMAN:  Objection to form.
17     **A   All of those persons died from pulmonary**
18  **complications, pulmonary congestion, pulmonary**
19  **fibrosis.  They were all in a state of hypoxia.  The**
20  **gross findings in the brain were suggestive and**
21  **supportive of the kind of damage that occurs in a**
22  **hypoxic person or animal.**
23     **In all of the studies done at lower doses**
24  **where animals were not in extremis, people -- not**
25  **people.  I'm sorry.**

Page 99

1      **The animals that were not in extremis did**
2  **not show damage to the brain.**
3      Q   (By Mr. Kennedy) I'm asking you about the
4  presence of paraquat in the brain.  And, sir, the fact
5  of the matter is, as we just discussed, Chevron never
6  did a study with lower doses long term and looked to
7  see whether there was paraquat in the brain, correct?
8      MS. REISMAN:  Objection to form.
9      Q   (By Mr. Kennedy) Never did?
10     **A   No.**
11     Q   And, sir, let me -- if you are looking at
12  brain tissue and the amount of paraquat in the tissue
13  sample is greater than the amount of paraquat in the
14  blood, does that mean that the paraquat has broken
15  outside of the capillary and into the brain tissue?
16     MS. REISMAN:  Objection to form.
17     **A   In those terminal cases?**
18     Q   (By Mr. Kennedy) Yes.
19     **A   Yes.**
20     Q   Let's look to worker studies.  Again, it is
21  your belief that the worker studies -- and the one you
22  talked about was the Malaysian study -- it was your
23  belief that the Malaysian studies supported your
24  belief that paraquat did not get into the brains of
25  applicators, correct?

Page 100

1      **A   It supported that there were no neurological**
2  **effects.**
3      Q   Again, I'm focused on paraquat in the brains
4  of workers.  One of the things that you told us
5  supports your opinion and belief back in the '80s that
6  paraquat did not get into the brain of applicators was
7  these worker studies, true?
8      MS. REISMAN:  Objection to form.
9      **A   Yes.  It was supportive of that.**
10     Q   (By Mr. Kennedy) And the worker study you
11  talked about was the Malaysian study, right, by Howard?
12     **A   Yes.  Excuse me.  Yes.**
13     Q   And in that study, they found paraquat in
14  the urine of these workers, did they not?
15     MS. REISMAN:  Objection to form.
16     **A   In the paper by Howard and Sabapathy, I**
17  **don't recall.**
18     Q   (By Mr. Kennedy) Well, the Chester paper that
19  dealt with the same group of Malaysian workers
20  evaluated as to whether or not they had paraquat in
21  their urine, did it not?
22     MS. REISMAN:  Objection to form.
23     **A   Yes.**
24     Q   (By Mr. Kennedy) That's the same Malaysian
25  study we've been talking about, but this is by Chester

Page 101

1  who's looking to see whether or not they have paraquat
2  in their urine?
3      MS. REISMAN:  Objection to form.
4      Q   (By Mr. Kennedy) True?
5      MS. REISMAN:  Objection to form.
6      **A   Yes.  That was done.**
7      Q   (By Mr. Kennedy) And indeed, they found
8  paraquat in the urine of these applicators, did they
9  not?
10     MS. REISMAN:  Objection to form.
11     **A   Of some of them, at least.**
12     Q   (By Mr. Kennedy) Well, they found it in 9 out
13  of 19, do you remember that?
14     MS. REISMAN:  Objection to form.
15     Q   (By Mr. Kennedy) Sir, if a worker has
16  paraquat in their urine, that means they have paraquat
17  in their blood, true?
18     **A   True.**
19     Q   And blood circulates through the entire
20  body, does it not?
21     **A   It does.**
22     Q   And it circulates through the entire body
23  including the brain, true?
24     MS. REISMAN:  Objection to form.
25     **A   Yes.**

26  (Pages 98 to 101)

Richard Cavalli
August 23, 2022

CONFIDENTIAL

Page 102

1    Q   (By Mr. Kennedy) Now, you testified in this
2  Malaysian study by Dr. Howard that examinations were
3  done, and these workers with paraquat in their blood
4  circulating through their brains were -- were perfectly
5  fine, perfectly healthy on examination.
6        Do you recall that testimony?
7    A   Yes, sir.
8        MS. REISMAN:  Objection.
9        Mr. Cavalli, I know it's been a while since
10  we've been going this morning.  You just need to give
11  me a minute before you respond.
12    A   I'm sorry.
13        MS. REISMAN:  Give me a moment to object
14  when I need to.
15        Objection to form on that question.
16    Q   (By Mr. Kennedy) Oh.  Sir, do you have an
17  answer to my question?
18    A   Can you repeat it?
19    Q   Question:  You testified in the Malaysian
20  study by Dr. Howard that examinations were done and
21  these workers with paraquat in their blood circulating
22  through their brains were perfectly -- were perfectly
23  normal and healthy on examination?
24        MS. REISMAN:  Objection to form.
25    Q   (By Mr. Kennedy) Correct?  Remember that

Page 103

1  testimony?
2    A   Yes, I do.
3    Q   And I think you testified on that on
4  examination that there were neurological or central
5  nervous system findings.  Do you recall that?
6    A   I do.
7    Q   And what I want to ask you about is how you
8  arrived at this conclusion that there were no
9  neurologic findings and that they were perfectly
10  healthy on exam.  All right?
11        MR. KENNEDY:  If you can give us
12  Exhibit 111.
13        (Exhibit 111 has been marked and now
14        identified for the record.
15    A   Can I get a -- I'm supposed to look at it?
16    Q   (By Mr. Kennedy) Yes.
17        Now, Exhibit 111, this is a publication of
18  the study, the Malaysia study that we've been talking
19  about; is that right?
20    A   Yes, it is.
21    Q   It says it's by Dr. Howard.  You see that?
22    A   Yes.
23    Q   And the study title:  "A Study of the Health
24  of Malaysian Plantation Workers With Particular
25  Reference to Paraquat Spraymen."

Page 104

1    True?
2    A   That's what it says.
3    Q   It's a 1981 study, right?
4    A   Published in '81.
5    Q   Would have been done earlier than that?
6    A   It would have.
7    Q   Go to the next page, 36.
8        See in that right-hand column right above
9  "Exposure to Paraquat"?  Look right above that.  I
10  think it indicates that this involved 27 paraquat
11  spraymen.
12        Do you see that right-hand column?
13    A   Yes.
14    Q   Right above "Exposure to Paraquat,"
15  27 workers, true?
16    A   Yes.
17    Q   All right.  If you'll go to the next page,
18  37.  You see where it says "Clinical Examination"?
19  Could you take a look at that?
20        MR. KENNEDY:  Could you pull that up,
21  please, and --
22    A   Yes.
23        MR. KENNEDY:  -- highlight "Clinical
24  Examination."
25    A   Yes.  I see it.

Page 105

1    Q   (By Mr. Kennedy) It says "Clinical
2  Examination."  Again, I'm trying to understand how you
3  are drawing the conclusion there were no neurologic
4  findings on -- on examination.  All right?
5        The paper says:  "All workers were given a
6  full clinical examination, particular attention being
7  paid to the respiratory system and the skin."
8        Did I read that right?
9    A   You did.
10    Q   So they're paying closer attention to the
11  respiratory system in the skin, that seemed to be
12  their primary focus.
13        Would you agree?
14        MS. REISMAN:  Objection to form.
15    A   That's what the paper says.
16    Q   (By Mr. Kennedy) No mention of a neurologic
17  examination, true?
18        MS. REISMAN:  Objection to form.
19    A   No mention here, yes.
20    Q   (By Mr. Kennedy) And there's no mention
21  anywhere in this paper as to what examinations were
22  actually done.
23        Would that be right?
24        MS. REISMAN:  Objection to form.
25    A   Not in the paper.

27  (Pages 102 to 105)

Richard Cavalli
August 23, 2022

CONFIDENTIAL

Page 106

1    Q   (By Mr. Kennedy) And there's no mention
2    anywhere in this paper as to what their finding were on
3    examination.
4         Would that be true?
5         MS. REISMAN:  Objection to form.
6    A   I'd have to read it.
7    Q   (By Mr. Kennedy) And, sir, the physician
8    that -- that did -- did these examinations was -- was
9    the physician even a neurologist?  Do you know?
10        MS. REISMAN:  Objection to form.
11   Foundation.
12   A   I don't believe either one was, but I don't
13   remember.
14   Q   (By Mr. Kennedy) And were you provided
15   with -- with any kind of a data or documents at any
16   time that would tell you what examinations were
17   actually done and what the findings actually were?
18   A   They -- the discussions that we had leading
19   up to this study, the full clinical examination meant
20   the kind of evaluation of the function of the nervous
21   system that you would get by looking at an intact
22   person.  It's part of the clinical examination.
23   Q   Was that anywhere in the -- were you
24   provided with a protocol that told you specifically
25   and can you tell us here today what examinations were

Page 107

1    done and what the findings were?
2         MS. REISMAN:  Objection to form.
3    A   I don't recall the protocol as we sit here.
4    Q   (By Mr. Kennedy) And I think when you -- when
5    you testified in response to the -- to the questions
6    asked by Chevron's counsel and I think here today
7    you -- you testified that a standard clinical exam
8    was -- was done?
9    A   That -- correct.
10   Q   Well, you're not a medical doctor?
11   A   I am not.
12   Q   Have you ever performed what -- what you're
13   calling a standard clinical exam on any patients at
14   all?
15   A   No.
16   Q   In -- in your training in biology, zoology,
17   toxicology, did you take a course in what a standard
18   clinical examination is for a patient?
19   A   I did not.
20   Q   Were you ever trained as to what a standard
21   clinical examination includes?
22        MS. REISMAN:  Objection to form.
23   A   I think I did gain over the years a concept
24   of what constituted a physical exam.
25   Q   (By Mr. Kennedy) Okay.  And that wasn't based

Page 108

1    upon any education or any training or ever the
2    performance of such an examination, true?
3         MS. REISMAN:  Objection to form.
4    A   Except for the examinations I underwent
5    myself.
6    Q   (By Mr. Kennedy) All right.  You continued
7    and your testified also on -- on questioning from
8    Chevron's counsel that this Howard study did not show
9    any signs of -- of Parkinson's disease amongst these
10   patients.
11        Do you recall that testimony?
12   A   I do.
13   Q   Do you know the early signs of Parkinson's
14   disease?
15        MS. REISMAN:  Objection to form.
16   A   I know relatively little about Parkinson's
17   disease.
18   Q   (By Mr. Kennedy) Well, let me ask you.  These
19   examinations that were done, did -- did they look for
20   orthostatic changes in blood pressure?  Do you know?
21        MS. REISMAN:  Objection to form.
22   A   No, I don't.  I don't know that.
23   Q   (By Mr. Kennedy) Do you know that that's an
24   early sign of Parkinson's disease?
25        MS. REISMAN:  Objection to form.

Page 109

1    Foundation.
2    A   I do not.
3    Q   (By Mr. Kennedy) Did these examinations and
4    evaluations look into dream enactment, do you know?
5    A   Say that again.
6    Q   Dream enactment?
7         MS. REISMAN:  Objection.  Form.
8    Q   (By Mr. Kennedy) Did they look into that
9    during these valuation of these 27 Malaysian workers?
10        MS. REISMAN:  Objection to form.
11   A   I don't -- I don't understand the term.
12   Q   (By Mr. Kennedy) Then I would assume you
13   don't understand that that's an early sign of
14   Parkinson's disease also, correct?
15        MS. REISMAN:  Objection to form.
16   Foundation.
17   Q   (By Mr. Kennedy) Did they look for that?  Do
18   you know?
19        MS. REISMAN:  Same objection.
20   A   I -- I -- I can't say one way or another.
21   Q   (By Mr. Kennedy) The ability to -- to smell
22   an olfactory manifestation, did they look for that in
23   these evaluations of these Malaysian workers?  Did they
24   look for that?
25   A   Again, I would have to read the whole paper,

28  (Pages 106 to 109)

Richard Cavalli
August 23, 2022

CONFIDENTIAL

Page 110

1   but I don't recall anything like that.
2       Q   What about retropulsion and propulsion?  Was
3   that evaluated?
4           MS. REISMAN:  Objection to form.
5       A   I don't -- I don't recognize those terms.
6       Q   (By Mr. Kennedy) Those are early
7   manifestations of Parkinson's disease.  Did you
8   understand that?
9           MS. REISMAN:  Objection to form.
10  Foundation.
11      A   No.  But everything you've mentioned can be
12  caused by many things.  But no, I don't -- I don't
13  even know what you mean by those terms.
14      Q   (By Mr. Kennedy) What about cogwheel
15  rigidity?  Was that evaluated in this study of the
16  27 workers?
17      A   Again, I -- not familiar with the term.
18      Q   That's an early or a manifestation of
19  Parkinson's disease.  Did you understand that?
20          MS. REISMAN:  Objection to form.
21  Foundation.
22      A   No.  I -- I don't.
23      Q   (By Mr. Kennedy) Other than the statement in
24  the article that the exam focused on the lungs and the
25  skin, can you tell us anything about the specific exams

Page 111

1   done and the specific findings done in any one of these
2   27 workers?
3           MS. REISMAN:  Objection to form.
4       A   First of all, it doesn't say it focused.  It
5   just says particular attention was paid.  And again, a
6   clinical examination would include looking for
7   neurologic signs and symptoms.
8       Q   (By Mr. Kennedy) Where does it say that in
9   the paper?
10          MS. REISMAN:  Objection to form.
11      A   It's under the -- I mean, specifically it
12  doesn't, but it would be part of clinical examination.
13      Q   (By Mr. Kennedy) Such an examination that you
14  have never performed in your career, true?
15          MS. REISMAN:  Objection to form.
16  Argumentative.
17      Q   (By Mr. Kennedy) True?
18          MS. REISMAN:  Same objection.
19      A   I have never performed one.  I've seen them
20  performed on my children.  I have had the experience
21  of having physical examinations myself, and they all
22  included that.
23      Q   (By Mr. Kennedy) So the extent of your
24  experience is what exams you have undergone and what
25  your kids have undergone.

Page 112

1   Would that be the extent of your experience?
2           MS. REISMAN:  Objection to form.
3       A   You know, other than perhaps reading about
4   them, but I don't recall that.
5       Q   (By Mr. Kennedy) And, sir, the workers in
6   this -- in this -- in this study, this Howard study,
7   they were examined on a single occasion; is that true?
8           MS. REISMAN:  Objection.  Form.
9       A   I believe so.  But again, I would have to
10  read it.
11      Q   (By Mr. Kennedy) I think you testified to
12  that yesterday, a single examination?
13          MS. REISMAN:  Objection to form.
14      Q   (By Mr. Kennedy) Does that refresh your
15  recollection?
16      A   Yes.  I think it was a single exam.
17      Q   So Chevron ICI had no idea how these workers
18  were doing five years later, ten years later,
19  fifteen years later, true?
20          MS. REISMAN:  Objection.  Form.
21      A   Well, we -- they weren't followed up.
22      Q   (By Mr. Kennedy) And do you understand that
23  half of these workers were under 35 years of age when
24  they had this single, one occasion examination.
25          Do you understand that?

Page 113

1           MS. REISMAN:  Objection to form.
2       A   Yeah.  Again, I would have to look.
3       Q   (By Mr. Kennedy) Well, assuming that's
4   true -- and I read the article again this morning -- if
5   half of them were under 35, Chevron had no idea how any
6   of these workers were doing at the age of -- of 40, 45,
7   50, true?
8           MS. REISMAN:  Objection to form.
9       Q   (By Mr. Kennedy) Because there's no
10  follow-up?
11          MS. REISMAN:  Objection to form.
12      A   That is true.
13      Q   (By Mr. Kennedy) And you testified in
14  response to the questions by -- by Chevron's lawyer
15  that you did not believe that there was a need for
16  follow-up examinations because paraquat rapidly is
17  eliminated from the body.
18          Do you remember stating that as the reason
19  why there was no need for follow-up examinations?
20          MS. REISMAN:  Objection to form.
21      A   Yes.  That was -- that was my belief and
22  opinion at the time.
23      Q   (By Mr. Kennedy) But, sir, the fact is
24  Chevron had no idea how long paraquat stayed in the
25  brain, true?

29  (Pages 110 to 113)

Richard Cavalli
August 23, 2022

CONFIDENTIAL

Page 114

1    MS. REISMAN: Objection to form. And he's
2  testifying as -- in his individual capacity, not on
3  behalf of Chevron.
4        You can give your response to the extent you
5  have personal knowledge subject to my objection to
6  form of the question.
7    **A   I -- I -- I don't specifically -- well,**
8  **would you ask the question again. I'm sorry.**
9    Q   (By Mr. Kennedy) Sir, you told us there was
10  no need for follow-up examinations because paraquat was
11  rapidly eliminated from the body, and my question is
12  isn't it true that neither you nor anyone at Chevron
13  knew how long paraquat remained in the brain?
14    MS. REISMAN: Objection to form.
15  Foundation.
16    **A   I -- I don't have a specific memory one way**
17  **or the other. There was a lot of information**
18  **available how long paraquat stayed in the body.**
19    MR. KENNEDY: Pull up the testimony of
20  McMillen taken on April 27, '22, if you could, please.
21    MS. REISMAN: Do you have a hard copy of
22  this, Mr. Kennedy?
23    MR. KENNEDY: No.
24    MS. REISMAN: I'm just going to object to
25  the extent you're going to pull out a single question

Page 115

1  and answer that there's context, I suspect, for
2  everything. So we're going to have a standing
3  objection on not having a full transcript here.
4    Q   (By Mr. Kennedy) This is the deposition of
5  Sara McMillen. Sara McMillen was -- was chosen by
6  Chevron to speak in their behalf about the issues --
7  certain issues in this case. All right? You can
8  assume that, that she is representing Chevron in this
9  case with respect to their position on various topics.
10  All right?
11    MS. REISMAN: Objection to foundation, an
12  understatement.
13    Q   (By Mr. Kennedy) If you go to page 258.
14  258, line 2, McMillen representative of Chevron.
15    "QUESTION: I'm not interested in the lungs.
16  I'm trying to finish.
17    "ANSWER: I have already said they did not
18  analyze the brain.
19    "QUESTION: Okay. Between 1960 and 1986,
20  did ICI or Chevron do any rat studies where they
21  determined how long paraquat would stay in the brain
22  of a rat that was exposed to paraquat.
23    "ANSWER: I don't recall that that was done.
24    "QUESTION: At any time between 1960 and
25  1986, did Chevron or ICI do any studies to determine

Page 116

1  how long paraquat would stay in the brain of a dog?
2    "ANSWER: I don't recall that a study like
3  that was done.
4    "QUESTION: At any time between 1960 and
5  1986, did ICI or Chevron do any studies to determine
6  how long paraquat would stay in the brain of a monkey?
7    "ANSWER: I don't recall seeing that
8  study -- a study like that.
9    "QUESTION: Between 1960 and 1986, with
10  respect to any animal, did ICI or Chevron do a study
11  to determine how long paraquat would stay in the brain
12  after exposure?
13    "ANSWER: I think we already discussed
14  earlier, we couldn't find a study where they analyzed
15  paraquat in the brain. So that -- so -- that it
16  stayed in the brain or that it was there. So far as I
17  know, there's no data about paraquat in the brain."
18        Do you have any recollection, sir, that
19  would dispute the accuracy of the testimony of the
20  person representing Chevron on that issue?
21    MS. REISMAN: Standing objection for pulling
22  out portion of this testimony without all the
23  testimony present to be able to see context for this
24  and other statements made during the deposition.
25        Object to form.

Page 117

1        Subject to that, you can answer if you have
2  an answer.
3    **A   Could you re-ask it, please?**
4    MR. KENNEDY: Your objection is noted. When
5  I ask the question again, I don't want the objection
6  again for five minutes so that I have to ask it again.
7  This is completely inappropriate, and you understand
8  it and know it, but you've been doing it for two days.
9    MS. REISMAN: That's completely an
10  inappropriate comment, and please don't point your
11  finger at me as you're -- as you're --
12    MR. KENNEDY: Completely inappropriate.
13    MS. REISMAN: It is not. If we were at
14  trial, you would be required to have a full transcript
15  there so we could check the -- the -- the portions
16  that you're reading. Go ahead. I have a standing
17  objection to this.
18    Q   (By Mr. Kennedy) Do you have any recollection
19  that in any way would disagree with that testimony of
20  the representative of Chevron?
21    MS. REISMAN: Objection to form.
22    **A   No.**
23    Q   (By Mr. Kennedy) Was there any reason -- any
24  reason why Chevron could not have done a study to make
25  a determination as to how long paraquat stayed in the

30  (Pages 114 to 117)

Richard Cavalli
August 23, 2022

CONFIDENTIAL

Page 118

1  animal?
2       MS. REISMAN:  Objection to form.
3       Q   (By Mr. Kennedy) A rat, a mouse, a dog, a
4  monkey.  Any reason why they couldn't have done that
5  prior to 1986?
6       MS. REISMAN:  Objection to form.
7       A   In the whole animal or in the brain?
8       Q   (By Mr. Kennedy) The brain.
9       MS. REISMAN:  Same objection.
10      A   No.  There's no reason why.
11      Q   (By Mr. Kennedy) Had Chevron done studies and
12  come to understand that paraquat stayed in the brain of
13  a monkey for seven to ten months, would that have
14  changed your approach?
15      MS. REISMAN:  Objection to form.
16      A   I'm not aware of the -- of that finding.
17      Q   (By Mr. Kennedy) I'll ask you to assume that
18  the first time anybody ever looked into a monkey brain,
19  they found that paraquat persisted for a minimum of
20  seven to ten months in the brain of a monkey.  You can
21  assume that.
22          Had you known that back in 1980, 1985, would
23  that have changed your -- your position with respect
24  to how paraquat needs to be evaluated to confirm its
25  safety.

Page 119

1       MS. REISMAN:  Objection.  Form.  Asked and
2  answered.
3       A   You know, it would depend on the
4  circumstances.  I just -- I have no information to --
5  to make a judgment on that.
6       Q   (By Mr. Kennedy) Can we agree from a basic
7  toxicological standpoint that the amount of the dose is
8  very important in determining whether or not a toxin or
9  a substance will be harmful, correct, the amount?
10      MS. REISMAN:  Objection.  Form.
11      A   That is correct.
12      Q   (By Mr. Kennedy) And it's equally true that
13  not just the amount is important in determining
14  toxicity and harm, but also the length of the exposure
15  is also important in determining whether or not a toxin
16  will cause harm, true?
17      MS. REISMAN:  Objection.  Form.
18      A   Generally speaking, yes.
19      Q   (By Mr. Kennedy) I just want to kind of sum
20  up here if we can.  With respect to the studies, the
21  Malaysian study and the applicators, that was a study
22  of 27 workers with a single examination, correct?
23      A   Yes.
24      Q   With respect to the poisoning cases when the
25  person poisoned survived, Chevron never did long-term

Page 120

1  follow-ups of those survivors, correct?
2       MS. REISMAN:  Objection to form.
3       A   We did not.
4       Q   (By Mr. Kennedy) And with respect to the
5  animal studies, Chevron never determined how long
6  paraquat stayed in the brain, correct?
7       MS. REISMAN:  Objection to form.
8       A   Yes.
9       Q   (By Mr. Kennedy) And with respect to the
10  animal studies, the long-term chronic low-dose exposure
11  studies, Chevron never did those type studies to see if
12  paraquat got into the brain, correct?
13      MS. REISMAN:  Objection to form.
14      A   Specifically, no.  But we did do
15  observations during the lifetime of the animals, a
16  determination that showed that accepted very, very
17  high doses.  The lung was compromised.  There was no
18  change in brain anatomy or function to the extent it
19  could be noted.
20      MR. KENNEDY:  I would move to strike.
21      Q   (By Mr. Kennedy) I'm going to ask you a
22  question again.  Would it be true that Chevron never
23  did long-term low-dose studies to determine whether or
24  not paraquat was in the brain?
25      MS. REISMAN:  Objection to form.  Asked and

Page 121

1  answer.
2       Q   (By Mr. Kennedy) True?  It never looked to
3  see if it got into the brain in a rat, a mouse, a dog,
4  a monkey, a hen, a dog, or a goat, true?
5       MS. REISMAN:  Same objection.
6       A   I -- no.  I don't believe we did.
7       Q   (By Mr. Kennedy) And Chevron never did an
8  epidemiology study in the United States of America, did
9  they?
10      MS. REISMAN:  Objection to form.
11      A   No.
12      Q   (By Mr. Kennedy) And Chevron never did an
13  epidemiology that specifically looked to see whether or
14  not workers were developing early signs and symptoms
15  with Parkinson's, correct?
16      MS. REISMAN:  Same objection.  Form.
17      A   No.
18      Q   (By Mr. Kennedy) And when you folks received
19  brain tissue from -- from people that had been poisoned
20  by paraquat and had died, when you received that brain
21  tissue, you evaluated it to determine whether or not
22  there was paraquat.  But you never did detailed
23  histopathological examinations of that brain tissue,
24  correct?
25      A   We did not, but at the autopsies, there were

31  (Pages 118 to 121)

Richard Cavalli
August 23, 2022

CONFIDENTIAL

Page 122

1    certainly -- well, certainly -- probably would have
2    been done by the pathologist.
3         Q    Chevron never did it, and you never retained
4    anybody to do it, true?
5         A    True.
6         Q    And could we agree just in the general
7    scientific sense, sir, if you don't look for
8    something, you're not going to find it, true?
9              MS. REISMAN:  Objection to form.
10        A    Referring to paraquat in the brain, it
11   didn't manifest itself as causing anything.  So, you
12   know, we -- we looked -- maybe we didn't look for it,
13   but we looked at it.
14             MR. KENNEDY:  I have nothing further.
15             MR. FLOWERS:  Take a 2-minute break.
16             MR. KENNEDY:  Yeah.  Take a 2-minute break.
17   I probably missed something.
18             VIDEOGRAPHER:  We're going off the record at
19   11:58 a.m.
20             (A break was taken.)
21             VIDEOGRAPHER:  We're back on the record at
22   12:01 p.m.
23             MR. KENNEDY:  Still Eric Kennedy.  I'm
24   simply making a record with respect to materials that
25   Mr. Cavalli reviewed in preparation for his testimony

Page 123

1    today.
2         Q    (By Mr. Kennedy) Mr. Cavalli, could you give
3    me a list and tell me the documents -- first, the
4    documents, paper documents, that you reviewed in
5    preparation for your deposition?
6              MS. REISMAN:  And I'm going to assert an
7    objection, and this was a discussion we've already had
8    off the record.  We're going to assert privilege over
9    the documents and -- work product over the documents
10   that were shown to Mr. Cavalli.
11             We have disclosed him out of an abundance of
12   caution as a nonretained expert, and we have disclosed
13   within there the materials that he reviewed and the
14   context of his work at Chevron back in the '80s.  As
15   is clear from today, he doesn't have a recollection of
16   that he's testified, that nothing refreshed his
17   recollection.
18             But we have disclosed to you that his
19   opinions were based on animal data, worker exposure
20   data, and human autopsy data, all of which has been
21   produced to you.  Subject to that disclosure, I'm not
22   going to permit Mr. Cavalli to talk about and reveal
23   the documents that he reviewed in preparation for this
24   deposition.
25             I have said to the witness and to you,

Page 124

1    Mr. Kennedy, that he is free to tell you the documents
2    that he reviewed that refreshed his recollection.  But
3    other than that, and if -- if he recalls specific
4    worker exposure studies or animal studies that he
5    reviewed or autopsy reports that he reviewed in the
6    context of his review, he can reveal those to you.
7              But past those specific limited materials,
8    I'm going to instruct him not to answer.
9              MR. KENNEDY:  Okay.
10             MS. REISMAN:  And we are not waiving
11   privilege or work product even with respect to those
12   animal studies or autopsy reports or worker exposure
13   data that he does recall reviewing.  But I'm fine with
14   he -- with Mr. Cavalli testifying with respect to the
15   animal studies, the worker exposure studies, and the
16   human autopsy reports that he reviewed.
17        Q    (By Mr. Kennedy) Okay.  And so that I'm
18   clear, I'm asking you to identify any -- any documents,
19   written or electronic, any medical literature, or any
20   other publication or any deposition testimony that you
21   reviewed -- the totality of what you reviewed, whether
22   it was provided to you by counsel or that you went and
23   got it on your own.  All right?
24             Are you able to -- to give us that
25   information?

Page 125

1              MS. REISMAN:  Without waiving privilege or
2    attorney work product, if you recall the animal
3    studies or the worker exposure studies, the human
4    autopsy reports that you reviewed in the context of
5    your preparation, you can testify as to those.
6              As to the other materials, we are asserting
7    privilege under work product, and we are not waiving
8    either of those with respect to the limited set of
9    materials that I've described that you can testify
10   about.
11        A    I cannot give you a list of the documents
12   that -- or other material that I looked at.
13        Q    (By Mr. Kennedy) Did you review any summaries
14   of materials or memorandum?
15             MS. REISMAN:  I'm going to object on
16   privilege and work product basis, but I will also
17   represent that the only materials that were shown to
18   Mr. Cavalli were produced in this litigation,
19   documents from Chevron's files.
20        Q    (By Mr. Kennedy) Did you review any medical
21   literature?
22             MS. REISMAN:  Again, subject to my
23   objections, if you recall specific worker exposure or
24   animal studies or human autopsy reports that are
25   published in the medical literature you can testify

32  (Pages 122 to 125)

Richard Cavalli
August 23, 2022

CONFIDENTIAL

Page 126

1  with respect to those.
2      Q   (By Mr. Kennedy) And other than counsel, the
3  attorneys representing Chevron, did you speak with
4  anybody else in preparation for your deposition?
5      A   No.
6          MR. KENNEDY:  I don't think I have any
7  further questions unless I missed something?
8          MR. FLOWERS:  No.
9          MR. KENNEDY:  All good here.
10         MS. REISMAN:  Thank you.
11         Why don't we break for lunch and come back
12 at 1:00, 1:15?  What do you think?  Good?  1:15.
13         VIDEOGRAPHER:  Okay.  We're going off the
14 record at 12:05 p.m.
15         (A break was taken.)
16         VIDEOGRAPHER:  Stand by.  We're back on the
17 record at 1:27 p.m.
18         [EXAMINATION]
19 QUESTIONS BY MS. REISMAN:
20     Q   Good afternoon, Mr. Cavalli.
21     A   Good afternoon.
22     Q   We're back from a break for lunch, and the
23 same rules apply to my questioning as those that apply
24 to Mr. Kelly's, Mr. Kennedy's and my own yesterday.
25 Can you hear me, Mr. Cavalli?

Page 127

1      A   I can.
2      Q   Are you having difficulty hearing me?
3      A   Well, the air conditioner is competing with
4  you.
5          MS. REISMAN:  Can we shut -- let's go off
6  the record.
7          VIDEOGRAPHER:  Going off the record at
8  1:27 p.m.
9          (A break was taken.)
10         VIDEOGRAPHER:  Stand by.  We're back on the
11 record at 1:28 p.m.
12     Q   (By Ms. Reisman) Good afternoon, Mr. Cavalli.
13     A   Good afternoon.
14     Q   I was just saying we're back from lunch, and
15 I just wanted to remind you that the same rules apply
16 to my questioning as -- as -- as did apply when
17 Mr. Kelly, Mr. Kennedy were asking you questions.
18 That is if you don't understand my question, just let
19 me know.  And if you get fatigued and are losing
20 focus, let me know and we can take a quick break.
21     A   Okay.
22     Q   I want to talk to you, Mr. Cavalli, first
23 about your appearances here today and the basis for
24 your testimony.  I believe you testified yesterday
25 that you left Chevron in 1999; is that correct?

Page 128

1      A   Yes.
2      Q   Do you still practice toxicology?
3      A   I do not.
4      Q   Have you practiced toxicology since you
5  retired in 1999?
6      A   I have not.  Excuse me.
7      Q   Have you kept abreast with the -- with the
8  literature?  Have you kept up with the scientific
9  literature on any topic since 1999?
10     A   Not really.
11     Q   And with respect to paraquat specifically,
12 have you done anything to keep up with the literature
13 on paraquat since Chevron left the business in 1986?
14     A   I have not.
15     Q   Now, you've testified several times over the
16 last couple of days that no document that you have
17 seen has refreshed your recollection.
18         So is it correct that your testimony here
19 today and yesterday is based only on your
20 recollections of your recollections prior to when
21 Chevron exited the paraquat business in 1986?
22         MR. KENNEDY:  Objection.  Form.  Leading.
23     A   That's correct.
24     Q   (By Ms. Reisman) Now, you testified that you
25 believe that paraquat applicators had low-dose

Page 129

1  exposures over several years.  I believe that was
2  something that you testified to earlier today, and you
3  agreed with Mr. Kennedy that the same -- that that was
4  the same, that low-dose exposure over several years was
5  the same as chronic low-dose exposure?
6          MR. KENNEDY:  Objection.  Leading.
7      Q   (By Ms. Reisman) Mr. Kelly, I'm just setting
8  the stage and reminding him of testimony.  I haven't
9  even gotten to my question.
10         MR. KENNEDY:  I'm going to object to the
11 speeches prior to the question being asked.
12         MS. REISMAN:  I'm going to ask you to please
13 hold your objections until there is a question on the
14 table.  I'm reminding the witness where we are.
15     Q   (By Ms. Reisman) You agreed with Mr. Kennedy
16 earlier that low-dose exposures over several years was
17 the same as chronic low-dose exposure.
18         Do you recall that testimony?
19         MR. KENNEDY:  Objection.  Leading.
20     A   Yeah, I think so.
21     Q   (By Ms. Reisman) Did you have an
22 understanding as to how many times a year a field
23 worker in the US would apply paraquat?
24     A   My impression at -- at the time, I believe,
25 was that in the United States, paraquat was sprayed

33  (Pages 126 to 129)

Richard Cavalli
August 23, 2022

CONFIDENTIAL

Page 130

1   intermittently and only for short periods of time
2   during the year.
3       Q   Do you recall how many times a year a
4   paraquat -- a field worker would apply paraquat?
5       A   No, I don't.
6       Q   Do you remember if it was a few times or
7   many times during a year?
8       A   I really couldn't say.
9       Q   To the best of your knowledge and
10  understanding when you worked on paraquat issues, was
11  the frequency of a farmer's/field worker's exposure more
12  akin to -- I think you just called it a intermittent,
13  sporadic exposure?
14      MR. KENNEDY:  Objection.  Leading.
15      Q   (By Ms. Reisman) Would you characterize
16  farmer/field worker exposure as inter- -- intermittent
17  exposure?
18      A   That was my understanding.
19      MR. KENNEDY:  Objection.  Leading.
20      Q   (By Ms. Reisman) Did you understand -- did --
21  did you have an understanding as to whether it was
22  sporadic?
23      MR. KENNEDY:  Objection.  Leading.
24      A   That was my impression.
25      Q   (By Ms. Reisman) Well, let me ask you.  How

Page 131

1   would you describe farmer/field worker exposure to
2   paraquat in the US?
3       A   The -- my understanding is that it would be
4   used for weed control maybe once, maybe twice a year.
5       Q   What type of animal study would that be most
6   similar to?
7       A   Say probably a subacute study or, depending
8   on the frequency, of just acute studies.
9       Q   Would you liken the exposure that you just
10  described that paraquat workers in the US had as akin
11  to chronic studies in animals?
12      A   Not exactly, no.
13      Q   I want to switch gears now, Mr. Cavalli, and
14  talk to you about a -- an exhibit that was marked
15  by -- I actually think it was Mr. Kelly yesterday.
16  You should have it in front of you.  It's Cavalli 40.
17          (Exhibit 40 has been marked and now
18          identified for the record.)
19      A   Yes, I have it.
20      Q   (By Ms. Reisman) Cavalli 40 -- Cavalli 40 is
21  an article entitled "The Toxicity of Paraquat," authors
22  Clark -- D.G. Clark, T.F. McElligott, and Weston Hurst.
23      Are you with me, Mr. Cavalli?
24      A   Yes, I am.
25      Q   Mr. Kelly asked you several questions

Page 132

1   yesterday about the central nervous system effects
2   listed in that study.  So I want to talk to you about
3   that study and those questions now.
4       If you would turn to page 128 of that study,
5   Mr. Cavalli, which has Bates No. 879 on the bottom and
6   tell me when you are with me.
7       A   We're getting there.  Okay.  Yes, I am.
8       Q   In the left column of that page, there is a
9   paragraph that begins "Signs of Poisoning after
10  Intraperitoneal Dosing."
11      Do you see that?
12      A   I do.
13      Q   And Mr. Kelly read you several sentences
14  from that paragraph.  I recall him reading, I think,
15  through the first sentence, second sentence, third
16  sentence, and fourth sentence.  And I want to read to
17  you a sentence that follows the passage that Mr. Kelly
18  read to you yesterday.
19      Do you see a sentence that begins
20  "Additionally..." in the middle of that -- two-thirds
21  of the way through that paragraph?
22      A   Yes, I do.
23      Q   I'm going to begin reading there.
24  "Additionally, in the earlier stages breathing might
25  be gasping or, alternatively, deep and fast."

Page 133

1       Do you see that?
2       A   Yes, I do.
3       Q   What does that indicate to you as to what
4   was occurring in these rats?
5       A   That indicates that the rats' pulmonary
6   system, the lungs were not working well.
7       Q   Does that indicate some lung damage?
8       A   Yes.  That's better way to put it.
9       Q   Yesterday you said -- you mentioned that you
10  disagree with the author's statement of findings with
11  respect to these CNS -- central nervous system effects
12  in this study.  How so?
13      A   Well, again, the animals were having
14  difficulty exchanging oxygen, and it would be in a
15  mildly to severe hypoxic state and a secondary effect
16  of that would occur in the nervous system.
17      Q   In the next paragraph of that study,
18  Mr. Cavalli, Mr. Kelly read you the first sentence of
19  that paragraph, and I'd like to read to you a sentence
20  that follows.
21      "In animals which survived for a number of
22  days after the last of a series of ascending doses,
23  the later signs of illness were chiefly difficulty
24  breathing" and it goes on.
25      What does that passage indicate to you about

34  (Pages 130 to 133)

Richard Cavalli
August 23, 2022

CONFIDENTIAL

Page 134

1  the animals?
2      A   Again, pulmonary damage.
3      Q   Yesterday you testified that there were no
4  reports -- and it may have been this morning.  It was
5  during Mr. Kelly's questioning.  You testified that
6  there were no reports of CNS effects, central nervous
7  system effects in the animal studies you reviewed.
8          Did you mean that you didn't recall any
9  studies reporting primary effects of paraquat in the
10 brain and central nervous system?
11         MR. KENNEDY:  Objection.  Leading.
12     A   Yes.
13     Q   (By Ms. Reisman) Let me ask it this way:
14 What did you mean when you said you did not recall any
15 studies reporting central nervous system effects in
16 animal studies that you reviewed?
17     A   That I was not aware of any study that
18 showed a primary effect on the nervous system.
19     Q   Okay.  Switch gears with you again,
20 Mr. Cavalli.  Following up on another area of
21 questions by the plaintiff's counsel.
22         Mr. Kelly asked you yesterday who you
23 considered most knowledgeable about paraquat at
24 Chevron when you became more involved in the 1973 and
25 1974 time period, and you answered "no one."

Page 135

1          Now, I understand you didn't think any one
2  person was most knowledgeable.  Were there people at
3  Chevron who you believe had knowledge and understood
4  the toxicity of paraquat prior to your more focused
5  involvement in 1973 and 1974?
6      A   Yes, I do.
7      Q   And who were they?
8      A   That would have been Nils Ospenson, Lauren
9  Stelzer, T.W. Reed, Dick Wessel.  I think that's the
10 list of people.
11     Q   During your testimony -- testimony yesterday
12 or, again, may have been this morning, you mentioned
13 that there was a more senior toxicologist at the
14 company at that time.  Who was that?
15     A   That was Dr. Duane Hallesy.
16     Q   Do you remember if he had any involvement in
17 paraquat issues?
18     A   Specifically, no.
19     Q   Do you know one way or the other?
20     A   I don't know one way or the other.
21     Q   You also mentioned that you recall folks at
22 Chevron working with Joe Calandra prior to 1973, 1974,
23 and specifically on paraquat work.
24         Were the IBT studies that -- that were done
25 by Joe Calandra and his -- his people at IBT, were

Page 136

1  those the only animal studies that Chevron and you
2  relied on in the early years?
3      A   I believe there were other -- other animal
4  studies.
5      Q   Were the results of Dr. Calandra's studies
6  on paraquat consistent with the other animal data that
7  you had at the time?
8      A   Yes, they were.
9      Q   And were those studies conducted by IBT on
10 paraquat repeated at a later time?
11     A   They were.
12     Q   Did the results of those studies that were
13 repeated at a later time, that is, when those studies
14 were done, did those studies change your understanding
15 of the toxicity of paraquat?
16         MR. KENNEDY:  Objection.  Leading.
17     A   No, they did not.
18     Q   (By Ms. Reisman) Did you learn anything new
19 from those -- strike that.
20         You've testified several times the last
21 couple days about a body of knowledge that you relied
22 on for your understanding as to the toxicity of
23 paraquat and your belief and understanding that could
24 be used safely when it was used in accordance with the
25 label.

Page 137

1          Were there non-IBT animal studies and other
2  data that you relied on as part of that body of
3  knowledge that --
4      A   There were certainly other -- other data,
5  some of which was from animal studies.
6      Q   You were asked yesterday about whether you
7  or your group conducted a formal study on the adverse
8  health effects of paraquat in farm-related workers,
9  and it may have been different words, but that was
10 basically the gist of the question.
11         And you said you had not conducted such a
12 formal study.  Why didn't you or anyone in your group
13 conduct such a formal study of those workers?
14     A   Because over time we had a large body of
15 knowledge about paraquat's toxicity.  We had a lot of
16 information on the exposure levels that were occurring
17 among workers.  We -- we had -- you know, if they
18 followed the precautionary labels, it all added up to
19 exposure would be very low.
20     Q   And did you believe that you had sufficient
21 data to believe that if agricultural workers used
22 paraquat according to the labels and instructions for
23 use that paraquat was safe to use?
24         MR. KENNEDY:  Objection.  Leading.
25     A   Yes.

35  (Pages 134 to 137)

Richard Cavalli
August 23, 2022

CONFIDENTIAL

Page 138

1    Q   (By Ms. Reisman) Same question that I asked
2  you about the study on the health effects of paraquat
3  on farm-related workers.  Mr. Kelly asked you the same
4  question as to agricultural workers in the US; that is,
5  you were asked yesterday about whether you or your
6  group conducted a formal study of risks to
7  US agricultural workers applying paraquat.
8        Why didn't you or anyone in your group
9  conduct a formal study of those workers with respect
10  to health risks --
11    A   Well, there were --
12    Q   -- to those workers?
13    A   There were former -- there were formal
14  studies available to us that had been done by others
15  that showed, again, very low exposure to paraquat.
16    Q   And what did that low exposure to paraquat
17  tell you about the risk to those workers?
18    A   Low exposure, low risk.
19    Q   Did Chevron sponsor any of those US studies
20  done on worker exposure in the US, if you recall?
21    A   I believe we did one, at least.
22    Q   You were asked whether you or anyone in your
23  group commissioned an epidemiologic survey to evaluate
24  the safety of paraquat use, and you were also asked
25  whether Chevron ever conducted such an epidemiologic

Page 139

1  survey, and you answered "no" to both questions.
2        Did you support such a study being done,
3  even if Chevron itself did not technically commission
4  or conduct it?
5    A   Yes.
6    Q   Was such an epidemiologic study ever done?
7    A   Yes.
8    Q   And was that the Howard study that you've
9  testified about?
10    A   Yes.
11    Q   Mr. Cavalli, I'm jumping around quite a bit
12  because I'm trying to hit various issues that came up,
13  so bear with me.  And if you need more background as I
14  switch topics, please let me know.
15        During Mr. Kennedy's questioning, he asked
16  you whether if paraquat -- strike that.
17        During Mr. Kennedy's questions --
18  questioning, he asked you about the Howard study and
19  noted urine found in -- paraquat found in some of the
20  workers' urine.
21        Do you remember that line of questioning?
22    A   Yes, I do.
23    Q   He asked you, then, if paraquat was found in
24  the urine in those workers' samples, did it mean that
25  for those workers where it was circulating in their

Page 140

1  urine that it was circulating in their blood, and you
2  answered "yes" --
3    A   Yes.
4    Q   -- is that correct?
5    A   Yes, I did.
6    Q   He then asked you if that blood circulated
7  through the brain, and you said "yes."
8        Do you recall that?
9    A   Yes, I do.
10    Q   What part of the brain was that blood
11  circulating through?
12    A   It would have been in the major blood
13  vessels and smaller blood vessels and the capillaries.
14    Q   Was it circulating through brain tissue
15  under those circumstances?
16    A   I don't believe so.
17    Q   Switching gears once again, Mr. Cavalli,
18  bear with me.  I want about training.
19        You were asked a series of questions on
20  whether you have ever trained paraquat applicators, or
21  field workers, or farmers, I think the question was.
22        And you said you had never personally done
23  that training, but you mentioned that you had trained
24  field representatives, and that's what I want to talk
25  to you about today.

Page 141

1        Do you recall doing training of field
2  representatives with respect to paraquat?
3    A   Yes, I do.
4    Q   And what did you train them on?
5    A   We trained them on, of course, the toxicity
6  of paraquat, the value of the precautionary labels.
7  Tried to answer questions that they may have received
8  from the field.
9    Q   When you said that you trained them on the
10  value of the precautionary labels, what did you mean
11  by that?
12    A   Just that if the precautionary labels are --
13  are followed, the exposure to paraquat, hence risk,
14  would be very low.
15    Q   Did part of the training include discussing
16  the labels and instructions for use?
17    A   I'm -- I'm pretty sure it did, yes.
18    Q   What was the purpose of training these field
19  representatives?
20    A   These were what we -- what were called
21  technical field representatives, and they -- they
22  actually went out into fields.  They -- they met with
23  agricultural extension professors from universities.
24  They went to meetings of farmers.  They went to what
25  used to be called "Grange meetings."  I don't know if

36  (Pages 138 to 141)

Richard Cavalli
August 23, 2022

CONFIDENTIAL

Page 142

1  there are anymore -- and to essentially do what I did
2  for them.
3       Q   Did you have an understanding as to whether
4  those field representatives went out in the field and
5  conveyed the information that you trained them on?
6       A   That is my understanding.
7       Q   I want to go back to your role at Chevron as
8  a toxicologist.  In general, Mr. Kelly asked you
9  yesterday about other Chevron products that you worked
10 on over time, and he named to you various petroleum
11 products and lubricants and solvents.
12      Did you also work on nonpetroleum products
13 including specifically other pesticides and insecti-
14 -- insecticides?
15      A   Yes, I did.
16      Q   And had you worked on those other
17 pesticides, insecticides, and herbicides before you
18 began your focus on paraquat in 1973, 1974 time frame?
19      A   Yes.
20      Q   Were any of those pesticides and,
21 specifically, some of the insecticides known to be
22 neurotoxic?
23      A   Yes.
24      Q   So did you and others at Chevron have some
25 experience researching, identifying, evaluating

Page 143

1  neurotoxic substances prior to 1973 or 1974?
2       A   Yes.
3       MS. REISMAN:  Switching topics once again,
4  and I'm going to ask if our colleague here can pull up
5  the Ferebee transcript.  This was a transcript -- if
6  you just put up the front page first.
7       Q   (By Ms. Reisman) Mr. Cavalli, Mr. Kennedy
8  asked you some questions about your testimony in a case
9  called Ferebee.
10      Do you recall that you answered some
11 questions on some testimony you gave in Ferebee?
12      A   Yes, I do.
13      Q   And that testimony was given in 1982; is
14 that correct?
15      A   That's what the document says, yes.
16      Q   Do you have a specific recollection as you
17 sit here today?
18      A   No.  Not the exact date, no.
19      Q   And -- and with respect to your testimony,
20 do you have any specific recollections about giving
21 this testimony and the specifics of that testimony or
22 only that you gave testimony?
23      A   Onl- -- basically, I gave testimony.
24      Q   I'd like to turn to page 1545 -- 1545 of
25 that transcript line 17 through 22 which was the

Page 144

1  portion that Mr. Kennedy asked you about, and I want
2  to read the full question and answer into the record.
3       The question was:  "Doctor, can you answer
4  my question once again or can you answer it once?  If
5  you put an ounce of paraquat on your skin, it will
6  kill you, won't it?  If you leave it on, if you don't
7  wash it off.
8       "ANSWER:  If you leave it on and if the skin
9  breaks down, I would guess that that might be a
10 sufficient amount."
11      Was that your testimony -- your sworn
12 testimony in the Ferebee case?
13      A   Yes, it was.
14      Q   And is that consistent with your response
15 here today that it depends on the circumstances to
16 know whether such an amount would have any harmful
17 effect let alone kill you?
18      A   Yes.
19      MS. REISMAN:  Let's go off the record for
20 one minute.
21      VIDEOGRAPHER:  Going off the record at
22 1:50 p.m.
23      (A break was taken.)
24      VIDEOGRAPHER:  We're back on the record at
25 1:53 p.m.

Page 145

1       Q   (By Ms. Reisman) Just one last question of
2  you, Mr. Cavalli.  Mr. Kelly asked you yesterday about
3  your undergraduate degree, and he asked you whether it
4  could have been in zoology as opposed to biology.
5       So I'm going to ask you to take a look at --
6  at a document we'll pull up on the screen which is a
7  yearbook picture we found of you from the University
8  of San Francisco, year 1962.
9       Is that you in the lower row, four people
10 from the left, I guess it is?
11      A   I believe it is.
12      Q   Can you see?  Is that you, Richard D.
13 Cavalli?
14      A   Yes.
15      Q   Does this help remind you that you actually
16 got your degree in biology?
17      A   Yes, it does.
18      Q   Okay.  Thank you.
19      MS. REISMAN:  Pull that down.  I have no
20 further questions at this time.
21      MR. KENNEDY:  Yeah, I can ask -- I can ask
22 them from here.
23      [EXAMINATION]
24 QUESTIONS BY MR. KENNEDY:
25      Q   Mr. Cavalli, again, this is Eric Kennedy

37  (Pages 142 to 145)

Richard Cavalli
August 23, 2022

CONFIDENTIAL

Page 146

1   representing the plaintiffs in this case.
2        You testified just now that it was your
3   understanding that paraquat applicators only applied
4   paraquat once or twice a year; is that your testimony?
5        MS. REISMAN: Objection. Form.
6        A   That was my -- did I specifically say once
7   or twice a year?
8        Q   (By Mr. Kennedy) Yes.
9        A   That was my understanding at the time, yes.
10       Q   And so is it your testimony that the entire
11  time that you were at Chevron and you were evaluating
12  the risk of paraquat on applicators, you were always
13  assuming that they would never apply paraquat more
14  than once or twice a year?
15       MS. REISMAN: Objection to form.
16       A   No.  That's not correct.
17       Q   (By Mr. Kennedy) Then your testimony is you
18  don't know whether it's only once or twice a year?
19       MS. REISMAN: Objection to form.
20       Q   (By Mr. Kennedy) Is that your testimony?
21       A   My -- my testimony is that we had a large
22  database which we were able to apply to paraquat
23  workers in the field without -- without consideration
24  of it being just once or twice a year.
25       Q   So you understand some apply 20 times a

Page 147

1   year, 30 times a year?
2        MS. REISMAN: Objection to form.
3        Q   (By Mr. Kennedy) You understand that?
4        A   I -- I don't.  I don't have any reason to
5   say either way.
6        Q   All right.  Then you were talking about the
7   difference between chronic and subacute.  How many
8   times a year does an applicator have to apply paraquat
9   to be considered chronically exposed?  What's that
10  line?
11       MS. REISMAN: Objection to form.
12       Q   (By Mr. Kennedy) Do you know?
13       A   No.  No, I don't.
14       Q   And how many years does a paraquat worker
15  have to apply paraquat to be considered a chronically
16  exposed worker?  Do you know where that line is?
17       MS. REISMAN: Objection to form.  Calls for
18  expert opinion.
19       A   In the abstract, no.
20       Q   (By Mr. Kennedy) And then just -- just
21  finally, you -- I think you just testified that you
22  would actually meet with field reps; is that correct?
23       A   Yes.
24       Q   What's the job of a field rep?
25       MS. REISMAN: Objection to form.

Page 148

1        A   The -- as I understood it, the technical
2   field rep's job was to assist -- assist understanding
3   how to use paraquat, what it did, what it didn't do.
4   They also did a lot of work on crops.  But they were
5   in contact with, as I said, the ag extension agents
6   and quite often with groups of farmers.
7        Q   (By Mr. Kennedy) Well, when you would meet
8   with them, and knowing and understanding that they
9   would be talking to farmers and applicators, did you
10  ever tell them that every time Chevron or ICI did an
11  animal study, whether it was rats, mice, dogs, pigs,
12  goat, hens, or monkeys, every time they found paraquat
13  in their brain, did you tell that to the -- to the
14  field reps?
15       MS. REISMAN: Objection to form.
16       A   No.  I don't -- I don't remember that.
17       Q   (By Mr. Kennedy) Did you tell the field reps
18  that you folks had received brain tissue on autopsy and
19  26 times you found paraquat in the brains on autopsies?
20  Did you tell the field reps that so they could
21  communicate that to the farmers and applicators?
22       MS. REISMAN: Objection to form.
23       A   No.
24       Q   (By Mr. Kennedy) Did you tell them at all
25  about the -- the 1966 Clark study that we talked so

Page 149

1   much about where there were stated signs of brain
2   involvement, did you tell them about the '66 study?
3        MS. REISMAN: Objection to form.
4        A   No.
5        Q   (By Mr. Kennedy) Did you tell them in 1983,
6   these field reps, knowing that they're going to be
7   meeting with farmers and applicators, did you tell them
8   about the 1983 Barbeau epidemiology study that found an
9   association between Parkinson's disease and pesticides?
10  Did you tell them about that study?
11       MS. REISMAN: Objection to form.  Assumes
12  facts not in evidence.
13       Q   (By Mr. Kennedy) Did you tell them about
14  that?
15       MS. REISMAN: Objection to form.
16       A   You know, I was not meeting with them that
17  late in the day.  I can't answer for my colleagues.
18       Q   (By Mr. Kennedy) Let me ask you this.  Then
19  did you tell these field representatives who
20  communicated with farmers, did you tell them that
21  Chevron and ICI had never done a study to determine how
22  long paraquat stays in the brain?  Did you tell them
23  that?
24       MS. REISMAN: Objection to form.
25       Q   (By Mr. Kennedy) We don't know, did you tell

38  (Pages 146 to 149)

Richard Cavalli
August 23, 2022

CONFIDENTIAL

Page 150

1  them that?
2       MS. REISMAN:  Objection to form.
3  Argumentative.
4       A   No.
5       Q   (By Mr. Kennedy) And finally, did you tell
6  the field representatives that even if workers follow
7  all of the instructions, all of the precautions, they
8  can still get paraquat in their blood that runs through
9  their brain?  Did you tell them that?
10      MS. REISMAN:  Objection to form.
11      A   Could you repeat that?
12      Q   (By Mr. Kennedy) Did you tell the field
13  representatives that even if an applicator follows all
14  the instructions, all of the precautions, they can
15  still get paraquat in their urine, meaning in their
16  blood that runs through the brain?  Did you tell them
17  that?
18      MS. REISMAN:  Objection to form.
19      A   No.  I wouldn't have told them that because
20  I don't believe that.
21      MR. KENNEDY:  Nothing further.  Thank you.
22      MS. REISMAN:  Nothing further here.  Thank
23  you.
24      Thank you, Mr. Cavalli.
25      VIDEOGRAPHER:  Okay.  This concludes the

Page 151

1  deposition of Richard Cavalli.  We're now going off
2  the record at 2:01 p.m.
3       (Whereupon the deposition ended, and
4       the witness was excused.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 152

1          REPORTER CERTIFICATE
2
3
4       I, Angela M. Taylor, RPR, MO-CCR, IL-CSR, do
5  hereby certify that there came before me at 14811
   Kruse Oaks Drive, Lake Oswego, OR  97035,
6
7          RICHARD CAVALLI,
8  who was by me first duly sworn; that the witness was
   carefully examined, that said examination was reported
9  by myself, translated and proofread using
   computer-aided transcription, and the above transcript
10 of proceedings is a true and accurate transcript of my
   notes as taken at the time of the examination of this
11 witness.
12      I further certify that I am neither attorney
   nor counsel for nor related nor employed by any of the
13 parties to the action in which this examination is
   taken; further, that I am not a relative or employee
14 of any attorney or counsel employed by the parties
   hereto or financially interested in this action.
15
   Dated this 6th day September, 2022.
16
17
18
   _____
19 ANGELA M. TAYLOR, RPR, MO-CCR, IL-CSR
20
21
22
23
24
25

39  (Pages 150 to 152)