# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| *IN RE: PARAQUAT PRODUCTS LIABILITY LITIGATION*<br><br>This document relates to:<br><br>*Fuller v. Syngenta AG*, No. 3:21-cv-429<br>*Richter v. Syngenta AG*, No. 3:21-cv-571<br>*Walkington v. Syngenta AG*, No. 3:21-pq-601<br>*Marx v. Syngenta AG*, No. 3:21-pq-922<br>*Burgener v. Syngenta AG*, No. 3:21-pq-1218<br>*Coward v. Syngenta AG*, No. 3:21-pq-1560 | Case No. 3:21-md-3004-NJR<br><br>MDL No. 3004<br><br>Hon. Judge Nancy J. Rosenstengel |

## DEFENDANTS' PARTIAL MOTION TO STRIKE
## REBUTTAL EXPERT REPORT OF MARTIN T. WELLS

Ragan Naresh, P.C.
KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave., N.W.
Washington, D.C. 20004
Tel.: 202.389.5000
Fax: 202.389.5200
ragan.naresh@kirkland.com

Leslie M. Smith, P.C.
Bradley H. Weidenhammer, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Tel: (312) 862-2000

***Counsel for Syngenta Defendants***

Leon F. DeJulius, Jr.
Sharyl A. Reisman
JONES DAY
250 Vesey Street
New York, NY 10281
Telephone: (212) 326-3939
Fax: (212) 755-7306
lfdejulius@jonesday.com
sareisman@jonesday.com

***Counsel for Defendant***
***Chevron U.S.A. Inc.***

## INTRODUCTION

To prevail in these bellwether cases, Plaintiffs need to establish that exposure to paraquat causes Parkinson's disease ("PD"). They try to make that critical showing through the opinion of Martin Wells, their expert statistician. Wells based his opinion on a "meta-analysis," meaning that he selected and "synthesized" the results of certain epidemiological studies (while omitting others). The results of a meta-analysis are effectively dictated by which studies are included and which are excluded. Wells's selection methodology for inclusion and exclusion is therefore crucial, and his expert opinions cannot pass muster under *Daubert* and Federal Rule of Evidence 702 unless that methodology is reasoned, reliable, and replicable.

In his original report, however, Wells identified seven "occupational" case-control studies he included in his meta-analysis, without specifying the criteria that he used to choose those studies and exclude others that undermined his conclusion (let alone the scientific justifications for those criteria). At his deposition, Wells doubled down on that *lack* of methodology, admitting that he selected and excluded studies based solely on an "unwritten" and "holistic" evaluation of "all the features" of the studies. Despite being asked multiple times, Wells refused to identify any set of specific criteria he had consistently applied, or any other replicable methodology. That represented a blatant departure from the scientific method—cherry-picking, to use a technical term.

Apparently recognizing vulnerability on an essential element of their case, Plaintiffs last week served a supposed "rebuttal report." This report attempts to rewrite Wells's original report and sworn testimony by offering a newly minted methodology to justify Wells's original cherry-picking. This *post hoc* methodology (which appears in Part II of the new report and is itself longer than his original report) is not "rebuttal" by any standard.

1

To the contrary, Wells's "rebuttal" announces an entirely new methodology for selecting the studies, complete with new analyses, new sets of criteria, new appendices and charts, and new definitions of key concepts. These new opinions are not only untimely, they also *contradict* in numerous ways Wells's original report and testimony. A detailed comparison of Wells's rebuttal report against his original report and deposition testimony is attached (Exh. A). The flip-flopping it exposes is a telltale sign of an opinion in search of a methodology. Wells's obvious backfilling—cobbling together a methodology after the fact to justify his "holistic" outcome-driven opinion that paraquat causes PD—is the epitome of improper rebuttal.[1]

Part II of the rebuttal report thus does not reflect what Wells *said*, or even what he *did*. It is improper for both reasons, and the Court should strike it. Rebuttal reports, like rebuttal evidence, are proper only to respond to the other side's submissions—not to add to, let alone change, the sponsor's case-in-chief. Wells crossed that line by a mile. His "rebuttal" now:

- Manufactures a suspiciously precise two-step methodology that he never before mentioned or used, in lieu of what he previously described as a "holistic" all-things-considered gestalt analysis;
- In its new first step, specifies five inclusion criteria he never previously set forth, including at least one that *contradicts* his own deposition, and uses them to narrow a never-mentioned set of 36 studies down to a never-mentioned set of eight;
- In its new second step, develops five "quality" criteria found nowhere in his original report, including several he *affirmatively disclaimed* at his deposition; and
- Undertakes a lengthy analysis to explain why he purportedly excluded as unreliable the largest, longest, most recent study of the paraquat-PD relationship, even though he testified at his deposition that he had no opinion on its reliability.

In effect, Wells has served an entirely new report using an entirely new methodology at the very *end* of expert discovery, depriving Defendants of the chance to scrutinize his work. Courts often strike far less egregious "rebuttals." The Court should do the same to Part II of this report.

---

[1] Wells's flip-flopping and inconsistency also underscore why all of his opinions fail the *Daubert* and Rule 702 inquiry, but that separate issue will be addressed in later briefing.

**BACKGROUND**

As the Court knows, one of the key factual disputes in these cases is whether—as Plaintiffs claim but the EPA and all reputable sources have long denied—paraquat exposure can cause PD. In these bellwether cases, Plaintiffs designated one expert to opine on that general causation issue: a statistician named Martin Wells.

**Original Report.** Plaintiffs served Wells's report (the "Original Report" or "OR") on October 14, 2022 (Exh. B). It principally conducted a "meta-analysis," meaning Wells selected and aggregated a set of epidemiological studies on whether paraquat exposure is associated with PD. But the reliability of what comes *out* of a meta-analysis obviously depends on what goes *in*. Much of the meaningful work in conducting a meta-analysis is thus determining, at the outset, the inclusion/exclusion criteria that the investigator will apply to a body of literature to select the studies to "meta-analyze." If those inclusion criteria are contrived or unprincipled, the meta-analysis can be rigged to show whatever conclusion is desired.

Indeed, although the three prior published meta-analyses of the paraquat-PD literature that Wells cited all found far less than a two-fold increased risk of PD and further found the evidence insufficient to conclude that paraquat causes PD, Wells reached the opposite conclusion. He opined that *any* paraquat exposure—even on a single occasion and while wearing full protective equipment—causes a 2.8 times increase in the odds of PD. OR 17. He reached this conclusion by gerrymandering his selection of epidemiological studies to exclude data from relevant "occupational" studies, most notably the Agricultural Health Study published by Shrestha *et al.* in 2020, which is the largest, longest, most recent prospective cohort study of the paraquat-PD relationship. While Wells included seven studies, his meta-analysis placed 74% of its weight on one 26-year-old study (Liou 1997), which is one of only two among those seven that reported a statistically significant association between paraquat exposure and PD. OR 18.

3

The Original Report cited the seven "occupational" case-control studies Wells included in his meta-analysis, mentioned several other studies he reviewed, included a data file with 14 studies, and included an Appendix that described 11 studies. But it nowhere specified the criteria he used to select the 14 or 11 studies, to narrow them down to seven, or to exclude the rest of the universe. Instead, it simply described in narrative form the methodology of some of the studies he excluded, focusing on different features of each rather than any cross-cutting, consistently applied criteria.

**Deposition.** Defendants deposed Wells on November 8, 2022, and repeatedly pressed him to explain what methodology he had used to select studies for inclusion in the meta-analysis. But Wells doubled down on the *lack* of any true methodology. Wells admitted that his Original Report did not contain "a list of criteria for inclusion in [the] meta-analysis." Exh. C ("Dep. Tr.") 113:23-114:1. When asked what process someone could follow to "replicate" his analysis, Wells said that person would have to "look at everything" about each study "simultaneously or holistically" and just "make a decision what's in or out." *Id.* at 112:4-15. And he refused to provide any consistent set of criteria to govern inclusion, instead insisting that "each study" be considered separately to explain "why it's in, why it's out." *Id.* at 114:7-9; *see also* Exh. A at 1-2.

When Wells referred to terms and concepts that appeared to play a role in how he included or excluded particular studies, Defendants asked for definitions—but Wells demurred. Among other examples, he refused to provide a consistent definition of what he deemed an "occupational" study ("I'm just using what the studies are defining," Dep. Tr. 16:17-17:6); how he evaluated the quality of a study's exposure assessments (he just asked if it was "done well" and "reliable," *id.* at 67:9-68:14); and what threshold he considered to be a high-quality participation rate ("I don't have a number," *id.* at 249:5-8). Everything had to be viewed "holistically," Wells said repeatedly. *See id.* at 106:18-22, 108:3-11, 112:12-15, 249:5-13, 254:14-255:6; *see also* Exh. A at 1-2.

4

**Defendants' Expert Report.** On January 20, 2023, Defendants submitted the report of epidemiology expert Dominik D. Alexander (Exh. D). He opined that a weight-of-the-evidence assessment of the totality of the epidemiology literature does not support a conclusion that paraquat is causally associated with PD. Exh. D at 7. Alexander also critiqued Wells's report. He explained that Wells "fail[ed] to follow the scientific method … in conducting his meta-analysis," including by failing "to set out clear inclusion and exclusion criteria," which Alexander tried but was unable to divine from the report. *Id.* at 7, 86. Without those clear criteria, Wells's meta-analysis "excluded the most methodologically reliable studies" and thus predictably devolved into "cherry pick[ing] only data points that support his conclusions." *Id.* at 7.

**Wells's Purported "Rebuttal."** On March 15, 2023, Plaintiffs served a new expert report from Wells styled as a "Rebuttal to Report of Dominik Alexander" ("Rebuttal Report" or "RR") (Exh. E). Part I is indeed an eight-page response to Alexander's meta-analysis—traditional (albeit incorrect) rebuttal testimony. RR 1-8. Defendants do not seek to strike Part I.

The bulk of the report, however, is a 29-page Part II (longer than the Original Report) in which Wells purports—for the first time—to identify a two-step methodology to determine which studies to include in his meta-analysis, and asserts in revisionist fashion that he applied those steps to reach his original conclusion. RR 8-37.

Specifically, the Rebuttal Report now asserts that Step 1 of Wells's analysis measured each study against five specific inclusion/exclusion criteria, *e.g.*, that they be "occupational" studies (a term he now defines). RR 10-15. Studies meeting those criteria would progress to Step 2, where Wells supposedly evaluated them using five "quality" criteria, including (for example) a threshold participation rate and whether the study controlled for particular confounders. RR 15-21.

5

The Rebuttal Report then also purports to *apply* that new methodology for the first time by subjecting 36 studies (a subset never before mentioned) to the new inclusion/exclusion criteria, narrowing the universe down to eight studies (another number never mentioned in Wells's report or deposition testimony). The Rebuttal Report claims to apply the new "quality" criteria to those eight studies, resulting in exclusion of one of them as "lower quality." All of this is captured in new charts: Appendices B and C, which were not previously disclosed. Conveniently, this new methodology specifies for inclusion the same seven studies that Wells included in his original meta-analysis.

To be clear, however, neither the 2-step methodology nor the Step 1 or Step 2 criteria were identified, defined, or applied in the Original Report or Wells's deposition testimony, in which he was unable to identify the steps he now claims he applied. And in numerous ways detailed further in Exhibit A and below, they actually *contradict* his Original Report and testimony.

## LEGAL STANDARD

The role of a plaintiff's rebuttal evidence is to defuse the defendant's evidence, not to offer new or additional material to support the plaintiff's case-in-chief. *See United States v. Grintjes*, 237 F.3d 876, 879 (7th Cir. 2001). That is why "[t]estimony offered only as additional support to an argument made in a case in chief … is improper on rebuttal." *Peals v. Terre Haute Police Dep't*, 535 F.3d 621, 630 (7th Cir. 2008); *see also Braun v. Lorillard, Inc.*, 84 F.3d 230, 237 (7th Cir. 1996) (reiterating that material "germane to the prima facie case" must be submitted "as part of [plaintiff's] case in chief" and not withheld until rebuttal).

The same principles apply to expert opinions. Rebuttal expert reports "cannot be used to advance new arguments or new evidence to support plaintiff's expert's initial opinions." *Larson v. Wis. Cent. Ltd.*, No. 10-C-446, 2012 WL 368379, at *4 (E.D. Wis. Feb. 3, 2012); *see also Baldwin Graphic Sys., Inc. v. Siebart, Inc.*, No. 03 C 7713, 2005 WL 1300763, at *2 (N.D. Ill.

6

Feb. 22, 2005). An expert thus "cannot offer new bases for an old opinion on rebuttal," *e.g.*, by "appl[ying] a new methodology to answer a question" he "failed to address in his Initial Report." *Matthew Enter., Inc. v. Chrysler Grp. LLC*, No. 13-cv-04236, 2016 WL 4272430, at *4 (N.D. Cal. Aug. 15, 2016). Nor is rebuttal "the time to change methodologies to account for … deficiencies." *Bowman v. Int'l Bus. Mach. Corp.*, No. 11-cv-0593, 2013 WL 1857192, at *7 (S.D. Ind. May 2, 2013). Indeed, to qualify as valid rebuttal, it is not enough that a Rebuttal Report "cover[s] the same topics and to some extent respond[s] to Defendants' experts"; a rebuttal still "cannot do so with new analyses and arguments." *Bowman v. Int'l Bus. Mach. Corp.*, No 11-cv-0593, 2012 WL 6596933, at *6 (S.D. Ind. Dec. 18, 2012).

When a rebuttal report contains improper rebuttal testimony, it is effectively a *new* expert report—filed long after the applicable deadline. And the consequence is clear: A party that fails to timely provide an expert report "is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial." Fed. R. Civ. P. 37(c)(1). Accordingly, when a party attempts to "offer testimony under the guise of 'rebuttal' only to provide additional support for his case in chief," the remedy is to strike the report and exclude the testimony. *Cage v. City of Chi.*, No. 09 C 3078, 2012 WL 5557410, at *2 (N.D. Ill. Nov. 14, 2012). That remedy of "exclusion is automatic and mandatory unless the sanctioned party can show that its violation … was either justified or harmless." *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003).

Applying this standard, courts in this Circuit regularly strike "rebuttal" reports that actually constitute expansion or revision of the plaintiff's case-in-chief expert testimony. *See, e.g.*, *Gravitt v. Mentor Worldwide LLC*, 342 F.R.D. 130, 135 (N.D. Ill. 2022) (striking "rebuttal" that "belonged in the Plaintiffs' opening expert reports"); *Africano v. Atrium Med. Corp.*, No. 17 CV 7238, 2019 WL 5085338, at *4 (N.D. Ill. Oct. 10, 2019) (striking report because it "does not respond to an

7

affirmative defense … or offer a response to new arguments"); *McCann v. Ogle Cnty.*, No. 11 C 50125, 2016 WL 5807922, at *2 (N.D. Ill. Oct. 5, 2016) (striking "opinions that should have been included in [expert's] initial report since they … buttress his initial report"); *Stanfield v. Dart*, No. 10 C 6569, 2013 WL 589222, at *3 (N.D. Ill. Feb. 14, 2013) (striking report that was "attempt to bolster [plaintiff's] case-in-chief"); *Noffsinger v. The Valspar Corp.*, No. 09 C 916, 2011 WL 9795, at *6 (N.D. Ill. Jan. 3, 2011) (striking portions of rebuttal report containing "opinion on issues for which [the plaintiff] bears the burden of proof"); *Bowman*, 2012 WL 6596933, at *5 (striking two expert reports that "improperly provide additional support and at times completely change their methodology"); *Welch v. Eli Lilly & Co.*, No. 06-cv-0641, 2009 WL 700199, at *5 (S.D. Ind. Mar. 16, 2009) ("The original expert deadline was the time for plaintiffs to have provided a complete … analysis based on the data they had."); *Nelson v. Ipalco Enters., Inc.,* No. IP02477, 2005 WL 1924332, at *8 (S.D. Ind. Aug. 11, 2005) (striking report for similar reasons).

**ARGUMENT**

In some cases, the line between valid and invalid expert rebuttal testimony may be subtle. Not here. Wells's Original Report failed to lay out a replicable or reliable methodology to justify his inclusion and exclusion of studies from his meta-analysis. And Wells all but disclaimed *any* meaningful methodology at his deposition. Now, Part II of Wells's Rebuttal Report gerrymanders a detailed new methodology to support his original conclusion. That is not legitimate rebuttal.

Even if the methodology in the Rebuttal Report truly represented what Wells did from the start (contrary to what he said in his Original Report and at his deposition), it would be improper: Providing a "rebuttal" report detailing an expert's process cannot "absolve Plaintiffs' experts from excluding purportedly important aspects of their methodology in the initial reports." *Bowman*, 2013 WL 1857192, at *7. To the contrary, where an "initial report did not discuss" an aspect of the expert's methodology that a rebuttal reveals "play[ed] an important … role," the rebuttal report

8

is prejudicially improper. *Id*. Worse, however, the many contradictions between Wells's initial testimony and the Rebuttal Report signal that the latter perpetuates his outcome-driven approach—it is an *ex post* effort to develop a methodology to support a pre-ordained opinion. That not only foreshadows why all of Wells's opinions are inadmissible (a point that later *Daubert* briefing will address); it also confirms that the Rebuttal Report must be stricken at the outset: "A rebuttal report is not the time to change methodologies to account for noted deficiencies." *Id.*

Either way, this Court should refuse to grant Plaintiffs a do-over—with the defense theories already in hand and no opportunity for rebuttal—of their most critical expert report. The Court should strike Part II of the Rebuttal Report (and Appendices B and C).

### A. New Two-Step Meta-Analysis Methodology.

At the outset, the Rebuttal Report purports to identify a two-step procedure for determining which studies to include in the original meta-analysis. It asserts that Wells first applied five inclusion/exclusion criteria to narrow a universe of 36 potential studies down to eight, and then applied five "quality" criteria to those studies to determine which ones to ultimately include. RR 15. **This methodology appears nowhere in Wells's Original Report or deposition testimony.** Indeed, when asked if inclusion criteria were in his report, Wells admitted: "No. It's not in there." Dep. Tr. 113:9-114:1. For that reason alone, the new methodology is not proper rebuttal material and should be stricken and excluded. *See Matthew Enter.*, 2016 WL 4272430, at *4.

Moreover, even a cursory review of Wells's Original Report and testimony reveals that he did *not* apply this two-step methodology when originally selecting studies. For example, Wells now contends he used a threshold set of inclusion/exclusion criteria to winnow a set of 36 studies down to eight, and then evaluated the quality of those eight studies with a separate set of criteria to decide which to include in his meta-analysis. **But neither the list of 36 nor the list of eight**

**appears anywhere in Wells's Original Report or testimony.** Instead, the Original Report lists a separate set of 11 studies described as the "Studies Included in the Analyses." OR 36-39.

Similarly, the Original Report described Wells's seven-study meta-analysis and results in the following way: "*Occupational case-control studies* fixed-effect meta-analysis *for participants with in-person evaluations, including a standardized medical and neurological history and examination by movement disorder specialists*." OR 18 (Fig. 4) (emphasis added). That description combines *two* (out of five) criteria from the new Step 1 (namely, that Wells included "[o]ccupational" and "case-control" studies) with *one* factor (out of five) from the new Step 2 (namely, that Wells considered the quality of the studies' diagnostic assessments). It thus confirms once again that Wells's Rebuttal Report, with its two separate steps and multiple sets of criteria, is an after-the-fact rationalization rather than a faithful recitation of what he actually did.

The methodology described in the Rebuttal Report also conflicts with Wells's testimony at his deposition, where he *disclaimed* any specific criteria and instead repeatedly insisted that he had just "looked at all the features of the study" to gauge "whether it's a good epidemiological study." Dep. Tr. 107:10-108:2. That self-described "holistic" approach cannot be reconciled with the remarkably specific two-step methodology that the Rebuttal Report now articulates. It is thus evident that Wells did *not* proceed the way the Rebuttal Report now claims.

    B.  **New Inclusion/Exclusion Criteria and Their Application.**

The pattern continues when one examines each of the two steps in the new methodology. At Step 1, Wells defines for the first time in his Rebuttal Report five inclusion/exclusion criteria he says he applied: whether the study (i) addressed the risk of occupational exposure to paraquat; (ii) evaluated exposure to paraquat; (iii) evaluated PD as the outcome of interest; (iv) used the same case-control design; and (v) reported sufficient data. RR 10-15. The Rebuttal Report also provides a new chart (Appendix B) assessing those criteria for the 36 studies Wells now claims he

10

started with. As with the broader methodology, **none of that work—neither the criteria nor the analysis—was in Wells's Original Report or deposition**. That makes it clearly improper as rebuttal. *See Matthew Enter.*, 2016 WL 4272430, at *6 (rejecting new charts purporting to reflect expert's original analysis).

Wells tries to excuse this belated disclosure by claiming these criteria were "obvious." RR 10. Yet if they were truly obvious (and not made up after the fact), Wells would have been able to identify them at his deposition when repeatedly asked. In fact, Defendants' expert *tried* to intuit the criteria Wells might have applied to reach the results he did—but, based on the Rebuttal Report, got it *wrong*. Alexander explained it "was not possible for [him] to follow a clear set of inclusion / exclusion criteria" from Wells's report, but "[a]s best [he] can tell from his report, Dr. Wells attempted to limit his meta-analysis to (1) occupational (2) case-control studies (3) for participants with in-person evaluations, including a standardized medical and neurological history and examination by a movement disorder specialist." Exh. D at 86; *see also id.* at 88 (acknowledging that Wells "disclaimed" the requirement of in-person exams at his deposition). As explained, however, that combines *part* of Wells's new Step 1 with *one factor* from Wells's new Step 2, and does not even correctly capture the latter. *See supra* at 10. Even Defendants' expert was unable to divine the supposedly "obvious" methodology Wells now says he followed.

The reason is that the criteria Wells describes at Step 1 are actually *inconsistent* with what he earlier said he did. Take the first one: whether the study addressed "occupational" exposure to paraquat. The Original Report never defined that term or explained how Wells categorized studies as occupational or non-occupational. OR 6. At his deposition, Wells was evasive and inconsistent. He first suggested studies are occupational if they focus on "exposure because of their workplace," as opposed to *residential* exposures. Dep. Tr. 15:1-10. Then he said he looked at *labels*: "I looked

11

at the studies that say they're occupational studies, and I included those studies." *Id.* at 16:9-17:6. The Rebuttal Report, meanwhile, offers a third, brand-new definition of "occupational" exposure completely untethered to the workplace or to the study's labeling: It "use[s] the term 'occupational exposure' to refer to studies that assessed the 'direct contact with pesticides.'" RR 11. Indeed, the Rebuttal Report claims Wells *included* studies of "residential" exposure if they concerned individuals who "used or had potential dermal contact with paraquat." RR 10. This definition appears nowhere in Wells's Original Report (which did not even use the word "dermal") and Wells never gave this definition at his deposition despite extensive questioning on how he defined "occupational" exposure.

This is no mere matter of semantics: It controls whether Wells properly included the study that carries nearly 74% of the weight in his meta-analysis: Liou 1997. At Wells's deposition, he testified he would not consider a study that "includes both occupational and residential exposure," because he was limiting himself to "purely occupational studies." Dep. Tr. 17:22-23. And he later admitted that Liou "did not meet [his] own stated criteria for occupational exposure" because it "included residential exposure." *Id*. at 116:24-117:3. But Wells claimed he opted to include Liou anyway because he "decided this [was] a good study" based on other factors. *Id.* at 117:4-15. After that answer, it is not surprising that Plaintiffs would want to try again. So the Rebuttal Report moves the goalposts, redefining "occupational" so Liou can now be included by virtue of focusing on "use of paraquat." RR 12. This is not a rebuttal. It is a redo.

C.   New "Quality" Criteria and Their Application.

Wells's new analyses at his new Step 2 are equally if not more egregious. At this step, the Rebuttal Report defines what makes a study "High Quality" or "Low Quality" across five "quality" criteria, then grades the eight studies that survived Step 1 against this rubric. RR 15-17 & App. C. As with his Step 1 analyses, **no such list of criteria—much less a definition of what counts as**

12

**high- or low-quality—appears anywhere in the Original Report**. Nor did the Original Report address each of these criteria for the eight studies he now evaluates at Step 2; it instead referenced different general characteristics for different studies. For example, Appendix A of Wells's Original Report, which described features of "Studies Included in the Analyses," did not address or apply the five new "quality" criteria. *Compare* OR App. A, *with* RR App. C.

At this step too, inconsistencies abound between Wells's Rebuttal Report and his earlier testimony—suggesting that this analysis is not merely *newly explained* but also *newly developed* to impose an ostensible scientific framework around Wells's conclusions:

- The Rebuttal Report says a study had a "high quality" exposure assessment if it relied on a "personal interview using detailed exposure questionnaires." RR App. C. Yet even when directly and repeatedly asked at deposition what criteria he used to evaluate exposure assessments, Wells did not identify anything like that. Instead, he testified only that he looked at whether "the exposure assessment was done well" and was "reliable." Dep. Tr. 67:9-68:3; *see also* Exh. A at 7.

- Similarly, on the participation-rate quality criterion, the Rebuttal Report defines a "higher quality" study as one with "over 60% participation for both cases and controls." RR App. C. But at his deposition, Wells maintained that he did not look at participation rates for all of the studies because he considered it relevant only for large studies—and he *affirmatively denied* having "a number" in mind as a numerical threshold for sufficient participation. Dep. Tr. 247:8-13, 248:17-21, 249:5-8; *see also* Exh. A at 8. Somehow that became a bright-line rule of 60% in the Rebuttal Report.

- One of the Rebuttal Report's new "quality" criteria is whether the study controlled for specified confounding variables. RR App. C. Yet, at his deposition, Wells admitted some of the studies he included did not control for confounders, and further admitted that he "didn't evaluate that when [he] included" those studies "in [his] meta-analysis." Dep. Tr. 222:3-11; *see also id.* at 203:7-11, 309:10-310:1; Exh. A at 9.

Moreover, Wells now claims he applied the "quality" criteria at Step 2, *after* narrowing the list of studies based on his inclusion/exclusion criteria at Step 1. But his Original Report addressed some of the "quality" criteria for studies he now claims were excluded *before* this stage, including Elbaz and Pouchieu (OR 15-17), making clear that Wells did not actually follow his new two-step methodology. Again, this is an *ex post* concoction, certainly not proper rebuttal evidence.

13

### D. New Justifications for Excluding Shrestha 2020.

Dig another layer deeper, and more new and contradictory material emerges. The largest, longest, most recent study of U.S. agricultural workers to examine the paraquat-PD relationship is Shrestha 2020, a prospective cohort study conducted using U.S. Agricultural Health Study data. It reported no association (no increased risk) between exposure to paraquat and PD. Wells was aware of this study—but excluded it from his meta-analysis.

In his Original Report and deposition, Wells justified that exclusion because Shrestha was a cohort study, rather than a case-control study, and had a "different" approach to evaluating PD diagnoses in its study population. *See* OR 19; Dep. Tr. 154:4-19, 155:12-16. The Original Report did not evaluate Shrestha by reference to any of the five "quality" factors he now identifies. And, at his deposition, Wells specifically stated that he had no opinion about the reliability of Shrestha's diagnostic approach. *See* Dep. Tr. 176:22-177:9, 181:7-12.

In his Rebuttal Report, however, Wells now devotes *five pages* to an in-depth discussion of Shrestha's characteristics, as a basis to opine that it was properly excluded because a study from nine years earlier based on a limited subset of Shrestha's data (Tanner 2011) was supposedly more reliable. In particular, Wells now says "Tanner was more thorough in its diagnostic assessment," "more thorough in its exposure assessment," and "more appropriately controlled for correlated exposures while minimizing the effects of multicollinearity." RR 24-29. Thus, Wells would "not substitute[]" the Shrestha results for the Tanner results in his meta-analysis. RR 29.

None of this lengthy new analysis is proper rebuttal. Wells was aware of Shrestha at the time of his Original Report, and knew it was an important study that contradicted his conclusions. *See* Dep. Tr. 159:5-15. Wells cannot now "attempt to bolster" his choice to reject Shrestha "with new analyses not previously performed on the exact same data." *Welch*, 2009 WL 700199, at *6. He must instead be held to his original limited explanations for excluding Shrestha.

### E. New Bradford Hill Arguments and Justifications.

Although the heart of Wells's work was his meta-analysis, his Original Report also included a "Bradford Hill" analysis intended to evaluate whether the statistical association that he identified was a causal one. *See* OR 20-25. For the most part, Wells's analysis rested on the same seven studies he had chosen to include in his meta-analysis; he did not, for example, cite Shrestha 2020 or any evidence cutting against his hypothesis. *See id.* In his report, Alexander criticized Wells, explaining that his Bradford Hill analysis was cherry-picked and unjustifiably excluded reliable studies, such as (among others) Shrestha 2020. Exh. D at 7.

On this front, too, the Rebuttal Report attempts to defend Wells's original, deficient analysis by rewriting it. Among other things, he now insists (again contrary to his testimony) that his Bradford Hill analysis *did* consider evidence that Alexander criticized him for omitting. For example, the Rebuttal Report claims Wells did not "ignore[]" Shrestha but rather devoted "considerable time" to that study in his Original Report and deposition. RR 32. In fact, Wells squarely and repeatedly acknowledged in his deposition that he *did not* rely on Shrestha when evaluating the Bradford Hill criteria. *See* Dep. Tr. 295:1-3, 297:8-11, 303:10-13 (admitting he did not consider Shrestha in evaluating any of the Bradford Hill factors).

As another example, Wells's Rebuttal Report offers a novel explanation for how he evaluated the "temporality" Bradford Hill factor, which requires that exposure precede the onset of disease. At his deposition, Wells admitted that the "prodromal phase" of PD can precede the onset of symptoms by 20 years or more. Dep. Tr. 299:6-9. Wells further agreed that, "[f]or exposure to paraquat to be considered a cause of Parkinson's disease, it would need to precede not just the diagnosis but the prodromal phase as well." *Id.* at 299:10-14. Yet, problematically, none of the studies that Wells considered had established that paraquat exposure preceded the prodromal phase. *See id.* at 299:15-300:3. In his Rebuttal Report, Wells now tries to solve that problem by

15

contradicting himself: To prove causation, he says, "the relevant exposure would need to precede the movement disorder and not necessarily the prodromal, pre-movement disorder manifestations." RR 34. In other words, as elsewhere in his Rebuttal Report, Wells responds to criticism simply by shifting the goalposts and inventing a new method of evaluating the issue. But Wells cannot rewrite his deficient Bradford Hill analysis under the guise of rebuttal.

*     *     *

Because the new analysis in Part II of the Rebuttal Report is not proper rebuttal, it had to be included in Wells's original report. Fed. R. Civ. P. 26(a)(2)(B). Because it was not included, its "exclusion is automatic and mandatory" unless the "violation of Rule 26(a) was either justified or harmless." *David*, 324 F.3d at 857. Plaintiffs cannot make either showing here.

*First*, there is no justification for the untimely disclosure of Wells' testimony. His new testimony does not merely clarify minor details; it announces a completely new methodology in conflict with what Wells previously said and did. Nor does the Rebuttal Report rely on newly discovered studies or information; all of the testimony at issue relies on information long known and available to Wells. And Plaintiffs have been aware for years that the critical issue addressed by Wells's analyses—the alleged association between paraquat and PD—is a disputed issue on which they bear the burden of proof. Plaintiffs thus cannot feign surprise that Defendants' experts questioned Wells's opinions and methods.

*Second*, Wells's improper Rebuttal Report is unquestionably and unfairly prejudicial. By withholding Wells's methodology until Alexander had laid out his opinion and critiques, Plaintiffs gained an unfair advantage. Wells usurped the opportunity to concoct a new methodology in response to critiques of his original conclusions and with full knowledge of Alexander's analysis. Plaintiffs' "disregard of the schedule … cannot be deemed harmless" where "it gave the plaintiffs

the opportunity to wait for defendants to show their expert cards." *Nelson*, 2005 WL 1924332, at *8.  Further, the belated disclosure has blocked Defendants "from rebutting" Wells's new opinions "because the deadline for disclosing rebuttal experts has passed," making this ploy "a hornbook example of sandbagging."  *Vu v. McNeil-PPC, Inc.*, No. 09-CV-1656, 2010 WL 2179882, at *3 (C.D. Cal. May 7, 2010).

In short, this "rebuttal" is an improper, eleventh-hour new expert report.  Allowing it would "all but negate the distinction between an initial 'affirmative expert' and a 'rebuttal expert.'"  *R & O Constr. Co. v. Rox Pro Int'l Grp., Ltd.*, No. 09-cv-01749, 2011 WL 2923703, at *5 (D. Nev. July 18, 2011).  The Court should strike Part II of the Rebuttal Report and exclude any testimony beyond Wells's Original Report and deposition.

## CONCLUSION

For the foregoing reasons, the Court should strike Part II of the Rebuttal Report, along with its accompanying Appendices B and C.

| | |
|---|---|
| */s/ Ragan Naresh* | */s/ Sharyl A. Reisman* |
| Ragan Naresh, P.C. | Leon F. DeJulius, Jr. |
| KIRKLAND & ELLIS LLP | Sharyl A. Reisman |
| 1301 Pennsylvania Ave., N.W. | JONES DAY |
| Washington, D.C. 20004 | 250 Vesey Street |
| Tel.: 202.389.5000 | New York, NY 10281 |
| Fax: 202.389.5200 | Telephone: (212) 326-3939 |
| ragan.naresh@kirkland.com | Fax: (212) 755-7306 |
| | lfdejulius@jonesday.com |
| Leslie M. Smith, P.C. | sareisman@jonesday.com |
| Bradley H. Weidenhammer, P.C. | |
| KIRKLAND & ELLIS LLP | ***Counsel for Chevron U.S.A. Inc.*** |
| 300 North LaSalle | |
| Chicago, IL 60654 | |
| Tel: (312) 862-2000 | |

***Counsel for Syngenta Defendants***

## CERTIFICATE OF SERVICE

I certify that on March 24, 2023, I served Defendants' Partial Motion to Strike Rebuttal Expert Report of Martin T. Wells on all parties of record through the CM/ECF system.

/s/ Sharyl A. Reisman