# EXHIBIT E

## REBUTTAL TO REPORT OF DOMINIK ALEXANDER

Framing a meta-analysis to best answer a research question is not only within my realm of expertise, I am a leading authority on the subject, recognized by experts in statistical science at independent institutions and scholarly publications around the world. My expertise is in statistical methodology at Cornell University, where I am a both a professor of Biostatistics and Epidemiology and serve as the chair of the Department of Statistics and Data Science. I have published extensively on statical methodology and meta-analysis in peer-reviewed journals, have edited leading journals on statistical science, and lectured on best practices for undertaking a meta-analysis to experts at the Cochrane Collaboration and the World Health Organization. In response to Dr. Alexander's report, I will first evaluate the problems in his report and then respond to his criticisms of my report.

## I.     DR. ALEXANDER'S REPORT AND META-ANALYSES CONTAIN METHODOLOGICAL AND STATISTICAL ERRORS, INCONSISTENCIES, AND OMISSIONS.

Methodological Errors

- Dr. Alexander wrongly concludes that the available epidemiology concerning the relationship between paraquat use and PD is too heterogenous in design and statistically to warrant meta-analysis.

As a matter of statistics, the meta-analysis in my report poses no heterogeneity problems. There is no dispute that an $I^2$ of 0% indicates that there is no statistical heterogeneity within my meta-analysis. My meta-analysis avoids any issue with design heterogeneity by combining studies of a similar design. When you combine narrowly focused studies of higher quality to answer a targeted research question, meta-analysis is a useful tool for synthesizing the statistical data.

- Dr. Alexander improperly combines study types in his meta-analyses.

Although Dr. Alexander claims it is improper to conduct a meta-analysis in this case, his report goes on to create one anyway—and then to run many others in an attempt to show that his is better. (Interestingly, Dr. Alexander's meta-analysis also shows a positive

association between paraquat use and PD.)  Dr. Alexander's meta-analysis suffers from at least one overarching methodological error: it is an improper statistical practice to combine cohort and case-control studies in a single meta-analysis.  This is why, for example, Vaccari at al. (2019) separated out the only cohort study from their meta-analysis of case-control studies. Vaccari at al. (2019) noted that they would present the results of the case-control investigations and the cohort study in separate meta-analyses "due to their different experimental designs." (Vacarri at al. (2019), p. 189).

It is inappropriate to combine studies of different designs because studies using different designs measure different things. The well-accepted NOS scale for assessing study quality assigns entirely different criteria for assessing quality of cohort versus case-control studies. Those criteria are designed to assess the accuracy, not the size, of the data pool, given the differing design features.  The criteria also acknowledge that the cohort and case-control studies are not interchangeable and should be assessed using different criteria on different scales.

The choice of which measure to use depends on the research question and study design. All three effect measures (odds ratios, risk ratios, and hazard ratios) can provide information on the association between an exposure and an outcome, but they measure different aspects of the association and have different interpretations.  If the data in a given study allows, one measure can be converted into another.

The odds ratio, for example, measures the odds of exposure among cases relative to the odds of exposure among controls. It is calculated as the ratio of the odds of exposure in the case group to the odds of exposure in the control group. The odds ratio is a useful measure when the outcome is rare, and it is difficult to obtain a reliable estimate of the incidence rate. The odds ratio estimates the strength and direction of association between exposure and outcome.

The risk ratio measures the risk of developing the outcome among the exposed group relative to the risk of developing the outcome among the unexposed group. It is calculated

as the ratio of the incidence rate of the outcome in the exposed group to the incidence rate of the outcome in the unexposed group. The risk ratio is used when the outcome is common, and the study population is followed over time.

The hazard ratio measures the instantaneous risk of the outcome occurring in the exposed group relative to the unexposed group. It is calculated as the ratio of the hazard rate of the outcome in the exposed group to the hazard rate of the outcome in the unexposed group. The hazard ratio is useful when studying time-to-event data, such as the time to developing a disease, and provides an estimate of the instantaneous risk of the outcome.

Nevertheless, in his meta-analyses, Dr. Alexander combines the published HR from Shrestha et al. (2020) (a cohort study) with the ORs in the other case-control studies. (Alexander Report, p. 96). At the very least, proper methodology would require that Dr. Alexander either combine for the same effect measure, or to convert the effect measures to a common scale—neither of which Dr. Alexander considered or attempted. (Cochrane Section 12.1).

- Dr. Alexander creates exposure categories that are contradicted by the studies themselves and does so without any stated rationale.

A rationale or justification for creating subgroups in a meta-analysis should be provided. Dr. Alexander testified that he provides such a rationale when performing meta-analysis in peer-reviewed publications. (Alexander Deposition, p. 112). In this litigation, however, Dr. Alexander fails to articulate a rationale for creating three subgroups for exposure to paraquat: "agricultural," "occupational" and "mixed." (Alexander Report, p. 96).

In his report and during his deposition, Dr. Alexander stated that "agricultural workers may have a greater understanding of use of pesticides," but he could not identify any validation of his assumption or cite any studies in support. Nor could he say whether or how that understanding might impact a study's result. (Alexander Deposition, p. 298). Dr. Alexander could also not identify any non-agricultural "occupations" that use paraquat to

justify his differentiation between "agricultural" or "occupational" use of paraquat. (Alexander Deposition, p. 290-91).

Finally, Dr. Alexander also created a "mixed" subgroup that he claims includes studies with "mixed environmental and occupational" exposure.  (Alexander Report, p. 96). Yet all three studies included within Dr. Alexander's "mixed" subgroup (Liou et al. (1997), Hertzman at al. (1994) and Dhillon et al. (2008)) measured the direct use of paraquat. Notably, Hertzman et al. (1994) defined exposure as handling paraquat or working in an area that had been recently sprayed with paraquat. Workers in fields recently sprayed with paraquat have direct contact with the chemical.  (Chester and Woollen, p. 31).  The Liou et al. (1997) study specifically observed that Hertzman et al. (1994) found a significant association between PD and "handling or directly contacting pesticides in British Columbia." (Liou et al. (1997), p. 1586).  Wray and Niman also define both Liou et al. (1997) and Hertzman et al. (1994) as purely occupational studies.  (Wray and Niman (2019), p. 32).

Importantly, the three studies that Dr. Alexander describes as "mixed environmental and occupational" exposure all reported ORs that relate to the participants' direct contact with paraquat.  The ORs for these three studies did not capture community or environmental exposure.

Dr. Alexander speculates about the significant statistical heterogeneity between the studies he divides into in these arbitrary subgroups.   (Alexander Report, Figure 2). It is unknown whether the p-value listed in Figure 2 is related to a difference in exposure type or from the $I^2$ in Figure 1.  His Figure does not identify what comparison the $I^2$ is supposed to measure (mixed v. occupational, for example, or mixed v. agricultural).  Yet Alexander eliminates his "mixed" exposure group based on his heterogeneity analysis.  (Alexander Report, Figure 4).

I used a meta-regression approach to assess the differences in Alexander's three exposure categories. Rather than using Shrestha et al. (2020), I replaced it with Tanner et al. (2011).

4

I found no significant differences between Alexander's "agricultural" and "mixed" subgroups (p=0.262) or the "occupational" and "mixed" subgroups (p=0.089). If one pools the "agricultural" and "occupational" subgroups, there is no statistical difference between the pooled and "mixed" subgroup (p=0.113). It follows that Dr. Alexander's elimination of the "mixed" subgroup, which included Liou et al. (1997), is driven by his initial replacement of Tanner et al. (2011) by Shrestha at al. (2020).

- Dr. Alexander improperly dismisses the Liou et al. (1997) study as a source of heterogeneity.

Dr. Alexander could see from the data that I provided that the heterogeneity score for the seven studies in my meta-analysis which includes Liou et al. (1997) was 0.0%.  Dr. Alexander testified at his deposition that he came to the same result.  (Alexander Deposition, p. 250).

- Dr. Alexander creates quality criteria that are internally redundant and not supported by the quality assessment criteria of other researchers.

In Dr. Alexander's Appendix 1, he outlines the design and statistical features that he assessed for quality in creating his meta-analysis.  Some of his criteria are redundant and are not utilized by other researchers.   By way of example, Dr. Alexander's "sample size" criterion assigns higher quality scores to larger studies.  Yet Dr. Alexander also assigns a higher score for the number of exposed cases, thereby doubling the impact of the size factor in his quality assessment.  Similarly, Dr. Alexander assigns higher quality scores for studies that utilize a cohort study population (which studies capture incidence of a given outcome), and also assigns a higher quality score to studies that capture incidence data rather than prevalence data.   Dr. Alexander's quality assessment is internally inconsistent and disproportionately favors large studies (which may or may not be of higher quality) that utilize a cohort design.

While Dr. Alexander is critical of my approach, it is not different from the subjective approach in his own analysis which evaluates the multiple characteristics of a study to assess its quality.  In his report, Dr. Alexander purported to use a quantitative protocol to

assess 11 occupational studies with respect to, for example, design (cohort or case control), population (agricultural workers or occupational users), exposure assessment and PD diagnostic criteria – assigning points for each and arriving at a total "Quality Score." (Alexander Report, p. 76, fn 18, Appendix 1).  In his deposition, Dr. Alexander made clear that the scores were not meant to be viewed relative to each other (as rankings). (Alexander Deposition, p. 181).

This was further clarified upon application.  According to Dr. Alexander's quantitative assessment, Pouchieu et al. (2018) received the second highest quality score of all the studies.  In his deposition, however, Dr. Alexander indicated that he considered Pouchieu et al. (2018) to be a low-quality study.   Dr. Alexander chose not to use Pouchieu et al. (2018) in his meta-analysis –choosing instead to use Elbaz et al. (2009), a study published 9 years earlier that reported on a fraction of the population studied in Pouchieu et al. (2018).

Although the 11 quality scores apparently were not "scores" after all, Dr. Alexander performed a meta-regression analysis of these scores and the corresponding studies' ORs to conclude that "the better the study, the lower (or no) risk of Parkinson's disease." (Alexander Report, p. 118). Dr. Alexander gives a purely graphical analysis to make his point, without identifying which 9 studies he used in his model.[1]  (Alexander Report, p. 119). Dr. Alexander did not provide his regression formula or present the statistical significance of his findings, preventing me from replicating his analysis.

Using the 9 "occupational studies" Dr. Alexander identifies in his report, I performed a meta-regression with the log odds ratio as the dependent variable and the combined quality score as the independent variable.  (Alexander Report, p. 96).  I found no significant association between the log odds ratio and the combined quality score (p=0.259). Similarly, there was no association between the log odds ratio with the design quality score (p=0.128) or the data quality score (p=0.506).

---

[1] If Dr. Alexander removed Tanner et al. (2011) and Pouchieu et al (2018) because of nesting, that would have been inappropriate.  His analysis was not being performed for the purpose of measuring an association. It was being performed to measure the relationship between quality scoring and ORs.

Statistical Errors/Inconsistencies

- Dr. Alexander violated his stated data-extraction protocol and used improper methods for extracting data.

Dr. Alexander claimed to use the most adjusted odds ratio for the highest level of exposure to paraquat in his meta-analysis. (Alexander Report, p. 95, at No. 2). Yet, when extracting data from the van der Mark et al. (2014) study to use in his meta-analysis, Dr. Alexander appears to have simply averaged the odds ratios from the low and high exposure durations (1.42 and 1.010) and then used the two confidence intervals (and their corresponding standard errors) to compute the confidence interval for the average. This not only violated his stated rule of using the highest level of exposure as a way to minimize the potential influence of exposure misclassification, calculating a simple average of two adjusted odds ratios is not a recognized approach.

- Dr. Alexander uses incorrect and unsupported data in his meta-analysis.

In his meta-analysis, Dr. Alexander used what he labels an "odds ratio" for Shrestha of 1.09. 1.09 is the HR reported by Shrestha et al. (2020), however, and it relates to incident cases. The reported OR in Shrestha et al. (2020) for combined incident and prevalence cases is 1.13. By labeling a HR as an OR, Dr. Alexander's meta-analysis hides the comingling of different effect measures, or uses incorrect data (which favors a lower odds ratio) in the calculation of his meta-analysis. This would be akin to combining a weight in pounds with a weight in kilograms or a body mass index score.

Omissions/Inconsistencies:

- Dr. Alexander fails to identify his inclusion/exclusion criteria for his meta-analysis.

Although Dr. Alexander asserts that meta-analysis is an improper vehicle for assessing the question, he nevertheless performs several meta-analyses in his Report. (Alexander Report, p. 96 at Fig. 1). Dr. Alexander's meta-analysis uses data from nine studies, the selection of which was never explained via inclusion/exclusion criteria.

- Dr. Alexander failed to provide the results and data that would allow replication or analysis of his results.

Dr. Alexander's report omits important regression formulas and significance testing for the various regression analyses he performs. (Alexander Report, p. 97, 100, 104, 119). All platforms, including Comprehensive Meta-Analysis, allow users to save (for purposes of replication) commands/formulas that were run using the data. In Comprehensive Meta-Analysis, these instructions can be saved in a "cmr file," if the user chooses to do so. The Comprehensive Meta software also allows a user to include regression formulas and significance results on projected regression plots. See for example:



Dr. Alexander chose not to save any of the formulas or significance results that would allow me or anyone to validate his analyses. Instead, Dr. Alexander provides only graphic depictions without the statistical results that might actually disprove his theories and undermine the visual impact of his bubble charts.

## II. DR. ALEXANDER'S CRITICISMS OF MY REPORT ARE CONTRADICTED BY MY REPORT, TESTIMONY, AND ANALYSIS.

My report lays out the statistical framework which I think best answers the question of whether the epidemiology supports a causal relationship between the use of paraquat and PD. Dr. Alexander's criticisms of my report ignore the work I performed in conducting my review of the literature and producing my meta-analysis. Dr. Alexander's criticisms of my report, my methodology, and my meta-analysis emphasize form over substance. I will nevertheless address these criticisms below.

1.     Dr. Alexander states that I failed to establish a research question. The first sentence of my report identifies my "research question." There, I stated that I was asked by counsel

for the Plaintiffs to analyze the epidemiological evidence concerning the association and causation of the occupational exposure to paraquat and the onset of PD. The point of articulating a research question in an academic paper is to advise the reader about the study topic. Given the stated purpose of my report, the pages that followed, and my deposition testimony, there can be no doubt that I articulated a research question.

2. <u>Dr. Alexander states that I failed to follow the scientific method</u>. I am well acquainted with meta-analysis methodology and followed it in conducting my analysis. As set forth in my report, I followed a Cochrane approach to meta-analysis, which requires two stages. (Report, p. 4). The first step in the process involves a literature search and extracting the data from the relevant studies, while the second step requires calculating a pooled effect estimate as a weighted average of the effects estimated in the individual studies.

3. <u>Dr. Alexander is critical of my report for failing to include search string terminology to document my search of the relevant epidemiological literature</u>. Dr. Alexander's criticism places form over substance and suggests that my report must use the same format as an academic paper published in a peer-reviewed journal. While my report used a different format, the methodology and substance were the same. My review of the literature was comprehensive, and all of the relevant studies were identified in the Materials Considered portion of my report. (Report, p. 26-35). Beyond that, Dr. Alexander ignores the fact that when I performed my analysis, the universe of epidemiological literature on the subject of paraquat and PD or parkinsonism was known. Reviews of related epidemiological studies had already been written by Breckenridge et al. (2016), Pezzoli et al. (2013), Vaccari et al. (2019), Ntazani et al. (2013), Allen et al. (2013), Tangamornsuksan et al. (2018), and Wray and Niman (2019), published as recently as 2019. I considered all of the studies considered in those reviews, and identified studies on the subject postdating those reviews. Despite his criticism, Dr. Alexander does not identify a single study he claims I missed that would alter my analysis.

Dr. Alexander's Report fails to reference four studies that were included in other meta-analyses and in my report. (Balderschi et al. (2003), Behari et al. (2001), Paul et al.

(2018), and Wan and Lin et al. (2016)). The only study that Dr. Alexander considers that I did not cite in my report was a study (Caballero et al. 2018) authored by an undergraduate student concerning an ecological exposure analysis of PD. The study had no bearing on the issues I was asked to assess and is described by Dr. Alexander as being "fraught with limitations." (Alexander Report, p. 73).

4.     Dr. Alexander criticizes my report for not providing a "data extraction methodology." Although not separated under a heading of "Data Extraction Protocol," my report articulated the preferences and mechanisms for extracting data from relevant studies under a Cochrane approach. (Alexander Report p. 4-5). I provided my data and Stata formulas, allowing Dr. Alexander to see precisely what data I was inputting. Dr. Alexander concedes that he was able to reconstruct the data in my meta-analysis. (Alexander Report, p. 84, 92-93.) With one exception, Dr. Alexander's assertion that my data was "incorrect" is supported only by his disagreement with me, not by any miscalculation on my end. My original report used the data from the Firestone et al. (2005) study, instead of Firestone et al. (2010). This was corrected at my deposition. I am attaching as Appendix A the revised forest plots for my meta-analysis which incorporate the Firestone et al. (2010) data.

5.     Dr. Alexander criticizes my report for failing to use transparent inclusion and exclusion criteria used in my meta-analysis. I was asked by counsel for the Plaintiffs to analyze the epidemiological evidence of an association between PD and occupational or direct exposure to paraquat in the course of work, agricultural, or residential applications– in other words, individuals who used or had potential dermal contact with paraquat – as opposed to indirect community exposure through, e.g., drift. Based upon the scope of this work, and as articulated in my report and deposition, my inclusion/exclusion criteria are self-evident. Although my report did not have a section titled "Inclusion/Exclusion Criteria," the fact that I only included studies relating to PD is obvious. The fact that I only included studies relating to paraquat should have been obvious. The fact that I only included case-control studies in my meta-analysis was stated in my report and deposition. The fact that I only included studies where an OR could be calculated should be obvious.

Finally, the fact that I only chose studies involving "occupational exposure" should be apparent from the opening sentence of my report.

For further clarification, and to address some of the misunderstandings Dr. Alexander identifies in his report, the inclusion/exclusion criteria I used are more specifically addressed below. To add visual context, I have attached as Appendix B a table identifying the studies relating to exposure to paraquat and its association with PD that I considered for inclusion in my meta-analysis and the criteria considered for inclusion/exclusion.  All of these studies were included in the materials I considered in the preparation of my original report.

<u>First Inclusion/Exclusion Criteria: Studies That Addressed the Risk of Occupational Exposure to Paraquat</u>

In my report, I explained that I would evaluate "occupational exposure" to paraquat, as opposed to "community exposure."  (Report, p. 6).  This inclusion/exclusion criteria was derived from what I was asked to analyze and it is my understanding that this criteria is related to the use of paraquat, or contact with paraquat where there is the risk of dermal exposure. (Report, p. 1).

I used the term "occupational exposure" to refer to studies that assessed the "direct contact with pesticides." In contrast, I excluded studies that relied on "spatial extrapolations" to assess "community exposure."  (Report, p. 6).  Community exposure studies, as stated in my deposition, were excluded because they do not involve use or direct contact with paraquat.  (Deposition, p. 97-98).  Rather, those studies involve exposure due to living or working in proximity to paraquat, and tend to assess exposure via air or water contamination.  (E.g. Ritz et al. (2009), Gatto et al. (2009)).

The EPA has also recognized that "occupational study populations [are] more likely to experience exposure as a result of direct use of paraquat."  (Wray and Niman (2019), p. 5). The EPA viewed non-occupational study populations as those exposed to lower-level

"environmental concentrations." (Wray and Niman (2019), p. 3.) Other researchers have used a similar distinction.[2]

At my deposition, I testified that I did not necessarily exclude residential studies in my meta-analysis based on a label or category assigned by another researcher. (Deposition, p. 19). I evaluated the studies themselves to determine whether they assessed use or direct contact with paraquat, and to ensure I was being consistent with the literature. (Deposition, p. 19). Although the study by Liou et al. (1997) involved both residential and occupational exposure, it calculated an OR specific to the "use of paraquat." Thus, I included it in my meta-analysis because it evaluated direct contact with paraquat (irrespective of where it occurred). Other analyses are in agreement. Both Wray and Niman (2019) and Breckenridge et al. (2016) categorized Liou et al. (1997) as an occupational study concerned with the use of paraquat. (Breckenridge et al. (2016) Supp. 3, Table I).

Second Inclusion/Exclusion Criteria: Studies that Evaluated Exposure to Paraquat

I was advised that paraquat is the exposure at issue in this litigation. Because many epidemiological studies have examined the association between PD and pesticides or herbicides more generally, I included in my meta-analysis only studies that specifically looked at paraquat. This should be apparent.

As I stated in my Report, I excluded the Elbaz et al. (2009) study from my meta-analysis because the study "only reported on an association related to quaternary ammonium." (Report, p. 14). Although the quaternary ammonium class of herbicides includes paraquat, it also includes other chemical compounds and herbicides. Accordingly, quaternary ammonium is not a "reliable surrogate of paraquat exposure." (Report, p. 15). In my deposition, I further clarified that the reason for the exclusion of the Elbaz et al. (2009)

---

[2] Wan and Lin, 2015 at p.1 ("Human pesticide exposure can be classified into two categories: occupational exposure and nonoccupational exposure. Occupational exposure occurs among individuals (e.g., farmers, pesticide applicators) whose occupation exposes them and their immediate family members to pesticides. Nonoccupational exposure occurs among individuals who live close to farmlands and pesticide application sites."). Tangamornsuksan et al. (2018) defines occupational exposure defined as including participants "directly exposed to paraquat" in the workplace and "environmental" exposure defined as including participants "indirectly exposed to paraquat" (p. 226).

study from my meta-analysis was that the exposure classification was not sufficiently specific as to be reliable.  (Deposition, p. 69, 262, 264, 265).  I testified that the unspecific exposure classification was a "fatal problem" for inclusion of the study in my meta-analysis.[3]  (Deposition, p. 69, 264).

Since authoring my report, I have learned that in 2020, Syngenta urged the EPA to consider Elbaz et al (2009) in support of its position on the association between paraquat exposure and PD.  The EPA rejected Syngenta's invitation to do so for the same reason:

> The remaining study by Elbaz et al. (2009) considered paraquat exposure in its discussion, but only reported on the association between the quaternary ammonium class of herbicides and PD. The quaternary ammonium class of herbicides includes paraquat as well as other compounds and may not be a reliable surrogate of paraquat exposure alone. No additional information is provided by Elbaz *et al.* (2009) to determine if their study population used paraquat rather than other quaternary ammonium herbicides, including cyperquat, chlormequat diethamquat, difenzoquat, diquat, and mepiquat. As such, Elbaz et al. (2009) provides insufficient information to specifically assess the relationship between paraquat and PD and was not included in the agency's evaluation.  (SYNG-PQ-MDL-000897583).

Dr. Alexander includes Elbaz et al. (2009) in his paraquat specific meta-analysis without any acknowledgement that the study's stated odds ratio relates to the broader class of herbicides.

Third Inclusion/Exclusion Criteria: Studies that Evaluated PD as the Outcome of Interest

Based upon my assignment as articulated in my report and at my deposition, it is self-evident that my analysis included only studies that evaluated PD as the outcome of interest. Studies that were nonspecific as to the studied outcome and included parkinsonism as an outcome of interest were excluded. (Appendix B).  It appears that Dr. Alexander used this

---

[3] Because the Elbaz et al. (2009) study was excluded from my meta-analysis due to its non-specific exposure classification, my testimony and report were unclear as to whether the outcome studied in Elbaz was sufficiently specific for PD. (Deposition, p. 265).  Review of Dr. Lang's Deposition suggests that the diagnostic criteria and assessment was sufficiently thorough in Elbaz such that PD was likely the studied outcome.

same criteria as the basis for excluding the Engel et al. (2001) and Tanner et al. (2009) studies from his analysis.  (Alexander Report, p. 32 at fn 8; p. 96).

Fourth Inclusion/Exclusion Criteria:  Studies Using the Same Case-Control Design

My primary meta-analysis included only studies using a case-control design.  (Report, p. 17).  As opposed to other epidemiological study designs, case-control studies are the superior method of studying rare diseases and diseases with long latency.  Parkinson's disease is one such disease. As previously explained, case-control studies should not be combined with cohort studies in a single meta-analysis.

Information bias is a source of bias in cohort studies, which occurs when the measurement of exposure or outcome is inaccurate or incomplete. In cohort studies involving diseases with long latency, accurately measuring exposure and outcome data over a long period can be complex. This can lead to misclassification of exposure or outcome, which can bias the estimated exposure-outcome association.

An advantage of case-control studies is that they can often recruit cases more efficiently than cohort studies. This is particularly true for rare or complex diseases or conditions where a large sample size is needed to study the outcome. By selecting cases from a well-defined population and controls from the same population or a similar population, case-control studies can provide efficient estimates of the odds of exposure.

My deposition further clarified that I believe it is bad statistical practice to combine cohort and case-control studies into one meta-analysis. (Deposition, p. 88-89, 144-145).  Case-control and cohort studies use different design features, different timescales, and measure different effects.  (Deposition, p. 88, 90-93).  There is widespread agreement on the dangers of combining cohort and case-control studies in a single meta-analysis.  In Vacarri et al. (2019), the authors stated that the results of their case-control investigations were presented separately from the cohort study "due to their different experimental designs." (p 189).   I followed the recommended approach of Cochrane to keep separate studies of different designs. (Cochrane, Section 24.6.2.1).

<u>Fifth Inclusion/Exclusion Criteria:  Studies Reporting Sufficient Data</u>

While it seems obvious to include only studies from which there is applicable and/or sufficient data, it was not articulated in my report or inquired into during my deposition. This criteria is the basis for excluding the Seidler et al. (1996) and Semchuk at al. (1992) studies from my meta-analysis.  I considered both of these studies in my report and included them on my review list.  (Report, p. 7, 14, 33).   However, neither provided risk estimates nor data sufficient to allow me to calculate a risk estimate. Dr. Alexander explained in a footnote why these two studies were not included in his analysis and similarly chose to omit these studies from a larger inclusion/exclusion framework.   (Alexander Report, p. 32 at fn 8).

6.      <u>Dr. Alexander mischaracterizes my assessment of the studies' quality and criticizes my conclusions</u>. After applying the above criteria, it is important to assess the studies' quality for determining whether they should be included in a meta-analysis and whether any heterogeneity would result. Dr. Alexander confuses inclusion/exclusion criteria with the factors I used to evaluate the quality of the included studies. After application of the inclusion/exclusion criteria, I was left with eight studies.  I then evaluated the quality of these studies using five factors.  The need to evaluate the quality of the studies used in my meta- analysis and exclude studies of lesser quality is supported by the authorities cited by Dr. Alexander.

In Borenstein's <u>Introduction to Meta-Analysis</u>, cited by Dr. Alexander, the authors state as follows under the heading "Garbage In, Garbage Out":

> A systematic review or meta-analysis will always have a set of inclusion criteria and those should include criteria based on the quality of the study.  …In fact, it is common in a systematic review to start with a large pool of studies and end with a much smaller set of studies after all inclusion/exclusion criteria are applied.  (p. 380).

15

In Finckh's 2008 "Primer: strengths and weaknesses of meta-analysis", another source cited by Dr. Alexander, the author stated:

> The validity of meta-analyses depends on the methodology quality of the included studies… (p. 146).
>
> …Meta-analyses can only be as valid as the studies selected for the systematic review.  When high-quality studies are available and the methodology of the meta-analysis is sound, the conclusions of the review are likely to be reliable… (p. 148).

There are many different methods to evaluate the quality of epidemiology studies. Tangamornsuksan et al. (2018), Vaccari et al. (2019), Pezzoli et al. (2013), Wray and Niman (2019), and Dr. Alexander all used different methods and applied different but similar factors to evaluate quality.  Their approaches to evaluating quality ranged from rating study characteristics with numbers or tiers, to descriptive phrases like "high, medium, low."  Vaccari et al. (2019) used a "probably/definitely yes" and "probably/definitely no" scale to assess the risk of bias in the epidemiological studies they reviewed.  It is not uncommon for epidemiologists to disagree on the quality of the same study.   For example, Breckenridge et al. (2016) gave the Firestone et al. (2010) study the highest quality score of all studies evaluated, while Wray and Niman (2019) viewed Firestone et al. (2010) as "low quality."

I used five different factors to evaluate the quality of each study that was not excluded after application of my previously described inclusion/exclusion criteria.  None of these factors alone formed the basis for a study's exclusion.  As stated throughout my deposition, and throughout my report, a study was only excluded after application and consideration of all quality factors, which resulted in the conclusion that the study was insufficiently reliable to be included in the meta-analysis.  (Deposition, p. 107-08, 320-22; Report, p. 36-39). The factors utilized were as follows:   (a) method and diagnostic criteria for the identification of PD cases (Report, p. 15, Deposition, p.  98-100, 238-39); (b) exposure assessment methodology (Deposition, p. 243-44, 245, 265); (c) identification and composition of control groups (Report, p. 36-39; Deposition, p. 107, 112, 208); (d)

16

participation rates; and (e) adjustments/controls of confounding variables. (Report, p. 36-39, Deposition, p. 39, 45-46, 85, 309-10).  Attached as Appendix C is a table that adds visual context to how the quality criteria were applied to the studies in my meta-analysis. I will discuss these factors below.

a.      Method and Diagnostic Criteria for Identification of PD Cases

In his report, Dr. Alexander mistakenly represents that this factor was utilized as the sole basis for the exclusion of studies from my meta-analysis.  I never stated in my report or during my deposition that the diagnostic criteria and methodology for identifying PD cases was anything other than one of several factors considered in my quality analysis.  This was repeatedly stated throughout my deposition.  (Deposition, p.108-09, 111, 238-44).   A mistake in Figure 4 of my report was immediately corrected during my deposition. (Deposition, p. 98-100).

Dr. Alexander criticized my approach, and failure to "speak to or consult with a Parkinson's disease specialist in developing this criteria or assessing the studies for compliance."  However, I was asked to assume that Dr. Lang had reviewed the criteria of all studies considered in my analysis.  Having had the opportunity to review Dr. Lang's report and testimony on this subject, it is clear that the criteria I used were appropriate. Dr. Alexander used a similar scale in his evaluation of PD diagnostic criteria. (Alexander Report, p. 117,).

All 7 studies I included in my meta-analysis met the highest level of quality concerning the diagnostic criteria.[4]  In each of the studies, Dhillon et al. (2008), Hertzman et al. (1994), Kuopio et al. (1999), Liou et al. (1997), Rugjberg et al. (2011), and Tanner et al. (2011), the outcome assessment was conducted by a neurologist who conducted in-person examinations of the PD cases participating in the study. The seventh study, Firestone et al.

_____

[4] The reliability of the outcome assessment can have a profound statistical impact on a study.  In a meta-analysis of cohort studies reviewing a generalized association between pesticides and PD, the authors found that risk was significantly higher for the cases confirmed by neurologist exams than those ascertained by self-reported diagnoses.  Van Maele-Fabry, F., et al. (2012) (studies where PD diagnosis is confirmed by a neurologist (RR=2.56) and for others (RR=1.07)).

(2010), relied on a medical records review by a panel of three neurologists in confirming the diagnosis.  The outcome assessment in the van der Mark et al. (2014) study was of lower quality because it relied on medical chart reviews by neurologists.  Unlike in Firestone et al. (2010), the van der Market al. (2014) study omitted any mention of agreed-upon and identifiable diagnostic criteria used by the reviewing neurologists.  (Deposition, p. 107, 240).

### b.   Exposure Assessment Methodology

I considered studies with individualized exposure information to be of higher quality. (Deposition, p. 243-44, 245, 265.) As I testified at my deposition, I included studies in my meta-analysis that provided specific exposure information, and included interviews, surveys, or other sources of individualized evidence. Other meta-analyses agree with this approach.  By way of example, the Breckenridge meta-analysis recognized that studies with "individual-level exposure assessment" are of higher quality and that "ecologic group-level exposure" assessments are of lesser quality.  (Breckenridge et al. (2016), p, 5). Moreover, "causation is more clearly established when the studies reflect a clear determination that the individuals within the studies were actually exposed to the risk factor."

Studies that rely on ecologic information to determine exposure were considered to be of lower quality.[5]  Dr. Alexander agrees that "ecologic studies" are less informative. In his report, he states that "[e]rroneous conclusions may be reached if inferences about individuals are made based on aggregate observations." (Alexander Report, p. 11).  Dr. Alexander also states that a major limitation of ecologic studies is the impact of confounding and bias.  "Since information is collected at the aggregate, rather than the individual level, the impact of confounding cannot be controlled adequately." (Alexander Report, p. 10).

---

[5] Wray and Niman (2019) also observed that ecologic data is less specific and ranked the Wan and Lin (2016) study as low quality.  The "primary reason for this determination is that the study used an ecologic design that does not provide individual-level information on paraquat exposure and PD."  (p. 30).

All 7 studies I included in my meta-analysis collected individualized exposure information and were therefore ranked as higher quality.  The van der Mark et al. (2014) study was of lower quality because the individual exposure data gathered by the researchers was not connected to the risk estimate concerning paraquat use. The study relied upon a crop exposure matrix to assess paraquat exposure.  The van der Mark et al. (2014) authors constructed a crop exposure matrix to estimate exposure to specific active ingredients based on participants' self-reported cultivation of crops.  The approach relied on outside judgment to assign paraquat usage to specific crop types and may be subject to misclassification.[6]  The van der Mark et al. (2014) study stands in contrast with all of the other studies included in my meta-analysis, which utilized individualized exposure assessment strategies.

### c.   Composition of Control Group

As with the other quality factors, the control groups established in each study were evaluated to be of either higher or lower quality.  The higher quality studies utilized physical examinations to ensure that controls did not have undiagnosed PD.  The lower quality studies used other methods. This quality factor was discussed at my deposition (Deposition, p. 107, 112, 208).

### d.   Participation Rates/Completeness of Data

My report and deposition also made clear that I reviewed the participation rates of the studies included in my meta-analysis. (Report, p. 15; Depo, 246-49). While Tanner et al. (2011), Liou et al. (1997) and Hertzmann  et al. (1994) had high participation rates, the remaining studies had significantly lower participation and were assessed as lower quality for this factor.

---

[6] Wray and Niman (2019) assessed the Pouchieu et al. (2018) study as "low quality" for similar reasons.  (p. 19-20).  They also observed that a crop-exposure matrix limited the researchers' ability to evaluate paraquat in isolation.

e.   Controlling for Confounding Variables

Dr. Alexander incorrectly suggests I did not consider the potential impact of confounding factors in the studies I included in my meta-analysis.  Confounders are variables that can influence the revealed cause and effect.  In my report, I discuss the methods used by each study to control for confounding.  (Report, p. 36-39).   These methods were further discussed in my deposition.  (Deposition, p. 39, 45-46, 85, 201-202, 309-310).  They can be controlled through study design (e.g., restriction, matching), randomization, or statistics (regression modeling).  When the potentially confounding variables are correlated with each other or with the outcome being studied, the variables are described as correlated.   In my original report and in my deposition, I addressed the problems that can arise when attempting to control for potentially confounding, highly-correlated variables through statistical regression.   (Report, p. 17, 25; Deposition, p. 45-46, 85, 277).

Aside from his claim that I did not consider confounding, Dr. Alexander contends that I did not "assess the impact of controlling or failing to control for confounding" in various studies.    (Alexander Report, p. 180, fn 38).    This may have resulted from miscommunication during my deposition, because in order to "assess the impact" of potential confounding, certain data is required to do an analysis.  This data was not available in the studies and that was my testimony.  (Deposition, p. 219, 222, 226).  When Dr. Alexander was similarly asked about his ability to assess the impact of confounding in Liou et al. (1997), Tanner et al. (2011), Firestone et al. (2010), Hertzman et al. (1994), and Kuopio et al. (1999), he also acknowledged that without further data, such an assessment could not be done. (Alexander Deposition, p. 239-243).

To reiterate, each of these quality factors alone did not constitute a basis for further consideration in the meta-analysis.  It was the sum total of their application to each of the studies and the resulting quality assessment that led to further consideration of whether the study should be included.  I took an approach similar to other researchers and assessed study quality in a more general, holistic fashion—evaluating multiple aspects of the studies' features. In the table of quality criteria attached as Appendix C, van der Mark et al. (2014) was the only study that contained lower quality information in every one of the

categories.   I did not assign a specific score or number of dots/characters to my quality assessment because such an assignment is purely subjective and may not be validated. However, the lower quality rating of van der Mark et al. (2014) across all matrices made the study a clear outlier and provided some indication that the study could introduce significant bias to the results of a meta-analysis.

The PRISMA guidelines also recommend that the degree of heterogeneity between studies be assessed and reported, and that sensitivity analyses be conducted to explore the impact of the choice of meta-analytic model on the results of the analysis (p.16). The MOOSE guidelines also suggest the meta-analytic model should be based on the degree of heterogeneity among the included studies, as well as the quality and characteristics of the studies (p. 2010).

I performed sensitivity testing to assess the degree of statistical heterogeneity among the studies – first excluding and then including van der Mark et al. (2014).  This is done by calculating the $I^2$.   I found no heterogeneity in assessing the seven higher quality studies. Adding van der Mark et al. (2014) introduced a substantial amount of heterogeneity to the analysis ($I^2 >$ than 60%).   The combination of the low-quality ratings and marked heterogeneity supported the study's exclusion.

7. <u>Dr. Alexander disputes the statistical model I used to conduct my meta-analysis and disagrees with the processes and procedures I used to assess its validity</u>.  Dr. Alexander repeatedly asserts, without support, that a random effects model is the favored model for meta-analysis.  (Alexander Report, p. 14, 84, 95).  Cochrane recommends that the choice of meta-analytic model should be based, among other things, on the degree of heterogeneity among the included studies. If there is little heterogeneity between studies, a fixed effects model is more appropriate, while a random effects model may be more suitable when there is substantial heterogeneity.

If the studies in the meta-analysis are homogeneous, a random effects model may overestimate the between-study variance. This can result in wider confidence intervals and

reduced statistical power to detect an actual effect. As a result, a true effect may be missed, leading to a false negative result, a type II error. To minimize the possibility of false negative results, assessing the degree of heterogeneity between the included studies and choosing the appropriate meta-analytic model is essential. Poole and Greenland (1999) argue that random effects models may be overly sensitive to outlying individual effect sizes. These studies can disproportionately impact the estimation of the between-study variance in the random effects model, leading to wider confidence intervals and reduced statistical power (increased type II error).

Dr. Alexander's fixed vs. random effects criticism is one more instance of form over substance. Meta-analysis of the seven case control studies results in the identical 2.8 odds ratio and confidence interval under both models. (Appendix A).

8.      Dr. Alexander suggests that I improperly assessed studies and excluded some that were "equally reliable."  Dr. Alexander may disagree with my assessments of the epidemiological literature, but my assessments are supported by the information and data contained within the studies, as well as the assessments conducted by other researchers. Below I will respond to Dr. Alexander's criticisms of my assessment of each study.

Included Studies:

Dhillon et al. (2008): Dr. Alexander criticizes my inclusion of this study because the diagnostic criteria were not set forth, but later in his Appendix concedes its high-quality diagnostic assessment.  We are in agreement that requiring an in-person evaluation by a neurologist to confirm the PD diagnosis is a high-quality approach.  Other researchers have likewise included the study in their analyses.  (Breckenridge et al. (2016), Pezzoli et al. (2013), Vaccari, et al. (2019), Tangamornsuksan et al. (2018), and Ntzani et al. (2013)).

Kuopio et al. (1999):  Dr. Alexander criticizes my inclusion of this study because he states that the diagnostic criteria relied upon were not provided, although the diagnosis of PD was confirmed by a PD neurologist during an in-person exam. (Alexander Report, p. 89). Although, as pointed out, the study only mentions the UK Parkinson's Disease Society

diagnostic criteria in the context of its exclusion of five cases (Kuopio et al. (1999) at 929), the study references a sister study of the identical population wherein the same group of authors expressly state that after an in-person exam, they diagnosed PD based upon "the diagnostic criteria of the UK Parkinson's Disease Society." (Kuopio et al. (1999) at 929 fn 39, citing Kuopio et al. (1999) at 2, citing Hughes 1992).  Dr. Alexander assigns a 2+ rating (a middle ranking) to the diagnostic criteria used in this study. Kuopio et al. (1999) is also included in the analyses of other researchers. (Breckenridge et al. (2016), Vaccari, et al. (2019), Tangamornsuksan et al. (2018), and Allen et al. (2013)).

Firestone et al. (2010):  Dr. Alexander points out that at my deposition I clarified that I considered the medical record review by a panel of PD neurologists to be of sufficient quality to include in my meta-analysis. Again, other researchers included this study in their meta-analyses.  (Breckenridge et al. (2016), Pezzoli et al. (2013), Vaccari, et al. (2019), Tangamornsuksan et al. (2018), Ntzani et al. (2013), Allen et al. (2013)).  Dr. Alexander incorrectly argues that my inclusion diagnostic criteria required an in-person exam by a movement disorder specialist.  My report made clear that I considered alternative methods of diagnosis, although of lesser quality. (Report, p. 36-39)  Dr. Alexander correctly states that I originally included the wrong data for Firestone in my original meta-analysis, which was acknowledged during  my deposition.  Attached as Appendix A is my updated meta-analysis which incorporates the correct data from the Firestone et al. (2010) study and reflects an OR of 2.84 rather than 2.88.

Hertzman et al. (1994):        Dr. Alexander criticizes me for calculating and considering in my meta-analysis an OR and confidence interval for this study that was not published by the authors. Statisticians routinely calculate ORs and confidence intervals based on data provided in studies.  In Hertzman et al. (1994), the authors published an OR of 1.25 (0.34-4.63).  I calculated an OR of 1.43 (0.33-7.04).  In doing so, I used both the male and female voters in the control groups because I believed this provided more complete information and, in my opinion, is more representative. Tangamornsuksan, et al. (2018) calculated the OR in this same study to be 1.85 (0.50-6.93). Vaccari et al. (2019) calculated the Hertzman OR to be 1.30 (0.45-3.74).  Breckenridge et al. (2016) calculated the RR to be 1.34 (0.71-

2.52). In response to Dr. Alexander's criticism, I re-ran my meta-analysis, using the author's 1.25 (0.34-4.63). The net effect of doing so changed the overall OR from 2.84 to 2.81.

<u>Rugbjerg et al. (2011)</u>: Dr. Alexander again incorrectly states my criteria requires an in-person exam by a movement disorder specialist. This study identified cases from a group taking PD medications who underwent an in-person exam, reviewed by a neurologist and based upon clearly enumerated diagnostic criteria. Dr. Alexander conceded he was able to identify the information allowing me to calculate my OR.

<u>Tanner et al. (2011)</u>: Dr. Alexander's criticism of my inclusion of this high-quality study is undermined by his own high-quality assessment of the diagnostic and exposure criteria used. We are in agreement that it is a high-quality study.

Excluded Studies:

<u>Van der Mark et al. (2014)</u>: The low specificity of the study's exposure assessment, the PD diagnosis by different neurologists using unspecified criteria to evaluate medical records, the low participation rate, and the study's failure to control for other exposures, all confirmed that van der Mark is low quality. Heterogeneity confirmed that exclusion from my meta-analysis was appropriate. Nevertheless, it was included in a sensitivity analysis, the data for which was provided, and in a subgroup analysis. If I include van der Mark as a "low quality" subgroup, meta-analysis using the van der Mark OR proposed by Dr. Alexander results in an OR of 2.41 under a fixed effects model (which I believe is appropriate). Under a random effects model, this subgroup analysis results in an OR of 1.94 (with an upper bound of 3.04). Because van der Mark is such a low-quality study, I do not believe that the 7 plus van der Mark et al. (2014) meta-analyses should be assigned very much weight in assessing the relationship between paraquat and PD. Still, the results of the analyses are consistent with my original meta-analysis.

<u>Shrestha et al. (2020)</u>: As stated in my original report, after reviewing and performing meta-analyses of the case-control studies, I considered the body of cohort studies looking

for an association between occupational/agricultural exposure to paraquat and PD. Like Tanner et al. (2011) and Kamel et al. (2007), and Shrestha et al. (2020) relied upon data collected in the Agricultural Health Study (AHS). Because Kamel et al. (2007) addresses a subset of participants included in Shrestha et al. (2020), it would be inappropriate to meta-analyze the two, leaving just Shrestha et al. (2020) for a cohort analysis.

For the following reasons, as well as those previously stated in my original report and during my deposition, I believe that Tanner et al. (2011) is a higher quality study than Shrestha et al. (2020) and that my case control meta-analysis (incorporating data from Tanner et al. (2011)) deserves far greater weight than should be afforded to Shrestha et al. (2020).

- Tanner was more thorough in its diagnostic assessment.

Tanner et al. (2011) (FAME) based a diagnosis of PD on the agreement of two neurologists, one of whom was Dr. Tanner herself after independently reviewing all available diagnostic information (medical records, in-person examination records, and videotaped examination) for all suspect cases and when PD was suspected in a control. Diagnoses were made based upon established and published criteria. (Tanner et al. (2011), p. 867). This approach has been consistently lauded. (e.g., Vaccari et al. (2019), p. 178, Breckenridge et al. (2016), p. 1-2, Tangamornsuksan, et al. (2018), p. 228, Alexander Report 117).

Although Shrestha et al. (2020) relied upon diagnoses made by Tanner et al. (2011) and another neurologist in FAME, these diagnoses accounted for only a fraction of cases in Shrestha et al. (2020). Cases were otherwise diagnosed based on "self-report." 80% of those self-reported cases had some corroborating evidence which included: (1) a screener questionnaire (Dr. Lang does not believe this establishes a diagnosis), (Lang Deposition, e.g., p. 292); (2) a medical record ("using medical records suffered from low response" n=65); or (3) a death certificate. Significantly, although Shrestha et al. (2020) took steps to confirm a PD diagnosis among cases, eliminating several that were thought to be improbable, there is no evidence that the same process was employed with respect to the

25

controls. Employing more rigid diagnostic criteria for cases than controls leads to differential misclassification which has the effect of biasing a result towards the null.   In his quality scoring, Dr. Alexander assigned Tanner et al. (2011) three plusses ("+++") for the study's diagnostic methodology and only assigned Shrestha et al. (2020) two ("++").

- Tanner was more thorough in its exposure assessment.

Although both Tanner et al. (2011) and Shrestha et al. (2020) relied upon data collected from the Agricultural Health Study (AHS), Tanner et al. (2011) employed additional measures to refine the exposure information contained therein.  According to the National Institute of Environmental Health Sciences (NIEH), Tanner et al. (2011) conducted field visits to subjects' homes and farms, performed dust and soil sampling, reviewed farm records and conducted additional telephone interviews. https://epishare.niehs.nih.gov/studies/FAM/.  In the study itself, Tanner et al. (2011), et al report using "telephone interviews to obtain detailed information on pesticide use from 14 years of age onward for 31 selected pesticides." (Tanner at al. (2011), p. 867).  For cases and controls who were unable to complete interviews, the authors used proxy informants. The authors considered pesticide use that occurred prior to the diagnosis of PD (for cases) and prior to the age/state/gender specific medium age of PD diagnosis for controls.  They also determined duration and frequency of use for specific pesticides. (Tanner et al. (2011), p. 867).

Shrestha also characterizes Tanner et al. (2011)'s exposure assessment as more thorough or "granular" than her own.  (Shrestha et al. (2020), p. 7). When attempting to reconcile the difference in outcome between her own study and Tanner et al. (2011)'s, Shrestha states,

> Limited reproducibility of FAME findings in the current study could be due to differences in … exposure data …. FAME, although conducted within the AHS framework, collected more granular exposure data on some pesticides suspected to be etiologically relevant to PD, some of which were infrequently used and therefore covered superficially at AHS enrollment (ever-use of "other pesticides")..

Exposure information on FAME participants is markedly different than that reported by Shrestha et al. (2020).  According to Shrestha's Supplementary Table 8, 15.5% of cases that were identified as having no exposure in Shrestha et al. (2020) were recorded as having exposure in Tanner et al. (2011).  Table 8 also reveals that 5.3% of the controls that were identified as having no exposure in Shrestha et al. (2020) were recorded as having exposure in Tanner et al. (2011).   On the other hand, 41.2% of the cases that were coded as being exposed in Shrestha et al. (2020) were reported as having no exposure in Tanner et al. (2011). And 46.6% of the controls that were coded as being exposed in Shrestha et al. (2020) were reported as having no exposure in Tanner et al. (2011).

Supplemental Table 8: Comparison between pesticide exposure information reported at the AHS enrollment questionnaire and at FAME among FAME participants – in overall sample and by cases and control status

| | AHS exposure status at enrollment | | | | | | | | | | |
| | Overall FAME sample[a] | | | FAME cases | | | | FAME controls | | | |
| FAME exposure | Exposed n (%) | Unexposed n (%) | Missing | All cases n (%) | Exposed n (%) | Unexposed n (%) | Missing | All controls | Exposed n (%) | Unexposed n (%) | Missing |
| | | | | * * * * | | | | | | | |
| Paraquat | | | | | | | | | | | |
| Exposed | 41 (54.7) | 25 (7.5) | 6 (16.7) | 23 (23.7) | 10 (58.8) | 11 (15.5) | 2 (22.2) | 49 (14.1) | 31 (53.4) | 14 (5.3) | 4 (14.8) |
| Unexposed | 34 (45.3) | 308 (92.5) | 30 (83.3) | 74 (76.3) | 7 (41.2) | 60 (84.5) | 7 (77.8) | 298 (85.9) | 27 (46.6) | 248 (94.7) | 23 (85.2) |
| 2,4-D | | | | | | | | | | | |

18

This discrepancy between the two studies suggests that one of them suffers from an extreme non-differential misclassification.  Because of Tanner et al. (2011)'s more granular assessment of exposure, in my opinion, it is most likely that Shrestha et al (2020) suffers from non-differential misclassification.   Nondifferential misclassification of exposure generally biases toward the null.  The exposure figures in Shrestha et al. (2020), specifically – assuming they are inaccurate – bias her result towards the null.

- Tanner more appropriately controlled for correlated exposures while minimizing the effects of multicollinearity.

In order to control for confounding exposures, Shrestha et al. (2020) performed statistical regression, adjusting for several individual correlated pesticides.  Dr. Alexander praised Shrestha for her adjustment of these highly correlated variables. (Alexander Deposition, p. 134).

In my original report and in my deposition, I addressed the problems that can arise when attempting to control for potentially confounding, highly correlated variables through statistical regression.      (Report, p. 17, 25; Deposition, p. 45-46, 85, 277).  Doing so will likely result in multicollinearity which will make the results unstable and biased, potentially making a positive association disappear or lose its significance.

Individual pesticides are not only correlated with each other (i.e., people who use one pesticide might be more likely to use others), they have also been hypothesized to be associated with the disease of study (e.g., maneb).  For that reason, adjusting for confounders that are affected by exposure and outcome is discouraged. (Lee et al. (2014)). In Brouwer et al. (2017), for example, the authors pointed out that they were unable to perform this adjustment for paraquat and maneb as the two pesticides were highly correlated (spearman correlation coefficient of .89).

Neither Dr. Alexander nor Shrestha et al. (2020) acknowledged the issue of multicollinearity or the potential impact that it had on Shrestha's results.  Nor did the study provide the information necessary to perform that post-hoc analysis. It is noteworthy that the unadjusted odds ratio for the incident and prevalent cases in Shrestha et al. (2020) (Supplemental Table 4) is 1.52 (95% CI: 1.21, 1.90). This significant OR is reversed when co-exposures correlated with paraquat exposure are included as covariates.

One way to mitigate issues with correlated exposures and multicollinearity is to create composite exposures by combining highly correlated exposures into a single summary measure. (Sen and Srivatstava, et al. (1990).  Results with the composite exposure variable can be compared to the individual exposures. Other approaches to multicollinearity involve variance inflation factors, stratification, principal components analysis, and regularization (Anderson and Wells, 2008). When selecting the appropriate approach for multicollinearity, it is essential to consider the specific research question, study design, and available data. These general approaches to control multicollinearity examine the independent effect of each exposure and can be used in regression methods such as logistic regression, Cox regression, or Poisson regression.

Tanner et al. (2011) adopted the more prudent composite approach when assessing the impact of other pesticides on the risk of paraquat.  Specifically, the study examined whether adjusting for overall pesticide use or educational level changed point estimates (± 15%) for individual pesticides and found that it did not appreciably do so. While the stated OR for paraquat was not adjusted for overall pesticides, we know that making that adjustment did not significantly influence the stated OR.

In the reanalysis of the FAME cohort, Lau et al. (2013) also identified the specific contribution of paraquat exposure. Estimates of associations between PD and paraquat along with maneb and/or ziram did not reveal evidence of a synergistic effect. The ORs for the composite pesticide groups were lower than the corresponding ORs for paraquat exposure alone (Lau et al. (2013), Tables 8-10).

- I would not substitute's Shrestha's OR for Tanner's OR in my meta-analysis.

Even though Shrestha et al. (2020) provides an OR in the supplement, this was still generated from a cohort study. I would not choose to use this OR in my case-control meta-analysis because: (1) I do not believe it is appropriate to combine different study types in a single meta-analysis and (2) it overlaps with Tanner et al. (2011) and for all of the reasons described above, I believe that Tanner et al. (2011) is of superior quality.  Similarly, I would not substitute Shrestha et al. (2020) for Tanner et al. (2011) in any of the meta-reviews done by Breckenridge et al. (2016), Tangamornsuksan et al. (2018) and Vacarri et al. (2019). This is true even though Shrestha et al. (2020) has a larger sample size and a more recent publication.  (Dr. Alexander did the same thing with respect to choosing to use Elbaz et al. (2009) over Pouchieu et al. (2018) in his own meta-analysis).

Pouchieu et al. (2018):   Dr. Alexander suggests that I overlooked this study in my evaluation.  As stated in my original report, after reviewing and performing meta-analyses of the case-control studies, I considered the body of cross-sectional studies looking for an association between occupational/agricultural exposure to paraquat and PD.  The only cross-sectional study meeting those inclusion criteria is Pouchieu et al (2018).  As with

Shrestha et al. (2020), it was considered as a single study as opposed to being part of a meta-analysis.

For the reasons set forth in my original report and during my deposition, I believe that my case control meta-analysis deserves far greater weight than should be afforded to Pouchieu et al. (2018). (Report, p. 16-17, Deposition, p. 267). Pouchieu et al. (2018) relies upon self-reported diagnoses of PD. See my earlier discussion about limitations of this approach. Further, like van der Mark et al. (2014), Pouchieu et al. (2018) relies upon a crop exposure matrix for exposure ascertainment. Individuals were classified as exposed if they reported applying pesticides on a crop during a year that given pesticides (among a long list) were registered and recommended as being appropriate for that crop. (Pouchieu et al. (2018), p. 302). Unlike van der Mark et al. (2014), exposure to the entire cohort (cases and controls) was based upon this matrix. The authors themselves conceded that "[t]his approach may generate non-differential exposure misclassification with overestimation of exposed subjects leading to a bias of the estimate towards the null, especially when the strength of the association is modest." (Pouchieu et al. (2018), p. 308).

Finally, in an attempt to control for confounding exposures, Pouchieu et al. (2018), like Shrestha et al (2020), performed a statistical regression of several highly correlated variables ("50% of correlation coefficients between active ingredients exceeded .80"), without controlling for multicollinearity. As in Shrestha et al. (2020), the adjustment caused a significant and positive association (OR = 1.43: 95% CI: 1.17, 1.75) to disappear (OR = 1.01: 95% CI: 0.41, 2.49). While the authors themselves acknowledged that their findings could be due to the high correlation between active ingredients there is no indication that they performed alternative analyses to assess the possible impact of multicollinearity.

After making the same observations, Wray and Niman (2019) graded the study as low quality and found that it had very limited value in assessing paraquat specific associations (Wray and Niman (2019), p. 19-20). Presumably, Dr. Alexander also found it to have low value. Dr. Alexander used Elbaz et al. (2009) (examining an earlier subset of the Pouchieu

30

cohort) in his meta-analyses instead of Pouchieu et al. (2018).  Although Pouchieu et al. (2018) measures its effect in an OR, because of design heterogeneity, I do not believe it would be appropriate to meta-analyze the study's results with those of the case controls.

9.      <u>Dr. Alexander asserts that I failed to assess the potential for recall bias in the case-control studies in my meta-analysis</u>.  I was asked in my deposition if I did anything independently to assess whether the studies may have been subject to recall bias. As I stated, I was not able to perform any independent statistical analysis on the issue. (Deposition, p. 219).  I made clear in my testimony that I did not have the data to do an independent calculation.  Nowhere did I state that I did not consider recall bias, short of being unable to statistically calculate its existence or magnitude.   I reviewed the studies themselves which documented efforts to control for recall bias through blinding, control group definition, or in structuring their questionnaires.   My emphasis on high-quality exposure information and improved data collection mitigates the impact of recall bias.  Dr. Alexander did not identify any testing that he performed to assess recall or publication bias. (Alexander Deposition, p. 239-245)

10.      <u>Dr. Alexander criticized my meta-analysis methodology as "incomplete."</u>  Dr. Alexander suggests that my quantitative synthesis of the case-control occupational studies was insufficiently tested with secondary testing.  It is unclear what Dr. Alexander would consider sufficient.  As a trained and experienced biostatistician, I conducted the tests I believed were appropriate to ensure confidence in my results. I tested for heterogeneity, performed sensitivity analyses, considered subgroups for my meta-analysis and tested for publication bias.

The tests I conducted for heterogeneity revealed the strength of my approach.  By way of example, I considered only studies that evaluated PD as the studied outcome. The heterogeneity testing I performed confirmed this approach.  (Report, p. 12.) Likewise, the heterogeneity testing I ran when I considered van der Mark et al. (2014) in my meta-analysis revealed significant heterogeneity and confirmed my approach to exclude it for its unspecific exposure assessment and overall low quality.  I also shared the sensitivity testing

I conducted with three separate studies, and subgroup testing using the high- and medium-quality studies compiled by Wray and Niman (2019).  (Report, p. 11-12).

Dr. Alexander also mentions publication bias five separate times in his report, but fails altogether to assess it.  In contrast, my report demonstrates that publication bias was another factor I considered.  The Begg test is widely used in meta-analysis to test for publication bias in epidemiological studies.  I performed the Begg test on my meta-analysis, as well as the quantitative synthesis of the Wray and Niman (2019) occupational case-control study findings. (Report, p. 11-12, 17).  The results revealed no evidence of publication bias on either meta-analysis. Dr. Alexander was unable to say whether the meta-regression that he performed incorporated a Begg test, and because he chose not to save his regression formulas, it is impossible for me to determine whether he did so and, if he did, what his results showed.

11.     Dr. Alexander criticizes my Bradford Hill causation analysis as "fundamentally flawed."  At the outset, it should be clear that my four-page Bradford Hill analysis is not the totality of my thoughts and considerations.  Dr. Alexander's Bradford Hill analysis was one page in his report.  When asked about studies missing from his analysis, Dr. Alexander explained that his entire weight of the evidence analysis should be incorporated into his Bradford Hill analysis. (Alexander Deposition, p. 237-38).  As with Dr. Alexander, my entire weight of the evidence analysis is not mutually exclusive from my Bradford Hill analysis.

Specifically, Dr. Alexander first argues that the inclusion of my meta-analysis in my Bradford Hill review provides no support because my meta-analysis is also fundamentally flawed.  Other portions of my report address his criticisms of my meta-analysis.

Dr. Alexander next claims that my Bradford Hill analysis "completely ignores Shrestha…without justification."  (Alexander Report, p. 106.)  Neither my report nor my deposition states that Shrestha et al. (2020) was ignored.  In fact, considerable time was devoted to Shrestha et al. (2020) in both.  Nor does the fact that Shrestha et al. (2020) was

not specifically cited in the Bradford Hill section of my report mean that it was not considered in the weight of the evidence. Although, at my deposition, I was unable to express an opinion on the reliability of Shrestha's diagnostic criteria, I did, both in my report and deposition, discuss Shrestha's "self-report, plus" diagnostic approach relative to the "in-person exam" diagnostic approach utilized in other studies. I do not have access to data that would allow me to calculate the actual reliability or unreliability of the study. I previously addressed the study's relative weakness in exposure ascertainment and attention to confounding.

Dr. Alexander is critical of the fact that I cited studies in my Bradford Hill analysis that were not also included in my meta-analysis. I considered and believe that it was appropriate to consider the totality of evidence in my Bradford Hill review. As set forth in my original report, studies that were appropriately excluded from my case control meta-analysis (e.g., because they employed different designs, they were looking at different populations, or they were considering different forms of exposure) still provide evidence for consideration. Dr. Alexander also considered studies in his Bradford Hill analysis that he excluded from his own meta-analysis (e.g., Tanner et al. 2011).

Dr. Alexander states that I did not appropriately use studies in my dose-response analysis. He mischaracterizes my deposition testimony to suggest that I ignored studies that disproved the existence of a dose-response. (Alexander Report, p. 107, fn 37). My testimony makes clear that I appropriately used studies in my review that were probative of the dose-response analysis. Non-significant statistical results would not impact the analysis and do not demonstrate a lack of a dose response. ("[T]here's no evidence of a dose-response. It doesn't say there's not a dose response.") (Deposition, p. 256).

Dr. Alexander states that I did not account for temporality in my analysis of the epidemiological studies. He claims that none of the studies in my meta-analysis account for the fact that PD has a prodromal period during which a patient may manifest signs and symptoms other than the movement disorder associated with PD (tremor, bradykinesia, rigidity, etc.). If the studies were evaluating the association between paraquat and the prodromal period, then the exposure would have to precede the prodromal period in order

to be causative.  The epidemiological literature I reviewed is looking for an association between paraquat exposure and PD as a movement disorder.  Therefore, the relevant exposure would need to precede the movement disorder and not necessarily the prodromal, pre-movement disorder manifestations. Additionally, the rebuttal report of Anthony Lang, M.D. provides: "It is highly likely that anything that contributes to the reduction of nigral dopaminergic neurons or their function will result in individuals in a prodromal phase progressing to develop and manifest a movement disorder."  Based upon this, exposure after commencement of the prodromal period would be relevant to a study of PD as a movement disorder.

12.     <u>Dr. Alexander argues that my OR of 2.8 does not represent the risk associated with paraquat use because I failed to consider the confounding of other risk factors.</u> To a probability, the computed OR of 2.8 relates to paraquat as opposed to any potential confounding. First, of the 7 studies considered in my case-control meta-analysis, the two most robust studies, accounting for more than 90 percent of the meta-analysis's statistical weight, are Tanner et al. (2011) and Liou, et al. (1997).  Both of these studies appropriately controlled for confounding alternative exposures.  As discussed in the context of Shrestha et al. (2020), Tanner et al. (2011) adopted the more prudent composite approach when assessing the impact of other pesticides. Tanner et al. (2011)'s analysis established that the confounding of overall exposure to pesticides had no appreciable effect on the stated OR for paraquat.  This finding was, again, corroborated by the reanalysis of the FAME cohort by Lau et al. (2013), which also identified the specific contribution of paraquat exposure. Estimates of associations between PD and paraquat along with maneb and/or ziram did not reveal evidence of a synergistic effect. The ORs for the composite pesticide groups were lower than the corresponding ORs for paraquat exposure alone (Lau et al. (2013), Tables 8-10).

Liou et al. (1997) similarly assessed the specific effect of paraquat without introducing effects of multicollinearity.  Subjects in Liou et al. (1997) were asked to identify specific herbicide/pesticides, chemicals, heavy metals, and minerals they had used.  A positive exposure was defined as contact with a given factor for at least one year before the onset

34

of PD. In Liou et al. (1997), controls were matched to cases by age, sex, and locale. As a quality data check, twenty PD patients and 20 control subjects were reinterviewed 4 to 10 months after an initial interview. The results of all 40 reinterviews were identical to those of their corresponding initial interviews.

Liou et al. (1997) report that having a history of herbicides/pesticides and paraquat use was associated with a significant increase in PD risk after other environmental factors were adjusted. After adjustment for previous occupational herbicides/pesticides and paraquat use, the increased PD risk associated with rural residence and farming were no longer significant, thus indicating that the risk associated with residence and farming exposures observed in the univariate analysis was likely due to the associations of herbicides/pesticides and paraquat exposure (Liou et al. (1997), Table 2).

Liou et al. (1997) noted that "because the use of herbicides/pesticides and paraquat were highly correlated, only one of them was included in the multiple conditional logistic regression models to avoid the problem of "hypercollinearity."  Moreover, multivariate analysis for the combination of use of herbicides/pesticides and paraquat was performed." (Liou et al. (1997), p.1584). Compared with those who had no exposure to herbicides/pesticides as the reference group, those who had used herbicides/pesticides other than paraquat had a non-significant elevated risk for PD (OR=2.17: 95% CI, 0.85 to 5.571), indicating the non-significant risk of PD with herbicides/pesticides other than paraquat. Those who had used paraquat with or without other herbicides/pesticides had a significant risk of PD (OR=4.74: 95% CI, 1.95 to 11.52). The OR of developing PD was 2.0 (p < 0.01) among those who had used paraquat and other herbicides/pesticides compared with those who had been exposed to herbicides/pesticides other than paraquat. (Liou et al. (1997), p. 1585). These comparisons highlight the unique additional risk of paraquat use among possible co-exposures.

The analyses by Tanner et al. (2011) and Liou et al. (1997) make likely that the studies' stated ORs relate to paraquat.  I also believe to a probability that the studies' stated ORs are not being driven by a history of head trauma or family history of PD regardless of

whether either study specifically controlled for those potential confounders.  First, the evidence that head trauma is positively associated with PD is inconsistent.  (Tanner et al. (2009); Shrestha et al. (2020)).  Although Shrestha et al. (2020) found that head trauma increased the risk of PD when combined with exposure to certain chemicals (including paraquat), the study also found that head trauma decreased the risk of PD when combined with other chemicals (calling into question an isolated effect of head trauma).

All of the studies included in my meta-analysis controlled for age.  (Summary of Epidemiological Studies).  The two largest studies (Liou et al. (1997) and Tanner et al. (2011)) also adjusted for smoking.

Although the studies may not have controlled for family history and/or genetics, to a probability, this variable is likely additive. (Goldman et al. (2012); Ritz et al. (2009)).  In Goldman et al. (2012), for example, an OR for a subset of paraquat exposed participants from FAME varied from 1.5 (.6-3.6) to 11.1 (3.0-44.6) depending on the existence of a gene mutation.  In Ritz et al. (2009), individuals who were exposed to paraquat and maneb with one susceptibility allele demonstrated an OR of 2.99 (.88-10.2).  Individuals with 2 or more susceptibility alleles demonstrated an OR of 4.53 (1.70-12.1).  Ritz et al. (2009) stated that "most important in our study, risk of PD seems to depend on whether subjects are exposed to pesticides."  (Ritz et al. (2009), p. 968).

Although I considered both Shrestha et al. (2020) and Pouchieu et al. (2018) in my weight of the evidence analysis, I do not believe that either warrants a reduction of the OR calculated in my meta-analysis.

Based upon the totality of evidence reviewed and considered, it is my opinion to a reasonable degree of statistical certainty that the OR for an association between use of paraquat and PD is greater than 2, with the best estimate being 2.8.

I reserve the right to supplement or modify this report in the light of any new information, including more detailed information about the analyses conducted.

Martin T Wells, PhD

March 15, 2023

## MATERIALS CONSIDERED

Anderson, W. and Wells, M.T. 2008. Numerical analysis in least squares regression with an application to the abortion-crime debate. Journal of Empirical Legal Studies, 5(4), pp.647-681.

Borenstein, M, Hedges, J.P., et al. 2009 *Introduction to Meta-Analysi*s, Chichester, West Sussex, UK Wiley.

Chester G, Woollen BH. Studies of the occupational exposure of Malaysian plantation workers to paraquat. Br J Ind Med. 1982 Feb;39(1):23-33.

Finckh A, Tramèr MR. Primer: strengths and weaknesses of meta-analysis. Nat Clin Pract Rheumatol. 2008 Mar;4(3):146-52.

Gray, M., Goldstein, B., et al. The Federal Government's Agricultural Health Study: a Critical Review with Suggested Improvements, Hum. Ecol. Risk. Assess. Vol. 6:1 (2020).

Greenland S, Pearce N. Statistical foundations for model-based adjustments. *Annu Rev Public Health* 2015.

Greenland, S., Daniel, R. and Pearce, N., 2016. Outcome modelling strategies in epidemiology: traditional methods and basic alternatives. International journal of epidemiology, 45(2), pp.565-575.

Jüni P, Witschi A, Bloch R, Egger M. The hazards of scoring the quality of clinical trials for meta-analysis. JAMA. 1999 Sep 15;282(11):1054-60.

Kestenbaum, B., Epidemiology and Biostatistics (Springer) 2019.

Kleinbaum DG, LL Kupper, KE Muller, A Nizam. Applied Regression Analysis and Other Multivariable Methods. 3rd ed. Pacific Grove, CA: Duxbury Press; 1998.

Kuopio, A-M et al., Changing epidemiology of Parkinson's Disease in southwest Finland, Neurology 52.2 (1999): 302.

Lee PH. Should we adjust for a confounder if empirical and theoretical criteria yield contradictory results? A simulation study. Sci Rep. 2014 Aug 15;4: 6085.

Poole C, Greenland S. Random-effects meta-analyses are not always conservative. Am J Epidemiol. 1999 Sep 1;150(5):469-75.

Sen, A. and Srivastava, M., 2012. *Regression Analysis: Theory, Methods, and Applications*.

Stroup, D. F., J. A. Berlin, S. C. Morton, I. Olkin, G. D. Williamson, D. Rennie, D.

Moher, B. J. Becker, T. A. Sipe, and S. B. Thacker. Meta-analysis of observational studies in epidemiology: a proposal for reporting. JAMA. 283 (15):2008-2012.

Van der Mark M, Nijssen PCG et al., A Case-Control Study of the Protective Effect of Alcohol, Coffee, and Cigarette Consumption on Parkinson Disease Risk: Time-Since-Cessation Modifies Effect of Tobacco Smoking. PLoS ONE 2014; 9e95297: 2.

Van Maele-Fabry, F., Hoet, P., et al., Occupational Exposure to Pesticides and Parkinson's Disease: a Systematic review and Meta-Analysis of Cohort Studies, Environ Int. 2012 Oct. 1;46:30-43.

Walker, E., A. V. Hernandez, and M. W. Kattan. 2008. Meta-analysis: Its strengths and limitations. *Cleve.Clin J Med.* 75 (6):431-439.

Zhang, M.B. and Yu, K., What's the Relative Risk. JAMA 1998; 280(19):1690-1691.

Other Materials Considered:

https://jamanetwork.com/journals/jama/pages/instructions-for-authors

https://epishare.niehs.nih.gov/studies/FAM/.

https://www.meta-analysis.com/downloads/MRManual.pdf

Alexander, Dominik, Expert Report In the Matter of *Paraquat Products Liability Litigation*, No. 21-md-03004 (S.D. Ill.), Jan. 20, 2023.

Alexander, Dominik, Deposition In the Matter of *Paraquat Products Liability Litigation*, No. 21-md-03004 (S.D. Ill.), March 8, 2023.

Alexander, Dominik, Data Sheet, 1-page PDF.

Lang, Anthony, Deposition In the Matter of *Paraquat Products Liability Litigation*, No. 21-md-03004 (S.D. Ill.), Nov. 14, 2022.

Lang, Anthony, Rule 26 Report, October 14, 2022.

Lang, Anthony, Rebuttal Report, March 3, 2023.

# APPENDIX A



## Occupational Case-Control Studies

| | | | | % |
|---|---|---|---|---|
| Study | Year | Diagnosis | OR (95% CI) | Weight |
| Hertzmann et al | 1994 | PD Exam | 1.43 (0.33, 7.04) | 2.66 |
| Liou et al | 1997 | PD Exam | 3.22 (2.41, 4.31) | 73.73 |
| Kuopio et al | 1999 | PD Exam | 1.21 (0.18, 6.31) | 1.97 |
| Dhillon et al | 2008 | PD Exam | 3.46 (0.38, 31.55) | 1.28 |
| Firestone et al | 2010 | Medical Records | 0.90 (0.14, 5.43) | 1.86 |
| Rugbjerg et al | 2011 | PD Exam | 1.01 (0.13, 7.55) | 1.51 |
| Tanner et al | 2011 | PD Exam | 2.50 (1.40, 4.70) | 16.99 |
| Overall  (I-squared = 0.0%, p = 0.533) | | | 2.84 (2.22, 3.65) | 100.00 |

.0317                    1                    31.6



# Occupational Case-Control Studies

| | | | | % |
|---|---|---|---|---|
| Study | Year | Diagnosis | OR (95% CI) | Weight |
| Hertzmann et al | 1994 | PD Exam | 1.43 (0.33, 7.04) | 2.66 |
| Liou et al | 1997 | PD Exam | 3.22 (2.41, 4.31) | 73.73 |
| Kuopio et al | 1999 | PD Exam | 1.21 (0.18, 6.31) | 1.97 |
| Dhillon et al | 2008 | PD Exam | 3.46 (0.38, 31.55) | 1.28 |
| Firestone et al | 2010 | Medical Records | 0.90 (0.14, 5.43) | 1.86 |
| Rugbjerg et al | 2011 | PD Exam | 1.01 (0.13, 7.55) | 1.51 |
| Tanner et al | 2011 | PD Exam | 2.50 (1.40, 4.70) | 16.99 |
| Overall (I-squared = 0.0%, p = 0.533) | | | 2.84 (2.22, 3.65) | 100.00 |

NOTE: Weights are from random effects analysis

.0317        1        31.6

# APPENDIX B

Inclusion/Exclusion Criteria for Case-Control Occupational Meta-Analysis

| Study | Study Design: Case Control | Studied Exposure: Paraquat | Exposure Type: Occupational (Use/Contact Dermal) | Studied Outcome: Parkinson's Disease | Inclusion or Exclusion Rationale |
|---|---|---|---|---|---|
| Baldereschi '03 | ✓ | X | ✓ | ✓ | Excluded due to studied exposure (lack of specificity, pesticides) |
| Behari '01 | ✓ | X | ✓ | ✓ | Excluded due to studied exposure (lack of specificity, herbicides) |
| Brouwer '17 | ✓ | ✓ | X | ✓ | Excluded due to exposure type (community exposure) |
| Costello '09 | ✓ | ✓ | X | ✓ | Excluded due to exposure type (community exposure) |
| Dhillon '08 | ✓ | ✓ | ✓ | ✓ | Included for consideration of quality/heterogeneity |
| Elbaz '04 | ✓ | X | ✓ | ✓ | Excluded due to studied exposure (gene interaction, pesticides) |
| Elbaz '09 | ✓ | X | ✓ | ✓ | Excluded due to exposure type (lack of specificity, quaternary ammonium) |
| Engel '01 | X | ✓ | ✓ | X | Excluded due to of study design (cohort); studied outcome (parkinsonism) |
| Firestone '05 | ✓ | ✓ | ✓ | ✓ | Excluded due to overlap with larger, more recent study |
| Firestone '10 | ✓ | ✓ | ✓ | ✓ | Included for consideration of quality/heterogeneity |
| Furlong '15 | ✓ | X | ✓ | ✓ | Excluded due to studied exposure (gloves); overlap Tanner (2011) |
| Gatto '09 | ✓ | ✓ | X | ✓ | Excluded due to exposure type (community exposure) |
| Gatto '10 | ✓ | X | X | ✓ | Excluded due to studied exposure (gene interaction) and exposure type (community exposure) |
| Goldman '12[1] | ✓ | X | ✓ | ✓ | Excluded due to studied exposure (gene interaction); overlap Tanner (2011) |
| Hertzman '90 | ✓ | ✓ | ✓ | ✓ | Excluded due to overlap with larger, more recent study |
| Hertzman '94 | ✓ | ✓ | ✓ | ✓ | Included for consideration of quality/heterogeneity |
| Kamel '07 | X | ✓ | ✓ | ✓ | Excluded due to study design (cohort); AHS |
| Kamel '14 | X | X | ✓ | ✓ | Excluded due to study design (cohort); studied exposure (dietary fat and paraquat); AHS |
| Kuopio '99 | ✓ | ✓ | ✓ | ✓ | Included for consideration of quality/heterogeneity |
| Lee '12 | ✓ | ✓ | X | X | Excluded due to exposure type (community exposure); studied outcome (traumatic brain injury) |
| Liou '97 | ✓ | ✓ | ✓ | ✓ | Included for consideration of quality/heterogeneity |
| Paul '18 | ✓ | X | X | ✓ | Excluded due to studied exposure (lack of specificity for paraquat, gene interaction); exposure type (community exposure) |
| Pouchieu '18 | X | ✓ | ✓ | ✓ | Excluded due to study design (cross-sectional) |
| Ritz '09 | ✓ | X | X | ✓ | Excluded due to studied exposure (gene interaction, not specific for paraquat); exposure type (community exposure) |

---

[1] In my deposition, I misspoke when I stated that the 2012 Goldman study was excluded from my meta-analysis because it was not a case-control study.   (Deposition, p. 303.)  The 2012 Goldman study was a case-control study, and is identified as such in my Report.  (Report, 23-24.)

| Study | Study Design: Case Control | Studied Exposure: Paraquat | Exposure Type: Occupational (Use/Contact Dermal) | Studied Outcome: Parkinson's Disease | Inclusion or Exclusion Rationale |
|---|---|---|---|---|---|
| Rugbjerg '11 | ✓ | ✓ | ✓ | ✓ | Included for consideration of quality/heterogeneity |
| Sanders '17 | ✓ | ✓ | X | ✓ | Excluded due to exposure type (community) |
| Seidler '96 | ✓ | ✓ | ✓ | ✓ | Excluded for lack of data sufficient to calculate OR |
| Semchuk '92 | ✓ | ✓ | ✓ | ✓ | Excluded for lack of data sufficient to calculate OR |
| Shrestha '20 | X | ✓ | ✓ | ✓ | Excluded due to study design (cohort); AHS |
| Tanner '09 | ✓ | ✓ | ✓ | X | Excluded due to studied outcome (parkinsonism) |
| Tanner '11 | ✓ | ✓ | ✓ | ✓ | Included for consideration of quality/heterogeneity; AHS (FAME) |
| Tomenson '11 | X | ✓ | X | X | Excluded due to study design (cohort); exposure type (manufacturing/dust/inhalation); studied outcome (PD/mortality); overlapping |
| Tomenson '21 | X | ✓ | X | X | Excluded due to study design (cohort); exposure type (manufacturing/dust/inhalation); studied outcome (PD/mortality) |
| Van der Mark '14 | ✓ | ✓ | ✓ | ✓ | Included for consideration of quality/heterogeneity |
| Wang '11 | ✓ | ✓ | X | ✓ | Excluded due to exposure type (community) |
| Wan Lin '16 | X | ✓ | X | ✓ | Excluded due to study design; exposure type (community) |

# APPENDIX C

| Study | Diagnostic criteria | Exposure ascertainment | Controls | Participation rate | Controls for confounders |
|---|---|---|---|---|---|
| Dhillon 2008 | Higher Quality | Higher Quality | Lower Quality | Lower Quality | Lower Quality |
| Firestone 2010 | Higher Quality | Higher Quality | Lower Quality | Higher Quality | Lower Quality |
| Hertzman 1994 | Higher Quality | Higher Quality | Lower Quality | Higher Quality | Lower Quality |
| Kuopplo 1999 | Higher Quality | Higher Quality | Higher quality | Lower Quality | Lower Quality |
| Liou 1997 | Higher Quality | Higher Quality | Higher Quality | Higher Quality | Higher Quality |
| Rugbjerg 2011 | Higher Quality | Higher Quality | Lower Quality | Lower Quality | Lower Quality |
| Tanner 2011 | Higher Quality | Higher Quality | Higher Quality | Higher Quality | Higher Quality |
| van der Mark 2014 | Lower Quality | Lower Quality | Lower Quality | Lower Quality | Lower Quality |

Diagnostic Criteria. Higher quality: in-person exam or medical records review with acceptable diagnostic criteria.  Lower quality: all others, including self-report or absence of acceptable diagnostic criteria.

Exposure Assessment. Higher quality: personal interview using detailed exposure questionnaires. Lower quality: all others, including job and/or other exposure matrices.

Controls.  Higher quality: examination by movement disorder specialist or other trained personnel to exclude PD. Lower quality: all others, including medical record review and self-report of no PD diagnosis.

Participation rate. Higher quality: over 60% participation for both cases and controls. Lower quality: below 60% for either cases or controls.

Controlling for confounders. Higher quality: controlling for co-exposures plus age, sex, smoking, or family history. Lower quality: no controlling for co-exposures but controlled for age, sex, smoking or family history.