**IN THE UNITED STATES DISTRCT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| In re: PARAQUAT PRODUCTS LIBAILITY LITIGATION | Case No. 3:21-md-3004-NJR |
| This Document Relates to: | MDL No. 3004 |
| *Fuller v. Syngenta AG*, No. 3:21-cv-429 | |
| *Richter v. Syngenta AG*, No. 3:21-cv-571 | |
| *Walkington v. Syngenta AG*, No. 3:21-pq-601 | |
| *Marx v. Syngenta AG*, No. 3:21-pq-1218 | |
| *Burgener v. Syngenta AG*, No. 3:21-pq-1218 | |
| *Coward v. Syngenta AG*, No. 3:21-pq-1560 | |

## PLAINTIFFS' RESPONSE TO DEFENDANTS' PARTIAL MOTION TO STRIKE WELLS REBUTTAL REPORT

### INTRODUCTION

Defendants' Introduction makes clear that their Motion is not a sincere attempt to strike the Rebuttal Report of Dr. Wells, but rather an untimely prelude to their forthcoming *Daubert* challenge. Defendants' arguments are based on misstatements and mischaracterizations of the record. Where accurate, Defendants' representations amount to form over substance. To be clear, Dr. Wells's Original Report does not follow the formulaic format of the defense expert, Dominik Alexander. The approach reflects the difference between a tenured full-time college professor (Dr. Wells) and a professional witness (Dr. Alexander) who testified 58 times and, together with his full-time professional staff of two (2) and part-time staff of five (5), authored over 100 expert reports in 2020 alone. (Alexander dep. pp. 18, 46, attached hereto as Exhibit A).

Defendants ignore the fact that Dr. Wells's Rebuttal Report is structured to, and in fact does, respond to each of the specific critiques and/or assertions made by Defendants' expert. Rebuttal reports of an expert have uniformly been held to be appropriate where they relate to the "same subject matter" identified in the expert report of their adversary. Defendants

mischaracterize the law to imply that any new or additional material in a rebuttal report should be stricken.

Significantly, Defendants make no serious argument that they have been prejudiced by the Rebuttal Report of Dr. Wells. Their claim that they have been "deprived of any opportunity to scrutinize his work" ignores the 121-page report of their expert and the opportunity to take an additional deposition of Dr. Wells allowed by the Court's scheduling order. Ultimately, Defendants' Motion to Strike is an attempt to focus the Court's attention on Dr. Wells and away from the shortcomings of defense expert, Dominik Alexander. As will be demonstrated at the appropriate time, Dr. Alexander cherry picked the studies he would include and exclude from grouped analyses without providing a rationale for his selections. Although Defendants would obviously benefit from Plaintiffs' inability to identify mischaracterizations and unsound opinions by Dominik Alexander, Defendants cannot credibly suggest that Plaintiffs be given no opportunity to do so through their expert. Dr. Alexander's opinions will be addressed in Plaintiffs' *Daubert* challenge – at the appropriate time, within the procedures established by the Court.

Defendants make a gratuitous statement in the first sentence of the Background section of their Motion to Strike that cannot go unaddressed:

> As the Court knows, one of the key factual disputes in these cases is whether – as Plaintiffs claim but the EPA and all reputable sources have long denied – paraquat exposure can cause PD.

(Doc. 3855, p. 3).

Defendants are well aware of the falsity of this claim, because they have helped perpetuate it. A peer-reviewed article in the journal entitled Movement Disorders published last month articulated the causal association between paraquat and Parkinson's disease:

> According to the Guardian, in 2009 the makers of paraquat were trying to determine if "the scientific community [will] conclude from the laboratory and

> epidemiological data that paraquat exposure is a *causal factor* [their emphasis] in Parkinson's Disease or parkinsonism." It appears that this is a conclusion the company did not want us Parkinson's researchers to make. This report and the company's own findings now indicate that we know what one cause of Parkinson's disease is – paraquat. With this conclusion, paraquat should be banned, and the search for other causative factors in the environment should accelerate.

Dorsey ER, M.D., et al., *Paraquat, Parkinson's Disease, and Agnotology*. Movement Disorders (2023). DOI: 10.1002/mds.29371, found at https://doi.org/10.1002/mds.29371, *2, *citing to* Gillam C, Uteuova A. *Secret files suggest chemical giant feared weedkiller's link to Parkinson's disease*. The Guardian 2022; [cited 2022 Dec 19]. Available from: https://www.theguardian.com/us-news/2022/oct/20/syngenta-weedkiller-pesticide-parkinsons-disease-paraquat-documents. The Movement Disorders article goes on to explain the actions of the EPA and any delay in the scientific communities' understanding of the causal connection between paraquat and Parkinson's disease:

> Rather than remove this dangerous chemical from the market or develop a safer alternative, the company doubled down on its "blockbuster" product and sought to expand its use. Along the way, the company appeared to use techniques to underestimate the toxic effects of the chemical, hide the results of its own research from regulatory authorities, and discredit the research of an academic investigator and prevent her from serving on a U.S. Environmental Protection Agency (EPA) advisory panel....
>
> \* \* \* \*
>
> The company's alleged efforts seem to have worked brilliantly. Despite numerous animal and epidemiological studies linking the environmental toxicant to Parkinson's disease, paraquat's use in the United States from 2013 to 2018 more than doubled…Because of its health risks, over 30 countries – including China – have banned paraquat…
>
> \* \* \* \*

Knowledge of the toxic effects of paraquat is alleged to have been hidden for decades, and a credible academic researcher appears to have been prevented from highlighting the weedkiller's true risks. All the while, the manufacturer continues to maintain that paraquat does not cause Parkinson's disease. Actions like these

should be recognized for what they are:  attacks on science, attacks on scientists, and attacks on the health of the public…

Dorsey, *Paraquat, Parkinson's Disease, and Agnotology*, at *1.

The Movement Disorders journal is the most recognized medical publication in the world on the topic of Parkinson's disease.  Defense expert, Dr. Warren Olanow, was the Co-Editor-in-Chief of that Journal from 2010 to 2015.  The Movement Disorders journal is the publication of The International Parkinson and Movement Disorder Society.  The Society is the most prestigious Parkinson's disease medical organization in the world.  Defense expert, Dr. Warren Olanow, is a past President, as is Plaintiff's Expert, Dr. Anthony Lang.

Consistent with what was published in Movement Disorders and The Guardian, discovery has revealed actions of Syngenta to improperly influence the scientific community and to hide the results of unfavorable internal studies.  For example, Syngenta concealed the following:

- The existence of a 2003 policy mandating that paraquat not be measured in the brains of study animals because "any detection in the brain (no matter how small) will not be perceived externally in a positive light" (Botham dep. Exh. 293);[1]

- Three (3) studies between 2003-2005 where all found damage to the brains of paraquat-exposed mice in the exact location of damage considered a hallmark feature of Parkinson's disease (Botham dep. Exhs. 262-265);

- That between 2006 and 2011, Syngenta improperly consulted and influenced the outcome of a paraquat/Parkinson's disease study being funded by the British government and conducted by Exponent[2] (Botham dep. Exh. 274-282);

---

[1] Philip Botham was Syngenta's 30(b)(6) witness whose deposition was taken by Plaintiffs on February 15-16, 2022.

[2] Exponent was or is the employer of three of Defendants' experts in this litigation.

- A successful, carefully hidden attack on the scientific integrity of a leading U.S. researcher to prevent her from being appointed to the EPA Science Panel in 2005 and again in 2010 (Botham dep. Exhs. 250-258);

- A 2011 study of monkeys that found that eight weeks after exposure was stopped, the level of paraquat in the brain of every monkey was not decreasing (Botham dep. Exh. 207);

- A 2013 analysis of data from the Agricultural Health Study that found a 250% increase in the risk of Parkinson's disease among workers occupationally exposed to paraquat (Botham dep. Exh. 272);

- That over the past 15 years, Syngenta has paid for, edited and controlled the content of more than a dozen scientific publications.

All of these internal studies and behind the scenes actions were hidden from the public and scientific community and directly rebut Defendants' gratuitous assertion.[3]

## APPLICABLE LEGAL STANDARD

Defendants statement of the law is misleading.  They would have this Court believe that any new or additional material in a rebuttal report must be stricken.  Defendants cite four (4) cases

---

[3] This is not an exhaustive list of actions taken by Syngenta to conceal knowledge from the public and influence the scientific community.  Also, the article in Movement Disorders is not the only statement supporting the association between paraquat and Parkinson's disease. In 2016, Syngenta contributed to the publication of an article in the *New York Times* titled "A Pesticide Contradiction: Prohibited in Britain, but Made There for Export."  In addition to quoting Syngenta scientists, the article also quoted a renowned Parkinson's disease researcher, Dr. Samuel M. Goldman:  "'*The data is overwhelming' linking paraquat and Parkinson's disease, said Dr. Samuel M. Goldman, an epidemiologist in the San Francisco Veterans Affairs health system who has studied the connection.*"  A 2020 textbook titled, "Ending Parkinson's Disease: A Prescription for Action", Hachette UK, acknowledged the causal relationship between pesticides and Parkinson's disease, highlighting the role of paraquat.  One of its authors, Bastiaan R. Bleom, M.D. is currently the most highly published author in the world on the topic of Parkinson's disease. (2020).  In 2020, The Michael J. Fox Foundation for Parkinson's Research filed a lawsuit against the EPA challenging their decision to allow the sale of paraquat in the United States.

from the 7th Circuit to support their position.  All are factually distinguishable.  The issue before this Court is whether Dr. Wells's Rebuttal Report is appropriate – a Rebuttal Report that was expressly provided for in the Court's scheduling order.  This situation can be contrasted with those in the cases Defendants cite as the "Legal Standard."  For example, Defendants cite the cases of *United States v. Grintjes*, 237 F.3d 876 (7th Cir. 2001), and *Peals v. Terre Haute Police Dep't*., 535 F.3d 621 (7th Cir. 2008).  Both cases involve fact rebuttal witnesses offered during criminal trials.  Neither case even mentions the word expert, let alone expert rebuttal reports.  Similarly, Defendants cite *Braun v. Lorillard, Inc*., 84 F.3d 230 (7th Cir. 1996) but again, this case has nothing to do with the issues here.  In *Braun*, the Plaintiff attempted to call a fact witness that it did not identify until ten days before trial. *Id.* at 236.  The Court did not allow the testimony during the case-in-chief, so the Plaintiff attempted to call the witness in rebuttal. *Id*. at 237.  The court, understandably, held that even as a rebuttal witness the plaintiff failed the "good cause" requirement for late identification and further held that the witness was not proper for rebuttal.  *Id.* Defendants also cite *David v. Caterpillar, Inc*., 324 F.3d 851 (7th 2003), for the proposition that when a party attempts to offer testimony under the guise of rebuttal that is actually offered only to support their case in chief that the "remedy of 'exclusion is automatic and mandatory unless the sanctioned party can show that its violation … was either justified or harmless'."  (*See* Doc. 3855, p. 7).  Critically, in *David,* the Court held that a witness who was not disclosed in Plaintiff's Rule 26(a) disclosures as "having evidence supportive of her claims" should not be allowed to testify at trial in support of Plaintiff's claim unless the violation of Rule 26(a) was either "justified or harmless."  *Id*. at 856-57.  The case offers no guidance to this Court in determining whether Dr. Wells's Rebuttal Report was appropriate.

While an expert rebuttal report must address the same subject matter as the report it critiques, contrary to Defendants' assertion, limiting its analysis to only those methods from the expert's original report would impose a restriction that is not provided for in the Rules. *Ernst v. City of Chicago*, 2013 U.S. Dist. LEXIS 127993 (N.D. Ill. Sept. 9, 2013), *5.  If offered to contradict or rebut the other party's report, an expert may introduce new methods of analysis in a rebuttal report. *Id.*  Rebuttal reports can use, as well, additional data not found in the original report so long as it relates to the same subject matter. *Id*. *See also City of Gary v. Shafer*, 2009 U.S. Dist. LEXIS 41004 (N.D. Ind. May 13, 2009) at *14; *Piercy v. Warkins*, 2017 U.S. Dist. LEXIS 62552 (N.D. Ill. Apr. 25, 2017).

In *Piercy*, a case involving medical malpractice, the plaintiff's expert opined both that the cause of the plaintiff's bleeding could not be identified and that the defendants should have acted promptly to determine its cause.  In response, the defendants offered the reports of several experts who claimed that the plaintiff likely suffered from an acute event resulting in significant blood loss.  In rebuttal, the plaintiff's experts opined that medical records of the plaintiff contained evidence "strongly suggestive of a gastric ulcer" as being the cause of the bleed. The defendants moved to strike the rebuttal reports, claiming that they were improper attempts to strengthen the plaintiff's case-in-chief, abandoning their earlier opinion and offering new opinions based on a "change in methodology."  The court disagreed with the defendants' characterization. Although the court acknowledged that the rebuttal report included a detailed description of medical records that was not included in the original report, it concluded that in adopting the "rebuttal" opinions, the plaintiff's experts did not abandon earlier expressed opinions.  Rather, according to the court, the new opinions bolstered the earlier opinions and explicitly contradicted the opinions offered by the defendants' experts.  2017 U.S. Dist. LEXIS 62552 at *29-31.

Rebuttal reports can additionally include evidence and analysis that the expert could have included in his original report. *Bakov v. Consol. World Travel, Inc*., 2019 U.S. Dist. LEXIS 46510, at *32-35 (N.D. Ill. Mar. 21, 2019). Like Chevron and Syngenta do here, the defendants in *Bakov* argued that a rebuttal expert's report was improper because it contained "information that was required to be included in an initial expert report from Plaintiffs." The *Bakov* court rejected that assertion, pointing out that the function of rebuttal evidence is "to contradict, impeach or defuse the impact of the evidence offered by an adverse party." *Id*., *citing Peals v. Terre Haute Police Dep't*, 535 F.3d 621, 630 (7th Cir. 2008). As the *Bakov* court stressed, "the focus is not on the similarity between the initial and rebuttal reports, but rather on whether the opinions expressed in a rebuttal report rebut the same subject matter identified in the other party's expert report." *Bakov*, *citing Green v. Kubota Tractor Corp.,* 2012 U.S. Dist. LEXIS 56770, at *15 (N.D. Ill. Apr. 24, 2012). The *Bakov* court further emphasized:

> Rule 26 does not automatically exclude evidence that an expert could have included in his original report as such a rule would lead to the inclusion of vast amounts of arguably irrelevant material in an expert's report on the off chance that failing to include any information in anticipation of a particular criticism would forever bar the expert from later introducing relevant material.

*Id.* at *34, *citing City of Gary*, 2009 U.S. Dist. LEXIS 41004 at *5. Finally, the *Bakov* court made clear that "the very purpose of a reply report [is] to refute a defendant's expert's arguments and to provide further support, rather than abandoning one's initial opinions." *Bakov*, 2019 U.S. Dist. LEXIS 46510, at *35; *accord Kleen Prods. LLC v. Int'l Paper,* 306 F.R.D. 585, 592 (N.D. Ill. 2015).

In *Kleen*, the plaintiffs filed a motion for class certification, attaching the reports of two experts who used one approach to calculate antitrust damages. 306 F.R.D. at *591-92. Thereafter the defendant filed an opposition to class certification, attaching the reports of its own experts –

who criticized the methodology employed by plaintiffs' experts.  In a rebuttal report, the plaintiffs' expert performed the analyses that the defendants' expert argued he should have done initially. The defendants moved to strike that rebuttal report as new.  The court denied that motion – holding that "the very purpose of a reply [rebuttal] report [is] to refute a defendant's expert's arguments and to provide further support, rather than abandoning, one's initial opinions." *Id.*, *citing Sloan Valve Co. v. Zurn Indus.*, 2013 U.S. Dist. LEXIS 85897 (N.D. Ill. June 19, 2013).

*Sloan Valve Co*. is similarly instructive. In that case involving patent infringement, the plaintiff's expert calculated damages in his initial report based on a "weighted ratio" approach. The defense expert, in his opposition report, criticized plaintiffs' expert for failing to employ an "unweighted ratio" approach.  2013 U.S. Dist. LEXIS 85897 at *4.  In a rebuttal report, the plaintiffs' expert included a new calculation of damages based on an unweighted ratio – as the defense expert suggested.  The defendant moved to strike the rebuttal report on the grounds that it presented new arguments and opinions and further requested leave to have its own expert amend his own report.  The Court denied the motion.  With respect to the "unweighted ratio" calculation, the Court pointed out that plaintiffs' expert was not abandoning his original calculation based on the "weighted ratio;" rather, he was providing an additional calculation to refute or defuse the criticisms of defendants' expert. *Id.* at *10-11. Further, as the rebuttal report was found to be "responsive to" the report of defendant's expert, the court denied the defendant's request to offer a sur-rebuttal report. *Id.* at *11.[4]

---

[4] The Court did grant a partial motion to strike a portion of the plaintiff expert's rebuttal in which he performed a brand-new alternative calculation of collateral sales damage (neither included in the original report nor suggested by the opposition) using data that existed at the time of his original report. 2013 U.S. Dist. LEXIS 85897 at *10.

The forgoing authorities are not unique.  They all stand for the simple notion that the defense is not allowed to dictate how an opposing expert may disagree with them.

> The measure of proper rebuttal is not whether it offers support for arguments that could have been raised in the case-in-chief, but whether it directly refutes arguments offered by the opposition. … Rule 26 does not automatically exclude evidence that an expert could have included in his original report. … Consequently, the mere fact that opinions offered in a rebuttal report touch upon the same subjects covered in an initial expert report does not require that the rebuttal be stricken. … Indeed, rebuttal reports may cite new evidence and data so long as the new evidence and data is offered to directly contradict or rebut the opposing party's expert. … Thus, when evaluating whether a proposed rebuttal report is appropriate, the focus is not on the similarity between the initial and rebuttal reports, but rather on whether the opinions expressed in a rebuttal report rebut the same subject matter identified in the other party's expert report.

*Sonrai Sys. v. Romano*, 2021 U.S. Dist. LEXIS 53362, at *15-23 (N.D. Ill. Mar. 22, 2021) (internal citations and quotations omitted).  The *Sonrai* court went opinion by opinion through the rebuttal report, confirming, overwhelmingly, that the opinions addressed and were intended to "defuse" criticisms asserted by the defendants' expert and were, accordingly, appropriate under the rules. *Id.* at 22-23.  Finally, the court rejected the defendants' invitation to consider the veracity and/or admissibility of the plaintiffs' expert's opinions – finding the *Daubert*-type challenge to be premature. *Id.* at *14.  *See also City of Gary*, 2009 U.S. Dist. LEXIS 41004, at *14 ("Under this rule, [a rebuttal expert] is free to support his opinions with evidence not cited in … [the earlier] reports so long as he rebuts the 'same subject matter' identified in those reports.").

While a rebuttal report need not follow any particular format, in structuring a rebuttal, a useful approach for a judge (as well as the opposing party) would be to address the opposition expert's points, either in sequence or by identifying them and critiquing them. *Ernst*, 2013 U.S. Dist. LEXIS 127993, at *10.  "As it is often said in this circuit, judges are not like pigs, hunting for truffles in briefs." *Id.*, *citing Gutierrez v. Kermon*, 722 F.3d 1003, 1012 (7th Cir. 2013).

## ARGUMENT

The law allows a rebuttal to include new materials and analyses that are intended to contradict, impeach or defuse the assertions of the opposing expert.  Defendants' Motion to Strike ignores the law and does little more than compare the Original Report and testimony of Dr. Wells with his Rebuttal Report.  Defendants do so even though "the focus is not on the similarity between the initial and rebuttal reports, but rather on whether the opinions expressed in a rebuttal report rebut the same subject matter identified in the other party's expert report."  *Bakov*, 2019 U.S. Dist. LEXIS 46510, at *32-35; *Green*, 2012 U.S. Dist. LEXIS 56770, at *15.  Nowhere in Defendants' entire Motion do they claim that the Wells Rebuttal Report is outside the subject matter of their expert's criticisms.  Indeed, as was suggested as a useful approach in *Ernst*, 2013 U.S. Dist. LEXIS 127993, at *10, in his Rebuttal Report, Dr. Wells identified each opinion and/or criticism of Dr. Alexander that he was responding to in an attempt to make it as easy as possible for the Court (and Defendants) to follow his analysis.  The fact that Defendants have chosen to ignore what should undeniably have been the focus of their argument makes transparent the true purpose of their motion – an untimely attack on the credibility of Dr. Wells to set the stage for their *Daubert* challenge.

Although Defendants' point by point comparison of Dr. Wells's Original Report, testimony and Rebuttal Report is a misguided exercise, Plaintiffs feel the need to respond to this poorly cloaked credibility attack.

### The "List" of Inclusion Criteria Contained In The Rebuttal Report Does Not Constitute A New Methodology That Should Be Stricken.

The Defendants' focus on form over substance is best illustrated by their loudest complaint.  Defendants argue that Dr. Wells failed in his Original Report to enumerate the "inclusion criteria" he used to choose the studies he included in his meta-analysis and now, inappropriately listed such

criteria in his Rebuttal Report.[5]  The facts of what actually occurred undermine the substance of this argument:

- Wells's Original Report (10.13.22) (*see* Doc. 3855-2)

    - The first sentence stated "I, Martin T. Wells, Ph.D., have been asked by counsel for the Plaintiffs to analyze the epidemiological evidence relating the association and causation of the **occupational exposure** of **paraquat** to the onset of **Parkinson's disease**."  (Emphasis added).

    - His report thereafter stated, "I will also perform a quantitative synthesis of the **occupational case-control study findings**." (meta-analysis) (Emphasis added) (p. 7).

    - Thereafter, the report outlined a meta-analysis which included only studies of **occupational exposure, paraquat, Parkinson's disease** and **case-control design**.

- Defense expert Dominik Alexander report (1.20.23) (*see* Doc. 3855-4)

    - "Dr. Wells does not include any clear inclusion or exclusion criteria in his report" outlining the studies he included in his meta-analysis. (p. 86).

    - …"[I]t was not possible for me to follow a clear set of inclusion/exclusion criteria." (p. 86).

- Wells's Rebuttal Report (3.15.23) (*see* Doc. 3855-5)

    - "Although my report did not have a section titled 'Inclusion/Exclusion Criteria,' the fact that I only included studies of PD is obvious.  The fact that I only included studies relating to paraquat should have been obvious.  The fact that I only included

---

[5] A meta-analysis is a mathematical calculation of a pooled (single) odds ratio based on the combination of data from multiple epidemiologic studies.  It is a commonly used tool by scientists in assessing the potential association between an exposure and a disease.

case-control studies in my meta-analysis was stated in my report and deposition. The fact that I only included studies where an OR can be calculated should be obvious. Finally, the fact that I only chose studies involving "occupational exposure" should be apparent from the opening sentence of my report." (pp. 10-11).

o The Rebuttal Report also identified "inclusion criteria" as **occupational, paraquat, Parkinson's disease, case-control** and studies where an odds ratio can be calculated "to address some of the misunderstandings of Dr. Alexander" outlined "inclusion criteria" as **occupational, paraquat, Parkinson's disease, case-control** and studies where an odds ratio can be calculated.[6] (pp. 10-11).

The only difference between the Original Report of Dr. Wells and his Rebuttal Report is the title "Inclusion/Exclusion Criteria" – form only. Defendants' assertion that they were in the dark as to Dr. Wells's inclusion criteria and are now somehow prejudiced by his Rebuttal Report is disingenuous. Defendants are nonetheless claiming, and want the Court to believe, they were actually surprised that Dr. Wells included studies of paraquat in his analysis, or that he included studies of Parkinson's disease or studies with sufficient data to calculate risk. Defendants not only claim that Dr. Wells's Original Report failed to state his inclusion criteria, but they also claim he did not actually apply such criteria. (Doc. 3855, p. 2). Ironically, the inclusion criteria articulated by defense expert Dr. Alexander are similar to those used by Dr. Wells, differing only in the ability to combine studies of differing experimental design (e.g., combining case-control and cohort

---

[6] The fact that Dr. Wells's meta-analysis only included cases where an odds ratio could be calculated was not articulated in his Original Report, however, it should go without saying that only studies that provide the necessary data can be included in a meta-analysis. Dr. Alexander also did not list this criteria in his report. Rather, he makes mention of it in a footnote.

studies in a single meta-analysis). (Alexander Rept. p. 24).  The misleading nature of Defendants'

Motion is revealed by their argument:

> "Indeed when asked if inclusion criteria were in his report, Wells admitted:  'No.
> It's not in there.'  Wells Dep. Tr. 113:9-114:1. For that reason alone, the new
> methodology is not proper rebuttal material and should be stricken and excluded."

 (Doc. 3855, p. 9).  To be clear, Dr. Wells was **never** asked whether his inclusion criteria were in

his report.  He was asked whether his report contained an "exhaustive list" of his criteria and he

truthfully answered that there was no such list in his report.  Though Defendants quote Dr. Wells's

answer in their Motion, they failed to include the question he was asked:[7]

```
16    Q    And my question was, did you give an
17  exhaustive list of the different aspects of the
18  studies that you used to decide whether they were
19  in or out?
20        MR. KENNEDY:  I'm asking you to look at
21  your report.  If she's asking an exhaustive
22  report, please refer to your report.
23    Q   If you can point me in your report to a
24  list of criteria for inclusion in your
25  meta-analysis, I would love that.
```

**1    A   No.  It's not in there.**
2    Q   Okay.
**3    A   It's not in there.**
4    Q   Thank you.

(Wells dep., attached hereto as Exhibit B, pp. 113:16-114:4).

There has never been an issue that Dr. Wells's Original Report did not contain a list under

the heading "Inclusion Criteria."  This does not mean, however, that his criteria were non-existent

or unknown.  The only reason they were offered as a list in his Rebuttal Report was to specifically

address the incorrect critique by Dr. Alexander.

---

[7] While Defendants' Motion failed to disclose the question asked Dr. Wells, it was disclosed in
Exhibit A attached to Defendants' Motion to Strike. (*See* Doc. 3855-1).

The transparent nature of Defendants' form over substance misdirection is no more apparent than when they complain three times and finally in bold letters for emphasis: **"But neither the list of 36 nor the list of eight appears anywhere in Wells' Original Report or testimony." (**Doc. 3855, pp. 9-10 (emphasis in original)).  The 36 studies referenced are those epidemiology studies listed in Dr. Wells's Rebuttal Report relating to paraquat exposure and Parkinson's disease.  Importantly, every one of the 36 studies was included in the list of Materials Considered attached to Dr. Well's Original Report.  Defendants do not argue that this list contains any studies it should not.  Defendants do not argue that any relevant studies are missing from this list.  In fact, using the same method of identifying only studies relating to paraquat and Parkinson's disease, Defendants' expert arrived at his own list of 32 studies, which are essentially the same studies that constitute the study list of Dr. Wells.[8]  The EPA 2019 review found 28 Parkinson's disease/paraquat studies; and when adding the 2 studies published after 2019, their list includes 30 studies.  When considering the studies that are relevant to any analysis in this litigation, there is complete overlap.  There is only one methodology that was used or could be used by Dr. Wells, Dr. Alexander and the EPA to arrive at essentially the same list of relevant studies – that being to identify studies relating to paraquat and Parkinson's disease. It is inexplicable how Defendants could claim that Dr. Wells somehow used one method in his Original Report and a second in his Rebuttal Report, when there is only one method to reach the same result as Dr. Alexander, the EPA and Dr. Wells.

Finally, contrary to the record, Defendants claim that Dr. Wells, without any "clear criteria", "reached his conclusions by gerrymandering this selection of studies" to exclude Shrestha

---

[8] The studies that represent the differences in the two lists are of no significance in either expert's evaluation or meta-analysis.

2020 from his analysis. (*Id*. at pp. 3,5). Shrestha 2020 is a cohort study. Dr. Wells combined only case-control studies in his meta-analysis. This was clearly articulated in his Original Report. (Wells Original Report, pp. 7, 17). It is the opinion of Dr. Wells that it is not appropriate to combine case-control studies and cohort studies in a single meta-analysis. This was unequivocally stated at his deposition. (Wells dep. tr. pp. 88, 90-93). Dr. Wells's position is supported by Vaccari 2019 where the authors stated that the results of their case-control studies were presented separate from the cohort study "due to their different experimental design." (*Id*. at p. 189). Defendants' statement that Shrestha 2020 was excluded from Dr. Wells's analysis without any "clear criteria" is untrue. Shrestha 2020 was expressly excluded from the case-control meta-analysis because it is a cohort study. While Dr. Alexander is free to disagree with Dr. Wells as to whether such studies should be combined into a single analysis, Defendants' misstatement of the record should not be used to exclude the report of Dr. Wells.

The list of inclusion criteria in Dr. Wells's Rebuttal is not a "newly minted methodology" as claimed by Defendants. Defendants' attack on the credibility of Dr. Wells is unwarranted and untimely. Importantly, Dr. Wells's rebuttal is a direct response to the claim of Defendants' expert that he had no inclusion criteria and, thus, under the applicable law should not be stricken. *See, e.g., Piercy*, 2017 U.S. Dist. LEXIS 62552; *Bakov*, 2019 U.S. Dist. LEXIS 46510. Importantly, Defendants do not even attempt to argue that Dr. Wells was not directly responding to the critique of their expert.

## The Description Of The Term "Occupational" Exposure Is A Direct Response To The Criticism Of Defendants' Expert And Not New Evidence.

One of the stated inclusion criteria used by Dr. Wells for his meta-analysis was whether the study addressed occupational exposure to paraquat. Defendants' expert claimed that Dr. Wells did not define "occupational" in his report or deposition. (Alexander rept., p. 87). This litigation

from its beginning has recognized the difference between occupational exposure and community

exposure.  Community exposure is exposure experienced by people who live near others who apply

or use paraquat (i.e., "drift" cases).  Defendants' Motion claims that Dr. Wells never defined

occupational exposure in his Original Report and should be barred from defining it in his Rebuttal

Report.  Dr. Wells, however, defined "occupational" by distinguishing it from "community

exposure."  (Wells Original Report, p. 6).  At his deposition, Dr. Wells testified that he excluded

"community exposure" studies because they were not "occupational studies."  (Wells dep. p. 97).

Defendants argue that during his deposition, Dr. Wells "…stated he looked at labels" to

determine whether a study was occupational.  Defendants support this claim by citing, but not

quoting, deposition testimony that does not even use the word "label":

  9    Q    So do participants in these studies have
10  to use paraquat as part of their job in order to
11  be classified as occupational exposure?
**12     A   They -- there's different ways they**
**13  classify what, you know, what their exposure was.**
**14  And so they have criteria that are within --**
**15  they're defined within the studies.  I'm using the**
**16  criteria that are given in those studies.**
17    Q   Okay.  So does exposure -- in order to
18  be classified as occupational exposure, do the
19  participants have to spray paraquat as part of
20  their job?
**21     A   It -- I'm just using what the studies**
**22  are defining.  So the studies have a definition of**
**23  what exposure is; I'm using the study's**
**24  definition.**
25    Q   And if the study does not require the

 1  participants to be exposed to paraquat as part of
 2  their job, would you have included this study in
 3  your meta-analysis?
** 4     A   I included the -- I looked at the**
** 5  studies that say they're occupational studies, and**
** 6  I included those studies.**

(Wells dep. pp. 16:9-17:6 (emphasis added)).

More significantly, Defendants cut off the very next question and answer in the deposition that makes clear that Dr. Wells was not relying on study titles or "labels" to determine whether a study was occupational:

> 7    Q    So are you relying on the title of the
> 8  study?
> **9      A    No.  They have included criteria within**
> **10  the study.**

(Wells dep. p. 17:7-10 (emphasis added)).

Defendants further distort Dr. Wells's testimony by claiming that "he testified he would not consider a study that 'includes both occupational and residential exposure'." (Doc. 3855, p. 12).  Defendants support this claim by citing two (2) lines of deposition testimony and make no mention of the testimony that immediately followed and clarified his consideration of such studies:

> 1    Q    So if other researchers had classified a
> 2  study as including both residential and
> 3  occupational exposure, you would have excluded it
> 4  from your meta-analysis, correct?
> **5      A    Not necessarily.  I would look at -- I**
> **6  would have to look at what the -- what the studies**
> **7  are.**

(Wells dep. p. 19:1-7 (emphasis added)). Dr. Wells did not exclude from his analysis studies that included both occupational and residential exposure as Defendants misrepresent.  As evidenced by his complete testimony, he appropriately reviewed such studies to determine whether they should be included in his analysis.

One such study was Liou 1997.  This study involves both occupational and residential "use" of paraquat. The Syngenta sponsored study, Breckenridge 2016, categorized the Liou 1997 study as a "use" study as did Dr. Wells when including it under the "occupational" umbrella.  Liou is not a community exposure (i.e., "drift") study.  Defendants, through their expert, have attempted to reframe Dr. Wells's own definition of the term "occupational" in order to argue that the Liou

1997 study should not have been included in his meta-analysis. What is ironic is that the EPA 2019 review of the paraquat epidemiologic studies that Defendants so heavily cite and rely upon, concluded that the Liou 1997 study was an "occupational" study and analyzed it as such.  *See* United States Environmental Protective Agency Subject:  Paraquat Dichloride:  Systematic Review; June 26, 2019. Wray and Niman, p. 32.  Defendants' focus on the Liou 1997 study and the lengths their expert, Dominik Alexander, goes to eliminate Liou from the cherry-picked list of studies he analyzed is transparently borne out of the fact that Liou 1997 found a significant association between paraquat use and Parkinson's disease.

Defendants are critical of Dr. Wells because Liou 1997 makes a 74% contribution to Dr. Wells's meta-analysis.  First, the 74% figure was calculated by Dr. Wells and included in his report.  It is not a qualitative assessment but rather a mathematical determination based upon data contained in the Liou 1997 study. What Defendants fail to disclose is that the Shrestha 2020 study, which Defendants' expert improperly includes in his meta-analysis, contributes over 65% to his own outcome after irrationally removing Liou 1997 from his analysis.  (Alexander Report, p. 99). Needless to say, this criticism of Dr. Wells has nothing to do with a court's review of a motion to strike a rebuttal report.

Significantly, Dr. Wells did not abandon or contradict his use of the term "occupational" in his Rebuttal Report.  *See generally Kleen*, 306 F.R.D. at 592.  What he did was clarify that the focus of his analysis was consistent with the focus of this litigation – the relationship between use of paraquat (as opposed to "drift") and Parkinson's disease.  Again, Defendants do not even attempt to argue that Dr. Wells was not directly responding to the critique of their expert.

**The Quality Criteria Used By Dr. Wells To Evaluate Studies Is Not Newly Described In The Rebuttal Report.**

Defendants' criticism of the Wells Rebuttal Report continues as an exercise of form over substance with Defendants again taking offense to the fact that the Wells Original Report did not provide a "list of criteria" that he used to evaluate the quality of studies while the Rebuttal Report does provide such a list.  Defendants' expert, Dr. Alexander, levies this criticism throughout his report.

To be clear, Defendants are not critical of the quality criteria themselves; how they are defined or their application to the various studies – they simply wanted them in a list in the Original Report.  Four of the five criteria outlined in the Wells Rebuttal Report were used by Defendants' expert in his analysis.  The Wells criteria have significant overlap with the criteria used in the Breckenridge 2019, Vaccari 2019, Tangamornsuksan 2019, and the EPA 2019 studies of paraquat. The basic core of criteria used by epidemiologists to evaluate the quality of a study are well established.

To bring context to Defendants' complaint, Dr. Wells excluded only one (1) study from his meta-analysis based on the application of his quality criteria - and did not do so before assessing the impact of the study's inclusion on the statistical heterogeneity on the analysis.  His Original Report described in two (2) paragraphs his quality criticism and why he was excluding van der Mark 2014 from his meta-analysis.  (Wells Original Report, pp. 15-16).  The appendix to the Original Wells Report details each feature of the study that was criticized.  At his deposition, Dr. Wells acknowledged the four (4) primary quality criteria that (along with statistical heterogeneity) led to the exclusion of the van der Mark study from his meta-analysis.  (Wells dep. p. 254).  There is no mystery as to what quality criteria Dr. Wells used to assess this study and ultimately, it was the only study excluded from his analysis.

Defendants argue that Dr. Wells not only failed to disclose any criteria but "at his deposition, he *disclaimed* any specific criteria." (Doc. 3855, p. 10). Unfortunately, once again, this assertion is false. During his deposition, Dr. Wells did not "disclaim" but, rather, identified all five (5) of the quality criteria that were made part of a list in his Rebuttal Report:

1. Parkinson's disease diagnostic criteria (Wells dep. pp. 107, 110-112, 321)

2. Definition of controls (Wells dep. pp. 107, 112, 321)

3. Adjustments for confounding (Wells dep. pp. 43-44, 277-280, 322)

4. Exposure assessment (Wells dep. pp. 68, 107, 112, 321)

5. Participation rates (Wells dep. pp. 246-247, 254, 322)

Dr. Wells further testified that his quality criteria were established before he evaluated the studies and applied systematically to each study. (Wells dep. pp. 67, 100, 113, 263, 320-323).

Defendants' persistent criticisms of Dr. Wells because he described his quality assessment as "holistic" is difficult to comprehend. "Holistic," as the term is commonly used, describes the process of looking at the "whole" or complete system. Dr. Wells undeniably looked at the "whole" of each epidemiological study in his quality evaluation. He considered five (5) different aspects of each study. This is no different than the method of defendants' expert who considered eleven (11) or of Breckenridge 2016 that looked at three (3) or of the EPA that considered five (5) different aspects of each study to evaluate quality. The defendants play on the term "holistic" is a further example of their form over substance approach.

**Quality Comparison Between Tanner 2011 and Shrestha 2020 Was A Necessary Part of The Rebuttal Report Given The Far Reaching Significance Placed on Shrestha 2020 By Defendants' Expert.**

Tanner 2011 is a case-control epidemiologic study that found a 250% increase in the risk of Parkinson's disease among persons occupationally exposed to paraquat. It was conducted by

Dr. Carlie Tanner, who is probably the most accomplished and respected Parkinson's disease researcher in the world.  It plays a significant role in the meta-analysis done by Dr. Wells.

Shrestha 2020 is a cohort epidemiologic study whose study population significantly overlaps with that of Tanner 2011.  As previously outlined, Shrestha 2020 was not included in Dr. Wells's case-control meta-analysis because in Dr. Wells's opinion, cohort studies should not be included in a case-control meta-analysis.

The Rebuttal Report of Dr. Wells, however, outlines a detailed comparison between the quality of the Tanner 2011 and the Shrestha 2020 epidemiology studies.  It is a direct response to the comparison of these two (2) studies done by Defendants' expert.  (Alexander rept., pp. 54-58, 78, 80, 90-91, 93, 95).  It is a direct response to the conclusion of Defendants' expert that the Shrestha 2020 study is of higher quality than the Tanner 2011 study and as a result:

1. Defendants' expert concludes that the Tanner 2011 study should be removed from the Wells meta-analysis and replaced with Shrestha 2020, resulting in a significantly lower odds ratio.  (Alexander rept., p. 93).

2. Defendants' expert concludes that Tanner 2011 should be removed from the meta-analysis done in Breckenridge 2016, Vaccari 2019, and Tangamornsuksan 2019 and replaced with Shrestha 2020, resulting in a significantly lower odds ratio.  All three (3) of the above published meta-analyses found a statistically significant association between paraquat exposure and Parkinson's disease;

3. After replacing Tanner 2011 with Shrestha 2020, Defendants' expert did six (6) different meta-analyses of his own (Alexander rept., pp. 96, 98-99, 101-102 and 108);

4. After replacing Tanner 2011 with Shrestha 2020, Defendants' expert conducted three (3) different regression analyses evaluating study quality, exposure type and exposure level.

While Dr. Wells described both studies in some detail in his Original Report, there was no direct comparison between the quality of Tanner 2011 with that of Shrestha 2020. The two (2) studies were not competing for a spot in the Wells meta-analysis because Dr. Wells opined that case-control studies (Tanner 2011) should not be combined with cohort studies (Shrestha 2020) in a single meta-analysis. (Wells Original Rept., p. 7; Wells dep. p. 87-88). The choice of Defendants' expert to combine such studies and to substitute Tanner 2011 with Shrestha 2020 in three (3) published meta-analyses and to create six (6) new meta-analyses and three (3) regression analyses using Shrestha 2020 instead of Tanner 2011 required rebuttal. Much of Dr. Wells's discussion on this issue was not contained in his Original Report, but as set forth above, this does not form the basis to strike such analysis.

### Dr. Wells's Rebuttal Report Did Not Offer New Arguments to His Bradford Hill Causation Analysis.

A Bradford Hill analysis is the methodology used by Dr. Wells to assess causation. It is the most common and accepted method to address causation. Dr. Wells's Bradford Hill analysis was a total of four (4) pages in his Original Report. It was never intended to represent the totality of his considerations.

Defendant's expert, Dr. Alexander, criticized Dr. Wells for studies he did not cite in his Bradford Hill analysis, claiming they were ignored. (Alexander rpt., pp. 7, 82). Dr. Alexander, however, did his own Bradford Hill analysis that only amounted to one page of his 121-page report. When confronted at his deposition regarding what he had left out of his analysis, Dr. Alexander replied that his entire review should be incorporated into his one-page Bradford Hill analysis. (Alexander dep., pp. 237-238).

Dr. Wells's Rebuttal Report simply followed the lead of Dr. Alexander and stated that his entire evidentiary analysis should be incorporated into his Bradford Hill analysis. (Wells Rebuttal

Rept., p. 32). The fact that either Dr. Wells or Dr. Alexander would have to make such a clarification illustrates how far away from substance and into form Defendants have taken us. Again, Defendants do not even attempt to argue that this portion of Dr. Wells's Rebuttal Report is outside the subject matter of Dr. Alexander's critique. In fact, it is a direct response to a specific criticism of Dr. Alexander.[9]

## CONLUSION

From start to finish, Defendants' Motion to Strike is a comparison between the content of the Original Report, testimony and Rebuttal Report of Dr. Wells. This is not the necessary analysis to determine whether to strike a rebuttal report. Defendants' utter failure to even remotely address whether the Rebuttal Report responds to the specific opinions and/or criticisms of their expert exposes the true nature of their Motion. Simply put, Defendants' Motion is a merits brief that belongs as an attachment to their yet unfiled *Daubert* Motion. Defendants' untimely attack on the credibility of Dr. Wells contains misstatements and mischaracterizations of the record. At best, Defendants' attacks amount to form over substance. Although Defendants challenge is untimely and improper, Plaintiffs found it necessary to address these unwarranted claims. Left unchallenged, Plaintiffs risked starting the *Daubert* process at a disadvantage.

For the foregoing reasons, the Court should deny Defendants' Partial Motion to strike Rebuttal Report of Martin T. Wells (Doc. 3855).

---

[9] Dr. Alexander was critical of the fact that none of the epidemiological studies took into account the prodromal period that precedes the manifestation of a movement disorder (e.g., tremor, bradykinesia, rigidity). (Alexander Dep., p. 107). The Rebuttal Report of Dr. Wells responds directly to this argument, citing the Rebuttal Report of Plaintiffs' expert, Anthony Lang, M.D. (Wells Rebuttal, p. 33).

Dated:    April 3, 2023

Respectfully submitted,

**PLAINTIFFS' CO-LEAD COUNSEL**

/s/ *Sarah Shoemake Doles*
Sarah Shoemake Doles
LEVIN, PAPANTONIO, RAFFERTY,
PROCTOR, BUCHANAN, O'BRIEN,
BARR & MOUGEY, P.A.
316 South Baylen Street, Suite 600
Pensacola, FL 32502
Telephone: (850) 435-7011
sdoles@levinlaw.com

Khaldoun A. Baghdadi
WALKUP, MELODIA, KELLY &
SCHOENBERGER
650 California Street, 26th Floor
San Francisco, CA 94108
Telephone: (415) 981-7210
kbaghdadi@walkuplawoffice.com

Peter J. Flowers
MEYERS & FLOWERS, LLC
225 West Wacker Drive, Suite 1515
Chicago, IL 60606
Telephone: (630) 232-6333
pjf@meyers-flowers.com

## CERTIFICATE OF SERVICE

I hereby certify that on April 3, 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send electronic notification of such filing to counsel of record.

/s/ *Sarah Shoemake Doles*
Sarah Shoemake Doles
LEVIN, PAPANTONIO, RAFFERTY,
PROCTOR, BUCHANAN, O'BRIEN,
BARR & MOUGEY, P.A.
316 South Baylen Street, Suite 600
Pensacola, FL 32502
Telephone:  (850) 435-7011
Facsimile:  (850) 436-6011
sdoles@levinlaw.com