# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

|  |  |
|---|---|
| ) | |
| ) | Case No.  3:21-md-3004-NJR |
| ) | |
| **IN RE: PARAQUAT PRODUCTS** ) | MDL No.  3004 |
| **LIABILITY LITIGATION** ) | |
| ) | Hon.  Judge Nancy J.  Rosenstengel |
| ) | |

## DEFENDANTS' MOTION FOR DOCKET CONTROL ORDER

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ..................................................................................................... 1

BACKGROUND ..................................................................................................... 4

    1.    Paraquat Plays An Important—But Limited—Role In U.S. Agriculture. .............. 4

    2.    Various Law Firms and Lead Generators Launch a Massive Plaintiff-Solicitation Advertising Campaign........................................................................ 5

    3.    The Bellwether and Discovery Process Reveals That Many Plaintiffs Were Not Exposed To Paraquat. ...................................................................... 7

ARGUMENT ......................................................................................................... 10

    1.    Category 1: Plaintiffs Who Have No Information about their Exposure to Paraquat Should Produce Third-Party or Documentary Evidence and Verifications from Counsel..................................................................... 12

    2.    Category 2: Plaintiffs Who Have No Medical Evidence to Support a Diagnosis of PD Should Serve Specific Causation Expert Affidavits and Verifications from Counsel..................................................................... 14

    3.    Category 3: Plaintiffs Who Used Paraquat in a Form in Which it Never Existed Or In a Manner Inconsistent with Paraquat Use Should Provide Third-Party or Documentary Evidence and Verifications from Counsel. ............ 15

    4.    Category 4: Plaintiffs Who Present Other Evidentiary Issues Like Those that Led to the Voluntarily Dismissal of *Marx* and *Walkington* Should Produce Third-Party or Documentary Evidence and Verifications from Counsel. .............................................................................................. 18

CONCLUSION..................................................................................................... 22

## INTRODUCTION

Even limited discovery has demonstrated that this Court's docket contains cases filed by plaintiffs that cannot plausibly allege they were exposed to paraquat or that they have Parkinson's Disease ("PD").  Some cases have gone through full fact and expert discovery, and voluntarily dismissed with prejudice rather than face summary judgment; others went through limited discovery, and even that limited discovery demonstrated that plaintiffs were not exposed to paraquat; and others selected for discovery voluntarily dismissed to avoid discovery altogether. The Court was thus correct to express in CMO 18 its "concern[] about the presence of cases on its docket that present implausible or far-fetched theories of liability, and therefore would not have been filed but for the availability of this multidistrict litigation."  (ECF No. 4242 at 3–4.)  Where, as here, courts have dockets with cases that cannot withstand scrutiny and would not have been brought but-for the fact that the litigation is an MDL, courts have broad discretion to issue docket control orders "to identify such cases now rather than letting them remain on the docket indefinitely."  (*Id.* at 4.)

Specifically, as the Court noted in CMO 18, "[c]onsidering the revelations in the Deceased Plaintiffs Motion and the voluntary dismissal of *Marx* and *Walkington*, the Court is concerned about the presence of cases on its docket that present implausible or far-fetched theories of liability, and therefore would not have been filed but for the availability of this multidistrict litigation."  (*Id.* at 3.)  The Court identified four categories of cases that "present theories of proof that are so implausible on their face that good faith demands voluntarily dismissal[,]" including cases in which:

> (i)     a plaintiff states that they have no information concerning their exposure to paraquat (as opposed to a different product); or
>
> (ii)    a plaintiff has no medical evidence to support a diagnosis of Parkinson's disease; or

      (iii)     a plaintiff claims to have used paraquat in a form in which it never existed (*e.g.*, in powder or pellet form); or

      (iv)     there are other evidentiary issues such as those that led to the voluntarily dismissal of the bellwether plaintiffs.

(*Id.* at 4 n.4.)

CMO 18 further ordered that the parties meet and confer to identify any pending cases that fall within the enumerated categories above such "that good faith demands their voluntary dismissal." *Id.* at 4. In the weeks that followed, Defendants attempted to do that. (*See* Ex. 2, Emails Between R. Naresh and P. Flowers re CMO 18.) Those efforts were unsuccessful: indeed, they were all give and no take. Though Plaintiffs requested, and Defendants presented, a proposal, Plaintiffs failed to provide any substantive response. Instead, Plaintiffs filed a Motion to Modify CMO 18 (ECF No. 4433) the day before the instant motion was due. Defendants will respond to that Motion by June 30 as ordered by the Court, but suffice to say for the purposes of this Motion, Plaintiffs' Motion is misguided. The premise of this Motion is not that the Plaintiff Assessment Questionnaires ("PAQs") identified in this Motion are "deficient," which would subject the PAQs to the CMO 10 deficiency process. Nor are Defendants moving to dismiss any claims at this time. Defendants instead identify PAQs containing ***substantively*** implausible theories of injury, which can only be rectified by the identified plaintiffs coming forward with objective evidence to support their allegations.

Thus, consistent with CMO 18, Defendants now move the Court to enter a docket control order requiring plaintiffs who fall into the Court-identified categories to submit particularized types of evidence or face dismissal. The Federal Rules provide courts—particularly MDL courts—with the authority and discretion to issue docket control orders to address situations like those presented here. Indeed, without such an order, cases that never would (or should) have been filed in the first place will be permitted to linger on the MDL docket indefinitely or will cause

Defendants to expend considerable time and money in discovery, as they did in bellwether cases *Marx* and *Walkington.* To prevent this waste of judicial and party resources, Defendants have included as Exhibit 1 their best effort to identify plaintiffs that fall into the four categories set out in CMO 18.[1]

Defendants propose that plaintiffs who fall within the four Court-identified categories be required to submit the following types of evidence or else face dismissal. Plaintiffs in categories 1, 3, and 4 should be required to produce third-party or documentary evidence of exposure to paraquat. Plaintiffs in category 2 should be required to submit medical proof by way of a treating physician affidavit confirming a PD diagnosis. And counsel for each plaintiff identified in any category in Exhibit 1 should be required to submit a case-specific affidavit attesting that: (1) the claims being made have an evidentiary basis and (2) continuing to pursue the claims is consistent with their Rule 11 obligations.

To be clear, even for plaintiffs who have been diagnosed with PD and who plausibly allege paraquat exposure, the consensus view, shared by both the scientific community and federal regulators alike, is that the evidence does not support a claim that paraquat causes PD. And after decades of intense scrutiny and multidisciplinary research, no peer-reviewed study in the scientific literature concludes that paraquat causes PD. The Court will assess these issues at summary judgment and in evaluating the FRE 702/*Daubert* challenges to Plaintiffs' experts. But in parallel with that review, the Court should continue to use information obtained through bellwether discovery and the PAQ process to manage its docket.

---

[1] Defendants continue to review PAQs and other records and submitted by plaintiffs. Defendants will supplement the lists in Exhibit 1 on an ongoing basis.

## BACKGROUND

**1.      Paraquat Plays An Important—But Limited—Role In U.S. Agriculture.**

Paraquat has been an important but relatively targeted tool for farmers since it was first sold in the United States in the 1960s.  Although it is an excellent tool for weed control and has other agronomic and environmental benefits, the average consumer cannot use it.  Unlike common household herbicides like glyphosate ("RoundUp") that can be purchased "over the counter," paraquat has been a "Restricted Use Pesticide" since 1978.  This means that the EPA and state regulators strictly control the purchase and application of paraquat.   40 C.F.R. § 152.175. Moreover, unlike herbicides like RoundUp, paraquat cannot be sprayed on any growing crops. Rather, it is typically used once during a season on commercial farms to clear fields of weeds before the crops are planted and sometimes for dessication at the end of a season.  That is why, according to USDA data, paraquat use comprised only 0.17% of herbicide use in the 1970s.[2]



---

[2]      This chart of herbicide use is derived from data contained in USDA, *Farmers' Use of Pesticides in 1976*, Agricultural Economic Report (1978), available at https://naldc nal.usda.gov/download/CAT79716598/pdf.

2.      **Various Law Firms and Lead Generators Launch a Massive Plaintiff-Solicitation Advertising Campaign.**

Beginning in 2021, Plaintiffs' counsel and lead generators began an aggressive and misleading nationwide advertising campaign that, by its very nature, virtually guaranteed that individuals never exposed to paraquat would file lawsuits. This campaign has included television advertisements and infomercials, emails, print advertising, and online advertising, and has cost tens of millions of dollars to date.

Many of the ads targeted people who would never have been exposed to paraquat. For example, ads targeted home gardeners,[3] despite the fact that "there are no paraquat products registered for homeowner use and no products registered for application to residential areas." *See* Ex. 3, EPA (2019), *Paraquat Dichloride: Draft Human Health Risk Assessment in Support of Reregistration Review*, at 20. Similarly, ads targeted anyone associated with golfing,[4] despite the fact that paraquat use on golf courses has been prohibited by law for decades.[5]

Much of this advertising was sponsored by lead generators. For example, one of the top advertisements soliciting plaintiffs, sponsored by the Guardian Legal Network (one of the largest mass-tort marketing companies in the country) claims that "[p]eople who likely suffered injuries

---

[3]  *E.g.*, Riddle & Brantley Website ("Paraquat, an herbicide (weed killer) that has been widely used in applications from home gardening to commercial agriculture, has recently been linked to an increased risk of Parkinson's disease from regular exposure to Paraquat."), available at https://justicecounts.com/paraquat-lawsuit/paraquat-exposure/.

[4]  M. Papantonio, Paraquat Labeled As Deadliest Weedkiller To Humans On The Planet, The Ring Of Fire (June 18, 2021), https://www.youtube.com/watch?v=ohWYfSnaQ2c (claiming that if "you're working on a golf course, all right, you're using this stuff all the time"); *see also* Onder Law ("Avid golfers and their caddies may have been exposed to toxic low-dose quantities of paraquat while playing their favorite sport. . . . It comes as no surprise that hundreds of golf course workers, players, and golf club caddies have developed Paraquat Parkinson's disease from their regular exposure to paraquat."), *available at* https://www.paraquatparkinsonslawsuit.com/news/the-epa-paraquat-golf-course-ban-comes-too.asp.

[5]  Ex. 4, Gramoxone Extra label (1992), SYNG-PQ-02323531, at 2323534 ("It is a violation of Federal law and may endanger the applicator or third parties to use this product without complying with all label directions and warnings. . . .  DO NOT USE AROUND HOME GARDENS, SCHOOLS, RECREATIONAL PARKS, GOLF COURSES OR PLAYGROUNDS"); Ex. 5, Gramoxone Inteon label (2005) SYNG-PQ-MDL-000463797 at 000463800 (similar); Ex. 6, Gramoxone SL 2.0 label (2018), SYNG-PQ-05091377, at 5091386 (same).

5

due to toxic exposure include . . . [b]ystanders who were exposed to drifting spray."[6]  Lead generators like the Guardian Legal Network, are not law firms, but actively solicit plaintiffs, and then sell the leads that they generate to law firms, who ultimately file suit.[7]

Some of these ads, such as the following, actively recruited people who never used paraquat but merely lived near farms[8]:



And often these ads and websites were coupled with imagery of pesticide application that is plainly ***not*** paraquat application.  In the images below, for example, farmers apply herbicides that cannot possibly be paraquat—because paraquat is not sprayed directly on growing crops.[9]  The suggestion that paraquat would be sprayed on growing crops is nonsensical—it would kill the very crop it is intended to help grow.

---

[6]   *See* "Paraquat," GUARDIAN LEGAL NETWORK, available at https://theguardianlegalnetwork.com/product-liability/paraquat/?intakesource=BP_GLN_ParaquatOrganic-WEB (last visited May 31, 2023).

[7]   *See generally* "Inside the Mass-Tort Machine That Powers Thousands of Roundup Lawsuits," WSJ (Nov. 25, 2019), available at https://www.wsj.com/articles/inside-the-mass-tort-machine-that-powers-thousands-of-roundup-lawsuits-11574700480 (describing how lead generation works in the mass tort context).

[8]   Whitley Law Firm, "Paraquat Lawsuits," https://whitleylawfirm.com/raleigh-product-liability-lawyer/paraquat-herbicide/.

[9]   Ex. 6, Gramoxone SL 2.0 label (2018), SYNG-PQ-05091377 at 05091397 (describing paraquat's uses as limited to "preplant and preemergence (to the crop) uses").



In the time since this aggressive advertising campaign launched a little over two years ago, the MDL docket has swelled to over 4,300 cases, with dozens of new cases filed every week.

**3.      The Bellwether and Discovery Process Reveals That Many Plaintiffs Were Not Exposed To Paraquat.**

Since the inception of this MDL, this Court has emphasized the importance of plaintiffs providing some basic information about the claims they allege.  (*See, e.g.*, Order Selecting Additional Cases for Limited Discovery (ECF No. 2184.))  Thus, the Court has required all plaintiffs to serve sworn Plaintiff Assessment Questionnaires ("PAQs") detailing their exposure allegations.  The PAQs require plaintiffs to produce records substantiating their alleged exposures and to provide access to medical records.

Beyond the PAQs, the Court has also selected plaintiffs for further discovery.  First, the Court implemented a bellwether process, in which each side selected eight cases for case-specific discovery.  (Order Selecting Plaintiffs for Further Fact-Specific Discovery, ECF No. 1317.)  Each of those plaintiffs had to complete a sworn Plaintiff Fact Sheet ("PFS"), which provided additional detail about their exposure allegations and medical history.  All sixteen plaintiffs were deposed and were subject to third-party discovery.  The Court then selected six of those cases for additional discovery (including expert discovery), four of which were initially proposed by Plaintiffs and two

by Defendants. (*Id.*)  The Court later selected twenty additional plaintiffs to complete a PFS and

sit for a deposition.  (ECF No. 2184 2–3.)

      This discovery process has revealed that many plaintiffs cannot plausibly allege that they

used paraquat.  For example:

- Many plaintiffs claim to have used paraquat in forms that do not exist. ████████

  ████████████████████████████████████████████████████████████████
  ████████████████████████████████████████████████████████████████

- The descriptions of products used by some plaintiffs confirm that the products could

  not have been paraquat. ████████████████████████████
  ████████████████████████████████████████████████████████████████
  ████████████████████████████████████████████████████████████████

- Some plaintiffs claim to have used paraquat in a way that would be illegal ████

  ████████████████████████████████████████████████████████████████
  ████████████████████████████████████████████████████████████████

Still other plaintiffs voluntarily dismissed their cases rather than allow their claims to be vetted in

discovery.  For example, when Plaintiff Hawkins was selected by the Court for further discovery,

she sought to dismiss her claim.  *Hawkins v. Syngenta et al*, No. 21-pq-635, ECF No. 15 (Sep. 14,

2022).

---

[10]   Ex. 9, Decl. of John Clark Ouzts ("Outzs Decl."), ¶ 5.

[11]   *Supra* note 5.

[12]   Other plaintiffs who initially claimed in their PAQs to have used paraquat in an illegal manner abandoned those
allegations when required to submit to additional discovery. ████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

The process further revealed that plaintiffs who cannot prove personal use of paraquat cannot withstand basic scrutiny or survive summary judgment.  Specifically, after expert discovery, Plaintiffs voluntarily dismissed with prejudice bellwether cases in which Plaintiffs did not allege that they had used the product themselves, but rather claimed to have been nearby when others used paraquat. ████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████  Neither Ms. Marx nor Mr. Walkington could identify a witness to testify that the product sprayed in their vicinity was in fact paraquat.  It was unsurprising then that neither served an expert report opining that paraquat caused them to develop PD. ████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████

| | Plaintiff Eve Marx | Plaintiff Robert Walkington |
|---|---|---|
| **Representation As To Expected Expert Testimony** | | |
| **Actual Expert Testimony** | | |

---

Finally, discovery has confirmed that cases have been filed on behalf of plaintiffs who do not have PD. ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████

As described below, an examination of the PAQs served to date reveals that the pool includes many plaintiffs with similarly implausible claims.  To continue its efficient and fair management of this MDL, this Court should implement the additional docket control measures outlined herein to require substantiating evidence of exposure or PD in the cases listed in Exhibit 1 and where such evidence is not forthcoming, dismiss those cases.

## ARGUMENT

The Court has broad inherent authority to manage its docket, and the Federal Rules and Seventh Circuit precedent also expressly authorize this Court to implement docket control measures like those requested by Defendants here.  *See* Fed. R. Civ. P. 16(c)(2)(L) (empowering courts to "adopt[] special procedures for managing potentially difficult or protracted actions that may involve complex issues, multiple parties, difficult legal questions, or unusual proof problems"); *e.g.*, *Dzik v. Bayer Corp.*, 846 F.3d 211, 216 (7th Cir. 2017) (per curiam) (recognizing that courts "must be given wide latitude with regard to case management in order to achieve efficiency") (quotations omitted).  Consequently, courts overseeing mass tort MDLs like this one regularly create docket control processes requiring all plaintiffs to make evidentiary showings or else have their cases dismissed.  *In re Testosterone Therapy Prods. Liab. Litig.*, MDL No. 2545, 2018 WL 6258898, at *2 (N.D. Ill. June 11, 2018) (Kennelly J.) ("Docket Control Orders have been routinely used by courts to manage mass tort cases" and "[a]ppellate courts have regularly upheld their use in MDL cases").  (quotations omitted). For example, MDL courts have required

the following kinds of evidence to be produced by plaintiffs when concerned that certain cases are facially implausible:

- "certain medical and pharmacy records, and a report from an expert addressing whether [defendant's product] caused the plaintiff's injury," *Dzik*, 846 F.3d at 213 (affirming MDL court's dismissal of cases failing to make this showing);

- pharmacy records, medical records, affidavits of counsel, general causation expert reports, and specific causation expert reports, *In re Testosterone Therapy Prods. Litig.*, 2018 WL 6258898, at *2; and

- expert affidavits and details about the "circumstances under which [plaintiff] could have been exposed to harmful substances, and the basis for believing that the named defendants were responsible for [plaintiff's] injuries," *Acuna v. Brown and Root Inc.*, 200 F.3d 335, 340–41 (5th Cir. 2000) (affirming an MDL court's order of dismissal where plaintiff failed to comply with docket control order).

Such an order is appropriate here given what bellwether discovery and PAQs have revealed. Indeed, the limited discovery has shown that the docket faces the very issue that the Advisory Committee on Civil Rules has warned about: that the asymmetric nature of MDLs encourages the filing of claims without vetting because the marginal costs of doing so are low and MDL practice rewards such filings.[15] These "[b]aseless claims are harmful to the judicial system, corporate defendants and the public. For the judiciary, ignoring dockets that are overloaded with meritless complaints undermines public confidence in courts and imposes administrative burdens. . . ." *Id.* As Chief Judge Land of the Middle District of Georgia, who has presided over multiple MDLs, explained in *In re Mentor Corp. Obtape Transobturator Sling Prods. Liab. Litig.*, MDL Dkt. No. 2004, that MDL court had "spent considerable time . . . deciding summary judgment motions when plaintiff's counsel should have known that no good faith basis existed for pursuing the claim to the summary judgment stage." 2016 WL 4705827, at *1 (Sept. 7, 2016). Indeed,

---

[15] Advisory Committee on Civil Rules, "MDL Practices and the Need for FRCP Amendments: Proposals For Discussion with the MDL/TPLF Subcommittee of the Advisory Committee On Civil Rules," at 166 (Nov. 1, 2018), *available at* https://www.uscourts.gov/sites/default/files/2018-11_civil_rules_agenda_book_0.pdf.

MDLs "are not without unintended consequences," because they can "produce[] incentives for the filing of cases that otherwise would not be filed if they had to stand on their own merit as a stand-alone action." *Id.* Entering a docket control order now would advance the bedrock goal of managing this MDL efficiently by scrutinizing, and potentially dismissing, cases in which plaintiffs cannot realistically allege paraquat exposure or PD.

Other MDL dockets have been managed in just such a way. For example, *In Re Vioxx Prods. Liab. Litig.*, 557 F. Supp. 2d 741, all plaintiffs were required to produce additional evidence or face dismissal because "Plaintiffs must be able to provide something to the Defendant and to the Court to show that the Plaintiff suffered an injury and that Vioxx [the product at issue] caused that injury." *Id.* at 744–45. As Judge Fallon explained, "[i]t seems reasonable that, before both sides start incurring the costs involved with taking a . . . case to trial, the Plaintiffs show that there is a basis for the Plaintiffs' claims." *Id.* at 745. Similarly, in *Testosterone Therapy Prods. Litig.*, Judge Kennelly required plaintiffs to produce additional documents or risk dismissal with prejudice because it is of the "utmost importance in proceedings of this size" for the court to "manag[e] discovery and tak[e] actions designed to move the cases in a diligent fashion toward resolution by motion, settlement or trial." 2018 WL 6258898 at *2 (quotations omitted).

1.    **Category 1: Plaintiffs Who Have No Information about their Exposure to Paraquat Should Produce Third-Party or Documentary Evidence and Verifications from Counsel.**

Per CMO 18, the first category of plaintiffs who should be subject to the proposed docket control process are plaintiffs who "state that they have no information concerning their exposure to paraquat (as opposed to a different product[.])" (ECF No. 4242 at 4 n.4.) Category 1 plaintiffs are exemplified by plaintiffs who say "unknown" or "do not recall" or leave blank the parts of the PAQ related to paraquat exposure, including plaintiffs who claim to have personally used a chemical but cannot identify whether the chemical was paraquat. It also includes plaintiffs who

select a drop-down "yes" option for paraquat exposure, but who fail to identify paraquat or describe other chemicals when called to explain that exposure in a separate section of the PAQ.  By way of representative example:



Exhibit 1 contains Defendants' current best accounting of plaintiffs that fall in this category.[16]

According to these plaintiffs' own sworn statements in their PAQs, they do not know if they used or were exposed to paraquat.  As such, plaintiffs in this category should be required to produce third-party affidavits or other documentary evidence substantiating their alleged exposure to paraquat and verifications from counsel attesting that (1) the claims being made have an evidentiary basis and (2) continuing to pursue the claims is consistent with their Rule 11 obligations, or else have their cases dismissed.[17]  *See Acuna*, 200 F.3d at 340.

---

[16]   Some plaintiffs fall into more than one category.  Exhibit 1 categorizes Defendants according to the category in which they most clearly fall.

[17]   In no event should these plaintiffs be permitted a "do-over" (*i.e.*, a PAQ amendment) without the claim of substantiation noted above.

2.   **Category 2: Plaintiffs Who Have No Medical Evidence to Support a Diagnosis of PD Should Serve Specific Causation Expert Affidavits and Verifications from Counsel.**

The second category of CMO 18 plaintiffs are those who have "no medical evidence to support a diagnosis of Parkinson's disease[.]"   (ECF No. 4242 at 4 n.4.)   Exhibit 1 contains Defendants' current best accounting of plaintiffs who fall in this category 2.[18]

Fundamentally, these proceedings are about the claimed relationship between a specific product, paraquat, and a specific disease, PD.   But some plaintiffs in this MDL have not even been diagnosed with PD.  ███████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████   To date, the only medical diagnosis with respect to general causation about which any of Plaintiffs' experts have offered an opinion is PD, and that is the only condition that the JPML has mentioned for inclusion in this MDL (*see* ECF No. 1 (Transfer Order)).

There are many others in the plaintiff pool that likewise have not been diagnosed with PD, either by their own admission or as evidenced through the available medical records including:



---

[18]   Defendants continue to review medical records as they become available.

[19]   Certain discovery plaintiffs have been included here as examples to illustrate the implausibility of their claims borne out during the discovery process.  Defendants intend to seek relief related to discovery plaintiffs via separate motion.  Defendants presently seek relief only as to plaintiffs who have submitted a PAQ but have not yet been selected for further discovery.

[black redaction box]

Plaintiffs in category 2 should be required to serve medical proof (by way of a treating physician affidavit) that they have PD. *See Matter of AET Inc.*, 10-cv-51, 2011 WL 13301617, at *3 (E.D. Tex. Dec. 14, 2011) (explaining that docket control orders "typically require claimants to submit expert affidavits specifying the injury or illness suffered, the cause of such injury, and the scientific and/or medical basis for the expert's opinion").

**3.      Category 3: Plaintiffs Who Used Paraquat in a Form in Which it Never Existed Or In a Manner Inconsistent with Paraquat Use Should Provide Third-Party or Documentary Evidence and Verifications from Counsel.**

The third category of plaintiffs identified by the Court in CMO 18 are plaintiffs who claim "to have used paraquat in a form in which it never existed (*e.g.*, in powder or pellet form)." (ECF No. 4242 at 4 n.4.) Defendants interpret this to include plaintiffs who claim in their PAQ to have used paraquat:

- in granular, pellet, powder, dry-mix, or pre-mix form;

- in a concentration or mix ratio that could not be paraquat;

- at locations where paraquat could not be used legally at the relevant time (*e.g.*, schools, golf courses, home/garden, etc.);

- in a non-sensical or unauthorized way (*e.g.*, to kill insects or algae in a pond);

- before paraquat was on the market; or

- at a below-authorized age.

Defendants' current best accounting of plaintiffs that would fall in this category are reflected in Exhibit 1. There are many manifestations of implausible use, including:

- [black redaction box] Paraquat has never been sold

[20] ███████

███████████████████████████████████████████

- Numerous other plaintiffs chosen for limited discovery similarly allege that they used paraquat in dry mix form. █████████████████████ Paraquat was never sold in dry mix form.[21]

- Other plaintiffs allege that they used paraquat in a premixed form, ████ ████ ████████████████████████—again something that has never existed in the United States.[22]

████████████████████████████████████████████

Other plaintiffs allege using paraquat at locations where use of the product was not permitted. ██████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████ But it is illegal to use paraquat on school grounds.[23] ██████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████

---

[20] Ex. 9, Decl. of John Clark Ouzts ("Outzs Decl."), ¶ 4.

[21] Ex. 9, Decl. of John Clark Ouzts ("Outzs Decl."), ¶ 4.

[22] Ex. 9, Decl. of John Clark Ouzts ("Outzs Decl."), ¶ 5.

[23] *Supra* note 5.

16

██████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████

Other plaintiffs allege use of paraquat when they were too young to have done so. EPA regulations provide that the minimum age at which one may obtain a license to use Restricted Use Pesticides is eighteen years of age. 40 C.F.R. § 171.103(a)(1); 40 C.F.R. § 171.105(g). The only exception to this rule is that sixteen-year-olds may use Restricted Use Pesticides under the direct supervision of a certified applicator who is an immediate family member. 40 C.F.R. § 171.201.

These clear regulatory mandates notwithstanding, multiple plaintiffs in this MDL claim to have personally used paraquat prior to their eighteenth—and even sixteenth—birthdays.

Still other Category 3 plaintiffs claim to have used paraquat before it first came on the market in 1964.  For instance:

To be clear, Defendants do not dispute that Category 3 plaintiffs may have been exposed to some chemical at some time, and such plaintiffs may believe that they were exposed to paraquat based on the advertisements they have seen.  But their descriptions of their chemical use made under oath makes it clear that whatever they were exposed to, it was not paraquat.  Plaintiffs whose alleged exposure places them within Category 3 should have their claims dismissed unless they produce third-party or documentary evidence verifying their claimed exposure and demonstrating that their cases have any possible merit despite their facially defective exposure allegations and verifications from counsel attesting that (1) the claims being made have an evidentiary basis and (2) continuing to pursue the claims is consistent with their Rule 11 obligations.

**4.     Category 4: Plaintiffs Who Present Other Evidentiary Issues Like Those that Led to the Voluntarily Dismissal of *Marx* and *Walkington* Should Produce Third-Party or Documentary Evidence and Verifications from Counsel.**

CMO 18 identifies for possible dismissal plaintiffs with "evidentiary issues such as those that led to the voluntarily dismissal of the bellwether plaintiffs" (ECF No. 4242 at 4 n.4)—including plaintiffs who, like Marx and Walkington, do not allege personal use of paraquat.



Recognizing the failures in their proof, Marx and Walkington were forced to voluntarily dismiss their claims with prejudice. *See Marx v. Syngenta Crop Protection, LLC et al*, 3:21-pq-00922, ECF No. 13 (May 5, 2023); *Walkington v. Syngenta Crop Protection, LLC et al,* 21-pq-00601, ECF No. 24 (May 5, 2023).

A review of the PAQs has demonstrated that there are numerous examples of non-use plaintiffs whose fact pattern is similar to that of Marx and Walkington. For example:



Other plaintiffs that present evidentiary issues similar to *Marx* and *Walkington* claim that they were exposed to chemicals sprayed by others, but they do not know what those chemicals were. Bellwether discovery has demonstrated that these plaintiffs are unable to prove paraquat exposure.

---

24



████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████

Other representative examples include:

████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

Certain patterns of plaintiffs who have no exposure information are discernible when viewing the docket as a whole. Many plaintiffs represented by particular firms make the same generic and implausible allegations of paraquat exposure, which indicate a lack of information about exposure. For example, many plaintiffs represented by one law firm claim exposure at their homes (even though use at any home is illegal) and allege—with the same rote phrasing for all—that the paraquat originated one mile from their home. ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

Such plaintiffs' cases should be dismissed unless they can timely produce third-party affidavits or documentary evidence showing that what others sprayed in their vicinity was in fact paraquat.  If these plaintiffs and others who are similarly situated cannot prove exposure, and plaintiffs' counsel cannot affirm that continued representation is consistent with their Rule 11 obligations, then these claims should be dismissed on this ground alone.  Continued defense of meritless claims will be expensive; Plaintiffs should have to affirm that there is some evidentiary basis for these claims before forcing Defendants to incur these continued costs.

## CONCLUSION

This Court can and should use the information learned from the PAQ and bellwether process to efficiently manage its docket.  Defendants respectfully move that the Court enter a docket control order requiring plaintiffs identified in Exhibit 1 to produce the information required for plaintiffs in each category, as identified herein.

Dated: June 20, 2023                          Respectfully Submitted,

                                              */s/ Ragan Naresh*

Ragan Naresh, P.C.                            Michael J.  Nester, #02037211
KIRKLAND & ELLIS LLP                          DONOVAN ROSE NESTER P.C.
1301 Pennsylvania Ave., N.W.                  15 North 1st Street, Suite A
Washington, D.C.  20004                       Belleville, IL 62220
Tel.: (202) 389-5000                          Tel.: (618) 212-6500
                                              Fax: (618) 212-6501
                                              mnester@drnpc.com

                                              Leslie M.  Smith, P.C., #6196244
                                              Bradley H.  Weidenhammer, P.C.  #6284229
                                              KIRKLAND & ELLIS LLP
                                              300 North LaSalle
                                              Chicago, IL 60654
                                              Tel.: (312) 862-2000

        *Counsel for Defendant Syngenta Crop Protection LLC*

22

Steven N.  Geise
JONES DAY
4655 Executive Drive, Suite 1500
San Diego, CA 92121
Tel.: (858) 314-1200
Fax: (844) 345-3178
sngeise@jonesday.com

Joseph C.  Orlet
Bryan Hopkins
Megan Ann Scheiderer
HUSCH BLACKWELL LLP
190 Carondelet Plaza, Suite 600
St.  Louis, MO 63105
Tel.: (314) 480-1500
Fax: (314) 480-1505
joseph.orlet@huschblackwell.com
bryan.hopkins@huschblackwell.com
megan.scheiderer@huschblackwell.com

/s/ Leon F.  DeJulius, Jr.
Leon F.  DeJulius, Jr.
Traci L.  Lovitt
Sharyl A.  Reisman
JONES DAY
250 Veasey Street
New York, NY 10281
Tel.: (212) 326-3939
Fax: (212) 755-7306
lfdejulius@jonesday.com
tlovitt@jonesday.com
sareisman@jonesday.com

Jihan E.  Walker
JONES DAY
77 West Wacker Drive, Suite 3500
Chicago, IL 60601
Tel.: (312) 782-3939
Fax: (312) 782-8585
jihanwalker@jonesday.com

*Counsel for Defendant Chevron U.S.A. Inc.*

23

## CERTIFICATE OF SERVICE

I certify that on June 20, 2023, I electronically filed the foregoing with the Clerk of this

Court by using the CM/ECF system, which will provide notice to all users of record.

*/s/ Ragan Naresh*

Ragan Naresh