1    **IN THE UNITED STATES DISTRICT COURT**
     **FOR THE SOUTHERN DISTRICT OF ILLINOIS**
2

3    IN RE:  PARAQUAT PRODUCTS      )
     LIABILITY LITIGATION           )
4                                   ) Case No. 3:21-md-03004-NJR
                                    )
5    This Document Relates to All   ) MDL No. 3004
     Cases                          )
6

7

8

9            **TRANSCRIPT OF DAUBERT HEARING**

10    **BEFORE THE HONORABLE NANCY J. ROSENSTENGEL**
          **UNITED STATES CHIEF DISTRICT JUDGE**
11
                  **AUGUST 21, 2023**
12

13

14

15

16

17

18

19

20

21    **REPORTED BY:**          Laura A. Esposito, RPR, CRR, CRC
                                Field Reporting Services
22                              P.O. Box 252092
                                St. Louis, MO  63125
23                              (314) 461-2122

24

25        PRODUCED BY COURT REPORTER COMPUTER-AIDED TRANSCRIPTION

```
1                        APPEARANCES

2    FOR PLAINTIFFS:              R. Eric Kennedy, Esq.
                                  David Landever, Esq.
3                                 Weisman, Kennedy & Berris Co.
                                  2900 Detroit Ave., 2nd Floor
4                                 Cleveland, OH  44113
                                  (216) 781-1111
5
                                  Khaldoun A. Baghdadi, Esq.
6                                 Sara Peters, Esq.
                                  Walkup, Melodia, Kelly
7                                 650 California St., 26th Floor
                                  San Francisco, CA  94108
8                                 (415) 981-7210

9                                 Sarah Shoemake Doles, Esq.
                                  Levin, Papantonio, Rafferty,
10                                316 S. Baylen St., Suite 600
                                  Pensacola, FL  32502-5996
11                                (850) 495-5011

12
     FOR DEFENDANTS:              Ragan Naresh, Esq.
13   (Syngenta)                   Kirkland & Ellis, LLP
                                  1301 Pennsylvania Ave. N.W.
14                                Washington, DC  20004
                                  (202) 389-5000
15
                                  Bradley H. Weidenhammer, Esq.
16                                Leslie M. Smith, Esq.
                                  Kirkland & Ellis
17                                300 North LaSalle
                                  Chicago, IL  60654
18                                (312) 862-3218

19
     FOR DEFENDANTS:              Leon DeJulius, Esq.
20   (Chevron)                    Sharyl A. Reisman, Esq.
                                  Jones Day
21                                250 Vesey Street
                                  New York, NY  10281
22                                (212) 326-3939

23

24

25
```

8/21/23 - Pg. 2

```
 1        (Proceedings convened in open court at 2:00 p.m.)

 2        DEPUTY CLERK:  The matter of, In re: Paraquat Products

 3   Liability Litigation vs. Syngenta Crop Protection, LLC,

 4   et al., Case Number 21-MD-3004, is called for a motion

 5   hearing.

 6        Will the parties please identify themselves for the

 7   record.

 8        MS. SHOEMAKE DOLES:  Good afternoon, Your Honor.

 9   Sarah Shoemake Doles of Levin, Papantonio, Rafferty, co-lead

10   and liaison counsel for the Plaintiffs in this case.  If I

11   may, I'd like to introduce you to our team that you'll be

12   hearing from this week.

13        THE COURT:  Please.

14        MS. SHOEMAKE DOLES:  So today you will hear from

15   Plaintiffs' Executive Committee member Eric Kennedy.  You

16   will hear from him today and tomorrow.  On Wednesday you

17   will also hear from Mr. Kennedy's partner, David Landever,

18   also of Weisman, Kennedy & Berris.

19        MR. LANDEVER:  Good afternoon, Your Honor.

20        THE COURT:  Good afternoon.

21        MS. SHOEMAKE DOLES:  On Thursday you'll be hearing

22   from co-lead counsel, Khaldoun Baghdadi of Walkup, Melodia,

23   Kelly & Schoenberger.  Also on Thursday you will hear from

24   his partner, Sara Peters, also of Walkup, Melodia, Kelly &

25   Schoenberger.
```

```
 1        MS. PETERS:  Good afternoon.

 2        THE COURT:  All right.  Good afternoon.

 3        MS. SHOEMAKE DOLES:  And, if I may, we would suggest,

 4   Your Honor, as we work through these arguments, if you would

 5   please alert us to any particular issues you would like

 6   addressed.  We would be happy to address any of those things

 7   for you.

 8        THE COURT:  Okay.  Sounds good.  Thank you.

 9        MR. DeJULIUS:  Good afternoon, Your Honor.

10   Lee DeJulius from Jones Day on behalf of the Chevron

11   Corporation.  I'll be doing our roadmap argument for Chevron

12   today.  And with me is Sharyl Reisman and Steve Geise, also

13   of Jones Day.

14        THE COURT:  All right.  Good afternoon.

15        MR. NARESH:  Good afternoon, Your Honor.

16   Ragan Naresh, from Kirkland & Ellis, for the Syngenta

17   defendants.  You'll be hearing from me today on the roadmap

18   argument, and I'll also be arguing this week on some of the

19   other motions.

20        With me at counsel table is Leslie Smith and

21   Brad Weidenhammer.  Mr. Weidenhammer will be arguing several

22   of the motions as well through the course of the week.  Not

23   here at counsel table, but who will be arguing motions later

24   this week, is also Britt Cramer.  She'll be here later this

25   week for some of the other arguments.
```

 1            **THE COURT:**  Okay, great.  Well, good afternoon,

 2    everyone.

 3            Just a few housekeeping matters.  We do have a phone

 4    line established for anyone who wanted to call in.  I think

 5    Deana gave you some rules on that.  But I want to emphasize

 6    again:  There's no recording of these proceedings for anyone

 7    on the phone or in the courtroom.  The phone is in listen

 8    only mode, but it is important that everyone speak into a

 9    microphone when talking so that the people on the phone can

10    hear.

11            I noticed, in preparing for this hearing, that

12    tomorrow I didn't build in any sort of lunch break, which is

13    unusual for me because lunch is important.  So my thought

14    just today was that we'll each side gets two hours for

15    Dr. Wells, so we'll do the two hours, we'll take a break for

16    lunch, and then we'll resume in an hour, hour-and-a-half or

17    so because we have the whole day for that.

18            So I did set time limits.  I'm going to strictly

19    enforce those, and any side maybe save time for rebuttal.  I

20    don't think that's necessary for today since we're just

21    doing roadmaps, but for any other day of if anyone wants to

22    save time for rebuttal.

23            As of today we have 4,652 cases in the MDL.  That's a

24    current number, not reflecting any that have been dismissed.

25    That's what is actually pending.  So I have read every bit

```
 1    as much as possible of the briefs and the attachments

 2    et cetera.  There's obviously a lot here, and that's why I

 3    think this week is going to be very helpful.

 4         I will have -- I have some questions now that just,

 5    depending on how the testimony the arguments go, I may or

 6    may not ask, and some more may come up, but overall I see

 7    this week as just an opportunity for me to hear from the

 8    parties and learn more about what's in the papers so far,

 9    and understand it all better.

10         So, with that, if Plaintiffs would like to start with

11    the roadmap argument.  I don't have a precise timer, so --

12         DEPUTY CLERK:  I'll watch it.

13         THE COURT:  So, Deana will keep track of the time.

14    Would you like a warning when you're getting close to the

15    end?

16         MR. KENNEDY:  Yes, please.

17         THE COURT:  Okay.  About five minutes?

18         MR. KENNEDY:  Yes, please.

19         Your Honor, Special Master, Counsel.  As Sarah

20    indicated, my name is Eric Kennedy.  I represent the

21    Plaintiffs, Your Honor.

22         Let me start by saying that not every dispute, not

23    every claimed inconsistency, and certainly not every

24    disagreement and opinion is an appropriate Daubert

25    challenge.  Courts across the country, the Seventh Circuit,
```

 1    have consistently held that disagreements and opinion

 2    between two experts are for jury determination and not the

 3    Court.  This principle is particularly applicable to the

 4    present case where Defendants have challenged nine out of

 5    nine of Plaintiffs' experts, from their credentials to their

 6    methodologies to the application of their methodologies to

 7    their conclusions.  They have articulated over 50 arguments

 8    in this briefing.

 9         They maintain that our expert, Dr. Wells, is not

10    qualified to opine on epidemiology when he teaches

11    epidemiology at Cornell.  They maintain that our expert,

12    Dr. Lang, who did not give an opinion on general causation,

13    should have given an opinion.  We have scoured the case law,

14    Your Honor.  We have never found a *Daubert* decision where

15    someone is being challenged for not giving an opinion.

16         They maintain that two of our experts should be barred

17    from testifying because they parrot the opinions of others

18    when, in fact, they have three experts that do little more

19    than say, We agree with the EPA.

20         What we are asking, Your Honor, from the beginning,

21    that the Court always attempt to be mindful that every

22    dispute, every disagreement is not a *Daubert* challenge, and

23    that many of the arguments the Defendants have made are

24    properly within the realm of cross-examination.  And many of

25    those arguments are so contrary to the evidentiary record,

1    so reflective of the arguments and the methodology of their

2    own experts, they won't find it in the cross-examination.

3         Let's start, if I might, by talking about Parkinson's

4    disease.  Parkinson's disease is a movement disorder.  Oddly

5    enough, it was first named by Dr. James Parkinson in 1865.

6    It's a movement disorder that's characterized by tremor; by

7    bradykinesia, which is slow movement; rigidity, which is

8    difficulty moving around the joints; and postural

9    instability, which is a form of a balance problem.  The

10   overriding characteristic of Parkinson's disease is that it

11   is relentlessly progressive.  Given time, a human being will

12   be trapped in their own body unable to speak, unable to

13   move.

14        What's important about Parkinson's disease with

15   respect to this Court's analysis and general causation is

16   the pathological feature.  The hallmark features of

17   Parkinson's disease is what is important.

18        The blue structure, Your Honor, is the Substantia

19   Nigra Pars Compacta.  We've been calling it the SNc.

20   Parkinson's disease involves the destruction of the SNc.

21   What the SNc does, Your Honor, is it creates a chemical

22   called dopamine.  Dopamine is necessary for normal movement.

23   In Parkinson's' disease you have a destruction of 60 to 70

24   percent of the cells in the SNc.  Therefore, the SNc doesn't

25   produce dopamine.  Without dopamine, we have abnormal

1   movement, you have the tremor, the bradykinesia, and the

2   rigidity.

3       So the first hallmark feature of Parkinson's disease

4   is destruction of cells in the Substantia Nigra Pars

5   Compacta, or the SNc.  The second hallmark feature of

6   Parkinson's disease is an accumulation or a deposit of a

7   tissue called alpha synuclein in the SNc.  So two hallmark

8   features:  Destruction of cells in the SNc and the

9   accumulation of alpha synucleins in the SNc.

10       Paraquat.  Paraquat, as the Court knows, is an

11   herbicide that kills weeds.  It came onto the market in the

12   mid-sixties worldwide; under the market in 1966 in the

13   United States.  Paraquat is an extraordinarily effective

14   killer of cells:  Plant cells, animal cells, human cells.

15   It kills through a process called redox cycling.  Redox

16   cycling is a process that continuously kills cells as long

17   as oxygen is present.  The human brain is replete with

18   oxygen.

19       Now, the question becomes then, Parkinson's disease is

20   a disease of the brain.  Paraquat effectively kills cells.

21   Does paraquat get into the brain?

22       Applicators, when they apply paraquat, they can create

23   a mist.  Droplets can get into the lungs.  They can be

24   breathed in by an applicator.  They go into the lungs,

25   they're absorbed into the bloodstream.  The blood flows,

1    circulates to the brain.  The paraquat is deposited into

2    brain tissues.  An applicator can get paraquat in their

3    mouth when they breathe.  It can go to the stomach.  It's

4    absorbed through the stomach wall, gets into the

5    bloodstream.  The blood circulates to the brain and the

6    paraquat is deposited outside of the blood vessels into the

7    tissue of the brain.

8         The third form of exposure to an applicator is derma,

9    or skin.  If someone gets paraquat on their skin, on their

10   hands and their face and their arms, it soaks through their

11   clothing.  It could be absorbed by the skin into the

12   bloodstream.  The blood circulates to the brain; the

13   paraquat is deposited in the brain.  Dermal exposure is the

14   primary exposure to a human being, through the skin, into

15   the circulation, and up to the brain.

16        The Defendants have known, since the late sixties,

17   that paraquat got into the brain of humans.  A series of

18   autopsies came to the Defendants for decades where someone

19   would drink, intentionally or accidentally, paraquat.

20   Within days, weeks, as much as months, it would cause their

21   death.  An autopsy would be done and they would find

22   paraquat in the brain.

23        By 1976, every animal studied by Defendants showed

24   paraquat in the brain, whether they ingested it

25   intraperneal -- food -- they found paraquat in the brain.

1    Mice, rats, hens, cows, dogs, goats, and monkeys; every
2    animal tested found paraquat in the brain.
3         So what we have at this point, Your Honor, is kind of
4    a take-off point, a starting point for the analysis of
5    causation.  At this point we know that Parkinson's disease
6    is a disease that causes -- is caused by death of cells in
7    the brain.  We know that paraquat is an extraordinarily
8    effective killer of cells, so effective that Mr. Cavalli,
9    longtime scientist at Chevron, told us that if you put an
10   ounce, an ounce of paraquat on your skin and you don't wash
11   it off, in time it will cause your death.  And we know that
12   paraquat gets into the human brain.
13        So, Your Honor, the Defendants are going to ask you to
14   believe, at the end of the day, that this extraordinary
15   killer of cells, a toxin that the Defendants themselves call
16   Drano, gets into the human brain, stays for an indefinite
17   period of time, and causes no damage.
18        Let's talk about general causation.  General causation
19   asks the question:  Can a substance cause a particular
20   disease?  In this case, the general causation question is:
21   Can paraquat cause Parkinson's disease?  More specifically,
22   can occupational exposure to paraquat cause Parkinson's
23   disease?
24        The general causation analysis a two-step process.
25   The first step is the establishment of an association,

because association does not meet causation.  The second
step then is application of the Bradford Hill criteria.
Step one and step two.  Let's look at step one association.

     Over the past decade there have been six comprehensive
reviews of the literature addressing the exact issue before
this Court, the relationship between paraquat and
Parkinson's disease.  Now, an odds ratio is a numerical
representation of risk.  An odds ratio over two means that a
substance is associated with the disease being studied.
These six review articles, published in the last decade, all
peer-reviewed, they each did a meta-analysis.  A
meta-analysis is the combination of data from multiple
studies.  And then what is calculated is a single summary
odds ratio for all of the studies that have been combined.

     Each of these six studies did a meta-analysis and each
of these six studies found a significant positive
association between paraquat and Parkinson's disease.  The
significance of these findings in this case, Your Honor,
cannot be overstated.  No other toxin, chemical, substance,
or environmental exposure has ever been so consistently
associated with Parkinson's disease, and there is not a
close second in science.  And it's not for want of looking.
The scientific community's been looking for causes of
Parkinson's disease for over 50 years.  So we have
association on these studies alone.

1          The second step, as we discussed, is then -- moving
2    from association, it's application of the Bradford Hill
3    criteria.  The Bradford Hill criteria are the most widely
4    accepted and utilized criteria and methodology for
5    establishing causation.  What is important to remember with
6    respect to the Bradford Hill criteria, there is no one
7    single uniform acceptable way to apply the criteria.  An
8    expert is free to put different weight on different
9    criteria.  It is not required that every criteria be
10   addressed.  Courts have held that the application of four
11   criteria is sufficient to establish causation.  Courts have
12   held that three is sufficient.  Dr. Wells, Dr. Martin Wells,
13   our expert, applied six.
14         The first criteria that Dr. Wells looked at,
15   Your Honor, was strength of association.  That is just kind
16   of looking at, how high do we believe the odds ratio is?
17   With his analysis he concluded that the odds ratio was
18   probably over two; his best estimate, 2.84.  To get there,
19   Your Honor, he did various meta-analyses.  He did a
20   meta-analysis of the EPA studies, all of the studies, and
21   then an EPA analysis of those that are just moderately and
22   highly ranked with respect to quality.
23         He did another meta-analysis with seven studies, which
24   is talked about over and over.  He did a meta-analysis with
25   his seven studies and then included the Pouchieu study.  He

1    did another meta-analysis with his seven and included the

2    van der Mark study.  Based upon all of that and the totality

3    of the evidence he concluded that there was a strong

4    association.  There's issues about what he considered and

5    didn't consider that we will address in our argument.

6         Next he considered the consistency factor.  That asks,

7    how consistently are we finding an odds ratio over one?  He

8    looked at the six meta-analyses review articles that we've

9    talked about.  And, again, he looked at the EPA.  He did a

10   meta-analysis of those studies.  He did his own seven.  He

11   combined Pouchieu with those seven.  He combined

12   van der Mark with those seven and concluded that, yes, there

13   was consistency.

14        Specificity didn't move the ball much in either

15   direction.  He considered temporality, which is the question

16   of whether or not the disease is being diagnosed after the

17   exposure.  He found, yes, there was temporality.  What he

18   did there, Your Honor, was he did another meta-analysis

19   where he looked at the incidence studies, which are studies

20   that are very effective in making sure that the disease is

21   occurring and manifesting after the exposure.  So he found

22   temporality.

23        Dose-response.  He looked at a variety of

24   epidemiologic studies and indeed found there was a

25   dose-response.  Dose-response asks the question of:  Is the

1    risk increasing as the dose or the exposure is increasing?

2    If it is increasing, the risk is increasing with exposure,

3    that is evidence of causation.

4         He looked at the Tanner study, which is an eight-day

5    study where applicators who applied paraquat for more than

6    eight days were at greater risk of developing Parkinson's

7    disease than applicators who applied for less than eight

8    days.

9         He looked at the Goldman study, which was a four-year

10   study.  Applicators who utilized paraquat for more than four

11   years were at greater risk of developing Parkinson's disease

12   than those who applied paraquat for less than four days.

13        He looked at the Liou study, which is a 20-year study.

14   He looked at the Brouwer study, and then he looked at an

15   interesting study called the Furlong study.  The Furlong

16   study, Your Honor, studied applicators who wore their

17   protective gloves more than 50 percent of the time that they

18   worked.  They compared that group to applicators who wore

19   their gloves less than 50 percent of the time that they

20   worked.  And they found that the applicators who did not

21   wear their gloves were at a significantly higher risk for

22   the development of Parkinson's disease.

23        Looking at those studies and others, Dr. Wells

24   concluded that there indeed was a dose-response relationship

25   between exposure to paraquat and Parkinson's disease.

1    Experimental evidence?  Normally in science there's not much
2    experimental evidence because it's not ethical to do
3    experiments on human beings.  But he considered the Furlong
4    glove study to potentially fall within the category of
5    experimental evidence.
6         But he also looked at Gatto and Goldman, which were
7    interesting genetic studies where they studied people who
8    had a genetic abnormality that made their brains less
9    capable of protecting from oxidative stress.  They looked at
10   those people exposed to paraquat and then people without the
11   genetic disorder exposed to paraquat and found that those
12   with the abnormality had a significantly higher risk of
13   developing Parkinson's disease.
14        And, finally, biological plausibility.  Biological
15   plausibility is not within the expertise of Dr. Wells.  For
16   that element factor of Bradford Hill he assumed the opinions
17   of Dr. Vanessa Fitsanakis, who is Plaintiffs' expert with
18   toxicology.  She has a special interest in animal studies.
19        Now, the animal studies that we utilized to prove
20   biological plausibility are being used just for that, to
21   establish biological plausibility.  They are not being used
22   to prove causation.  We don't believe, under the science
23   that exists in this case, you can use animal studies to
24   prove causation.  But it is also our position, Your Honor,
25   that animal studies cannot be used to disprove causation.

1    There's a lot missing in that analysis, but one big piece of
2    science that is missing is that the Defendants, to this day,
3    do not know how long paraquat stays in the human brain.  The
4    product has been on the market for almost 60 years.

5        Now, to evaluate a toxin there's two elements, two
6    things you need to know:  How much gets to the brain and how
7    long does it stay?  The Defendants don't know how long
8    paraquat stays in the human brain.  They know how long it
9    stays in the mouse brain, the studies they want to rely
10   upon, they know that's half-life of 26 days.  They know it
11   stays in the human brain a whole lot longer but they don't
12   know how much longer.  You can't use animals to extrapolate
13   it to man when you don't know how long paraquat stays in the
14   brain.  We're using animal studies, Your Honor, to prove
15   biological plausibility.

16       Now, biological plausibility, it really asks the
17   question:  Is there some science, is there some reasonable
18   basis to believe biologically that A could cause B?  The
19   example I use is, if I were to drink a gallon of water for
20   30 days straight and then my left toe were to turn orange
21   and fall off, scientists would say, well, that doesn't make
22   sense, that doesn't make biological sense that water would
23   cause your toe to fall off.  That would be evidence that
24   would mitigate against the finding of causation.  This case
25   is the opposite.  Biological plausibility, Your Honor, is

1    not a yes or a no question.  Biological plausibility exists
2    in stages or levels, different evidentiary levels.
3         The first level of biological plausibility is
4    mechanism of injury.  It asks the question:  Is the
5    mechanism by which paraquat causes cell death, is it the
6    same mechanism that Parkinson's disease utilizes to cause
7    cell death?
8         The second level asks about location:  Does paraquat
9    cause damage to the same location in the brain that we see
10   in Parkinson's disease?
11        The third level asks:  Are the chemical changes caused
12   by paraquat the same as the chemical changes that we see in
13   Parkinson's disease?
14        The fourth level of biological plausibility asks:  Are
15   the tissue changes seen as a result of paraquat intoxication
16   the same as the tissue changes we see in Parkinson's
17   disease?
18        And, finally, clinical:  Are the clinical
19   manifestations seen in animal studies the same as the
20   clinical manifestations that we see in Parkinson's disease?
21        Let's start with the first, mechanism of injury.  Over
22   the last 20 years, Your Honor, consistently, consistently
23   the animal studies have shown that the mechanism by which
24   paraquat causes cell death -- oxidative stress, which is a
25   by-product of redox cycling -- that is the same mechanism

1    that Parkinson's disease utilizes to kill cells.

2         The second level of biological plausibility, location

3    of cell death.  Since 1999, Your Honor, the studies have

4    consistently shown that paraquat, of all of the different

5    places in the brain it could cause damage, it causes damage

6    in the SNc, the hallmark of Parkinson's disease.

7         Level three, chemical changes.  Animal studies dating

8    back to 1985 have shown that in animals intoxicated with

9    paraquat there is a depletion, a lower level of dopamine,

10   the same chemical change that we see in Parkinson's disease.

11        Number 4, tissue changes.  Consistently since 2002 the

12   studies have established that with intoxication of paraquat,

13   of all the different tissue changes that might be caused,

14   paraquat causes the second hallmark feature of Parkinson's

15   disease, that being an accumulation of alpha synucleins in

16   the brain.

17        And, finally, clinical changes.  Studies have been

18   consistent that paraquat causes the same or similar clinical

19   picture that we see with Parkinson's disease:  Slowness,

20   tremor, rigidity, posture instability, incoordination.

21        Your Honor, this brings us really then to a second

22   take-off point.  Takes us to a second take-off point.

23        Before I go there though, with respect to the animal

24   studies, let me say that Defendants' own expert,

25   toxicologist James Bus, his deposition was taken, and

1    Dr. Bus admitted to us that over the last 15 years every

2    single animal study done, other than those done by Syngenta,

3    have shown findings consistent -- every study -- findings

4    consistent with Parkinson's disease in the last 15 years.

5         So what we have is our second take-off point for the

6    analysis of causation.  And what we have at this point,

7    Your Honor, is six meta-analyses -- unprecedented

8    epidemiology -- coupled with animal studies where paraquat,

9    of all of the different places that it could go in the brain

10   and cause damage -- the pons, the cerebellum, the

11   parietal -- it goes to the SNc, the hallmark of Parkinson's

12   disease.  And of all of the different tissue changes that

13   paraquat could cause, all of the different tissue changes,

14   it causes the accumulation of alpha synucleins in the SNc,

15   the second hallmark feature of Parkinson's disease.

16        Defendants, Defendants are asking this Court to

17   combine -- take this body of epidemiology, combine it with

18   this bodies of animal studies, and conclude that all of this

19   science is just a coincidence.  More than that, Your Honor,

20   they are asking and taking the position that we're not even

21   entitled to present our case to a finder of fact based upon

22   this evidence.

23        Let's talk about specific causation.  Specific

24   causation asks the question:  To a reasonable degree of

25   certainty, 51 percent probability, is paraquat a substantial

 1    contributing cause of Plaintiff's Parkinson's disease?  We

 2    are not required to establish that paraquat is the sole

 3    cause or that it is the only cause; simply that it is a

 4    cause.

 5         The analysis on specific causation is two steps:  The

 6    first step, Your Honor, is differential diagnosis.  This is

 7    a determination of the diagnosis responsible for the

 8    clinical picture of the plaintiff.  To establish that, our

 9    movement disorder neurologists reviewed the records of each

10    plaintiff.  They examined each plaintiff.  They took

11    histories from each plaintiff.  They ruled out other

12    potential causes of their clinical picture such as MSA, PSP,

13    Lewy body dementia, stroke, and they arrived at a probable

14    diagnosis of Parkinson's disease with respect to each of the

15    Plaintiffs.

16         The second step in the establishment of general

17    causation is the differential etiology process.  That's the

18    determination of the cause of the diagnosis established in

19    step one.  Under this second step, Plaintiffs are not

20    required to prove or rule out all other possible causes.

21    What we are required to do is establish that paraquat is a

22    cause, is a cause of the Plaintiff's Parkinson's disease,

23    and to rule out that other potential causes are the sole

24    cause.  That is done by the application of the odds ratio

25    over two.

1        Now, the science -- the science, Your Honor, with

2   respect to this -- and the law has consistently held that an

3   odds ratio over two can be utilized to establish specific

4   causation.  The *Schur* case, Seventh Circuit case, the Court

5   stated:  "A relative risk greater than two is a method of

6   establishing a causal relationship that shows that the

7   exposure, more likely than not, caused the liver injury and

8   ultimate death."

9        The second *Daubert* decision, the Court held:  "To

10  prove plaintiff's birth defects were caused by Bendectin, an

11  odds ratio that exceeds two is needed."

12       And then finally, Your Honor, the Reference Manual on

13  Scientific Evidence, a treatise cited throughout the

14  Defendants' briefing, cited throughout Plaintiffs' briefing,

15  states: "Courts, thus, have permitted expert witnesses to

16  testify to specific causation based on the logic of the

17  effect of a doubling of the risk."

18       Defendants know and understand the power -- they know

19  and understand the power of an odds ratio over two.  They

20  know and understand that Dr. Martin Wells, our expert,

21  through the computation in a variety of meta-analyses, has

22  concluded that the odds ratio is over two, which explains,

23  in our estimation, why the Plaintiffs are so focused, so

24  relentless, and at times we believe desperate in their

25  attack of Dr. Wells.

 1          They maintain that Dr. Wells is not qualified to opine

 2     on the quality of an epidemiologic study when, in fact, as I

 3     said, he teaches epidemiology at Cornell.  They maintain

 4     that he is not qualified to do a complete meta-analysis when

 5     he teaches and lectures at the World Health Organization on

 6     the topic of meta-analysis.  They criticize him for not

 7     providing a list of his search terms with respect to his

 8     initial research, but they admit that he missed no relevant

 9     studies.  They indicate and claim and it's their word, used

10     eleven times throughout the briefing, that he cherrypicked

11     the studies into his meta-analysis when, in fact, what he

12     was doing was applying scientific principles.

13          Defendants engage in an endless comparison between his

14     first report and his second report.  The Defendants,

15     Your Honor, have gotten so far afield from what is a *Daubert*

16     challenge and into the realm of cross-examination that at

17     times it is difficult to remain focused on the real issues.

18          But, Your Honor, if you peel away, if you peel away

19     the critiques that are contrary to the evidentiary record,

20     if you peel away the arguments and the criticisms that are

21     simply reflective of the methodologies of the Defendants'

22     own experts, if you push aside the form over substance

23     arguments that are simply a distraction, what you are left

24     with in this case is differences in scientific opinion,

25     differences in opinion between two experts, the province of

the jury.

But, Your Honor, if you peel away all of these criticisms, remarkably what you're left with, what you are left with is three epidemiology studies: Shrestha 2020, the Pouchieu study, and the van der Mark study. Three studies. Dr. Wells, our expert, believes that those three studies should be excluded from his meta-analysis. Defendants' expert, Dr. Alexander, disagrees. He says they should not be excluded from his meta-analysis. A difference of opinion.

Let's look first at Shrestha. Your Honor, the Shrestha study, it's a 2020 study. Shrestha, by design, is a cohort study. Dr. Wells' meta-analysis combines seven case-control studies. Dr. Wells, in his opinion: You should not combine, in a single meta-analysis, studies of different design. So he did not put Shrestha within his case-control meta-analysis.

Dr. Alexander disputes this. He has a different opinion. If you look to the six published meta-analyses that we've talked about that have been published in the last ten years, three out of six combine studies of different design. The other three do not combine studies of different design. It's three to three. This is an issue within the scientific community. Province of the jury.

Shrestha's excluded from Dr. Wells' meta-analysis for

```
 1    a second reason:  Shrestha and Tanner 2011 have overlapping
 2    study populations.  They study the same population of
 3    people.  That is not disputed.  When two studies overlap,
 4    when they studied the same population of people, then what
 5    has to happen is the higher quality study gets put into the
 6    meta-analysis as opposed to the lower quality study.  That's
 7    not disputed.  Dr. Wells opines that Tanner 2011 is higher
 8    quality than Shrestha.  Dr. Alexander, Defendants' expert,
 9    disagrees.  He thinks Shrestha is of higher quality.  A
10    difference in opinion between two experts.  The province of
11    the jury.
12         Let's look to Pouchieu.  Pouchieu, by design, is a
13    cross-sectional study.  Again, Dr. Wells' meta-analysis was
14    seven case-control studies.  For the same reason that
15    Dr. Wells excluded Shrestha, because it was a
16    cross-sectional design, he also excluded Pouchieu because
17    it's a cross-sectional design different from the seven
18    meta-analyses that was done by Dr. Wells.
19         What's interesting is that Dr. Wells, after he did his
20    meta-analysis of seven, he said, What would the
21    meta-analysis show if we did include Pouchieu?  So he did a
22    sensitivity meta-analysis and found that if you include
23    Pouchieu with his seven, you still get an odds ratio
24    slightly over two.  A difference in opinion just like you
25    had with Shrestha.
```

1          Van der Mark, the third study.  Studies of poor

2     quality should not be included in a meta-analysis.  There's

3     no dispute.  Dr. Alexander agrees, Dr. Wells agrees, the

4     Bornstein treatise that both parties cite agrees.  Bornstein

5     talks about the concept of garbage in, garbage out.  If you

6     put garbage epidemiology studies in your meta-analysis then

7     your summary odds ratio will be garbage.  There is no

8     dispute:  Low quality studies should not be put in a

9     meta-analysis.

10         Dr. Wells, in his opinion, van der Mark is lower

11    quality.  Dr. Alexander and the Defendants disagree.  You

12    have a disagreement between two experts about the quality of

13    an epidemiology study.  Province of the jury.

14         Now, Your Honor, throughout the briefing, throughout

15    the briefing Defendants have attempted to put a gloss over

16    all of Dr. Wells' opinions, particularly his opinion with

17    respect to general causation.  And that gloss is with their

18    repeated statement that Dr. Wells is alone.  He is alone in

19    this wilderness, in this world, with respect to his opinion

20    on general causation.  And I suppose that that would be true

21    if we were to ignore the 2007 conference with 160 senior

22    academic neurotoxicologists from around the world where they

23    recognized the causal relationship between paraquat and

24    Parkinson's disease.  I suppose he would be alone if you

25    ignore the fact that the French government, in 2012,

1   declared that Parkinson's disease in an occupational disease

2   with a focus on pesticides.  You could say that Dr. Wells

3   was alone if you ignore that, in 2017, the Brazilian

4   government banned the sale and use of paraquat, finding that

5   the riske of Parkinson's disease was unacceptable.

6        ***DEPUTY CLERK:***  Mr. Kennedy, five minutes.

7        ***MR. KENNEDY:***  You could say that Dr. Wells is alone if

8   you ignore the Tangamornsuksan 2019 review article where the

9   authors stated that there was compelling evidence of the

10  link between paraquat and Parkinson's disease.  He's alone

11  if you push aside the textbook that was published in 2020 by

12  the most cited Parkinson's disease author in the world who

13  stated that pesticides cause Parkinson's disease with a

14  focus on paraquat.

15       Dr. Wells is alone if you ignore the Michael J. Fox

16  Foundation and their lawsuit against the EPA.  He is alone

17  if you ignore the recent 2023 publication in *Movement*

18  *Disorders* that say paraquat is a cause of Parkinson's

19  disease; the most respected peer-reviewed Parkinson's

20  disease journal in the world.

21       Now, Your Honor, we are not saying that there is a

22  consensus that paraquat causes Parkinson's disease in the

23  scientific community.  We're not saying that.  What we are

24  saying is there is an issue that exists that the voices that

25  are in support of the existence of causation can be heard at

1   the medical meetings, could be heard in regulatory agencies

2   throughout the world, in textbooks and review articles.  The

3   voice is there.  There exists an issue within the scientific

4   community.

5        The mantra, the mantra of the law of *Daubert* from the

6   beginning has always been:  The law shall not lead science.

7   The law shall not get out ahead of science.  But it is

8   equally true that the law should not lag behind science, so

9   that if there is an issue that exists in the scientific

10   community as to whether or not paraquat causes Parkinson's

11   disease, then that issue should have a place in the legal

12   system, a place in a courthouse where both sides can present

13   their evidence and a finder of fact can reach a verdict.

14        That is all we're asking for, Your Honor, is a chance

15   to be heard.  Nothing more, but nothing less.

16        Thank you.

17        **THE COURT:**  All right.  Thank you, Mr. Kennedy.  I

18   think those lights would be helpful to me if you can get

19   them to -- Deana or someone, somehow --

20        Why don't we take about a 15-minute break, give

21   Defendants a chance to switch gears if you need to do that.

22   And let's just say we'll resume at 3:00.

23        *(Court recessed from 2:43 p.m. to 3:00 p.m.)*

24        *(Proceedings reconvened in open court.)*

25        **THE COURT:**  So be seated, everyone.  And who will be

1   going first?  Are you and Mr. Naresh splitting?

2       **MR. DeJULIUS:**  Yes, Your Honor.  So I'm going to go

3   for about ten minutes.  Mr. Naresh will go for about 30

4   minutes.

5       **THE COURT:**  Okay.  You may proceed.  And you want

6   Deana to warn you?

7       **MR. DeJULIUS:**  Yes.  We sorted that out.

8       **DEPUTY CLERK:**  Just to make sure I'm clear, so you're

9   going for?

10      **MR. DeJULIUS:**  Ten minutes.

11      **DEPUTY CLERK:**  You want a warning at the nine-minute

12  mark?

13      **MR. DeJULIUS:**  Yes.

14      Good afternoon, Your Honor.  Lee DeJulius from Jones

15  Day on behalf of the Chevron Corporation.  Thank you for the

16  opportunity to argue these motions that are incredibly

17  important for the travel of this case.

18      As we discussed, I'm going to raise and talk about

19  Rule 702, how it applies, in part, to a few of our experts

20  that you're going to hear about this week, or a few of

21  Plaintiffs' experts.  And Mr. Naresh is going to explain the

22  scientific consensus outside the courtroom that paraquat is

23  not a demonstrated cause of Parkinson's disease.

24      Now, right before we left the courtroom, Mr. Kennedy

25  said, "The law does not lead science, but neither does it

1   lag science."  And that's exactly wrong.  The

2   Seventh Circuit has said the law lags science.

3       Science is to be done in peer-reviewed scientific

4   articles, not in a courtroom.  And I've been intentionally

5   using the word 702 because the Supreme Court recently

6   approved amendments to Rule 702 to expressly address some of

7   the issues we're talking about today.  The Court concluded

8   that *Daubert* was taking on a life of its own, that courts

9   were looking at the *Daubert* standard instead of applying

10  Rule 702.

11      Your Honor, do you need copies?

12      **THE COURT:**  No.  I have -- I'm not sure why it's

13  not -- oh, there, it came up.  Okay.  Sorry.

14      **MR. DeJULIUS:**  But there were two changes that the

15  Advisory Committee made:  One was that the proponent has to

16  demonstrate all of the elements of Rule 702; not just 703,

17  but 703 -- I'm sorry, 702(b) and 702(d).  And the rule was

18  clarified to say that the number of cases courts have

19  admitted testimony, even though 702(d) and (b) had not been

20  met.

21      The Court also amended Rule 702 to make clear that it

22  has to be a reliable application of the methodology to the

23  specific question posed by the expert.  It's not enough to

24  have a reliable methodology.  That's 702(c).  Has to

25  specifically apply to the facts of the case.  It's the fit

1   between the facts and the evidence and the methodology.

2          Thus, even though there's a methodology that could be

3   used in the abstract by scientists, that's not enough.  They

4   have to show it was appropriately used in this case.  And as

5   the Advisory Committee stated, conclusions matter.  When an

6   expert purports to apply principles and methods in

7   accordance with professional standards and yet reaches a

8   conclusion that other experts in the field would not reach,

9   the Court may fairly suspect that the principles and methods

10  have not been fairly applied.

11         That's not a jury issue.  Different conclusions is not

12  just something that you throw to the jury.  When an expert's

13  on an island that opinion should not come in.

14         And Judge Rosenberg in the Southern District of

15  Florida recently applied these principles in the *Zantac*

16  litigation.  I know the Court's aware of it.  I'm not going

17  to go into this case in detail, but there's a couple of

18  points worth flagging.

19         First, she recognizes, like the Seventh Circuit, the

20  courtroom is not an appropriate forum for scientific

21  methodologies and theories.  That's labs and published

22  journals.  She recognizes that when a scientist makes a leap

23  that other scientists outside the courtroom don't make, the

24  Court should look at that.

25         And she specifically addresses Bradford Hill and

1   weight of the evidence and says, "While these are standard

2   epidemiological methodologies, the reality is you have to

3   look at how they're applied in each case to determine

4   whether they are reliable."  All of those principles apply

5   here.

6        Now let's look at Plaintiffs' case.  They base their

7   case solely on epidemiology.  Without a 2.0, we're not

8   standing here today.  That's exactly what Dr. Lang said.

9   But they don't present an epidemiologist.  Dr. Wells is a

10   statistician that determines paraquat causes Parkinson's

11   disease.  That's the conclusion that no other scientist,

12   including scientists who have studied Parkinson's disease

13   for their lives, have determined in a peer review study.  No

14   other scientist has done that.

15        Dr. Wells has not studied paraquat.  He's not studied

16   Parkinson's disease.  He's disclaimed in the past the

17   ability to opine on causation.  None of that stops him here.

18   Dr. Wells then spoonfeeds his causation conclusion to

19   Dr. Lang.

20        Now, Dr. Lang, he is a world-class neurologist.  He

21   studies Parkinson's disease.  He provides the specific

22   causation analysis here but he does no work of his own.  He

23   comes up with a diagnosis of Parkinson's disease, that's not

24   contested.  But he relies solely on Dr. Wells, solely on

25   Dr. Wells.  He says, "If there's not a 2.0 odds ratio we

1  wouldn't with be sitting here today, I could not provide a
2  specific causation opinion."
3      So, despite his training, despite his knowledge of the
4  literature, he puts blinders on all of that and he assumes
5  that Dr. Wells has discovered something that no one else has
6  discovered.
7      And then you have Dr. Spencer, who's a
8  neurotoxicologist who expressly uses a lower scientific
9  standard.  He, in the 1980s, '90s, and 2000s, said paraquat
10  is not a neurotoxin.  He applies a different standard here
11  and comes to a different conclusion.
12     So when you apply Rule 702 to these experts, it's
13  clear these opinions can't be applied.  I'm not going to
14  talk about qualifications.  I'm going to go into fit on
15  these three -- fit and reliability for these three experts.
16     Back to fit.  This is 702(b), 702(d).  And this is --
17  again, the amendment was designed to emphasize the fit
18  between the methodology and the facts of the case.  And a
19  prime example of where this is missing is Dr. Wells.  He
20  fails to account for the last 12 years of data.  No matter
21  whether this is an appropriate methodology, you could argue
22  case cohorts, control studies, you can come up with all
23  kinds of rules, and that might make sense in some world, but
24  what doesn't make sense, Your Honor, is if you apply that
25  methodology to these facts, to this data, and have to

1    exclude the last 12 years.

2        He puts the meta -- we saw some of these metas earlier

3    in Mr. Kennedy's presentation.  Not one of those meta

4    conclude causation.  None of those studies on the right

5    conclude causation.  And he excludes the largest, most

6    recent studies in order to get to that 2.0.  If he puts them

7    in, he's under that 2.0.  Lang says he can't sit here today,

8    and we all go home.  The methodology doesn't fit the data.

9        Plaintiffs don't feel -- fare better under Rule

10   702(c), reliability.  And this is a standard the Court

11   applies frequently.  In general terms, you don't want

12   unscientific speculation by a genuine scientist.  It's got

13   to be real science that's being done here.  A lot of

14   different questions that one can ask.  We put dozens more in

15   how these experts are unreliable, but I'm going to focus on

16   three here today very quickly.

17       The first one is:  Does the expert apply the same

18   level of intellectual rigor and litigation as in ordinary

19   professional work?  Well, Dr. Peter Spencer acknowledged he

20   didn't do that.  He said, "When I submit a paper for

21   publication that says X causes Y, I would have a much higher

22   standard, because I know the reviewer would trash the

23   report, and I would not be published.  And I would develop a

24   very bad reputation."

25       That's how Peter Spencer is able to say outside the

1  courtroom, paraquat is not a neurotoxin, but come in here

2  with a different standard and give a different opinion.

3  That's not allowed under Rule 702.

4       Are there steps in the expert's logic or analysis that

5  are unsupported?  Well, Dr. Lang assumes a true and causal

6  odds ratio and, therefore, substantial causation.  Not

7  allowed to be a mouthpiece for another expert.

8       And, finally:  Did the expert cherrypick favorable

9  data rather than applying the data objectively?  And in this

10 case Dr. Wells has been excluded three separate times for

11 cherrypicking data.  Three.  A federal court in California

12 excluded Dr. Wells for cherrypicking results-driven data.

13 He was excluded in California two years ago, California

14 state court.  And as Your Honor knows, not many experts are

15 excluded in California state court.  As the Plaintiffs

16 contend in their Sargon motions here, it's a lower standard.

17 But he had a ramshackle methodology and the Courts excluded

18 him.

19      And a few years prior he was excluded in

20 South Carolina for failing to consider all the relevant

21 evidence.  It's not an exaggeration to say that courts

22 around the country have excluded Wells for the same reason

23 here.

24      And this is the very definition of cherrypicking.  He

25 excludes the largest, most recent studies, anything past

1    2011, to arrive at his result.  Had he included these

2    studies, he can't get to 2.0.  And when he was called out

3    for his lack of rigor in his initial report, he changed his

4    methodology and he came to the exact same conclusion.  He

5    literally has a conclusion searching for a methodology.

6    That's cherrypicking.

7         At bottom, as Mr. Naresh will demonstrate, the science

8    outside the courtroom does not support the case that

9    Plaintiffs present inside the courtroom.  And, because of

10   that, the Plaintiffs stretch beyond their expertise.  They

11   apply outcome determinative methodology.  They contradict

12   their own writings.  When the science doesn't support the

13   case, Rule 702 does not allow the Plaintiffs to manufacture

14   one.

15        Thank you, Your Honor.

16        **THE COURT:**  All right.  Thank you.

17        **MR. NARESH:**  Good afternoon, Your Honor.

18        **THE COURT:**  Good afternoon.

19        **MR. NARESH:**  All the legal principles that

20   Mr. DeJulius laid out, they all point in the same direction,

21   and that's when the peer-reviewed literature outside the

22   courtroom has not accepted a scientific conclusion that's

23   being offered by an expert in the litigation, then the Court

24   may fairly suspect -- and that's a quote from the committee

25   notes -- may fairly suspect the litigation opinions are not

1    the product of reliable methodologies reliably applied, as

2    Rule 702 requires.

3         And Mr. Kennedy made a terrific presentation but he

4    can't escape reality that outside this courtroom, despite

5    extensive and intensive study for decades, no scientist, no

6    scientist has reached a scientific analysis, has published a

7    scientific analysis in the peer-reviewed literature

8    concluding that paraquat causes Parkinson's disease.  None.

9         This isn't, at the end of the day, a matter of a

10   battle of experts, as Mr. Kennedy was setting it up as.

11   It's a difference between Plaintiffs' experts and all the

12   peer-reviewed literature that exists today on the question

13   of causation.

14        I'd like to frame this, Your Honor, by focusing on the

15   fact that this is not something new.  The study of

16   Parkinson's has been going on for a long time, as has the

17   safety of paraquat.  Let me turn to that.

18        So to start, Your Honor, it's worth noting that

19   Parkinson's is not a newly discovered disease.  It's been

20   around for hundreds, if not thousands, of years.  It was

21   given a name in the 1800s, but it was likely that people

22   were living with Parkinson's for thousands of years before

23   that.  As a result, the cause of Parkinson's disease has

24   been extensively studied.  Indeed, it's one of the most

25   common age-related neurologic conditions in the world today.

1  But despite all that study, today there's only one known

2  cause of Parkinson's disease, and it's genetics.

3       Paraquat, for its part, it's also been extensively

4  studied.  As Mr. Kennedy said, it's been on the market for

5  60 years, and there are literally thousands of studies

6  evaluating paraquat safety.

7       In that interconnection between the two, the question

8  of whether or not paraquat causes Parkinson's disease,

9  that's not a new question either.  It's been exhaustively

10  studied since it was first raised 40 years ago, in the early

11  1980s.

12       Around 1983 there was an incident in which illegal

13  drug users, heroin addicts, were exposed to a bad batch of

14  heroin, synthetic heroin, and they were all exposed to

15  something called MPTP, which is not paraquat, but it's a

16  chemical that superficially looks sort of similar to

17  paraquat in terms of its chemical ring structure.

18       Around that same time scientists for the first time --

19  or for the first time assessing whether or not there were

20  potential environmental causes of Parkinson's disease, the

21  question was raised by a scientist named William Langston:

22  Could paraquat be causing Parkinson's in humans?  And that's

23  where the paraquat Parkinson's hypothesis came from.

24       And this is important, Your Honor, because what we

25  have then in the real world, outside the courtroom, is 40

1  years worth of study into this question.  Some of that study
2  has been by Syngenta but most of it has been by outside
3  scientists.  We obviously can't go through all that today in
4  the time that we have.  What I'd like to do, just to
5  contextualize for Your Honor the gap between litigation
6  science and the real world science, is walk through some of
7  this chronologically.

8      In the immediate aftermath of the paraquat Parkinson's
9  hypothesis being raised, one of the first entities to look
10 at this and discuss this was the CalHHS, the California
11 Human Health Service.  In the 1970s the CalHHS had set up an
12 extensive database evaluating health outcomes for people
13 exposed to pesticides, including paraquat.  And very soon
14 after the paraquat Parkinson's hypothesis was born, CalHHS
15 received a letter asking them whether or not they had looked
16 into this.  And the answer was, Yes, we have.

17     And what they said was, "While MPTP, (not a pesticide)
18 causes Parkinson type symptoms in a few days, paraquat does
19 not have this effect.  We know this because there have been
20 many cases of paraquat exposure in workers in California and
21 none of them have developed neurological sequelae,"
22 neurological symptoms.

23     Obviously, deeper analysis of this was required, and
24 Syngenta was part of that.  I won't go through all the
25 studies that Syngenta did over time, but let me give you an

1   example.

2        In the 1980s Syngenta set up a study in Sri Lanka, the

3   Sri Lanka tea farmers, and this was ultimately published in

4   the peer-reviewed literature in 1993.  And the importance of

5   looking at Sri Lankan tea plantation farmers was, they used

6   paraquat for a long time.  The average was about 12 years up

7   to 20 years, and they used paraquat extensively.  Given the

8   climate, they used paraquat far, far more than an average

9   American farmer would.

10        Syngenta hired medical professionals to examine them

11   and look at all health outcomes, including neurological

12   ones, and the conclusion was there was no evidence of

13   Parkinson's-like disease as evidenced in the neurological

14   assessment.  That was in the peer-reviewed literature at the

15   time.

16        But externally to Syngenta, scientists were continuing

17   to evaluate the more general question of whether

18   environmental agents were causing Parkinson's disease.  So

19   in the 1995 book, Etiology of Parkinson's Disease, which was

20   co-authored by Langston, that scientist who came up with the

21   paraquat Parkinson's hypothesis in the first place, they

22   included a chapter called, "Environmental Agents in

23   Parkinson's Disease."  And that chapter was authored by

24   Dr. Peter Spencer, the person you heard Mr. DeJulius talk

25   about was one of Plaintiffs' experts in this case.  And he

1    wrote a long chapter, 47 pages, evaluating the relationship

2    between environmental agents, including paraquat, on

3    Parkinson's disease.  And he independently reached the same

4    conclusion, using different methodologies, that Syngenta

5    had:  There was no evidence of Parkinson's disease and there

6    was no increase in Parkinson's disease prevalence with heavy

7    use of paraquat in the available epidemiological studies.

8         Five years later Dr. Spencer published a book of his

9    own on neurotoxicology.  It's a highly regarded book, even

10   today, on his CV.  Dr. Spencer described it as "the

11   definitive reference text on neurotoxicology."

12        And that book also looked at environmental agents

13   generally, and paraquat specifically, and it concluded as

14   follows.  It said, "There have been many instances of human

15   survival from sever paraquat intoxication" -- so that's

16   paraquat poisoning.  "Most have displayed profound pulmonary

17   dysfunction" -- so lung disease.  "None has displayed

18   clinical evidence of CNS disease," central nervous system

19   disease, "and it appears unlikely that paraquat is

20   neurotoxic in humans."

21        Now, around this time in the 2000s the research into

22   the question of whether environmental agents had a

23   connection to Parkinson's disease was really beginning to

24   pick up, and scientists were looking at all sorts of

25   different things:  Pesticides, fungicides, but also things

1     like head injury and gender and diet.  In 2007, the

2     Parkinson's Action Network convened a group of 29 scientists

3     from a variety of different disciplines all of whom were

4     actively studying that question.  And this included, again,

5     people like Dr. Langston, who came up with that hypothesis

6     in the first place.

7          None of the scientists at this conference were

8     employed by Syngenta or Chevron.  This group of 29

9     scientists evaluated two dozen things that at various times

10    had been the subject of study as to whether or not they

11    caused Parkinson's disease.  What this group of scientists

12    was asked to do was to examine whether or not there was any

13    evidence to support a claim that any of these agents caused

14    Parkinson's disease.  So what they did is they came up with

15    four buckets.  First was:  Is there evidence of a causal

16    relationship?  So, a recognized genetic mutation falls into

17    that bucket.

18         Less strong was the question of:  Is there sufficient

19    evidence of an association?  Okay.  So, no causation, but we

20    feel good saying there's evidence of an association.  So

21    ultimately things like gender fell into this bucket.

22         The third was:  Okay, there's no causation, there's no

23    association, but there's at least some limited suggestive

24    evidence of an association.  So this ended up being things

25    like brain injury or nonsteroidal anti-inflammatories, dairy

1    intake.

2          And the final and weakest bucket was the fourth

3    bucket, which was inadequate or insufficient evidence to

4    determine whether there is an association at all.

5          And two years later, in 2009, this group published its

6    consensus statement in the peer-reviewed literature.  With

7    respect to paraquat, they put it in the fourth and final

8    bucket.  No cause, no association, not even a limited

9    suggestive evidence of an association.  It was consensus

10   among those scientists that there was inadequate evidence to

11   support a claim that there was even an association that

12   paraquat causes Parkinson's disease.

13         Syngenta kept studying the hypothesis itself.  And,

14   again, I won't go through all of them, but let me give one

15   more example.  In 2011 Syngenta asked an external scientist,

16   Dr. Jeff Brent, to survey all the public literature to see

17   what had happened to people who had experienced high-dose

18   paraquat exposure in the long-term.  So this was similar to

19   what was reported in Dr. Spencer's book, by looking at

20   people who had experienced paraquat poisoning but survived,

21   and then look at whether or not they had any sort of

22   neurological effects in the long-term.  And Dr. Brent found

23   such people who had survived paraquat poisoning, and some of

24   them, up to ten years had passed since that exposure.  And

25   he reached the exact same conclusion that was reported in

1    Dr. Spencer's book:  Not a single one of them had exhibited

2    any symptoms of Parkinson's disease.

3        Dr. Spencer isn't the only one of Plaintiffs' experts

4    to have offered opinions that contradict the Plaintiffs'

5    position in this case.  In fact, a neurologist, Dr. Lang,

6    who, as Mr. DeJulius mentioned, is a preeminent movement

7    disorder specialist who has in the past repeatedly talked

8    about the cause of Parkinson's disease.  Every time he's

9    been asked he's explained that there's no environmental

10   factor that's been accepted as a cause of Parkinson's

11   disease.  I won't go through all of them but let me give you

12   a couple.

13       In 2007 he was asked whether science knows what causes

14   Parkinson's disease other than genetics.  He said, "No, we

15   don't."

16       Six years later he explained that there was, "No

17   environmental factor accepted as a cause of Parkinson's

18   disease."

19       And just last year in his deposition in this case he

20   was asked, "Genetic mutations are the only cause of

21   Parkinson's, right?"  The answer was, "Yes."  Didn't point

22   to environmental agents.  Certainly didn't point to

23   paraquat.  He pointed to genetics as the only one.

24       Now, by 2019 or so, all this study of the paraquat

25   Parkinson's hypothesis had culminated in three separate

1    findings.  Each of these was exhausted, each of these was

2    independent of one another, and each of these was

3    independent of Syngenta and Chevron.  But even though each

4    of these studies independently looked at the question using

5    different scientific techniques, they all reached the same

6    answer, that it cannot be said, as a matter of science, that

7    paraquat causes Parkinson's disease.

8         We've got the Ag Health study by Shrestha.  We got the

9    Weed publication in Neurotoxicology, and the EPA evaluation

10    in 2019.  Let me discuss each of these briefly in turn.

11         Now, Your Honor, I think one thing that the parties

12    don't dispute is that the best way to evaluate whether there

13    was an etiological relationship between an agent and a

14    disease is through a large, long-term prospective study.

15    That's pretty much black letter.  These kinds of studies are

16    extremely hard to do because they require a huge amount of

17    advanced planning, a huge amount of time, a huge amount of

18    manpower, and a huge amount of funding.  But as questions

19    were being raised in the 1980s and 1990s about the risks of

20    rural living, that's exactly what the National Institutes of

21    Health, along with other governmental agencies, decided to

22    do.  The plan was to create a massive database of

23    prospective data that epidemiologists could use to assess

24    the risks of agricultural living.  And the results of that

25    is the most extensive, thorough, and reliable study of U.S.

1   farmers to have evaluated whether or not there's a

2   connection between paraquat exposure and Parkinson's

3   disease.  And just to give you a sense of the size of it,

4   Your Honor, it's over 65,000 applicators and their spouses

5   over decades were included in the overall study.

6       Ultimately in 2020, an author named Shrestha published

7   this, and that confirms that paraquat does not cause

8   Parkinson's disease.  A couple key take-aways -- you're

9   going to hear a lot more about this over the next several

10  days, but let me give you a couple take-aways.

11      The first is that Shrestha, in 2020 -- there, the

12  Ag Health study found that there was no statistically

13  significant association between paraquat exposure and

14  Parkinson's disease.  We're not talking about causation, not

15  even a statistically significant association between

16  paraquat exposure and Parkinson's disease.  That's the

17  opposite of what the Plaintiffs are arguing in this case.

18      Relatedly, what the Ag Health study found is that

19  there was actually an inverse relationship between paraquat

20  exposure and Parkinson's disease.  In other words, the

21  longer somebody was exposed to paraquat, the less likely it

22  was, according to that study, that they would develop

23  Parkinson's disease.  And, again, if there really is a

24  positive relationship between paraquat exposure and

25  Parkinson's disease, then what you'd expect to see is that

1   number go up.  The longer somebody's exposed to paraquat,

2   the more likely they'd have Parkinson's disease.  And,

3   again, what this study found was the opposite.

4        And third is that the Ag Health study was unable to

5   replicate what had been done in a much smaller interim study

6   using a subset of Ag Health study data by a scientist named

7   Dr. Tanner.  Nearly a decade before Dr. Tanner had looked at

8   a very small slice of the Ag Health data and found an

9   association between paraquat and Parkinson's disease.

10  Dr. Tanner's study had 468 participants, so that's less than

11  one percent of the 65,000 participants that would ultimately

12  be included in the overall Ag Health study in 2020.

13       In looking only at that one small slice of Ag Health

14  data, Dr. Tanner did find association between paraquat and

15  Parkinson's disease, and that's that part of Mr. Kennedy's

16  presentation earlier today.  But the whole point of doing

17  the 2020 study was to continue the work that Dr. Tanner had

18  started, which looked at all the data, not just part of it.

19  And, in fact, Dr. Tanner was credited by the authors of the

20  Shrestha study for her involvement and review of that study.

21  And many of the same authors that authored Shrestha were

22  involved in the Tanner study as well.

23       I heard Mr. Kennedy say that the Tanner study and the

24  Shrestha study were an overlapping set of subjects, but

25  that's not quite true.  The reality is that the Tanner study

1   was a tiny subset of the overall population.  The whole
2   point was, let's not look at some of them, let's look at all
3   of them.  And if there really was an association between
4   paraquat and Parkinson's disease, as a matter of science,
5   you'd expect to see the same thing hold true when you look
6   at everybody over a longer period of time.  And, again, what
7   the scientists found was the opposite.  So that's the
8   Ag Health study.
9        Let me spend a moment on Neurotoxicology.
10  Neurotoxicology is obviously a journal that is well-regarded
11  on the topic of neurotoxicology.  It's a peer-reviewed
12  journal.  And in 2021 it published a peer-reviewed paper by
13  Dr. Jonathan Weed.  Dr. Weed's a medical doctor with a Ph.D.
14  in epidemiology, and he has no affiliation with Syngenta or
15  Chevron.
16       In this study, Dr. Weed reviewed the work of 46
17  scientists who had put together 12 peer-reviewed articles
18  spanning from 2006 to 2019, analyzing the question of
19  whether or not paraquat causes Parkinson's disease.  So this
20  included -- I saw in Mr. Kennedy's final slide about
21  Mr. Wells -- Dr. Wells not standing alone, and listed, for
22  example, the Tangamornsuksan study from 2018.  But Dr. Weed
23  looked at that study.  That was included in the study.  And
24  the result of that, as published in the peer-reviewed
25  literature, was a consensus exists in the scientific

1    community that the available evidence does not warrant a

2    claim that paraquat causes Parkinson's disease.  The

3    peer-reviewed literature stands for the opposite of the

4    conclusion that Mr. Kennedy presented to you today.

5         Finally, the EPA.  In 2019 the EPA published the

6    results of an exhaustive analysis of the question of whether

7    or not paraquat causes Parkinson's disease.  This wasn't the

8    first time the U.S. government has evaluated the safety of

9    paraquat.  Different teams of EPA scientists have conducted

10   comprehensive reviews of paraquat safety in the 70s, 80s,

11   90s, 2000s, 2010s, and each time the EPA's concluded that

12   paraquat is safe under real world conditions.

13        But the EPA also did an exhaustive analysis on the

14   specific question of the paraquat Parkinson's hypothesis

15   with the support of scientists at the U.S. Department of

16   Health and Human -- Health and Human Services National

17   Toxicology Program.  That review included hundreds of

18   studies, but at the time it didn't include things like the

19   Ag Health results or even the Weed paper in Neurotoxicology,

20   but it independently reached the exact same conclusion.

21        The EPA concluded that, "After comprehensive review of

22   the relevant studies, the weight of evidence was

23   insufficient to link paraquat exposure from pesticidal use

24   of U.S. registered products to Parkinson's disease in

25   humans."

1          Now, it's true that some NGOs have challenged the
2     EPA's registration of paraquat on various grounds, which
3     we'll likely discuss in a couple days in conjunction with
4     Plaintiffs' motion to exclude Mr. Housenger, the former head
5     of the pesticide division of the EPA.  And it's true that
6     the EPA has agreed to take another look, and there's nothing
7     wrong with that.  The EPA has looked at paraquat for
8     decades, and if it wants to look at paraquat again to
9     evaluate the safety, there's nothing wrong.  There's no
10    reason not to do it again.

11         While the EPA has agreed to take another look, it has
12    not indicated any concerns.  It has not vacated or retracted
13    its findings as to the lack of evidence that paraquat causes
14    Parkinson's disease.  In fact, you could fast forward two
15    years after it found -- after it issued its 2019 finding.
16    Once the EPA reviewed the Ag Health study, in 2021 they put
17    out this statement.  It said -- it noted the Ag Health study
18    by Shrestha published in 2020, and it said, "Notably, this
19    updated study did not replicate earlier 2011 findings from
20    Ag Health" -- that's the Tanner study -- "that were
21    considered by EPA and suggested a potential association may
22    exist.  After a thorough review of the best available
23    science, as required under FIFRA, EPA has not found a clear
24    link between paraquat exposure from labeled uses and adverse
25    health outcomes such as Parkinson's disease and cancer."

1          The EPA has not distanced itself from the conclusions
2     it reached after all that study.
3          Your Honor, we pointed much of this out in our
4     briefing, and I will admit, I was curious to see what
5     Plaintiffs would come up with in response, and we saw that
6     in Mr. Kennedy's final slide.
7          They made some arguments about association, a slide
8     showing association, but association, of course, is not
9     causation.
10         Mr. Kennedy put up six meta-analyses that didn't
11    include Weed.  I don't think you heard about Dr. Weed's
12    paper, which considered many of those studies, not just
13    Tangamornsuksan, but several of the other ones, and
14    concluded that none of them established causation.  And they
15    all came before Ag Health anyway.
16         You heard them point to animal studies, but
17    Mr. Kennedy just said that animal studies cannot prove
18    causation.  The primary response we've seen by Plaintiffs is
19    by citing to this article in Movement Disorders by
20    Drs. Dorsey and Dr. Ray.  I'd like to spend a couple minutes
21    talking about that.
22         The Dorsey and Ray viewpoint article is not a serious
23    scientific analysis at all.  It's what's called a viewpoint
24    article about something called agnotology, written by
25    Dr. Dorsey and Dr. Ray, who's a professor of English.

1    Agnotology isn't a real hard science.  It's not toxicology

2    or epidemiology or neurology; it's what's called the study

3    of ignorance.  When you look at all the studies and writings

4    in the real world that have concluded that you cannot claim

5    that paraquat causes Parkinson's disease, the fact that

6    Plaintiffs end on -- they start with and end on Dorsey and

7    Ray -- proves our point that there's no scientific analysis

8    in the peer-reviewed literature concluding that paraquat

9    causes Parkinson's disease.

10          Now, you heard Mr. Kennedy tout the Movement Disorders

11   journal, and it's true, that's a real and serious academic

12   journal.  Not every article that it publishes is scientific.

13   It publishes on its website the various kinds of articles it

14   accepts, and most of them are scientific, things like

15   clinical research articles, which are intended to include

16   important and substantial new material, or in focus

17   articles, which are reports of breakthrough findings.

18          If there really were some new scientific conclusion

19   never before reached in the scientific literature, contrary

20   to what the Ag Health study found, contrary to what the EPA

21   found, then that's the kind of article you'd expect to see,

22   a scientific one.

23          But Movement Disorders also allows op-eds, which they

24   call viewpoint articles.  These aren't scientific analyses;

25   they're contrary reviews based on the author's opinion,

1    submitted without solicitation.  And on its face that's

2    exactly what the Dorsey and Ray article is.

3         In fact, Your Honor may have read the article at some

4    point, and as you'll see, it doesn't purport to conduct a

5    scientific analysis as to the question of whether paraquat

6    causes Parkinson's at all.  All the article does is

7    summarize a newspaper article written by a nonscientist and

8    casually concludes that the newspaper article shows that

9    paraquat causes Parkinson's disease.  And let me zoom in on

10   that for a second because it helps show that this is not

11   serious science.  The only article in the peer-reviewed

12   literature that they can cite in support of their claim that

13   the peer-reviewed literature supports Dr. Wells is not

14   actually science.

15        The way this article came to be is, at some point

16   several years ago a lawyer representing plaintiffs in

17   paraquat litigation leaked a set of documents to a

18   journalist named Carey Gillam who had been a supporter of

19   plaintiffs in the *Round-Up* litigation.  Ms. Gillam's not a

20   scientist.  She reviewed some subset of those documents and

21   published quotes of those documents in a newspaper article.

22        Dr. Dorsey, who is himself quoted in that article,

23   then summarized the very article that he'd been quoted in

24   and said that the newspaper article shows that paraquat

25   causes Parkinson's disease.  Not some new scientific study

1    that all the experts have missed.  He concluded that the

2    newspaper article summarizing the documents provided to the

3    journalist by a plaintiff's lawyer proved causation.

4         The very next day the same journalist hosted

5    Dr. Dorsey on a different blog and then, lo and behold,

6    within a few weeks the Plaintiffs in this litigation and

7    their experts were relying on that very article that had

8    been generated just a few weeks before.

9         This may be perfectly fine in the First Amendment

10   context, Your Honor, but this is not how scientific analysis

11   works.  And this kind of article is a stark contrast to the

12   decades of work by independent scientists who have published

13   scientific analyses in the peer-reviewed literature, like

14   the Ag Health study in the Neurotoxicology publication.  And

15   the lack of science becomes all the more apparent when one

16   considers the timing.

17        Your Honor, we sent a subpoena to Drs. Dorsey and Ray,

18   and Dr. Ray produced drafts of the article.  We know from

19   Dr. Ray's production that drafts of the article existed in

20   November of 2022.  They said nothing about causation

21   whatsoever.

22        In early December of 2022, the *Zantac* court issued its

23   *Daubert* opinion, and the *Zantac* court pointed out the gap

24   between the litigation world and the real world, noting that

25   no scientist outside the litigation had concluded that

1  ranitidine causes cancer.

2  Almost immediately, we know from the drafts produced

3  in discovery so far, the Dorsey article changed, and all of

4  a sudden the causation conclusion that the Plaintiffs cite

5  in this litigation suddenly appeared.  We're obviously very

6  interested in this, and we sent a subpoena to Dr. Dorsey as

7  well.  So far he has refused to produce any documents.  And

8  there's litigation pending in the Western District of

9  New York on that question.  But the bottom line is that

10  Dr. Dorsey's viewpoint article is a remarkably weak rebuttal

11  to the decades of independent science that's been generated

12  outside the courtroom.

13  Mr. Kennedy -- one final point about the

14  Dorsey-doesn't-stand-alone slide that Mr. Kennedy put up.

15  Plaintiffs also cite a book called, A Prescription for

16  Action, in which Dr. Dorsey was a co-author.  That's also

17  not a scientific causation conclusion.  It's an advocacy

18  piece.

19  Again, this is not something that the Court needs to

20  take from defense or defense counsel.  This is something

21  that you can take from Dr. Lang.  He was asked about it.  He

22  said this book "does not say that paraquat causes

23  Parkinson's, does it?"  The answer is, "No, it does not."

24  Let me wrap up, Your Honor, by coming back to what we

25  plan to cover over the next couple days.  We identified to

 1  the Special Master that we'd like to argue Dr. Wells,

 2  Dr. Lang, Dr. Spencer, and we'd submit on the rest.  We did

 3  think about arguing Dr. Fitzanakis, whose report included

 4  some highly problematic, in our view, extrapolations from

 5  mice to men, but Plaintiffs effectively abandoned any effort

 6  to extrapolate from those to show causation, so we'll submit

 7  on the papers.

 8      But what we hope to show you over the next several

 9  days is that the reason why there's such a gap between what

10  the peer-reviewed literature says on causation and what the

11  Plaintiffs' experts in this litigation say is that the

12  Plaintiffs' experts are applying a far lower level of

13  scientific rigor than is required by scientists in the real

14  world.

15      Again, I suspect you're going to hear that Dr. Spencer

16  quote a fair number of times -- I won't put it back up here

17  again -- but rarely do you have such candor in an expert

18  that they're applying a lower standard here than they would

19  in their academic work.

20      In the real world, Your Honor, Dr. Wells has never

21  before studied the connection between paraquat and

22  Parkinson's disease.  He's repeatedly disclaimed the ability

23  to offer general causation opinions, but in this litigation

24  world Dr. Wells is Plaintiffs' sole general cause expert on

25  the question of whether paraquat causes PD.  We wouldn't be

1    here without him.

2         In the real world Dr. Lang is a highly credentialed

3    neurologist and movement disorder specialist who's

4    repeatedly published and spoken on the question of what

5    causes Parkinson's disease.  But in this litigation world he

6    was directed, Don't do that, don't offer any opinions on

7    general cause.  And assume, based solely on Dr. Wells'

8    analysis, that paraquat has a risk factor of 2.84.

9         In the real world Dr. Spencer's a neurotoxicologist

10   who's repeatedly published books and chapters implying that

11   paraquat is not neurotoxic.  But in this world Dr. Spencer

12   says that Syngenta and Chevron should have reached

13   conclusions that he himself didn't reach at the time.  The

14   way he gets there, of course, is by applying a far lower

15   standard in litigation than he does in his scientific work.

16        With that, Your Honor, unless the Court has any

17   questions, we'd conclude our presentation.

18        **THE COURT:**  All right.  Thank you.  No, I don't have

19   any questions at this time.  I mean this has been very

20   helpful.  Just like the briefing, it's two very different

21   stories.  So I look forward to hearing from Dr. Wells

22   tomorrow and then the arguments that follow.

23        So we'll start promptly at 9:00 tomorrow morning.  So

24   everyone have a nice evening and I'll see you tomorrow.

25        **(Proceedings adjourned at 3:41 p.m.)**

1 **REPORTER'S CERTIFICATE**

2

3     I, Laura A. Esposito, Registered Professional Reporter

4 and Certified Realtime Reporter, hereby certify that the

5 foregoing is a true and accurate transcript of the

6 proceedings held in the above-entitled case, that said

7 transcript contains pages 1 through 56, inclusive, and was

8 delivered electronically.  This reporter takes no

9 responsibility for missing or damaged pages of this

10 transcript when same transcript is copied by any party other

11 than this reporter.

12     Dated at St. Louis, Missouri, this 28th day of August

13 2023.

14

15                          *Laura A. Esposito*

16                          Laura A. Esposito, RPR, CRR, CRC

17

18

19

20

21

22

23

24

25

*In re: Paraquat, Case #21-md-3004*                    8/21/23 - Pg. 58