**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| **In re: PARAQUAT PRODUCTS LIABILITY LITIGATION**<br><br>**This Document Relates to All Cases** | **Case No. 3:21-MD-3004-NJR**<br><br>**MDL No. 3004** |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' SUPPLEMENTAL JOINT MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS


Page

TABLE OF AUTHORITIES ... ii

RESPONSE TO STATEMENT OF MATERIAL FACTS ... iv

STATEMENT OF ADDITIONAL MATERIAL FACTS ... xiv

INTRODUCTION ... 1

ARGUMENT ... 2

I. Section 136v(b) Only Preempts State Tort Claims that Impose Labeling Requirements that Are “in Addition to” or “Different from” Those Imposed Under FIFRA—All Other State Law Claims Are Not Preempted ... 2

II. State Law Claims Prohibiting a Manufacturer from Selling a Defective Pesticide Product Are *Not* Preempted by FIFRA Because the Duty to Not Sell a Defective Product Is Not a Labeling Requirement ... 9

III. Defendants’ Attempt to Extend *Durnell* to All State Tort Claims Runs Counter to Decades of Supreme Court Precedent and Common Sense ... 12

A. There Is No Obstacle Preemption for Claims Premised on Prohibiting the Sale of a Defective Product ... 12

B. EPA’s Registration of a Pesticide Does Not Impliedly Preempt All Lawsuits Concerning that Pesticide ... 14

C. It Is Possible for Defendants to Comply with State Law Claims that Prohibit the Sale of Paraquat and Comply with Federal Law ... 16

D. EPA Approval of a Pesticide Label Does Not Render that Label “Adequate as a Matter of Law” ... 17

CONCLUSION ... 20

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Altria Group, Inc. v. Good*, 555 U.S. 70 (2008) .......... 1

*Bates v. Dow Agrosciences LLC*, 544 U.S. 431 (2005) .......... 1, 3-13, 16, 17

*Bausch v. Stryker Corp.*, 630 F.3d 546 (7th Cir. 2010) .......... 14

*Bennett v. T-Mobile USA, Inc.*, 597 F. Supp. 2d 1050 (C.D. Cal. 2008) .......... 14

*Bledsoe v. Medtronic, Inc.*, 2020 WL 43107 (N.D. Ind. Jan. 3, 2020) .......... 13

*Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001) .......... 14

*Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504 (1992) .......... 1, 9, 12

*English v. Gen. Elec. Co.*, 496 U.S. 72 (1990) .......... 2

*Hammond v. N. Am. Asbestos Corp.*, 454 N.E.2d 210 (Ill. 1983) .......... 10

*Hardeman v. Monsanto Co.*, 216 F. Supp. 3d 1037 (N.D. Cal. 2016) .......... 17

*Hines v. Davidowitz*, 312 U.S. 52 (1941) .......... 2

*Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150 (2016) .......... 1

*Hurley v. Motor Coach Indus., Inc.*, 222 F.3d 377 (7th Cir. 2000) .......... 15

*In re Abbott Labs*, 2026 WL 2254813 (N.D. Ill. Aug. 5, 2026) .......... 14

*In re Dicamba Herbicides Litig.*, 359 F. Supp. 3d 711 (E.D. Mo. 2019) .......... 17

*In re FEMA Trailer Formaldehyde Prods. Liab. Litig.*, 620 F. Supp. 2d 755 (E.D. La. 2009) .......... 14

*In re Medtronic, Inc., Sprint Fidelis Leads Prods. Liab. Litig.*, 623 F.3d 1200 (8th Cir. 2010) .......... 14

*Jones v. Rath Packing Co.*, 430 U.S. 519 (1977) .......... 2

*McPhail v. Deere & Co.*, 529 F.3d 947 (10th Cir. 2008) .......... 18

*Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996) .......... 2

*Mendoza v. Monsanto Co.*, No. 16CV406, 2016 WL 3648966 (E.D. Cal. July 8, 2016) .......... 17

*Mikolajczyk v. Ford Motor Co.*, 901 N.E.2d 329 (Ill. 2008) .......... 10

*Monsanto Co. v. Durnell*, 146 S. Ct. 2001 (2026) .......... 4, 7-11, 13-19

*Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472 (2013) .......... 9, 16

*Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218 (1947) .......... 1, 2

*Ruckelshaus v. Monsanto Co.*, 467 U.S. 986 (1984) .......... 4

*San Diego Building Trades Council v. Garmon*, 359 U.S. 236 (1959) .......... 12

*Sollami v. Eaton*, 772 N.E.2d 215 (Ill. 2002) .......... 10

*Thibault v. Sears, Roebuck & Co.*, 395 A.2d 843 (N.H. 1978) .......... 19

*Vautour v. Body Masters Sports Indus., Inc.*, 784 A.2d 1178 (N.H. 2001) .......... 18, 19

*Wisconsin Pub. Intervenor v. Mortier*, 501 U.S. 597 (1991) .......... 2, 3, 4, 5, 7, 8, 11, 12, 13

*Wyeth v. Levine*, 555 U.S. 555 (2009) .......... 4

**Statutes and Regulations**

7 U.S.C. § 136a(f)(2) .......... 17

7 U.S.C. § 136j(a) .......... 16, 17

7 U.S.C. § 136v .......... 2

7 U.S.C. § 136v(a) .......... 3, 4, 5, 6, 8, 10, 12, 13, 15, 16

7 U.S.C. § 136v(b) .......... 1, 3, 5, 6, 7, 8, 10, 11, 17

**Other Authorities**

Transcript of Oral Argument, *Monsanto Co. v. Durnell* (No. 24-1068) .......... 8

## RESPONSE TO STATEMENT OF MATERIAL FACTS

Plaintiffs object to the entirety of Defendants' purported Statement of Material Facts. The assertions made are not based in fact but, rather, contain Defendants' interpretations of federal statutes and case law. The assertions are legal arguments, not facts. *See generally Malec v. Sanford*, 191 F.R.D 581, 585 (N.D. Ill. 2000) (the local rule governing statement of facts "is not intended as a forum for factual or legal argument"). Nonetheless, Plaintiffs have attempted to respond.

### A. Regulatory Background

1. Federal law controls pesticide labeling and sales; it prohibits the distribution of pesticides that have not been registered by the EPA. 7 U.S.C. § 136a(a), (c).

**Response:** Plaintiffs dispute paragraph 1 as an overbroad and argumentative interpretation of the statute. Section 136a(a) provides that the statute regulates the distribution and sale of pesticides by way of a registration procedure set forth in § 136a(c). As part of the registration process, an applicant for registration of a pesticide must submit "a complete copy of the labeling of the pesticide, a statement of all claims to be made for it, and any directions for use." 7 U.S.C. § 136a(c)(1)(C). The text of § 136a(a) specifically acknowledges a State's ability to distribute, sell, or use a pesticide that is not registered under this subchapter, subject to regulation by the EPA. *Id.* at § 136a(a).

2. As part of its registration process, the EPA reviews proposed pesticide labels to ensure compliance with FIFRA. 7 U.S.C. § 136a(c)(1)(C), (F), (c)(5); 40 C.F.R. § 152.50(e). The EPA only approves labels that comply with FIFRA's general requirement to provide a "warning or caution statement" sufficient "to protect health" and after determining that no statement is "false or misleading." 7 U.S.C. §§ 136(q)(1)(A), (F), (G), 136a(c)(5)(B).

**Response:** Plaintiffs do not dispute the first sentence in paragraph 2. Plaintiffs dispute the second sentence in paragraph 2 to the extent that approval of a proposed label represents the EPA's "considered judgment" that the label is not false or misleading and does not omit a necessary warning.

*Monsanto Co. v. Durnell*, 146 S. Ct. 2001, 2007 (2026).

3. The EPA also reviews a product's composition to ensure it will not cause "unreasonable adverse effects on the environment" before registering it. 7 U.S.C. § 136a(c)(5)(C). This determination requires the EPA to find no "unreasonable risk to man" and to weigh "the economic, social, and environmental costs and benefits" of the pesticide. Id. § 136(bb). A registrant can only sell a product "with the composition" approved by the EPA. 40 C.F.R. § 152.130(a).

**<u>Response</u>:** Plaintiffs do not dispute the first sentence in paragraph 3. The third sentence is not material to the issue. Plaintiffs dispute the overbreadth of the second sentence in paragraph 3. Under FIFRA, a pesticide label must protect health and the environment, including` protection against any unreasonable adverse effects on the environment, which means, in pertinent part, "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(x), (bb).

4. Following approval, a registrant generally may not change the label or composition of the product without EPA permission. 7 U.S.C. § 136a(f)(1); 40 C.F.R. § 152.44(a). Doing so renders the product "misbranded," and selling a "misbranded" pesticide is unlawful. 7 U.S.C.§ 136j(a)(1)(E); 40 C.F.R. § 152.44(a). The EPA will only approve a change to the label or the product's composition that is based on sufficient data to support the change. *See, e.g.*, 40 C.F.R.§§ 152.50, 156.70; ECF No. 5776-3 (Office of Pesticide Programs Label Review Manual at Ch. 4, p. 7), *available at* https://www.epa.gov/system/files/documents/2024-12/label_review_manual_12122024.pdf.

**<u>Response</u>:** Plaintiffs dispute paragraph 4 to the extent that minor modifications to the label are allowed without prior EPA approval. *See* 40 C.F.R. § 152.46; Office of Pesticide Programs, EPA, Pesticide Registration Notice 98-10 (Oct. 22, 1998), *available at https://19january2017snapshot.epa.gov/sites/production/files/2014-04/documents/pr98-10.pdf*.

5. Paraquat is a pesticide registered with the EPA. ECF No. 5776-5 (EPA July 2021

Interim Registration Review Decision). Paraquat's EPA-approved label has never included a PD warning. *See, e.g.*, ECF No. 5776-6 (EPA Label Approved August 2022). Many EPA-approved labels since 1973 are available by searching "paraquat" or "Gramoxone" on the agency's "Pesticide Product and Label System," available at https://ordspub.epa.gov/ords/pesticides/f?p=PPLS:1. *See*, *e.g.*, ECF No. 5776-7 (EPA Label Approved March 2020); ECF No. 5776-8 (EPA Label Approved June 2023).

**Response:** Plaintiffs do not dispute that paraquat's label has never included a Parkinson's disease (PD) warning or that registration and labeling information is available on the EPA's website.

6. Paraquat's EPA registration is periodically reviewed in a process known as "reregistration." 7 U.S.C. § 136a-1; ECF No. 5776-5 (EPA July 2021 Interim Registration Review Decision) at 4. As part of EPA's reregistration process for paraquat, in 2019, EPA scientists conducted a "systematic review" of the body of scientific literature on paraquat and PD. ECF No. 5776-9 (EPA June 2019 Systematic Review) at 4. The EPA first analyzed the epidemiological data and determined that "[t]here is limited, but insufficient epidemiologic evidence" of "a clear associative or causal relationship" between paraquat and PD. ECF No. 5776-10 (EPA June 2019 Epidemiology Report) at 84. The EPA then evaluated additional data like toxicology studies. ECF No. 5776-9 (EPA June 2019 Systematic Review) at 5-6. Putting all the relevant data together, the EPA "concluded that the weight of evidence was insufficient to link paraquat exposure from pesticidal use of US registered products to PD in humans." *Id.* at 6.

**Response:** Plaintiffs dispute paragraph 6 to the extent Defendants describe the EPA's registration review decision as based on a full and thorough review of the scientific literature and other evidence. As described below, an administrative challenge to the EPA's 2021 interim registration review decision, which remains pending in the United States Circuit Court for the Ninth Circuit, details the inadequacies of the EPA's review and decision related to PD. (*See* Doc. 5871-2.) In fact, the EPA's Preliminary Supplemental Consideration of Certain Issues in Support of its Interim

Registration Review Decision for Paraquat January 30, 2024, acknowledged that while it had received "approximately 90 submissions including scientific studies, as well as testimony filed in an ongoing state lawsuit concerning paraquat," it was unable to complete review of that material and, therefore, the document did not reflect the EPA's review of *any* of those materials. It intended to incorporate its consideration of those materials, along with a then-recent volatilization analysis, into "any final document(s) issued by January 17, 2025." (Doc. 5776-11 at 4-5; *also available at* https://www.regulations.gov/document/EPA-HQ-OPP-2011-0855-0318.)

7. Two years later, in 2021, the EPA issued an Interim Registration Review Decision permitting paraquat to continue to be sold in the United States. ECF No. 5776-5 (EPA July 2021 Interim Registration Review Decision) at 18, 42–43. As part of that decision, the EPA cited its 2019 findings and reiterated that "the weight of evidence was insufficient to link paraquat exposure from pesticidal use of US registered products to PD in humans." *Id.* at 18.

**<u>Response</u>:** Plaintiffs dispute paragraph 7 insofar as that finding remains interim, has been challenged, and is not final.

8. Certain petitioners challenged the EPA's interim registration of paraquat, arguing, among other things, that the EPA insufficiently evaluated (1) paraquat's volatilization (*e.g.*, ability to evaporate after application) and (2) whether paraquat causes PD. Ex. 1 (*Cal. Rural Legal Assistance Found'n v. EPA*, No. 21-71287 (9th Cir.), ECF No. 27-1). In 2024, the EPA responded by publishing its preliminary consideration of some of the issues raised by those petitioners. ECF No. 5776-11 (EPA Jan. 2024 Preliminary Supplemental Consideration) at 3–4. It explained why various studies raised by those petitioners did not change its conclusion regarding the PD hypothesis. *Id.* at 29–32. And the EPA reiterated its conclusion that "PD is not an expected result of the pesticidal use of paraquat." *Id.* at 14.

**<u>Response</u>:** Plaintiffs dispute paragraph 8. In truth, Petitioners assert three principal

challenges, with the *first* being that the EPA improperly dismissed evidence of the connection between paraquat and Parkinson's disease; second, that the EPA failed to evaluate several ways that people are exposed to paraquat, including direct exposure to paraquat drift and to paraquat that volatizes; third, that the EPA's weighing of paraquat's risks and benefits failed to account for paraquat's substantial costs to public health and the environment. (Doc. 5872-2, pp. 24-25); Ex. 1, *Cal. Rural Legal Assistance Found'n*, Case No. 21-71287 (9th Cir.), ECF No. 66-2, pp. 1-2. The EPA did not include in its January 2024 review the "approximately 90 submissions including scientific studies, as well as testimony filed in an ongoing state lawsuit concerning paraquat, in issuing its January 2024 Preliminary Supplemental Consideration. (Doc. 5776-11 at 4-5.)

9. The Ninth Circuit case is currently stayed while the EPA evaluates a separate challenge raised by the petitioners unrelated to the PD hypothesis. Ex. 1 (*Cal. Rural Legal Assistance Found'n*, ECF No. 27-1) at 4. The EPA's 2021 Interim Decision remains in place pending the EPA's evaluation of data concerning that separate challenge. Ex. 2 (*Id.*, ECF No. 71-1) at 4 (EPA joining request to hold case in abeyance and "leave the Interim Decision in effect while EPA further investigates the volatilization issue"); Ex. 3 (*id.*, ECF No. 74 (order granting request)).

**Response:** Plaintiffs dispute paragraph 9. Rather than issuing a final determination on January 17, 2025, as the EPA stated it would do in its January 2024 Preliminary Supplemental Consideration, the EPA filed a motion for voluntary remand of the administrative petition to allow it to withdraw the Interim Decision. (Doc. 5872-5). Petitioners opposed the EPA's motion for voluntary remand as impermissibly seeking vacatur of the decision without a ruling on the merits. Ex. 2, *Cal. Rural Legal Assistance Found'n*, Case No. 21-71287 (9th Cir.), ECF No. 66-1. For its part, Intervenor-Respondent Syngenta Crop Protection LLC opposed the EPA's request and instead moved to hold the case in abeyance. (*See* Doc. 5872-3, p. 3.) Thereafter, the EPA changed course and joined Syngenta's motion to hold the case in abeyance while the EPA completes its volatilization assessments. (Doc. 5872-3).

Alternatively, the EPA requested that if the abeyance motion was denied, the EPA would request the Court grant the remand motion "so that EPA may withdraw the Interim Decision." (*Id*. at p. 4). In that alternative request, the EPA stated that "[r]emand and withdrawal is preferable to litigating *Petitioners' other, non-volatilization challenges to the Interim Decision* for several reasons: (a) EPA's forthcoming volatilization conclusions may narrow or even moot *Petitioners' remaining issues*; (b) Petitioners will have an opportunity to challenge any future final EPA action on paraquat; and (c) EPA has limited resources for administering and defending its FIFRA programs." (*Id*. at pp. 4-5) (emphasis added).

10. The EPA is not reconsidering its 2019 systematic review regarding paraquat and Parkinson's disease. *See* Ex. 4 (*id.*, ECF No. 63-1); Ex. 2 (*id.*, ECF No. 71-1) (EPA referencing only its intent to consider new volatilization data).

**Response:** Plaintiffs dispute paragraph 10 because, as stated in response to paragraph 9, the EPA's own briefing filed in the Ninth Circuit acknowledges that Petitioners' non-volatilization challenges remain and may be affected by the volatilization analysis. *See supra* (citing Doc. 5872-3 at pp. 4-5).

**B. Procedural and Legal Background.**

11. Plaintiffs and Defendants have reached an agreement in principle that, subject to certain conditions and acceptance by individual Plaintiffs, will resolve many of these claims. *See* ECF No. 5789 (canceling April 2026 trial in light of pending settlement). Some Plaintiffs, however, have opted out of the settlement. *See* ECF No. 5833 (Order Selecting Smith and DiCello Firms' Opt-Out Cases For Limited Discovery); ECF No. 5834 (Order Selecting Nachawati Law Group's Opt-Out Cases For Limited Discovery).

**Response:** Plaintiffs do not dispute paragraph 11.

12. On February 2, 2026, Defendants filed a joint motion for partial summary judgment

on all Plaintiffs' label-based claims based on FIFRA preemption. ECF No. 5776. In March 2026, this Court stayed further briefing until the Supreme Court decided *Durnell*, at the Plaintiffs' request. ECF No. 5791.

**Response:** Plaintiffs dispute paragraph 12 because the original motion was for *partial* summary judgment and targeted only "Plaintiffs' failure-to-warn claims." (Doc. 5776 at 6). Moreover, Defendants suggested in their motion that the Court "may wish to hold this motion in abeyance." (*See id*. at 7-8). On March 6, 2026, the Court ordered Defendants to either supplement or withdraw their motion for partial summary judgment within 30 days of the Supreme Court's decision in *Durnell*. (Doc. 5791). Rather than supplementing their motion for partial summary judgment as directed, Defendants filed a Supplemental Joint Motion for Summary Judgment. (Doc. 5872).

13. On June 25, 2026, the Supreme Court issued its ruling in *Durnell*, holding that any state-law tort claim premised on an inadequate EPA-approved label is expressly preempted by FIFRA. 2026 WL 1825691, at *8.

**Response:** Plaintiffs dispute paragraph 13 as an overbroad and argumentative interpretation of the holding in *Durnell*. As set forth in Plaintiffs' Argument, the central question is whether the state tort claim "would impose a labeling requirement that is 'in addition to or different from' federal labeling requirements imposed 'under' FIFRA." *Durnell*, 146 S. Ct. at 2010.

14. In *Durnell*, the Court started with a textual analysis of FIFRA's express preemption provision. That provision, entitled "Uniformity," provides that a "State shall not impose or continue in effect any requirements for labeling or packaging in addition to or different from those required under this subchapter." 7 U.S.C. § 136v(b). Common-law "[f]ailure to warn claims" are state "labeling requirements because those 'rules set a standard for a product's labeling.'" 2026 WL 1825691, at *6 (quoting *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 446 (2005)). So the key question was whether those state duties were "in addition to or different from" federal labeling requirements. *Id.* at *7.

**Response:** Plaintiffs dispute paragraph 14 as overbroad, argumentative, and not a factual assertion. As set forth in Plaintiffs' Argument, the proper inquiry requires an examination of the elements of the common-law duty at issue and, if that state law requires a labeling requirement, determining whether that requirement is in addition to or different from what is required under FIFRA. (*See* Plaintiffs' Argument, herein).

15. *Durnell* explained that, under FIFRA, the EPA may approve a pesticide's label only after determining that it contains all warnings "necessary and … adequate to protect health and the environment" and that the label "does not include any 'false or misleading' statements." *Id.* at *7. After the EPA makes those determinations and registers a pesticide, "manufacturers are legally *required* to use that label—unless and until [the] EPA approves or requires a label change." *Id.* *Durnell* thus held that a state tort claim that "would require Monsanto to add a cancer warning to its labels" was "in addition to" and "different from" Monsanto's "federal-law labeling obligations," as the EPA-approved label did not require a cancer warning. *Id.* at *8.

**Response:** Plaintiffs dispute paragraph 15 as overbroad, argumentative, and not a factual assertion. See Plaintiffs' Responses to paragraphs 2, 3, 4, 13, 14. Paragraph 15 is a legal argument rather than a statement of material fact.

16. The Court continued its analysis by looking at its precedents. *Bates* provided an example where FIFRA preemption would apply. If an EPA regulation required a "CAUTION" designation for a pesticide, *Bates* said, then a state failure-to-warn claim that required a "DANGER" warning would be preempted. *Bates*, 544 U.S. at 453. *Riegel v. Medtronic, Inc.*, 552 U.S. 312 (2008), addressed a similar preemption provision in the Medical Device Amendments of 1976 and held that the FDA's approval of a medical device preempted state tort claims. *Id.* at 316-22. The Court viewed both of those situations as analogous to the EPA's decision not to require a cancer warning on Roundup's label. *Durnell*, 2026 WL 1825691, at *8-9. Thus, under the Court's precedents, "safety

claims that would impose labeling requirements 'in addition to' or 'different from' those required under FIFRA are preempted." *Id.* at *8.

**Response:** Plaintiffs dispute paragraph 16 as argument rather than a factual assertion. Plaintiffs incorporate herein their Argument set forth herein to dispute Defendants' interpretation of Supreme Court precedent.

17. Most relevant here, *Durnell* addressed several counterarguments:

- First, *Durnell* rejected the argument that state and federal law are equivalent, rather than different, just because both state common-law and FIFRA require adequate warnings to protect human health. *Id.* at *9-10. That argument "disregards the central and comprehensive role that EPA performs in making labeling determinations under FIFRA's registration provisions." *Id.* at *9.

- Second, *Durnell* rejected the argument that EPA's regulations exceed or violate its statutory authority under FIFRA. *Id.* at *10. FIFRA empowers the EPA to prescribe regulations to implement the statute, and "expressly directs" the EPA to "'determin[e]' that the pesticide's 'labeling' complies with FIFRA's many specific requirements." *Id.*

- Third, *Durnell* rejected the plaintiff's reading of 7 U.S.C. § 136a(f)(2), which provides that "[i]n no event shall registration … be construed as a defense for the commission of any offense under this subchapter." *Id.* at *10-12. Among other things, *Durnell* read this provision to apply only in EPA enforcement actions—not state tort suits. *Id.* at *10.

- Fourth, *Durnell* rejected the concern about a lag between new scientific developments and the EPA's ability to assess that information. *Id.* at *12-13. This "policy concern about regulatory lag is amply addressed by the extensive process that FIFRA and EPA's implementing regulations have established to respond to new or evolving safety information." *Id.* at *12.

**Response:** Plaintiffs dispute paragraph 17 as argument rather than a factual assertion. Plaintiffs incorporate herein this Opposition's legal analysis.

18. At bottom, the Court rejected any argument that a plaintiff should be able to attack an EPA-approved label through state tort law because that would improperly "upend FIFRA's carefully calibrated and EPA-centric regulatory scheme[,]" which provides for "registration cancellation … proceedings[,]" the right to seek "civil or criminal penalties if a manufacturer fail[s]

to inform EPA of important new safety-related information[,]" and other carefully crafted statutory remedies. *Id.* at *11. Allowing a plaintiff to short-circuit these processes to seek retrospective liability against a pesticide manufacturer would also "trigger[] potential retroactivity and estoppel questions" by penalizing manufacturers who had relied on the EPA's determinations. *Id.*

**Response:** Plaintiffs dispute paragraph 18 as argument and not a factual assertion. Notably, Defendants use the word "attack" throughout their papers. That word is not used a single time in *Durnell*. Yet, Defendants use it here as if it is fact. In paragraphs 13 through 18, Defendants have cherry-picked quotations supporting their position and have asserted them as Statements of Material Fact. Following the dictates of Local Rule for the United States District Court for the Southern District of Illinois 56.1(b), Plaintiffs respond that these paragraphs are not supported by the record citation.

## STATEMENT OF ADDITIONAL MATERIAL FACTS

### A. Regulatory Background.

1. On March 3, 2026, Syngenta announced that it would cease global paraquat production by end of June 2026. *See* Press Release *available at* https://www.syngenta.com/media/syngenta-cease-paraquat-production-uk-2026.

2. On June 30, 2026, the EPA announced that it would host a "roundtable" on paraquat "this summer" to convene "scientists, subject-matter experts, farmworker and community advocates, and other stakeholders to discuss the documented safety challenges associated with the chemical, examine the latest science, and explore potential solutions and alternatives." *See* News Release *available at* https://www.epa.gov/newsreleases/epa-host-roundtable-paraquat-summer.

### B. Procedural and Legal Background

3. Monsanto Company filed its Petition for Writ of Certiorari in the United States Supreme Court, asking the Court to decide "[w]hether FIFRA preempts a state-law failure-to-warn claim where the EPA has repeatedly concluded that the warning is not required and the warning cannot be added to a product without EPA approval." Ex. 3 at PDF p. 2, *Monsanto Co. v. Durnell*, No. 24-1068 (*petition for cert. filed* April 4, 2025). In granting *certiorari*, the Supreme Court limited the petition to the following question: "Whether the Federal Insecticide, Fungicide, and Rodenticide Act preempts a label-based failure-to-warn claim where EPA has not required the warning." *Monsanto Co. v. Durnell*, No. 24-1068 (Jan. 16, 2026).

## INTRODUCTION

*Monsanto Co. v. Durnell* is a labeling-preemption decision, not a pesticide-immunity decision. Defendants ask this Court to transform *Durnell* from a relatively narrow decision concerning conflicting labeling requirements into something the Supreme Court deliberately did not hold: a sweeping rule immunizing manufacturers of EPA-registered pesticides from traditional state-law products-liability claims. The text and history of the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA") do not support that result, and neither does *Durnell*. Congress expressly preserved the states' authority to regulate the sale and use of federally-registered pesticides, while preempting only state requirements for labeling or packaging that are "in addition to or different from" those imposed under FIFRA. 7 U.S.C. § 136v(a)–(b). The Supreme Court has repeatedly respected that distinction, recognizing both the states' broad regulatory role and the continued viability of state-law duties governing product design, manufacture, testing, and sale.

*Durnell* does not disturb that framework. It holds that a State may not use tort law to require a manufacturer to place on an EPA-approved label a warning that federal law does not require. It did not overrule *Wisconsin Public Intervenor v. Mortier*, 501 U.S. 597 (1991) or *Bates v. Dow Agrosciences LLC*, 544 U.S. 431 (2005), address non-labeling duties or implied preemption, or hold that EPA registration categorically displaces state tort law. *Bates*, on the other hand, does address these issues, expressly holding that duties requiring manufacturers to design reasonably safe products, conduct appropriate testing, and market products free from defects are not labeling requirements and, thus, are not subject to FIFRA narrow preemption of labeling requirements.

That distinction is dispositive. Plaintiffs' claims cannot be swept aside merely because Defendants characterize them as "attacks" on an EPA-approved label. Preemption turns on the duty imposed by the particular state-law claim, not on whether a verdict might influence a manufacturer's labeling decisions. A duty to not place an unreasonably dangerous pesticide into the stream of

commerce is a duty concerning the sale of a defective product—not a command prescribing what words must appear on its label.

Defendants' motion therefore fails at the threshold. They seek summary judgment across numerous claims and jurisdictions without undertaking the claim-specific, state-law analysis Supreme Court precedent requires. Nor can they obtain the same sweeping result through implied preemption or by treating EPA registration as conclusive proof that paraquat was safe or adequately labeled. FIFRA preserves a federal-state regulatory partnership; it does not grant pesticide manufacturers immunity from state law. Because Defendants have not shown that Plaintiffs' particular claims impose labeling requirements conflicting with FIFRA, they have not carried their burden, and their motion should be denied in its entirety.

## ARGUMENT

### I. Section 136v(b) Only Preempts State Tort Claims that Impose Labeling Requirements that Are "in Addition to" or "Different from" Those Imposed Under FIFRA—All Other State Law Claims Are Not Preempted

Preemption nullifies a sovereign's authority to create laws and police its citizens; thus, all preemption analysis "start[s] with the assumption that the historic police powers of the States [are] not to be superseded by ... Federal Act unless that [is] *the clear and manifest purpose of Congress*." *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992) (emphasis added) (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230 (1947)). In "every pre-emption case" the "purpose of Congress" is "the ultimate touchstone" in assessing the "scope of a federal statute's pre-emptive effect[.]" *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 162-63 (2016) (quoting *Altria Group, Inc. v. Good*, 555 U.S. 70, 76 (2008)). Referred to as the "basic presumption against pre-emption," the Constitution's aversion to preempting state law means that, even when presented with a "plausible alternative reading" of the law that would allow preemption, "this Court would have a duty to accept the reading disfavoring pre-emption." *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 431, 432 (2005). The Court

has a constitutional mandate to preserve state law unless there is a "clear and manifest" purpose to displace state law. *Id.* at 449 ("[W]e assume that a federal statute has not supplanted state law unless Congress has made such an intention 'clear and manifest.'").

There are three types of preemption: express, field/implied, and conflict. *Eng. v. Gen. Elec. Co.*, 496 U.S. 72, 78 (1990). The first, express preemption, examines "Congress' intent to supplant state authority" as "expressed in the terms of the statute." *Wisconsin Pub. Intervenor v. Mortier*, 501 U.S. 597, 604–05 (1991) (citing *Jones v. Rath Packing Co.*, 430 U.S. 519, 525 (1977)). "[W]hen Congress has made its intent known through explicit statutory language, the courts' task is an easy one." *Eng.*, 496 U.S. at 79. The second, field preemption, exists "in the absence of explicit statutory language," where the "'scheme of federal regulation [is] so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it,' or where an Act of Congress 'touch[es] a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" *Id.* (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). The third, conflict or "obstacle" preemption, exists when state law "actually conflicts with federal law." *Id.* This occurs "where it is impossible for a private party to comply with both state and federal requirements" or "where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Id.* (quoting *Hines v. Davidowitz,* 312 U.S. 52, 67 (1941)).

The federal law at issue is FIFRA. To understand whether Congress intended FIFRA to displace state laws, implicitly or explicitly, the Court "primarily" looks to "the language of the pre-emption statute and the 'statutory framework' surrounding it." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 486 (1996) (citation omitted). FIFRA contains a section titled "Authority of States" that delineates the scope of the authority that states have to regulate pesticides. 7 U.S.C. § 136v. Section 136v starts with a broad "general" grant of authority: "[a] State may ***regulate the sale or use of any federally***

***registered pesticide or device in the State*** " and then proceeds to describe the limits of that authority. *Id.* at § 136v(a) (emphasis added). First, a state cannot allow "the sale or use" of a pesticide prohibited under FIFRA. *Id.* Second, should a state elect to regulate a pesticide, "[s]uch state shall not impose or continue in effect any requirements for labeling or packaging in addition to or different from those required" by FIFRA. *Id.* § 136v(b). Third, states can unilaterally cause a non-prohibited pesticide to be deemed "registered" under FIFRA for a use not previously approved under FIFRA under specific conditions. *Id.* § 136v(c)(1)–(2). Fourth, states cannot issue a registration for a "food or feed" unless there is an existing "tolerance or exemption under the Food, Drug, and Cosmetic Act that permits the residues of the pesticides[.]" *Id.* § 136v(c)(3). Finally, FIFRA empowers the EPA to suspend the authority of states to regulate pesticides if the state "is not capable of exercising adequate controls" to fulfill the purposes of FIFRA. *Id.* § 136v(c)(4).

In interpreting Section 136v, the Court must avoid a defendants' invitation to "overstate the degree of uniformity and centralization that characterizes FIFRA" because "the statute authorizes a relatively decentralized scheme that preserves a broad role for state regulation." *Bates*, 544 U.S. at 450; *see Mortier*, 501 U.S. at 602. "Most significantly, States may ban or restrict the uses of pesticides that EPA has approved[.]" *Bates*, 544 U.S. at 450. Indeed, "[p]rivate remedies that enforce federal misbranding requirements would seem to aid, rather than hinder, the functioning of FIFRA." *Id.* at 451.

This "concurrent authority of the Federal and State Governments in this sphere" is directly supported by the statutory framework and context of FIFRA's enactment. *Id.* Before FIFRA, "[s]tates provided the primary and possibly the exclusive source of regulatory control over the distribution of poisonous substances" including pesticides. *Id.* at 437. When FIFRA was first passed in 1947, it was a simple "licensing and labeling" law, requiring all pesticides sold in interstate commerce to be registered with Secretary of Agriculture. *Id.* Then, in 1972, "Congress adopted the extensive

amendments that 'transformed FIFRA from a labeling law into a comprehensive regulatory statute.'" *Id.* (quoting *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 991 (1984)). Importantly, "Courts entertained tort litigation against pesticide manufacturers since well before the passage of FIFRA in 1947, and such litigation was a common feature of the legal landscape at the time of the 1972 amendments." *Bates*, 544 U.S. at 440–41. And yet, despite being aware of these state tort lawsuits, Congress drafted Section 136v around the general understanding that "[a] State may regulate the sale or use of any federally registered pesticide or device in the State," 7 U.S.C. § 136v(a), and did *not* expressly preempt state tort suits. "If Congress had intended to deprive injured parties of a long available form of compensation, it surely would have expressed that intent more clearly." *Bates*, 544 U.S. at 449; *see, e.g.*, *Wyeth v. Levine*, 555 U.S. 555, 575 (2009) (Congressional "silence on the issue, coupled with its certain awareness of the prevalence of state tort litigation, is powerful evidence that Congress did not intend" preemption).

The Supreme Court has now interpreted the scope and nature of Section 136v preemption in a trilogy of cases—*Mortier*, *Bates*, and *Durnell*. The first, *Wisconsin Pub. Intervenor v. Mortier*, involved a local ordinance in the rural county of Washburn County, Wisconsin, that regulated the application of pesticides on public and private lands and gave a town board authority to issue permits. 501 U.S. at 603. Mortier, a resident who was prohibited from spraying pesticides, argued the ordinance was preempted by FIFRA. *Id.* at 603–04. The Wisconsin Supreme Court agreed. *Id.* at 604–605. The Supreme Court reversed, concluding "that FIFRA does not pre-empt the town's ordinance either explicitly or implicitly or by virtue of an actual conflict." *Id.* at 606.

Regarding express preemption, the Court held that "the statutory language … is wholly inadequate to convey an express preemptive intent on its own." *Id.* at 607. The Court recognized that FIFRA makes an "express grant of regulatory authority to the States" and there was no reason why that grant of authority would not apply to municipalities; indeed, "the statutory language tilts in favor

of local regulation." *Id.* The Court also looked to the legislative history surrounding Section 136v, which was "ambiguous" about whether political subdivisions would enjoy the same grant of regulatory authority as states did under Section 136v(a). *Id.* at 609–11. Ultimately, that ambiguous legislative history was insufficient to support express preemption.

Regarding field preemption, the Court held that "FIFRA fails to provide any clear and manifest indication that Congress sought to supplant local authority over pesticide regulation impliedly." *Id.* at 611. Section 136v "undercuts such an inference" because Section 136v(a) is a "grant of regulatory authority to the States" and Section 136v(b) is limited to labeling. *Id.* at 613. The Court explained "the statute leaves ample room for States and localities to supplement federal efforts even absent the express regulatory authorization of § 136v(a)." *Id.*

Regarding impossibility preemption, Mortier argued that the "ordinance stands as an obstacle to the statute's goals of promoting pesticide regulation that is coordinated solely on the federal and state levels[.]" *Id.* at 614–615. Again, the Court rejected the notion that FIFRA created an EPA-only regulatory structure: "[t]o the contrary, FIFRA implies a regulatory partnership between federal, state, *and* local governments." *Id.* at 615. The Court was clear that "Congress is free to find that local regulation does wreak such havoc and enact legislation with the purpose of preventing it. We are satisfied, however, that Congress has not done so yet." *Id.* at 616.

Next in the trilogy is *Bates*. Whereas *Mortier* grappled with the claimed preemptive effect of FIFRA on a municipal ordinance, *Bates* "addressed whether [FIFRA] pre-empts tort and other common-law claims arising under state law." *Bates*, 544 U.S. at 440. In *Bates*, twenty-nine Texas peanut farmers sued Dow Agrosciences when its EPA-approved pesticide severely damaged their crops. *Id.* at 434. The farmers alleged strict products liability, negligence, fraud, breach of warranty, and violations of a Texas consumer protection statute. *Id.* at 435–36. The trial court held the farmers' claims were preempted by FIFRA under Section 136v(b). *Id.* a 436. The United States Court of

Appeals for the Fifth Circuit affirmed, reasoning that allowing the claims to proceed to judgment would "induce [Dow] to alter its label," which they were not permitted to do under Section 136v(b) and, thus, constituted an improper requirement that was in addition to that imposed under FIFRA. *Id.* The Fifth Circuit also held that the farmers' "strict liability claim alleging defective design was essentially a 'disguised' failure-to-warn claim and therefore pre-empted." *Id.*

The Supreme Court, interpreting Section 136v(b), rejected the inducement theory: "An occurrence that merely motivates an optional decision does not qualify as a requirement." *Id.* at 443.[1] "[A]n event, such as a jury verdict, that merely motivates an ***optional decision*** is not a requirement." *Id.* at 445 (emphasis added). The Fifth Circuit was "quite wrong when it assumed that any event, such as a jury verdict, that might 'induce' a pesticide manufacturer to change its label should be viewed as a requirement." *Id.* Moreover, that interpretation of Section 136v(b) was "not [] consistent with § 136v(a), which confirms the State's broad authority to regulate the sale and use of pesticides." *Id.* The Court explained that a state "may ban the sale of a pesticide if it finds, for instance, that one of the pesticide's label-approved uses is unsafe" and even though such a "ban might well induce the manufacturer to change its label to warn against this questioned use," it does not run afoul of Section 136v(b). *Id.* at 446. "It is highly unlikely that Congress endeavored to draw a line between the type of indirect pressure caused by a State's power to impose sales and use restrictions and the even more attenuated pressure exerted by common-law suits." *Id.*

For Section 136v(b) to preempt a state law claim, "two conditions" are *required*: "First, it must be a requirement 'for labeling or packaging'; rules governing the design of a product, for example, are not pre-empted." *Id.* at 444. Second, "it must impose a labeling or packaging requirement that is "in addition to or different from those required" by FIFRA. *Id.* "[M]any … common-law rules

[1] Indeed, the Supreme Court specifically noted that "[a] design defect claim, if successful, would surely induce a manufacturer to alter its label to reflect a change in the list of ingredients or a change in the instructions for use necessitated by the improvement in the product's design" but flatly rejected the notion that FIFRA preempted such claims. *Bates*, 544 U.S. at 444.

… do not satisfy the first condition." *Id.* Specifically:

> Rules that require manufacturers to design reasonably safe products, to use due care in conducting appropriate testing of their products, to market products free of manufacturing defects, and to honor their express warranties or other contractual commitments plainly do not qualify as requirements for "labeling or packaging." None of these common-law rules requires that manufacturers label or package their products in any particular way. ***Thus, petitioners' claims for defective design, defective manufacture, negligent testing, and breach of express warranty are not pre-empted.***

*Id.* at 444 (emphasis added). That distinction is critical here. Section 136v(b) does not ask whether a verdict might affect a manufacturer's future labeling decisions; it asks whether the state-law duty itself requires the manufacturer to label the product in a particular way. The Court was clear: "the lengthy legislative history is barren of any indication that Congress meant to abrogate most of the common-law duties long owed by pesticide manufacturers." *Id.* at 452, n.26. Thus, even if a state tort claim induces a defendant to take action with regard to labeling, such as the imposition of a jury judgment, it does not constitute a labeling requirement under Section 136v(b).

The final case in the trilogy is *Durnell*. In *Durnell*, a plaintiff sued Monsanto, alleging that the pesticide Roundup caused his lymphoma. 146 S. Ct. at 2009. The plaintiff alleged a failure-to-warn claim under Missouri law, "claiming that Monsanto should have included a cancer warning on Roundup's label." *Id.* Monsanto argued that Section 136v(b) preempted the plaintiffs claim because requiring a cancer warning on the label would impose a requirement that differs from the requirements imposed under FIFRA. *Id.* The Court agreed with Monsanto. *Id.* at 2010–11. The analysis was simple: "[F]ederal law requires Monsanto to sell Roundup with the label that EPA approved at the initial registration … that is, the label without a cancer warning." *Id.* at 2011. However, Durnell's "state tort claim" would "require Monsanto to add a cancer warning to its labels." *Id.* Such a requirement "is 'in addition to' and 'different from' Monsanto's federal-law labeling obligations" and, thus, is expressly preempted by Section 136v(b). *Id.* Importantly, the Court did not abrogate *Mortier* or *Bates*—in fact, the majority cites both favorably—did not address any implied preemption arguments (unlike *Mortier*

and *Bates*) and did not discuss other theories of liability that do not impose labeling requirements.[2]

Read together, *Mortier*, *Bates*, and *Durnell* establish that state-law duties that do not impose labeling or packaging requirements fall outside §136v(b)'s express-preemption provision. This would necessarily include defective design, defective manufacture, negligent testing, breach of express warranty, and any warning claims that do not implicate labeling conduct.[3] *Bates*, 544 U.S. at 444. State law duties that impose labeling requirements that are the *same* as FIFRA are also not expressly or impliedly preempted; for example, if a failure to warn claim requires a manufacturer not to sell a misbranded pesticide—the *same* requirement under FIFRA. However, state law duties that require *labeling* that is "in addition to" or "different from" the labeling required by FIFRA runs into Section 136v(b) and is expressly preempted. This interpretation honors the history of FIFRA and its relationship to state tort claims, gives proper effect to Section 136v(a), and satisfies the "concurrent authority of the Federal and State Governments in this sphere." *Bates*, 544 U.S. at 451.

## II. State Law Claims Prohibiting a Manufacturer from Selling a Defective Pesticide Product Are *Not* Preempted by FIFRA Because the Duty to Not Sell a Defective Product Is Not a Labeling Requirement

Defendants frame the preemption question around whether a Plaintiff's claim "attacks" an "EPA-approved label." (Doc. 5872, p. 15). That is not correct. No state tort law claim "attacks" an EPA-approved label—rather, state laws impose duties and obligations on manufacturers that sell products in their state. Here, the central question is whether the state tort claim "would impose a labeling requirement that is 'in addition to or different from' federal labeling requirements imposed

[2] In fact, during oral argument, Monsanto's counsel reassured the Justices that design defect claims were not preempted: "JUSTICE BARRETT: Are design defect claims preempted? MR. CLEMENT: They're only preempted if they are disguised failure-to-warn claims. But the –that's --that is an important difference from this context and the medical device amendments context, which is, although they're worded similarly, the preemption clause in the medical device amendments sweeps in design defect claims. And, here, it's really just on the labeling. … So, with that caveat, **design defect claims are not preempted**." Transcript of Oral Argument at 31:19–32:12, *Monsanto Co. v. Durnell*, 146 S.Ct. 2001 (2026) (No. 24-1068) (emphasis added).

[3] These warning claims would include those state law claims that simply require a manufacturer to not sell a product with a warning defect, discussed below. It would also include any warning claims related to non-labeling communications that are not subject to Section 136v(b)'s express preemption clause.

'under' FIFRA." *Durnell*, 146 S. Ct. at 2010. To do this, "[t]he proper inquiry calls for an examination of the elements of the common-law duty at issue," *Bates*, 544 U.S. at 445 (citing *Cipollone*, 505 U.S. at 524), and then, if the state law imposes a labeling requirement, determining whether that requirement is in addition to or different from what is required under FIFRA. For example, in *Cipollone*, after determining the scope of the preemption clause at issue, the Supreme Court went through each state law cause of action to determine what obligations were imposed under each claim and whether each obligation was preempted by the federal statute. *Cipollone*, 505 U.S. at 524–530. Indeed, the Supreme Court noted that the plaintiff's failure to warn claims that required "additional, or more clearly stated, warnings" were preempted, but that the failure to warn claims based on "testing or research practices or other actions unrelated to advertising or promotion" were not. *Id.* at 524–25. Parsing the theories (and attendant obligations) underlying each cause of action—including the different theories within the same cause of action—is required before the Court can find a claim preempted. *Id.*; *see, e.g.*, *Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472, 482 (2013) ("That New Hampshire tort law imposes a duty on manufacturers is clear. Determining the content of that duty requires somewhat more analysis.").

Here, Defendants seek sweeping immunity across various claims without engaging in any state law analysis. The Court is left with a generalized request for relief—one that would eviscerate the claims of thousands of individuals—untethered to any meaningful consideration or discussion of what obligations are imposed under the specific state law claim of any plaintiff. This "silver bullet" approach to immunity is fatal to Defendants' requested relief. They have not done the work necessary to meet their burden of establishing preemption.

Take, for example, strict product liability claims under Illinois law. To establish a strict liability claim, a plaintiff must prove "that the injury complained of resulted from a condition of the product, that the condition was unreasonably dangerous, and that it existed at the time the product left

the manufacturer's control." *Mikolajczyk v. Ford Motor Co.*, 901 N.E.2d 329, 335 (Ill. 2008), *as modified on denial of reh'g* (Dec. 18, 2008) (citing *Sollami v. Eaton*, 772 N.E.2d 215, 219 (Ill. 2002)). "A product may be found to be unreasonably dangerous based on proof of any one of three conditions: a physical defect in the product itself, a defect in the product's design, or a failure of the manufacturer to warn of the danger or to instruct on the proper use of the product." *Id.* Importantly, "in a products liability action, all persons in the distributive chain are liable for injuries resulting from a defective product, including suppliers, distributors, wholesalers and retailers." *Hammond v. N. Am. Asbestos Corp.*, 454 N.E.2d 210, 216–17 (Ill. 1983). "Regardless of the nature of the commercial transaction and even though he does not create the defect, a seller who puts a defective product into the stream of commerce may still be held strictly liable to an injured user." *Id.* Thus, what gives rise to liability under Illinois strict products liability is not the creation of the defect—whether it is a manufacturing, design, or warning defect—it is the act of placing a defective product into the stream of commerce. Under this framework, the relevant obligation imposed under Illinois law is to not place an unreasonably dangerous product into the stream of commerce. Such an obligation does not constitute a "labeling requirement." It is merely a function of Illinois's sovereign authority to prohibit or restrict the sale of pesticides in the state—a power that is *expressly* recognized and authorized under FIFRA. 7 U.S.C. § 136v(a); *Bates*, 544 U.S. at 450 ("States may ban or restrict the uses of pesticides that EPA has approved[.]").

To be fair, a cause of action could impose multiple obligations. For example, a plaintiff could argue (similar to *Durnell*) that a defendant is liable for strict liability failure to warn under Illinois law because the manufacturer should have provided a specific warning on the EPA-approved label. Such a theory would likely implicate Section 136v(b) because it would be seeking to impose a labeling obligation, and the Court would then need to examine whether that obligation was in addition to or different from the labeling requirements under FIFRA. But, even if that theory of liability is

preempted, it does not affect a theory predicated on not selling a pesticide with a warning defect. The distinction is not semantic. The former duty dictates what the manufacturer must place on the pesticide's label; the latter imposes liability for the sale of an unreasonably dangerous product; it does not prescribe any particular labeling content. *Bates* is clear that state-law claims prohibiting the sale of a defective product—even if they pressure a manufacturer to alter its label—do not constitute a labeling requirement and are not preempted. 544 U.S. at 445–46.

In this brief, Plaintiffs cannot delve into the elements of each state law that governs every Plaintiff's claims. To be sure, under some state laws, there may be claims whose only theory is predicated on an obligation that is preempted by Section 136v(b). But, that analysis is nuanced. As it stands, with the Defendants bearing the burden of overcoming the presumption against preemption in the first instance, *see Bates*, 544 U.S. at 432, the Court must deny Defendants' ill-considered and incomplete motion. Lumping any claim that "attacks the EPA-approved label" into a single preempted bucket is not justified.

## III. Defendants' Attempt to Extend *Durnell* to All State Tort Claims Runs Counter to Decades of Supreme Court Precedent and Common Sense

### A. There Is No Obstacle Preemption for Claims Premised on Prohibiting the Sale of a Defective Product

Defendants argue that Plaintiffs' claims based on not selling a defective product[4] are preempted because they are an obstacle to "Congress's purposes in enacting FIFRA and delegating substantial authority to the EPA." (Doc. 5872 at 19). To support this argument, Defendants cite *dicta* in *Durnell*[5] that FIFRA is "EPA-centric" and carefully calibrated. *Id.* But the Supreme Court unanimously rejected obstacle preemption in *Mortier*,[6] where the Court held that local regulation of

[4] Defendants characterize these claims as design defect claims. But, as explained above, the duty to not sell a defective product—whether it is a manufacturing, design, or warning defect—applies to multiple causes of action.
[5] Defendants admit, as they must, that *Durnell* did not address any type of implied preemption. 146 S. Ct. at 2012, n.7.
[6] Defendants do not cite or mention *Mortier* in their brief, even though it is a Supreme Court decision that directly addresses obstacle preemption under FIFRA.

pesticides—including the prohibition of use—does not frustrate the goals or policy objectives of FIFRA. 501 U.S. at 615–16. That unanimous decision was echoed, again, in *Bates*, when the Supreme Court criticized Dow for overstating "the degree of uniformity and centralization that characterizes FIFRA." *Bates*, 544 U.S. at 450. "[T]he statute authorizes a relatively decentralized scheme that preserves a broad role for state regulation." *Id.* The Court reiterated that FIFRA contemplates a "concurrent authority of the Federal and State Governments in this sphere" and that "[p]rivate remedies that enforce federal misbranding requirements would seem to aid, rather than hinder, the functioning of FIFRA" because "tort suits can serve as a catalyst[.]" *Id.* at 451. The notion that state regulation of pesticides conflicts with the policy objectives of FIFRA cannot be reconciled with §136v(a), *Mortier*, or *Bates*. Indeed, Section 136v(a) expressly acknowledges the ability of states to "ban or restrict the uses of pesticides that EPA has approved." *Id.*

Defendants attempt to distinguish Section 136v(a) by arguing that state tort claims are not "state 'regulation' of the sale or use of paraquat" and, thus, Section 136v(a) does not apply. (Doc. 5872 at p. 20). Not true. The Supreme Court has long held that state tort claims constitute "regulation" in the context of preemption and statutory interpretation: "State regulation can be as effectively exerted through an award of damages as through some form of preventive relief. The obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy." *Cipollone*, 505 U.S. at 521 (quoting *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 247 (1959)). When Congress stated that "[a] State may regulate the sale or use of any federally registered pesticide or device in the State," that includes the ability of a state to enforce state tort law prohibiting the sale of a defective pesticide, especially considering state tort lawsuits on pesticides were "common well before" and after FIFRA's "1972 amendments." 7 U.S.C. § 136v(a), *Bates*, 544 U.S. at 451. Allowing state tort suits to proceed against EPA-approved pesticides does not frustrate or run counter to FIFRA's policy objectives.

**B. EPA's Registration of a Pesticide Does Not Impliedly Preempt All Lawsuits Concerning that Pesticide**

Next, Defendants argue that *all* design defect "claims are impliedly preempted when a federal agency has approved a product's design as safe to use before it was sold." (Doc. 5872 at 20). In other words, Defendants urge this Court to accept that any time a federal agency regulates a product, a state law claim that disagrees with an agency finding is preempted. That, however, is not how preemption works.

Congressional purpose "is the ultimate touchstone in every preemption case." *Levine*, 555 U.S. at 565. As discussed above, Congress did not intend EPA registration of a pesticide to displace state law regulation of pesticides, whether that was in the form of local bans or common law tort suits. *Mortier*, 501 U.S. at 611–12 ("FIFRA fails to provide any clear and manifest indication that Congress sought to supplant local authority over pesticide regulation impliedly. In particular, we reject the position … that the 1972 amendments transformed FIFRA into a comprehensive statute that occupied the field of pesticide regulation[.]"); *Bates*, 544 U.S. at 450 ("[T]he statute authorizes a relatively decentralized scheme that preserves a broad role for state regulation."); *Durnell*, 146 S. Ct. at 2008 ("States remain free to 'regulate the sale or use of any federally registered pesticide.' § 136v(a). For example, a State could outright ban a pesticide within its borders."). Section 136v(a)'s broad grant of authority to the states (as well as the ways states are permitted to go beyond the scope of EPA registration) would make no sense if Congress intended to prevent states from disagreeing with any EPA pesticide registration, as argued by Defendants.

Defendants do not cite a single case that suggests that Congress intended to delegate absolute authority to the EPA to regulate all pesticides in the United States. None of the cases cited by Defendants even addresses FIFRA, and each involves a completely different statutory scheme. Defendants cite *Bledsoe v. Medtronic, Inc.*, No. 2:18-cv-133-TLS, 2020 WL 43107, at *7 (N.D. Ind. Jan. 3, 2020), which contains a single paragraph analysis about why the plaintiff's design defect claim

would result in a challenge to the premarket approval of a medical device. The court, however, relies on *In re Medtronic, Inc., Sprint Fidelis Leads Prods. Liab. Litig.*, 623 F.3d 1200, 1206 (8th Cir. 2010), which discusses how the specific regulatory scheme governing premarket approval of medical devices expressly preempts any challenge to that approval by states. This case does not support the broad *implied* preemption Defendants seek here, under FIFRA.[7]

Moreover, the United States Court of Appeals for the Seventh Circuit cautions against extending implied preemption beyond the distinctive fraud-on-the-agency context addressed by the Supreme Court in *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001), where a plaintiff invokes a traditional state-law product-safety duty. *See Bausch v. Stryker Corp.*, 630 F.3d 546, 557–58 (7th Cir. 2010) (distinguishing *Buckman* and rejecting implied preemption where the plaintiff alleged breach of "a well-recognized duty owed to her under state law"). Although *Bausch* arose under the Medical Device Amendments, its distinction between a claim seeking to enforce federal regulatory obligations and one invoking an independent state tort duty is instructive, even when the duties and legal obligations are identical or "parallel." *See also In re Abbott Labs*, MDL No. 3026, Case No. 22-cv-3737, 2026 U.S. Dist. LEXIS 174782, 2026 WL 2254813 (N.D. Ill. Aug. 5, 2026) (rejecting claim of implied preemption and distinguishing *Durnell* as inapplicable to defective design claims). Here, Plaintiffs' claims arise from traditional state-law duties governing the safety, testing, design, and sale of products, and those obligations mirror those imposed by FIFRA. Plaintiffs, however, are not enforcing FIFRA. Rather, Plaintiffs are merely utilizing state tort law to exercise their state's

[7] Defendants also cite cases related to radio frequency ("RF") radiation regulated by the Federal Communications Commission ("FCC")—which, again, involves an entirely different regulatory scheme and statutory framework than FIFRA's dual federal-state framework, where Congress has divested substantial authority to the FCC. (*See* Doc. 5872, p. 21) (citing *Bennett v. T-Mobile USA, Inc.*, 597 F. Supp. 2d 1050, 1052 (C.D. Cal. 2008)). Similarly, Defendants cite a case involving the Department of Housing and Urban Development's setting of formaldehyde levels in temporary housing provided to victims of hurricane Katrina. (Doc. 5872 at 21) (citing *In re FEMA Trailer Formaldehyde Prods. Liab. Litig.*, 620 F. Supp. 2d 755, 763 (E.D. La. 2009)). Again, that case involved a nuanced parsing of the statutory language and how, and to what extent, Congress intended to displace state law. Neither the RF or formaldehyde cases stand for the proposition, as claimed by Defendants, that any state lawsuits that disagree with an agency determination are impliedly preempted.

sovereign authority to regulate pesticides within their borders.

Defendants also heavily rely on *Hurley v. Motor Coach Indus., Inc.*, 222 F.3d 377 (7th Cir. 2000). But, again, *Hurley* does not stand for the sweeping proposition that Defendants claim. In *Hurley*, the Department of Transportation ("DOT") created a regulatory scheme to gradually bring specific safety features into common use and ensure consumer adoption. *Id.* at 382. The underlying lawsuit, however, required immediate use of specific safety technologies (three-point seatbelts) that ran directly counter to the policy objectives stated by the DOT to phase-in that technology. *Id.* It was in this sense that the lawsuit "interferes with these federal policy choices" and, thus, was subject to obstacle preemption. *Id*. at 383.

Here, states are free to prohibit the sale of paraquat. Both Vermont and California have already phased it out. *See* Vt. Stat. Ann. tit. 6, § 1105d(b) (2026) (2026 Vt. Acts & Resolves No. 112, § 1.).[8] There is no federal policy undermined by states exercising their authority to restrict paraquat use in their state; an authority that is expressly preserved within FIFRA. *See* 7 U.S.C. § 136v(a). Indeed, *Durnell* itself confirms that a State may outright ban a pesticide. 146 S. Ct. at 2008. Whether that restriction is accomplished through state regulatory action, state statutes, local ordinances, or tort lawsuits, it makes no difference; no federal policy objective is frustrated.

**C. It Is Possible for Defendants to Comply with State Law Claims that Prohibit the Sale of Paraquat and Comply with Federal Law**

Defendants briefly raise impossibility preemption, claiming that any state tort claim that "would require a defendant" to not sell a pesticide is preempted, relying on *Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472, 488 (2013). (Doc. 5872 at 22-23). To meet the "demanding defense" of

[8] In 2024, California enacted a law requiring the state's Department of Pesticide Regulation ("DPR") to "reevaluate paraquat," and "make the determination to retain, cancel, or suspend its registration or to place new appropriate restrictions on [its] use" on or before January 1, 2029. Cal. Food & Agr. Code Div. 7, Ch. 3. § 14086. In lieu of providing human safety data to the DPR, however, Syngenta voluntarily cancelled its California registration of Gramoxone SL 3.0 on April 1, 2026. Other registrants followed suit, and California's DPR has now cancelled all remaining paraquat registrations with a right to sell remaining inventory through April 1, 2028.

impossibility preemption, Defendants must demonstrate that it would be impossible to simultaneously comply with state and federal law. *Levine*, 555 U.S. at 573. If the duty imposed by state law is to not sell a product with a defective warning or design, that duty parallels FIFRA. *See* 7 U.S.C. 136j(a)(1). In *Bartlett*, the Court held that a stop-selling rationale was not appropriate when there was a conflict between state and federal obligations and the only "out" was to do neither: "Our pre-emption cases presume that an actor seeking to satisfy both his federal- and state-law obligations is not required to cease acting altogether in order to avoid liability." *Bartlett*, 570 U.S. at 488. The Court, however, refused to extend that rationale when there are "state design-defect claims that parallel the federal misbranding statute" and specifically noted this in the context of FIFRA. *Id.* at 487, n.4 ("[S]tate-law pesticide labeling requirement not pre-empted under express pre-emption provision, provided it was "equivalent to, and fully consistent with, [federal] misbranding provisions[.]" (citing *Bates*, 544 U.S. at 447)). Unlike the federal generic drug regime at issue in *Bartlett*, FIFRA expressly preserves state authority to prohibit the sale or use of federally registered pesticides. 7 U.S.C. §136v(a). *Bartlett* itself distinguished *Bates* and expressly declined to address state-law design-defect claims that parallel federal misbranding requirements. 570 U.S. at 487, n.4. This case, thus, falls squarely into the exception left open by *Bartlett*. Tellingly, the majority in *Durnell* avoided this issue by refusing to reach any implied preemption arguments. Indeed, it would be difficult to suggest that state prohibitions on the sale of pesticides, as enforced through state tort law, are *impliedly* preempted by FIFRA when that authority is *expressly* recognized in the text. 7 U.S.C. § 136v(a). Considering the presumption against preemption and the language of Section 136v(a), Defendants do not meet their burden of impossibility preemption.

**D. EPA Approval of a Pesticide Label Does Not Render that Label "Adequate as a Matter of Law"**

Defendants state, without any citation, that "*Durnell* makes clear that an EPA-approved pesticide label is adequate as a matter of law." (Doc. 5872 at p. 23). Nowhere in *Durnell* did the Court

say that. In fact, FIFRA expressly states the opposite under the heading "Registration not a defense": "In no event shall registration of an article be construed as a defense for the commission of any offense under this subchapter." 7 U.S.C. § 136a(f)(2). If EPA approval rendered a label adequate as a matter of law, then registration would necessarily be a defense against any allegation of misbranding, including an enforcement action by the EPA. *Durnell* held that EPA's specific labeling determination creates a federal labeling requirement for §136v(b) purposes. It did not hold that EPA approval establishes factual adequacy for every purpose. 146 S. Ct. at 2015; *see also Hardeman v. Monsanto Co.*, 216 F. Supp. 3d 1037, 1038 (N.D. Cal. 2016); *In re Dicamba Herbicides Litig.*, 359 F. Supp. 3d 711, 733 (E.D. Mo. 2019) ("EPA approval of a label is not dispositive regarding whether a product label is accurate."); *Mendoza v. Monsanto Co.*, No. 16CV406, 2016 WL 3648966, at *2 (E.D. Cal. July 8, 2016) ("[A] properly registered label may still be misbranded.").[9]

Defendants also make unsupported statements like "after *Durnell*, state-tort claims cannot hold the EPA-approved labeling inadequate." (Doc. 5872 at p. 25). But, again, that is not what *Durnell* states. *Durnell* did not hold that EPA approval renders a pesticide label factually adequate for every purpose under state law. It held that EPA's specific determination concerning the required safety warning constitutes a federal labeling requirement that a state may not supplement or contradict through a state-law labeling requirement. If a state failure-to-warn or design-defect claim requires the defendant to not sell a misbranded pesticide, i.e., the *same* obligation imposed under FIFRA, *see* 7 U.S.C. § 136j(a), a jury could consider all the evidence presented and conclude that the label was misbranded under state law without ever running afoul of FIFRA. *Bates* makes this clear: "States have ample authority to review pesticide labels to ensure that they comply with both federal and state

[9] *Hardeman*, *In re Dicamba*, and *Mendoza* were abrogated by *Durnell* to the extent they held that the plaintiffs were permitted to impose *labeling requirements* in addition to or different from those imposed by an EPA-approved label. However, these cases also discuss the role of EPA approval within the context of a state tort claim, and that analysis is still good law, as reiterated in *Durnell* itself.

labeling requirements." 544 U.S. at 442. That "ample authority" would not exist if EPA-approval was, by itself, dispositive.

Citing *McPhail v. Deere & Co.*, 529 F.3d 947, 958 (10th Cir. 2008), Defendants claim that under Oklahoma law, a design defect can be cured by an adequate label. (Doc. 5872 at p. 23).[10] However, *Durnell* does not establish that EPA approval resolves every state-law inquiry in which the existence or content of warnings is relevant to whether a product is defectively designed. Neither *Durnell* nor the decades of precedent interpreting FIFRA suggest that EPA approval means the label is, as a matter of law, sufficient to defeat any allegation of misbranding.

The same holds for design defects based on the consumer expectation test. (*See* Doc. 5872 at p. 25). It is true that the consumer expectation test looks at whether a product performed as an ordinary consumer would expect. And, if a product label warns of the potential injury that a consumer could experience, then it would be difficult to argue that the product did not perform as an ordinary consumer would have expected. But here, the paraquat label never warned about any Parkinson's risk. Defendants therefore cannot obtain summary judgment on consumer-expectation claims merely by pointing to the EPA-approved label, which contained no Parkinson's warning.

Defendants also argue that in New Hampshire, a design defect claim "converts" into a warning claim when there is no alternative design available and, thus, under *Durnell*, is preempted. (Doc. 5872 at p. 24). This is not accurate. The New Hampshire Supreme Court rejected any "duty of proving a safer, alternative design" to establish a design defect. *Vautour v. Body Masters Sports Indus., Inc.*, 784 A.2d 1178, 1181 (N.H. 2001). To hold a defendant liable for a design-defect claim related to paraquat in New Hampshire, a jury would need to conduct a risk/utility assessment to determine whether paraquat is defectively designed[11]—which includes the "the presence or absence of a warning,"

[10] Defendants also claim this applies to an assortment of other states. (Doc. 5872 at p. 23, n.18).

[11] "In order to determine whether the risks outweigh the benefits of the product design, a jury must evaluate many possible factors including the usefulness and desirability of the product to the public as a whole, whether the risk of danger could have been reduced without significantly affecting either the product's effectiveness or manufacturing cost, and the

*Thibault v. Sears, Roebuck & Co.*, 395 A.2d 843, 846 (N.H. 1978)—assess whether that defect existed when it left Defendants' possession, assess whether a plaintiff's use was reasonably foreseeable, and assess whether paraquat caused a plaintiff's injury. *Vautour*, 784 A.2d at 1181. At no time is a jury required to find that Defendants were capable of redesigning paraquat. And, at no time would such a claim convert into a failure to warn claim. Simply put, Defendants have not demonstrated that New Hampshire's design-defect duty necessarily imposes a labeling requirement different from FIFRA's and, therefore, have not carried their burden on summary judgment. Nor is it clear that *Durnell* would preempt a New Hampshire claim for selling a pesticide with a warning defect. FIFRA expressly empowers states to prevent the sale of pesticides within its state, whether through regulation, statute, or common law, so there is no preemption.

**CONCLUSION**

The Supreme Court's holding in *Durnell* focused on conflicting labeling requirements. Defendants' attempt to expand it to preempt all state law claims should be rejected. Accordingly, for the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' overbroad and untenable motion for summary judgment. Instead, the Court should address the specific claims and state-law obligations imposed by a selection of cases as they are worked up for trial. Only in context and with that state's law analyzed, will the Court be able to assess whether each duty imposed by each claim is preempted by FIFRA. Alternatively, if this Court accepts Defendants' preemption defenses in any respect, Plaintiffs should be granted leave to replead their individual state law claims in their individual member cases. In the event Defendants' preemption defenses are accepted, Plaintiffs challenge the constitutionality of FIFRA. Said challenge will be asserted by separate motion.

---

presence and efficacy of a warning to avoid an unreasonable risk of harm from hidden dangers or from foreseeable uses." *Vautour*, 784 A.2d at 1182. None of these considerations are dispositive. *Id.*

Dated: August 26, 2026

Respectfully submitted,

**PLAINTIFFS' CO-LEAD COUNSEL**

/s/ *Sarah Shoemake Doles*
Sarah Shoemake Doles
LEVIN, PAPANTONIO, PROCTOR, BUCHANAN, O'BRIEN, BARR & MOUGEY, P.A.
316 South Baylen Street, Suite 600
Pensacola, FL 32502
Telephone: (850) 435-7011
sdoles@levinlaw.com

Khaldoun A. Baghdadi
WALKUP, MELODIA, KELLY & SCHOENBERGER
650 California Street, 26th Floor
San Francisco, CA 94108
Telephone: (415) 981-7210
kbaghdadi@walkuplawoffice.com

Peter J. Flowers
MEYERS & FLOWERS, LLC
225 West Wacker Drive, Suite 1515
Chicago, IL 60606
Telephone: (630) 232-6333
pjf@meyers-flowers.com

**CERTIFICATE OF SERVICE**

I hereby certify that on August 26, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send electronic notification of such filing to counsel of record.

/s/ *Sarah Shoemake Doles*
Sarah Shoemake Doles